1  XAVIER BECERRA
   Attorney General of California
2  MICHAEL L. NEWMAN
   Senior Assistant Attorney General
3  DOMONIQUE C. ALCARAZ
   LEE I. SHERMAN
4  JASLEEN SINGH
   MARISSA MALOUFF (SBN #316046)
5  Deputy Attorneys General
     300 S. Spring St., Suite 1702
6    Los Angeles, CA 90013
     Telephone: (213) 269-6467
7    Fax: (213) 897-7605
     E-mail: Marissa.Malouff@doj.ca.gov
8  *Attorneys for State of California*

9

10                 IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                     SAN FRANCISCO DIVISION

13

14  **THE STATE OF CALIFORNIA,**                Civil Case No.

15                               Plaintiff,    **COMPLAINT FOR DECLARATORY
                                                AND INJUNCTIVE RELIEF**
16             v.

17
    **U.S. DEPARTMENT OF HOMELAND
18  SECURITY; U.S. IMMIGRATION AND
    CUSTOMS ENFORCEMENT; CHAD F.
19  WOLF, in his official capacity as Acting
    Secretary of the United States Department
20  of Homeland Security; and MATTHEW
    ALBENCE, in his official capacity as Acting
21  Director of U.S. Immigration and Customs
    Enforcement,**
22
                                Defendants.
23

24

25

26

27

28

1.     The State of California (the State or Plaintiff) brings this lawsuit to stop Defendants from proceeding with their callous plan, issued in the midst of an escalating health crisis, to force either: (a) up to 32,000 international students, who are attending public higher education institutions in California, to depart the United States; or (b) the State's higher educational institutions to increase the risk of transmission of the novel coronavirus (COVID-19) through expanded in-person instruction contrary to the advice of public health experts.  In addition to being cruel, Defendants' attempt at a policy change to force in-person learning in the middle of a pandemic is absurd and the essence of arbitrary and capricious conduct in violation of the Administrative Procedure Act (APA).  If that were not enough, Defendants have failed to follow the procedures for notice and comment rulemaking required by the APA prior to enforcing and implementing this policy.

2.     As the U.S. Center for Disease Control and Prevention (CDC) has emphasized throughout the pandemic, social distancing is one of the core tools to stop the spread of the highly contagious COVID-19.  California has been vigilant in adopting social distancing guidelines.  On March 19, Governor Gavin Newsom issued the first statewide stay-at-home order in the United States.  Contemporaneous with the Governor's stay-at-home order, the California State University system and California Community College system (collectively, California higher education institutions) switched to almost exclusively online learning for the spring 2020 semester.

3.     The federal government, including Defendants, has recognized the unique threat posed by the pandemic.  On March 13, the President declared the crisis a national emergency, a declaration that remains in effect to this day.  At that same time, Defendant Immigration and Customs Enforcement (ICE) issued guidance documents granting exemptions to F-1 and M-1 nonimmigrant students, who are international students attending school in the United States, from federal regulatory requirements to take in-person classes in order to maintain their status.  ICE acknowledged that the exemptions were necessary "[g]iven the extraordinary nature of the COVID-19 emergency," and asserted that the policy would be "in effect for the duration of the emergency."

4.     While other parts of the world have stabilized their COVID-19 numbers since

Complaint for Declaratory and Injunctive Relief

1   March, the federal government has struggled to forge a national response to combat the virus.  In

2   recent weeks, as certain businesses and public spaces have re-opened, confirmed COVID-19

3   cases have surged throughout the United States to the highest levels of the entire pandemic.

4   Despite its best efforts to curb the effect of the pandemic, California, like the rest of the country,

5   has experienced increases in recent weeks of new confirmed COVID-19 cases and deaths

6   attributed to the disease.

7       5.      Inexplicably, on July 6, the date that marked the highest number of new COVID-

8   19 cases in the United States since the start of the pandemic, ICE announced that it was

9   rescinding the exemptions on in-person learning for F-1 and M-1 students.  Any such students

10   who cannot meet the in-person learning requirements of ICE's must either leave the United States

11   or transfer to a school that meets those requirements.  ICE justified the change in policy by

12   claiming that the prior exemptions were issued at the "height of the [COVID-19] pandemic."

13       6.      In changing its policy, ICE not only acted contrary to the clear record showing that

14   the COVID-19 emergency has escalated, not receded, but it also showed no consideration of the

15   significant harms presented by the pandemic.  Because of the public health risks associated with

16   in-person education and in an effort to safeguard the health and safety of students, faculty, and

17   staff, higher education institutions transitioned virtually all classes to remote learning in spring

18   2020, continued to do so in summer 2020, and plan to operate on a primarily online basis for the

19   fall 2020 semester.  ICE's rescission of these exemptions undermines these informed decisions

20   and pressures California higher education institutions to offer additional in-person classes to

21   avoid losing the contributions of tens of thousands of international students who are valuable

22   members of their academic and research communities.  And our nation would lose out on the

23   benefit of their contributions to academia while they likely enroll in academic programs in other

24   countries.

25       7.      As a result of ICE's rescission, many F-1 and M-1 students, who are otherwise

26   lawfully present in the United States if not for the COVID-19 pandemic's effect on their ability to

27   attend classes in-person, will either be forced to abruptly leave their lives in the United States, or

28   transfer to another higher education institution that has more in-person learning options.  If the

2

Complaint for Declaratory and Injunctive Relief

1    students leave the United States, they would be required to pay for expensive travel arrangements

2    amidst the pandemic—made more difficult given the limited international travel options currently

3    available—and take the public health risk of spreading or contracting the coronavirus by traveling

4    to their home country.

5          8.      ICE did not undergo the required procedures of notice and comment rulemaking

6    prior to implementing this change.  Rather, Defendants waited until just a few weeks before the

7    start of the fall semester to announce the rescission of these exemptions, with impending

8    deadlines on higher education institutions occurring as soon as July 15.  This sudden change and

9    ICE's inexplicable delay have created unnecessary chaos both among higher education

10    institutions and their students whose plans for the start of the fall school year have been thrown

11    into upheaval.  For these reasons, and those discussed below, the State seeks immediate relief to

12    stop Defendants from implementing this unlawful scheme.

13                           **JURISDICTION AND VENUE**

14          9.      Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this case arises

15    under the laws of the United States.  The Court also has jurisdiction under 28 U.S.C. § 1346

16    because this is a civil action against the federal government founded upon acts of Congress.

17    Jurisdiction is proper under the judicial review provisions of the APA, 5 U.S.C. §§ 701-706.  An

18    actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this

19    Court may grant declaratory, injunctive, and other relief, pursuant to the Declaratory Judgment

20    Act, 28 U.S.C. §§ 2201-2202 (Declaratory Judgment Act) and the APA.

21         10.     Under 28 U.S.C. § 1391(e)(1), venue is proper in the Northern District of

22    California because Plaintiff State of California and its Attorney General have offices at 455

23    Golden Gate Avenue, San Francisco, California, and at 1515 Clay Street, Oakland, California,

24    and Defendant has an office at 630 Sansome Street, San Francisco, California 94111.

25                        **INTRADISTRICT ASSIGNMENT**

26         11.     Assignment to the San Francisco Division of this District is proper pursuant to

27    Civil Local Rule 3-2(c)-(d) because Plaintiff and Defendant both maintain offices in the District

28    in San Francisco.

Complaint for Declaratory and Injunctive Relief

**PARTIES**

12.     The State of California, represented by and through its Attorney General, is a sovereign State of the United States of America

13.     Attorney General Xavier Becerra is the chief law officer of the State.  The Attorney General is responsible for protecting California's sovereign interests, including the sovereign interest in enforcing California laws.  Cal. Const. art. V, § 13.

14.     California is aggrieved by the actions of Defendants and has standing to bring this action because of the injury to its state sovereign and proprietary interests caused by Defendants' rescission of the COVID-19 exemptions for F-1 and M-1 nonimmigrant students.  This injury will be immediate and irreparable.

15.     California's interest in its educational institutions is established by the Equity in Higher Education Act, which affords all persons equal rights and opportunities in postsecondary educational institutions, including the California Community Colleges and the California State University (CSU).  Cal. Educ. Code §§ 66251, 68130.5.

16.     The California Community Colleges system represents the largest postsecondary system in the United States, with more than 2.1 million students attending one of 114 college campuses annually, and 1.5 million students who enrolled in the Spring 2020 semester.  The community colleges are the most common entry point into collegiate degree programs in California, the primary system for delivering career technical education and workforce training, a major provider of adult education, apprenticeship, and English as a Second Language courses, and a source of lifelong learning opportunities for California's diverse communities.  The community colleges host an estimated 21,754 F-1 and M-1 students throughout 70 districts.

17.     The CSU is the nation's largest four-year public university system with 23 campuses statewide and an enrollment of approximately 482,000 students per year.  Students at the CSU make up the most ethnically, economically and academically diverse student body in the nation.  In the fall of 2019, international or U.S. territory students made up three percent, or 16,122 students, of the CSU student population.  Across the state, the CSU had anticipated that approximately 10,300 F-1 students would return to its 23 campuses for the fall 2020 semester and

3,000 to 4,000 additional F-1 students would join the campus.

18.     The rescission of the COVID-19 related exemptions for F-1 and M-1 students will harm California's interest in, and expenditures on, its educational priorities and higher educational institutions.  By rescinding the in-person learning exemptions for international students, thereby jeopardizing their status in the United States and forcing them to depart, the California higher education institutions' missions will be frustrated, as F-1 and M-1 students contribute to those institutions' diversity, their research missions, and their foreign language speaking capacity.  California higher education institutions have made significant investments to support these students, which will be lost because of the rescission of the exemptions.  In addition to obstructing the institutions' academic missions, among other things, the likely loss of enrollment due to the rescission will harm them fiscally.

19.     If California higher educational institutions are forced to convert more classes to in-person learning in light of the rescission, there will be risks to public health that impact not just those campus communities, but the State of California at large.  California has a strong interest in protecting the health, safety, and well-being of all its residents, regardless of immigration status, which includes protecting its residents from harms to their physical and economic health.  *See e.g.,* Cal. Civ. Code § 3339(a); Cal. Gov. Code § 7285(a); Cal. Health & Safety Code § 24000(a); Cal. Labor Code § 1171.5(a).

20.     In sum, Defendants' rescission of COVID-19 related exemptions for F-1 and M-1 students harms the State of California directly and indirectly through its effects on California residents and California higher education institutions.

**Defendants**

21.     Defendant Department of Homeland Security (DHS) is a federal agency within the meaning of 28 U.S.C. § 2671, and engages in agency action within the meaning of 5 U.S.C. § 702.

22.     Defendant ICE is a division of DHS, is a federal agency within the meaning of 28 U.S.C. § 2671, and engages in agency action within the meaning of 5 U.S.C. § 702.  ICE is responding for rescinding the COVID-19 exemptions for F-1 and M-1 nonimmigrant students.

5

23.     Defendant Chad F. Wolf, Acting Secretary of DHS, oversees DHS and is responsible for the actions and decisions that are being challenged by Plaintiff in this action. Acting Secretary Wolf is sued in his official capacity pursuant to 5 U.S.C. § 702.

24.     Defendant Matthew Albence, Acting Director of ICE, oversees ICE and is responsible for the actions and decisions that are being challenged by Plaintiff in this action. Acting Director Albence is sued in his official capacity pursuant to 5 U.S.C. § 702.

## FACTUAL ALLEGATIONS

## I.     THE COVID-19 PANDEMIC IS AN ONGOING NATIONAL EMERGENCY

25.     COVID-19 is a public health emergency that has caused devastating impacts on all aspects of everyday life.  Every facet of daily American life has been disrupted.  California Governor Gavin Newsom declared a State of Emergency for the State of California in response to COVID-19 on March 4, 2020.  On March 13, 2020, President Donald J. Trump issued a Proclamation declaring the COVID-19 pandemic a national emergency.

26.     SARS-CoV-2, which causes COVID-19, is highly transmissible.  As of July 9, 2020, over 3 million individuals have become infected in the United States, and over 132,000 have died.[1]  In California alone, as of July 8, 2020, over 289,000 people have become infected, and 6,500 have died.  The United States has yet to bring the virus under control—to the contrary, cases have been surging nationwide at an alarming rate.  There is no indication that the spread of COVID-19 will stop in the foreseeable future.  Therapeutics are still under development, and a proven vaccine has yet to emerge.  The University of Washington's Institute for Health Metrics and Evaluation recently projected that between 157,216 to 244,540 people in the United States could die by November 1, 2020.[2]

---

[1] *Coronavirus Disease 2019 (COVID-19),* Centers for Disease Control and Prevention, https://tinyurl.com/CDCcovidcases (last visited July 9, 2020).

[2] Institute for Health Metrics and Evaluation at the University of Washington, COVID-19 Projections, https://tinyurl.com/IHMEprojections (last updated July 7, 2020).

27.     Even among those who do not die, COVID-19 can have serious, lasting health effects.  While the disease is too new for scientists to definitively know its long-term effects, there have been reports of COVID-19 patients experiencing prolonged recovery periods.[3] Patients have suffered from lung scarring, worsening kidney and liver function, blood clots, and heart and cognitive problems.  *Id.*

28.     While the severity of the disease can vary, every person is at risk of contracting and spreading it.  Asymptomatic or pre-symptomatic carriers, who may have no awareness that they have COVID-19, can spread the disease.[4]

29.     Evidence indicates that COVID-19 is an airborne disease that is especially communicable in crowded, indoor spaces, without sufficient ventilation.[5]

30.     With no vaccine or therapy available, the most effective health measure is to prevent people, and particularly those at risk for complications from the disease, from contracting COVID-19 at the outset.  This requires physical or social distancing, i.e., limiting face-to-face interactions where the disease can be spread, particularly in indoor spaces.

31.     Recognizing the need to slow the spread of COVID-19 through physical distancing, broad sections of society and industry have shut down.  On March 16, 2020, the White House and the CDC issued guidance calling for extensive physical distancing measures including: working from home, avoiding social gatherings, avoiding eating or drinking in restaurants or bars, avoiding discretionary travel, and avoiding nursing homes or long-term care facilities.[6]  The CDC's website currently advises that people should only visit essential businesses when

---

[3] Associated Press, *What are the potential long-term effects of having COVID-19?* (June 16, 2020), https://tinyurl.com/longtermeffectsCOVID.

[4] *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, U.S. Centers for Disease Control and Prevention, https://tinyurl.com/CDCasymptomatic.

[5] Apoorva Mandavilli, *239 Experts With One Big Claim: The Coronavirus Is Airborne*, NY Times (July 4, 2020), https://tinyurl.com/MandavilliNYT.

[6] The President's Coronavirus Guidelines for America, The White House (March 16, 2020), https://tinyurl.com/WhitehouseMarch16.

"absolutely necessary," and during those visits, should stay at least six feet from other people not living with them in the same household.[7]

32.     Consistent with the CDC's guidance and in recognition of the need to act urgently to protect public health, California quickly implemented physical distancing measures throughout the State.  On March 19, 2020 Governor Newsom and the State Public Health Officer Sonia Y. Angell, MD, MPH, issued a statewide stay-at-home order severely restricting in-person operations of non-essential businesses, schools, and other entities.

33.     As the pandemic has progressed, California continues to take a science-based approach that is centered on public health.  California has permitted counties that meet public health thresholds to reopen certain public spaces and parts of the economy under strict guidelines. However, as the COVID-19 crisis remains fluid, state and local authorities have retained the ability to revert to stricter shelter in place measures if necessary.  Indeed, California's stay-at-home order remains in place, and residents must stay home except when engaging in permitted activities.

34.     Despite California's extensive efforts to combat the disease, it continues spreading in the State, with nearly 11,694 new cases and 114 new fatalities announced on July 8, 2020 alone.

35.     Both the President's National Emergency Proclamation and the Governor's State of Emergency Order Declaration are still in effect.

II.     **THE COVID-19 PANDEMIC HAS CAUSED A DRAMATIC SHIFT IN LEARNING AT HIGHER EDUCATION INSTITUTIONS THROUGHOUT CALIFORNIA**

36.     Our country's educational institutions have had to respond urgently to the crisis and take drastic measures to protect the health and safety of their students and staff.  Colleges and universities throughout the country, including in California, have minimized operations at their campuses.  More than 4,000 institutions of higher education nationwide, and over 25 million students, have, as of this date, been impacted by COVID-19.[8]

---

[7] *Social Distancing*, Centers for Disease Control and Prevention, https://tinyurl.com/SocialDistancingCDC (last visited July 9, 2020).
[8] *Covid-19: Higher Education Resource Center*, Entangled Solutions, https://tinyurl.com/HigherEdresourcecenter  (last visited July 9, 2020).

37.     In March 2020, like other educational institutions, all of the California community colleges transitioned to online delivery or implemented social distancing guidelines for services that cannot be provided online.  Given the uncertainty surrounding the pandemic and the continued risk of the virus' spread, the community colleges continued remote learning through their summer 2020 semester.  As the pandemic continues to be an acute threat to public health— and in fact is increasingly worsening, California's community colleges opted to continue to operate virtually all-online classes for the fall 2020 semester.

38.     Likewise, on March 17, 2020, all CSU campuses moved nearly all courses to online learning platforms, including instructional labs or small group work if possible.  Only one CSU campus—CSU Maritime Academy—permitted a limited number of students to return onto campus in June to finish parts of their courses from the spring semester in-person, only after COVID-19 testing, due to the professional licensing requirements and the impossibility of completing that specialized program's courses online.  Classes for the summer 2020 term remain primarily online.  For the fall 2020 semester, the 23 CSU campuses will operate a hybrid program of both in-person and online classes; however, given the continued public health threat of COVID-19, most campuses will only be offering an average of ten percent of its classes in-person.  The majority of CSU courses will continue to be offered online.

**III.   AT THE START OF THE COVID-19 PANDEMIC, ICE EXEMPTED F-1 AND OR M-1 STUDENTS FROM SATISFYING IN-PERSON LEARNING REQUIREMENTS**

39.     Section 101(a)(15)(f) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1101(a)(15)(f), provides that a student is eligible for an F-1 nonimmigrant student visa if the student has a "residence in a foreign country which he has no intention of abandoning, [] is a bona fide student qualified to pursue a full course of study and [] seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study" at an "established," approved, educational institution.

40.     Similar to the F-1 visa, a student can receive an M-1 vocational nonimmigrant visa if the student has "residence in a foreign country which he has no intention of abandoning [and] seeks to enter the United States temporarily and solely for the purpose of pursuing a full course of

study at an established vocational or other recognized nonacademic institution." 8 U.S.C.
§ 1101(a)(15)(m).

41.     Under the INA's implementing regulations a "full course of study" for
undergraduate F-1 students is twelve credit hours per academic term.  In regulations issued before
COVID-19, Defendants interpreted a "full course of study" as encompassing no more than one,
three credit hour, online course per semester, trimester, or quarter, for F-1 students.  8 C.F.R.
§ 214.2(f)(6).  Additionally, under 8 C.F.R. § 214.2(m)(9)(v), students were not permitted to use
any online or distance education course credits toward their   M-1 Visa status.

42.     The Student Exchange and Visitor Program (SEVP), a component of ICE,
oversees compliance with F-1 and M-1 requirements in the United States.[9]   Schools must have a
"designated school official" (DSO) or a "principal designated school official" (PDSO) who is the
point of contact for any issue relating to the institutions' compliance with SEVP regulations.
DSOs must report certain information through the Student and Exchange Visitor Information
System (SEVIS) periodically.  Such reporting includes, but is not limited to, confirmation that a
student initially arrived in the United States, confirmation that the student is active each semester,
transfer information, changes in students' status, and general information regarding students'
employment, academic programs, and dependents.[10]  Additionally, once an international student
is accepted into SEVP, DSOs issue a Form I-20, Certificate of Eligibility for Nonimmigrant
Student Status.

43.     Recognizing that COVID-19 presented unprecedented challenges to educational
institutions, because in-person learning can be dangerous for students, staff, and the community at
large, in March 2020, ICE, through SEVP, exempted students from the regulatory in-person
learning requirements for the duration of the pandemic.

---

[9] Study in the States, FORM I-17 - INITIAL CERTIFICATION, Department of
Homeland Security, https://tinyurl.com/FormI-17.

[10] SEVIS Reporting Requirements for Designated School Officials, Immigration and
Customs Enforcement, https://tinyurl.com/SEVISdosrequirements.

44.     On March 9, 2020, ICE, through SEVP, issued a Broadcast Message (March 9 Broadcast), an instructive document intended for SEVIS users, in recognition of the fact that "schools may need to adapt their procedures and policies to address the significant public health concerns associated with the COVID-19 crisis."[11]  The March 9 Broadcast provided SEVIS reporting instructions to institutions and students for during the pandemic.  SEVP understood that institutions may need "to comply with state or local health emergency declarations," and therefore, eliminated the requirement that institutions provide SEVP with prior notice of procedural adaptations.  *Id.*  Per that message, ICE stated that it "intends to be flexible with temporary adaptations" due to COVID-19.  *Id.*

45.     On March 13, 2020, ICE published "COVID-19: Guidance for SEVP Stakeholders"[12] (March 13 Guidance) as a follow-up to the March 9 Broadcast, in response to inquiries concerning the "proper status" of international students who may "face slightly different scenarios related to emergency procedures implemented by SEVP-certified learning institutions." *Id.*  Recognizing that COVID-19 presented unprecedented circumstances, in which in-person learning can increase the spread of a highly dangerous virus, ICE's March 13 Guidance exempted students from the in-person learning requirements under the INA implementing regulations for the duration of the pandemic.

46.     The March 13 Guidance specifically addresses the status of students whose "school temporarily stops in-person classes but implements online or other alternate learning procedures and the nonimmigrant student remains in the United States." *Id.*  ICE directed that students in this situation should "participate in online other alternate learning procedures and remain in active status in SEVIS." *Id.*  ICE specifically declared that due to the "extraordinary nature of the COVID-19 emergency, SEVP will allow F-1 and/or M-1 students to temporarily count online classes towards a full course of study in excess of the limits of 8 C.F.R. § 214.2(f)(6)

[11] Broadcast Message: Coronavirus Disease 2019 (COVID-19) and Potential Procedural Adaptations for F and M nonimmigrant students, Immigration and Customs Enforcement (March 9, 2020), https://tinyurl.com/March9Broadcast.

[12] COVID-19: Guidance for SEVP Stakeholders, Immigration and Customs Enforcement (March 13, 2020), https://tinyurl.com/March13Guidance.

and 8 C.F.R. § 214.2(m)(9)(v)." *Id.* Thus, through the March 13 Guidance, ICE provided an assurance that it would not penalize students for COVID-19's effect on in-person learning or punish institutions for complying with public health directives. *Id.*

47.     The March 13 Guidance states that the exemption is "only in effect during the duration of the emergency." *Id.* The Guidance notes that it may be "subject to change," but indicates that any such changes would be reflective of the COVID-19 emergency, stating that "SEVP will continue to monitor the COVID-19 situation and [] adjust its guidance as needed." *Id.*

## IV.  ICE CHANGED ITS POLICY TERMINATING THE EXEMPTIONS WITHOUT CONSIDERING CRITICAL INFORMATION

48.     Although the COVID-19 pandemic has worsened, on July 6, 2020, ICE changed its policy through a Broadcast Message to SEVP stakeholders (July 6 Directive). ICE declared that the earlier exemptions provided for F-1 and M-1 students "during the height of the [COVID-19] crisis will be modified for the fall 2020 semester."[13] According to the July 6 Directive, those "[s]tudents attending schools operating entirely online may ***not*** take a full online course load and remain in the United States." *Id.* (emphasis in original).

49.     If an F-1 or M-1 student attends a school that has shifted to an entirely online program due to COVID-19, or cannot attended in-person courses due to their limited availability, the student has three options under the July 6 Directive. The student must either: (a) transfer to a school with in-person learning to keep his or her lawful status; (b) leave the United States; or (c) "face immigration consequences including, but not limited to, the initiation of removal proceedings." *Id.* The U.S. Department of State will not issue visas to students enrolled in a program that is fully online, and the U.S. Customs and Border Protection will not allow students to enter the United States if they are enrolled in a school that is fully online. *Id.*

50.     While F-1 students attending a higher education institution adopting a hybrid model with a mixture of online and in-person classes may be permitted to take more than one class or three credit hours online and still retain their status, that exemption does not apply to F-1

---

[13] Mem. to All SEVIS Users re: COVID-19 and Fall 2020, Immigration and Customs Enforcement (July 6, 2020), https://tinyurl.com/ICEcovidguidance.

students in English language training programs or to *any* M-1 students. *Id.* Moreover, as

discussed *supra*, because California higher education institutions have decided for public health

purposes to offer only a small percentage of their classes in-person, some F-1 students may not be

in a position to take any in-person class due to capacity restrictions.

51.     The July 6 Directive is clear that there is no safe harbor for institutions operating

in the "hybrid" model that decides to switch to online-only classes in the middle of the semester

should the public health crisis demand it.  In that instance, the students are "not permitted to take

a full course of study through online classes," and students "must leave the country or take

alternative steps to maintain their nonimmigrant status such as transfer to a school with in-person

instruction." *Id.*

52.     In announcing the July 6 Directive, ICE did not show that it accounted for the

significant harms that the policy will have on higher education institutions and their students.

ICE did not consider, for instance, the higher education institutions' and students' reasonable

reliance on the representations made by ICE in the March 13 Guidance that the in-person learning

exemptions would be "in effect for the duration of the emergency."  Nor does the Directive

consider the undue pressure that the new policy will have on higher education institutions to

choose between sustaining the education of tens of thousands of international students, who are

invaluable members of their institutions' academic and research communities, or risking the

health and safety of students, faculty, and staff by holding classes in-person contrary to the advice

of health experts.

53.     The July 6 Directive also reflects no consideration of the continued, and indeed,

escalating health crisis, that presently plagues the entire country.  ICE's reasoning to rescind the

exemptions— that those exemptions were granted at the "height" of the pandemic—indicates ICE

has determined that the pandemic is dissipating.  That reasoning does not comport with reality.

As referenced above, the rate of positive cases has spiked exponentially over the past several

weeks both across the country and in California.  Between March 13, when the exemptions were

granted, and June 26, there was no day in which there were 40,000 or more new confirmed

COVID-19 cases in the United States.[14]  Since June 27, there has not been one day in which there were *less than* 40,000 new confirmed COVID-19 cases.  *Id.*  There were 57,186 confirmed cases on July 6—***the day that ICE rescinded the exemptions for F-1 and M-1 students. Id.***  These spikes correlate with the reopening of businesses and public spaces.  Excessive in-person learning at higher education institutions will only exacerbate this trend.  The chart below illustrates the steep incline in cases.  *Id.*



54.     On June 30, when the daily numbers were lower than they are today, the Director of the National Institute of Allergy and Infectious Diseases, Dr. Anthony Fauci said the trends were "disturbing" and that the United States was "not in total control" of the virus.[15]  Dr. Fauci anticipated that under current trends, the United States could see over 100,000 new confirmed COVID-19 cases per day.  On July 9, 2020, Dr. Fauci emphasized that states that are experiencing surges in new confirmed COVID-19 cases should "pause" any plans for reopening.[16]

55.     Even though California has been cautious in its approach to reopening, it has suffered a recent spike in cases along with the rest of the country.  Since June 21, there have been at least 4,000 new confirmed COVID-19 cases in California each day, with the highest level

---

[14] World Health Organization, United States of America Situation, 2,973,695 confirmed cases, available at https://tinyurl.com/WHOcovidupdate  (last checked July 9, 2020 at 7:11 a.m. PT).

[15] Noah Higgins-Dunn and Will Feuer, *Dr. Anthony Fauci says U.S. coronavirus outbreak is 'going to be very disturbing,' could top 100,000 new cases a day*, CNBC (June 30, 2020), https://tinyurl.com/DunnCNBC.

[16] Gisela Crespo, Madeline Holcombe, Jason Hanna, *Coronavirus hot spots should pause reopening, not shut down again, Fauci now says*, CNN (July 9, 2020), https://tinyurl.com/yc6nzwcp.

being 11,694 cases on July 7.  *Id.*  There has also been an increase in deaths in California

attributed to COVID-19, which tends to follow an increase in positive cases.  *Id.*  On July 7, there

were 111 deaths attributed to COVID-19 in California, the second most deaths reported in any

single day since the start of the pandemic.  *Id.*  These figures will likely continue to increase if

California were to conduct more in-person learning as sought by the July 6 Directive.

56.     The July 6 Directive states that DHS will be publishing a Temporary Final Rule

"in the near future."  *Id.*  DHS or ICE failed to seek notice and comment prior to making a

decision on, or implementing, this policy, and have expressed no intention to undertake notice

and comment prior to the issuance of the Temporary Final Rule which is anticipated to only

reiterate the new policy that has already been established in the July 6 Directive.

57.     The practical effects of this new policy are immediate.  Higher education

institutions that plan to operate entirely online are required to inform ICE of their plans by July

15, while all other institutions must inform ICE of their plans to operate solely in-person classes,

delayed or abbreviated sessions, or hybrid plans by August 1.

58.     By August 4, higher education institutions are required to update and reissue new

Forms I-20 to each F-1 or M-1 student enrolled in the institutions during the fall 2020 semester.

*Id.*  If a F-1 student takes in-person classes, in order to retain his or her status, under the new

policy, the higher education institution must certify on the Form I-20 that: (a) the school's

program is not entirely online; (b) the student is not taking an entirely online course load for the

semester; and (c) the student is taking the minimum number of online classes required to make

normal progress in the degree program.  *Id.*  Because of these impending deadlines, California

higher education institutions, need immediate relief from the July 6 Directive.

V.     **ICE'S RESCISSION HARMS CALIFORNIA HIGHER EDUCATION INSTITUTIONS**

59.     ICE's arbitrary and cruel actions seeking to compel the removal of tens of

thousands of students who have lawful status in the United States inflict irreparable harm on

California higher education institutions and their students by damaging their students' access to

education (and their well-being).  ICE's rescission of the in-person learning exemptions for F-1

and M-1 students means that these students may be forced to withdraw from California higher

education institutions, which undermines their academic missions and the character and diversity of their student body, and also threatens the State's overall budget and revenues.

60.     ICE's sudden rescission has placed a significant administrative burden on California higher education institutions.  Because ICE's rescission would force the removal of tens of thousands of students enrolled in California higher education institutions, institutions' staff have been working around the clock to determine how to provide their F-1 and M-1 students with in-person class offerings that would allow them to stay enrolled and in lawful status while they continue their education. In doing so, institutions must also ensure that their students are safe, and take care to minimize the unfortunately likely result of ICE's mandate: the increased spread of COVID-19.

61.     Since May 2020, CSU administrators have spent countless hours researching, meeting, and planning campus specific education plans that account for the health and safety of their students, staff, and faculty.  The decision to move forward with a primarily virtual instruction plan/program at all 23 campuses for the fall 2020 semester was informed by these health and safety considerations and was made in reliance on ICE's March 13 Guidance. Likewise, the March 13 Guidance was part of community college districts' considerations in making the decision to operate entirely online so that their F-1 and M-1 nonimmigrant students could continue their education and stay within lawful status while the pandemic conditions continued.  ICE's rescission has required institutions to immediately reevaluate their fall class schedules, which had previously been created in reliance on ICE's March 13 Guidance.

62.     Institutions which plan to administer classes in a manner other than through exclusively online courses will be required to issue new Forms I-20 to their entire F-1 and M-1 student body by August 4, 2020.  Usually, the Form I-20 is issued by an institution to an incoming international student only once, with certain exceptions, and the student is required to keep this form for the duration of their education in the country.  Higher education institutions will have to divert financial resources—already limited by the COVID-19 economic crisis—and staff to quickly coordinate the re-issuance of the Form I-20 to their thousands of F-1 or M-1 nonimmigrant students.

63.     The inevitable dis-enrollment from California higher education institutions that will occur as a result of the July 6 Directive has both short and long-term deleterious effects.  The immediate impact of dis-enrollment will be felt in allocations of funds to higher education institutions for categorical programs, which total hundreds of millions of dollars, and are apportioned based solely upon fulltime equivalent attendance (FTE).  General apportionment funding is based upon a recently-enacted funding formula that includes FTE, and other metrics of success.  Dis-enrollments will adversely impact institutions' revenues under this formula by decreasing three-year average attendance figures, and lowering college success metrics—which are weighted toward vulnerable student populations.

64.     The impact of the July 6 Directive is more than financial.  International students enrich the educational experiences of all students and faculty by contributing their diverse life experiences and perspectives.  Forcing these students to drop out of school affects the diversity of the student population, the robustness and quality of classroom participation, and the overall academic climate.

65.     Because higher education institutions' budgets are determined, in large part, by the number of students enrolled, decreases in enrollment also have a significant effect on the types of academic courses they are able to provide, the staff they are able to hire, and the educational programs and services they are able to offer.  The July 6 Directive also fails to take this impact into consideration, and fails to consider the lack of practical alternatives available to students and the immense harm that befalls them.  Based on the plans community colleges have submitted, nearly all California community colleges will be mostly or entirely online.

66.     For F-1 students, who are permitted to take no more than one online course in order to meet their course load visa requirements, and M-1 students, who cannot count any online learning towards their course load visa requirements, finding an institution offering sufficient in-person classes in California—where the threat of COVID-19 remains prevalent—would be nearly impossible.  Students will likely be unable to meet the in-person course requirements to maintain lawful visa status and would be forced to leave the country.  This results in significant financial and personal costs to these students.  Students will have to uproot themselves from their lives in

the United States, breach leases and other commitments they may have made in reliance on the March 13, 2020 Guidance, pay for expensive travel arrangements amidst the pandemic—made more difficult given the limited international travel options currently available—and take the public health risk of spreading or contracting the coronavirus by traveling to their home country. Significantly, if their departure is not timely, regardless of the practical limitations at this time, these students risk being detained by immigration authorities and being subject to forced removal from the country, which in turn, may bar their return to the United States for ten years.  8 U.S.C. § 1182(a)(9).

67.     For students who do return to their home country, they face logistical barriers to continuing their education in the United States, including attending classes in a different time zone, and securing access to laptops and reliable internet connection.  An even more significant barrier may be limitations on access to the internet or information presented in certain courses in their home countries for students coming from nations with less freedom than ours.  Therefore, for many, accessing education at California's higher education institutions may prove impossible for those forced to return to their home country by ICE's new policy.

68.     Additionally, F-1 students would be denied the opportunity to participate in a pre-completion internship or other experiential learning opportunities, as well as work allowances in summer and fall 2021, as these students are required to maintain their F-1 status for a full academic year before being able to access practical training.  *See* 8 C.F.R. § 214.2(f)(10).

69.     The sudden uncertainty surrounding students' lawful status in the country results in increased levels of stress and anxiety for students.  These harms are exacerbated by the swiftness of ICE's rescission—coming only weeks before classes are scheduled to resume in mid-August.  Students' educational and career plans will be irreparably interrupted.

70.     Prior to the July 6 Directive, California higher education institutions made informed decisions regarding their fall class schedules, including which classes to offer exclusively online in order to protect the health of students, faculty, staff, and the surrounding community, and which they could safely offer in-person.  These decisions struck a balance between the present threat of the spread of coronavirus through in-person learning, the benefit of

18

1    in-person learning for students to connect with their peers and professors, and ICE's March 13

2    assurance that F-1 and M-1 students would be exempted from in-person class requirements for

3    the "duration of the emergency."

4         71.    Now, because of the July 6 Directive, California higher education institutions are

5    left with the prospect of tens of thousands of their F-1 and M-1 students being forced to return to

6    their home countries.  California higher education institutions are faced with an impossible

7    choice: create in-person classes that would heighten the risk of exposure to COVID-19 for their

8    students, staff, and community in order to keep their student bodies intact, or lose an integral part

9    of their student bodies altogether.

10                      **FIRST CLAIM FOR RELIEF**

11              **VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**

12                        **(Arbitrary and Capricious)**

13        72.    Plaintiff incorporates the allegations of the preceding paragraphs by reference.

14        73.    Defendant ICE is an "agency" under the APA, 5 U.S.C. § 551(1), and the

15    exemption rescission is an "agency action" under the APA, *id.* § 551(13).

16        74.    The rescission of the in-person learning exemption for F-1 and M-1 students in the

17    July 6 Directive is an "[a]gency action made reviewable by statute and final agency action for

18    which there is no other adequate remedy in a court." *Id.* § 704.

19        75.    The APA requires that a court "hold unlawful and set aside agency action,

20    findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

21    otherwise not in accordance with law." *Id.* § 706(2)(A).

22        76.    Defendants' rescission of the in-person learning exemption for F-1 and M-1

23    students is arbitrary and capricious and an abuse of discretion, as Defendants have failed to

24    "cogently explain why it has exercised its discretion in a given manner."  *See Motor Vehicle Mfrs.*

25    *Ass'n of the U.S. v. State Farm. Mut. Auto Ins. Co.*, 463 U.S. 29, 48 (1983).  Defendants have

26    engaged in "[u]nexplained inconsistency" in first stating that the exemption will remain for the

27    "duration of the emergency," and then rescinding the exemption as conditions have worsened.

28    *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

                                    19

1    Defendants' action is also arbitrary and capricious because, for among other reasons, Defendants

2    have: (a) relied on factors that Congress did not intend for them to when Congress created the F-1

3    and M-1 nonimmigrant visa statuses for students, by effectively excluding all or most

4    international students from attending higher education institutions in the United States during the

5    pandemic; (b) failed to consider the harm to higher education institutions and students in

6    conducting in-person learning during an escalating pandemic and the reliance interests of higher

7    education institutions and students that the in-person learning exemptions would exist throughout

8    the duration of the emergency; and (c) failed to provide an explanation that is consistent with the

9    evidence that is before the agency where COVID-19 cases are increasing throughout the United

10   States.  *See State Farm*, 463 U.S. at 43.

11          77.     For the reasons discussed herein, Defendants' rescission of the in-person learning

12   exemption for F-1 and M-1 students is unlawful and should be set aside under 5 U.S.C. § 706 for

13   being arbitrary and capricious and an abuse of discretion.

**SECOND CLAIM FOR RELIEF**

**VIOLATION OF ADMINISTRATIVE PROCEDURE ACT**

**(Without Observance of Procedure Required by Law)**

17          78.     Plaintiff incorporates the allegations of the preceding paragraphs by reference.

18          79.     Defendants DHS and ICE are "agenc[ies]" under the APA, 5 U.S.C. § 551(1), and

19   the exemption rescission is an "agency action" under the APA, *id.* § 551(13).

20          80.     The rescission of the in-person learning exemption for F-1 and M-1 students in the

21   July 6 Directive is an "[a]gency action made reviewable by statute and final agency action for

22   which there is no other adequate remedy in a court."  *Id.* § 704.

23          81.     The APA requires that a court "hold unlawful and set aside agency action,

24   findings, and conclusions found to be . . . without observance of procedure required by law."  *Id.*

25   § 706(2)(D).

26          82.     Agencies must complete the process of notice and comment rulemaking prior to

27   implementing a rule, subject to enumerated exceptions.  *Id.* § 553(b).

28          83.     Defendants' attempt to rescind its prior exemptions through the July 6 Directive,

and eventually through temporary final rule, without first going through notice and comment rulemaking is in violation of the APA.  No exception is applicable here, nor has one been provided.  The rescission is not an "interpretative rule[], general statement[] of policy, or rule[] of agency organization, procedure, or practice."  *Id.* § 553(b)(A).  Moreover, "good cause" does not exist to immediately alter the status of tens of thousands of students in the middle of a worsening pandemic, thereby forcing those students to leave their chosen educational institution or the United States.  *Id.* § 553(b)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in its favor, and grant the following relief:

1.      Issue a declaration that the rescission of the in-person learning exemption for F-1 and M-1 students is in violation of the APA;

2.      Set aside the rescission of the in-person learning exemption for F-1 and M-1 students under 5 U.S.C. § 706;

3.      Enjoin Defendants from rescinding the March 13 Guidance and imposing and enforcing in-person learning requirements on F-1 and M-1 students for the duration of the COVID-19 pandemic; and

4.      Grant such other relief as the Court may deem just and proper.

1    Dated:  July 9, 2020                              Respectfully submitted,

2                                                      XAVIER BECERRA
                                                       Attorney General of California
3                                                      MICHAEL L. NEWMAN
                                                       Senior Assistant Attorney General
4                                                      DOMONIQUE C. ALCARAZ
                                                       LEE I. SHERMAN
5                                                      JASLEEN SINGH

6                                                      */s/ Marissa Malouff*

7                                                      MARISSA MALOUFF
                                                       Deputy Attorneys General
8                                                      *Attorneys for Plaintiff*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Declaratory and Injunctive Relief