XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
DOMONIQUE C. ALCARAZ
JASLEEN SINGH
LEE I. SHERMAN
MARISSA MALOUFF (SBN #316046)
Deputy Attorneys General
300 S. Spring St., Suite 1702
 Los Angeles, CA 90013
 Telephone: (213) 269-6467
 Fax: (213) 897-7605
 E-mail: Marissa.Malouff@doj.ca.gov
 *Attorneys for State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **THE STATE OF CALIFORNIA,**<br><br>Plaintiff,<br><br>v.<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD F. WOLF, in his official capacity as Acting Secretary of the United States Department of Homeland Security; and MATTHEW ALBENCE, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,**<br><br>Defendants. | Case No. 4:20-cv-04592-JST<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:        August 19, 2020<br>Time:        2:00 p.m.<br>Dept:        Courtroom 6 – 2nd Floor<br>Judge:       Honorable Jon S. Tigar<br>Trial Date:  None Set<br>Action Filed: July 9, 2020 |

**TABLE OF CONTENTS**

Page

Notice of Motion and Motion for Preliminary Injunction ................................................ 1

Introduction ....................................................................................................................... 1

Background ........................................................................................................................ 3

I.     The Pandemic Has Forced a Dramatic Shift Toward Online Learning ................. 3

II.    California IHEs Acted in Reliance on the March 13 Guidance ............................ 5

III.   Defendants Terminated the In-Person Learning Exemption During an Escalating Public Health Crisis ........................................................................... 7

IV.   The July 6 Directive's Impact on California IHEs and Students .......................... 8

     A.    The July 6 Directive Harms California IHEs ............................................ 8

          1.    The July 6 Directive Disrupts Long Completed Fall 2020 Plans ............................................................................................ 9

          2.    The July 6 Directive Imposes Substantial Administrative Burdens ....................................................................................... 10

          3.    The July 6 Directive Frustrates the Diversity and Educational Missions of the California Higher Education Institutions ............................................................................... 10

     B.    The July 6 Directive Harms International Students at Great Personal and Financial Cost ................................................................................... 12

I.     Plaintiff Is Likely to Succeed on Its APA Claims .............................................. 14

     A.    The July 6 Directive is Arbitrary and Capricious ................................... 14

          1.    Defendants Failed to Consider Important Aspects of the Problem ............................................................................................ 15

          2.    Defendants' Explanation for the Rescission Runs Counter to the Evidence Before the Agency .................................................. 18

          3.    The July 6 Directive Fails to Provide a Sufficient Explanation to Justify the Rescission's Change in Policy ........... 20

     B.    Defendants Did Not Comply with Notice and Comment Procedures....... 20

II.    Plaintiff Satisfies the Remaining Factors for a Preliminary Inunction ................. 22

     A.    Plaintiff Will Suffer Irreparable Harm .................................................... 22

     B.    The Public Interest Weighs Heavily in Favor of Provisional Relief......... 24

Conclusion ....................................................................................................................... 25

i

1

# TABLE OF AUTHORITIES

2

**Page**

3

CASES

4

*All. for the Wild Rockies v. Cottrell*
5    632 F.3d 1127 (9th Cir. 2011).................................................................10, 14

6

*Am. Trucking Ass'n v. City of Los Angeles*
    559 F.3d 1046 (9th Cir. 2009)............................................................................23

7

*Ariz. Dream Act Coal. v. Brewer*
8    855 F.3d 957 (9th Cir. 2017)..............................................................................22

9

*Batterton v. Francis*
10    432 U.S. 416 (1977)...........................................................................................22

11

*Buschmann v. Schweiker*
    676 F.2d 352 (9th Cir. 1982)..............................................................................22

12

*California v. Azar*
13    911 F.3d 558 (9th Cir. 2018)..............................................................................25

14

*Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*
15    840 F.2d 701 (9th Cir. 1988)....................................................................22, 24, 25

16

*Chrysler Corp. v. Brown*
    441 U.S. 281 (1979)...........................................................................................20

17

*Colwell v. HHS*
18    558 F.3d 1112 (9th Cir. 2009)............................................................................21

19

*Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*
20    448 F. 3d 1118 (9th Cir. 2006)...........................................................................25

21

*DHS v. Regents of the Univ. of Cal.*
    140 S. Ct. 1891 (2020)...................................................................................16, 18

22

*E. Bay Sanctuary Covenant v. Barr*
23    No. 19-16487, 2020 WL 3637585 (9th Cir. July 6, 2020)................................17, 19

24

*Encino Motorcars, LLC v. Navarro*
25    136 S. Ct. 2117 (2016)...................................................................................15, 20

26

*FCC v. Fox Television Stations, Inc.*
    556 U.S. 502 (2009).................................................................................14, 15, 20

27

*Giovani Carandola, Ltd. v. Bason*
28    303 F.3d 507 (4th Cir. 2002)..............................................................................25

ii

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Greater Yellowstone Coal., Inc. v. Serveen*
   665 F.3d 1015 (9th Cir. 2011)................................................................19

4

5

*Kansas v. United States*
   249 F.3d 1213 (10th Cir. 2001)..............................................................23

6

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*
   752 F.3d 755 (9th Cir. 2014)..................................................................24

7

8

*Mada–Luna v. Fitzpatrick*
   813 F.2d 1006 (9th Cir. 1987)................................................................21

9

10

*Meyer v. Nebraska*
   262 U.S. 390 (1923)..............................................................................24

11

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*
   463 U.S. 29 (1983)..................................................................14, 15, 20

12

13

*Nken v. Holder*
   556 U.S. 418 (2009)..............................................................................24

14

15

*Norsworthy v. Beard*
   87 F. Supp. 3d 1164 (N.D. Cal. 2015) ..................................................22

16

17

*Perez v. Mortg. Bankers Ass'n*
   575 U.S. 92 (2015)................................................................................21

18

*Regents of the Univ. of Cal. v. DHS*
   279 F. Supp. 3d 1011 (N.D. Cal. 2018) ................................................23

19

20

*State v. Bureau of Land Mgmt.*
   286 F. Supp. 3d 1054 (N.D. Cal. 2018) ................................................23

21

*Trump v. Int'l Refugee Assistance Project*
   137 S. Ct. 2080 (2017)..........................................................................14

22

23

*United States v. Valverde*
   628 F.3d 1159 (9th Cir. 2010)................................................................22

24

25

*Washington v. Trump*
   847 F.3d 1151 (9th Cir. 2017)..........................................................22, 23

26

*Winter v. NRDC*
   555 U.S. 7 (2008)............................................................................14, 24

27

28

iii

1

2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3

**FEDERAL STATUTES**

4

5 United States Code

4

5

§ 553................................................................................................................1, 20, 21
§ 706................................................................................................................1, 14, 20

6

8 United States Code

7

§ 1182...........................................................................................................................13, 14
§ 1255..............................................................................................................................14

8

**STATE STATUTES**

9

California Education Code

10

§ 66010.4...........................................................................................................................11

11

§ 66251.............................................................................................................................23
§§ 69430-460...................................................................................................................23

12

**COURT RULES**

13

Federal Rules of Civil Procedure

14

Rule 65 ............................................................................................................................1

15

**OTHER AUTHORITIES**

16

8 Code of Federal Regulations § 214.2............................................................................5

17

85 Federal Register 15,337 (Mar. 18, 2020) ..................................................................3

18

19

20

21

22

23

24

25

26

27

28

iv

1

## NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

PLEASE TAKE NOTICE THAT ON August 19, 2020, at 2:00 p.m. or as soon therefore as it may be heard before the Honorable Jon S. Tigar, Plaintiff State of California (Plaintiff or the State) will and does hereby move the Court pursuant to Fed. R. Civ. P. 65 for a preliminary injunction prohibiting Defendants from implementing and enforcing the July 6 Directive that rescinds its earlier March 13 Guidance. That Guidance exempted F-1 and M-1 nonimmigrant student and vocational visa holders from regulations, which limit students' ability to enroll in online courses, during the novel coronavirus (COVID-19) emergency. The July 6 Directive violates the Administrative Procedure Act (APA) because it is arbitrary and capricious, 5 U.S.C. § 706(2)(A), and was issued without notice and comment, 5 U.S.C. § 553(b). This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the declarations, the Request for Judicial Notice, and any other written or oral evidence or argument as may be presented. While the motion is being noticed for August 19, 2020, Plaintiff respectfully requests that the hearing be held on July 22, 2020 per the Stipulation filed by the parties.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Plaintiff brings this motion to seek necessary provisional relief to stop the Department of Homeland Security (DHS) and Immigration and Customs Enforcement (ICE) (collectively, Defendants) from implementing the unlawful July 6 Directive, which forces international students to attend in-person courses under the threat of deportation and pressures institutions of higher education (IHEs) to substantially expand in-person learning in the midst of an escalating pandemic, with imminent deadlines imposed by Defendants beginning on July 15. International students should not be compelled to sacrifice their wellbeing so that they can remain in the U.S. and IHEs should not have to sacrifice the wellbeing of their students to continue serving them and lose the flexibility to function online in the interest of public health. Defendants agreed with this uncontroversial position in March, when they issued guidance permitting international students to take a full online course load. *See* Req. for Jud. Notice (RJN) Ex. 1 (March 13 Guidance). Now,

1

1   four months—and over 3 million confirmed COVID-19 cases in the U.S.—later, Defendants have

2   abruptly changed their mind. RJN Ex. 2 (July 6 Directive). This reversal is not only cruel, but it

3   was made in violation of the APA.

4         Since March 2020, COVID-19 has profoundly transformed everyday life in the United

5   States. Broad sectors of society have been forced to shut down or severely limit in-person

6   functions in order to stop the spread of the highly contagious disease. IHEs across the country,

7   including California IHEs, the California State University (CSU) and California Community

8   Colleges systems (collectively, California IHEs), are confronted with the unprecedented

9   challenge of carrying out their academic missions while protecting the health of their campus

10  communities in compliance with local and state public health directives. To meet the crisis,

11  California IHEs moved quickly to online learning and limited in-person courses where COVID-

12  19 could more easily be spread.

13        At the beginning of the pandemic, Defendants recognized these challenges, and issued the

14  March 13 Guidance exempting international students for "the duration of the emergency" from

15  federal regulations that limit, and in some cases fully prohibit, them from taking online courses.

16  RJN Ex. 1. Since March 13, the national emergency has not subsided. Rather, in recent weeks, as

17  businesses and other sections of society have reopened, cases have surged across the country to

18  the highest levels of the entire pandemic. With the expectation that their students' visas would not

19  be jeopardized by online classes since the country remains very much in the "duration of the

20  emergency," California IHEs carefully crafted fall 2020 programs that are predominately online

21  with limited in-person course offerings.

22        Inexplicably, on July 6—just weeks before the start of fall semester and on a date, at that

23  point, had marked the highest number of new COVID-19 cases in the U.S. since the start of the

24  pandemic—Defendants issued the July 6 Directive rescinding the March 13 Guidance. Per the

25  Directive, international students enrolled in a full course of online study must either leave the

26  U.S., transfer to a school where they can attend courses in-person (assuming such an option

27  exists), or be subject to removal. RJN Ex. 2. The shift in policy, per Defendants, reflected that the

28

1    prior exemption was issued during the "height of the [COVID-19] pandemic," indicating their

2    view that the COVID-19 pandemic is receding. RJN Ex. 2. This is simply untrue.

3          Defendants' reversal is the epitome of the arbitrary and capricious conduct that the APA

4    prohibits. Defendants utterly ignored the harm to students and IHEs as a result of their abrupt

5    rescission of the March 13 Guidance. Additionally, the July 6 Directive runs counter to the

6    evidence before Defendants—namely, the reality of the surging COVID-19 pandemic. Indeed,

7    given the exigency of the pandemic, Defendants failed to provide a reasonable justification for

8    changing the policy. Beyond that, Defendants failed to comply with the procedural requirements

9    of the APA, depriving IHEs, students, and public health officials, of the ability to weigh-in on an

10   action that will have serious health, financial, educational, and immigration consequences.

11         The July 6 Directive will irreparably harm the IHEs and their students. The July 6 Directive

12   will impose serious administrative and financial burdens on the IHEs, and worse, the California

13   IHEs could lose up to 32,000 international students, who greatly contribute to those institutions'

14   diversity, research, and academic missions. These international students must make impossible

15   choices: risk their health to stay in the U.S., uproot their lives to depart, or be subject to removal.

16   For these reasons, Plaintiff respectfully requests that the Court grant Plaintiff's motion to prevent

17   the unconscionable injuries that will result from Defendants' new policy.

18                                        **BACKGROUND**

19   **I.    THE PANDEMIC HAS FORCED A DRAMATIC SHIFT TOWARD ONLINE LEARNING**

20         COVID-19 is an ongoing crisis that has far-reaching implications globally, and especially

21   in the U.S., where it has not yet been contained. On March 4, 2020, California Governor Gavin

22   Newsom proclaimed a State of Emergency for the State of California in response to COVID-19.

23   RJN Ex. 4. On March 13, the President issued a Proclamation declaring the COVID-19 pandemic

24   a national emergency. 85 Fed. Reg. 15,337 (Mar. 18, 2020). Since that time over 3.2 million

25   Americans have been infected and more than 134,000 have died, the most in the world. RJN Ex.

26   5, 6. In California alone, more than 320,000 people have become infected, and 7,017 have died.

27   RJN Ex. 7. With no vaccine or therapeutic treatment available, forecasts project that between

28

3

Pl's Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (4:20-cv-04592-JST)

1    157,216 to 244,540 people in the U.S. could die by November 1, 2020.[1]

2            It is widely accepted that COVID-19 is easily transmitted and spreads mainly from person

3    to person, through respiratory droplets produced when an infected person coughs or sneezes, or

4    when an individual is speaking, shouting, or singing. Watt Decl. ¶¶ 9, 11. Crowded indoor spaces,

5    where there is close contact can particularly increase the risk of the disease's spread. *Id.* ¶¶ 12,

6    23. Accordingly, the U.S. Centers for Disease Control and Prevention (CDC) and the California

7    Department of Public Health (CDPH) have emphasized that physical distancing, i.e., staying

8    home as much as possible and remaining six feet from others when outside your home, is a core

9    tool to curbing COVID-19. RJN Ex. 8; Watt Decl. ¶ 10. Following this advice, on March 19,

10   Governor Newsom issued the first statewide stay-at-home order in the country. RJN Ex. 9.

11           Around that same time, the IHEs switched to almost exclusively online learning for the

12   spring 2020 semester. Wrynn Decl. ¶ 7; Hetts Decl. ¶ 12; Miner Decl. ¶ 10; Rodriguez ¶ 12;

13   Vuriden Decl. ¶ 9; Cornner Decl. ¶ 9; Hope Decl. ¶ 9; Knox Decl. ¶ 9. On short notice, the IHEs

14   were required to invest significant resources to ensure the success of an entirely online program.

15   Wrynn Decl. ¶¶ 8, 9; Hetts Decl. ¶ 12; Cornner Decl. ¶ 9; Knox Decl. ¶ 11. For instance, CSU

16   coordinated the instruction of over 70,000 courses, provided online instruction resources to

17   faculty, and distributed laptops and tablets to students who needed them. Wrynn Decl. ¶ 8. The

18   Chancellor's Office of the California Community Colleges system has been working to provide

19   internet services and computers at no or reduced cost for students who need them. Hetts Decl.

20   ¶ 19. As the public health risks associated with in-person education persisted, California IHEs

21   have continued to hold virtually all courses online in summer 2020. Wrynn Decl. ¶ 10; Hetts

22   Decl. ¶ 13; Miner Decl. ¶ 11; Rodriguez ¶ 12; Cornner Decl. ¶ 9; Knox Decl. ¶ 9. The California

23   IHEs' actions are consistent with current CDC guidance that in areas with substantial community

24   spread, IHEs should "consider extended in-person class suspension," RJN Ex.12. (IHE

25   preparedness) and that "virtual-only learning options" have the lowest risk of spread. RJN Ex. 11.

26           The rate of COVID-19's spread has, in fact, increased in recent weeks, coinciding with the

27   ─────────────────────
28   [1] Institute for Health Metrics and Evaluation at the University of Washington, COVID-19
     Projections, https://tinyurl.com/IHMEprojections (last updated July 7, 2020).

4

Pl's Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (4:20-cv-04592-JST)

1  reopening of businesses and public spaces throughout the country. Up until June 27, April 28

2  represented the peak of the pandemic in the U.S. with 38,509 confirmed cases on that day. The

3  U.S. has seen more than 40,000 confirmed cases every day, except one, since June 27, with

4  66,281 cases on July 12, representing, thus far, the new peak of the pandemic. RJN EX. 6.

5  Because California is also experiencing a surge in cases, on July 13, Governor Gavin Newsom

6  ordered the closure of most non-essential sectors in most of the state. RJN Ex. 10.

7  **II.   CALIFORNIA IHEs ACTED IN RELIANCE ON THE MARCH 13 GUIDANCE**

8          Recognizing that requiring international students to attend in-person courses during a

9  pandemic is unsafe and incompatible with public health guidance, on March 13, the Student and

10  Exchange Visitor Program (SEVP) division within ICE issued guidance, RJN Ex. 1, exempting

11  international students from federal regulations that restrict F-1 students from taking more than

12  one online course and restrict M-1 students from taking any online courses.[2] 8 C.F.R.

13  §§ 214.2(f)(6)(i)(G), 214.2(m)(9)(v). In this March 13 Guidance, SEVP specifically addressed the

14  scenario where a "school temporarily stops in-person classes but implements online or other

15  alternate learning procedures and the nonimmigrant student remains in the United States." *Id.*

16  SEVP directed these students to "participate in online or other alternate learning procedures and

17  remain in active status in SEVIS [Student and Exchange Visitor Program]." *Id.* SEVP further

18  declared that, "[g]iven the extraordinary nature of the COVID-19 emergency, SEVP will allow F-

19  1 and/or M-1 students to temporarily count online classes towards a full course of study in excess

20  of the limits of 8 C.F.R. § 214.2(f)(6) and 8 C.F.R. § 214.2(m)(9)(v)." *Id.*

21         The March 13 Guidance stated that the exemption for online learning would be in effect

22  "**for the duration of the emergency**." *Id.* (emphasis added). And, per the Guidance, Defendants

23  would adjust it "as needed" as they "continue to monitor the COVID-19 situation." *Id.*

24  Essentially, through the March 13 Guidance, Defendants expressed that they would be following

25  a rational policy: students and IHEs grappling with a global pandemic beyond their control would

26  not be penalized for complying with public health directives.

27  _____

28  [2] The in-person requirements for F-1 students, provided in 8 C.F.R. § 214.2(f)(6)(i)(G), only
    apply to students who are taking courses for credit or classroom hours.

5

1    Indeed, up until the July 6 Directive, all of Defendants' guidance indicated that SEVP's

2    requirements, and adjustments thereto, would be commensurate with the trajectory of the

3    pandemic. In its first COVID-19 related guidance, a March 9 Broadcast Message, Defendants

4    recognized "schools may need to adapt their procedures and policies to address the significant

5    public health concerns associated with the COVID-19 crisis," and assured that they "intend[] to

6    be flexible with temporary adaptations" due to COVID-19. RJN Ex. 13. Defendants also issued

7    guidance on June 4 that, while indicating that fall plans would be forthcoming, also expressed that

8    any changes would be tied to "the fluid nature" of the COVID-19 crisis. RJN Ex. 14. That

9    guidance also discussed the fact that "some students may find it difficult to return home during

10    the COVID-19 emergency because of diminished travel options." *Id.*

11    In reliance on the March 13 Guidance that international students would be exempted from

12    in-person class requirements for the "duration of the emergency," and in consideration of the

13    worsening pandemic, California IHEs made plans to primarily offer online classes for the fall

14    2020 semester to ensure the safety of their campus communities during the COVID-19 pandemic.

15    Wrynn Decl. ¶¶ 11, 17; Hetts Decl. ¶ 14; Miner Decl. ¶ 11; Adams Decl. ¶ 9; Vurdien Decl. ¶ 10;

16    Cornner Decl. ¶ 13; Hope Decl. ¶ 10; Knox Decl. ¶ 12. The California community colleges

17    convened a working group to assess the threat of COVID-19 on the system and make

18    recommendations on whether and when campuses should reopen to students. Hetts Decl. ¶ 13.

19    Individual districts in the community colleges system also tracked the spread of the virus in their

20    localities and considered local and state stay-at-home orders in order to determine what method of

21    instruction would be safest for the campus. Miner Decl. ¶¶ 12, 16; Adams Decl. ¶¶ 10, 11;

22    Vurdien Decl. ¶ 11; Cornner Decl. ¶ 10; Hope Decl. ¶ 9-10; Knox Decl. ¶ 13. This careful

23    planning led to most community colleges planning to offer primarily online courses but for very

24    limited exceptions. Miner Decl. ¶ 11; Rodriguez Decl. ¶ 20; Vurdien Decl. ¶ 10; Cornner Decl.

25    ¶¶ 11-12; Hope Decl. ¶ 10; Knox Decl. ¶ 12.

26    Likewise, CSU administrators have spent countless hours planning campus specific

27    education plans that safeguard the health and safety on their campuses. Wrynn Decl. ¶¶ 11-12, 14,

28    17. Similar to the community colleges, CSU will have a "hybrid" program, whereby most

6

Pl's Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (4:20-cv-04592-JST)

campuses will operate approximately 90% online. *Id.* ¶ 16. In May 2020, the CSU published

guidance for the fall semester so that faculty and staff would have sufficient time to make

necessary preparations to deliver a rich, but remote, educational experience. *Id.* ¶ 14.

**III.    DEFENDANTS TERMINATED THE IN-PERSON LEARNING EXEMPTION DURING AN ESCALATING PUBLIC HEALTH CRISIS**

Although the COVID-19 pandemic in the U.S. has worsened since the March 13 directive,

on July 6, 2020, SEVP changed its policy to declare that the earlier exemptions provided for F-1

and M-1 students "during the height of the [COVID-19] crisis will be modified for the fall 2020

semester." RJN Ex. 2. SEVP stated that because schools have started to reopen, in its view, "there

is a concordant need to resume the carefully balanced protections implemented by Federal

regulations." *Id.* SEVP claims that the change "balance[s] public health concerns against the

varied approaches that schools and universities are taking" in response to COVID-19, but it does

not address the risk of transmission that is presented by expanded in-person learning or the

escalating nature of the public health crisis. RJN Ex. 3.

According to the July 6 Directive, those "[s]tudents attending schools operating entirely

online may ***not*** take a full online course load and remain in the United States." RJN Ex. 2.

(emphasis in original). If an international student attends a school that has shifted to an entirely

online program due to COVID-19, or cannot enroll in in-person courses due to their limited

availability (or a student's disabilities or health concerns), the student must either: (a) transfer to a

school with in-person learning; (b) leave the U.S.; or (c) "face immigration consequences

including, but not limited to, the initiation of removal proceedings." *Id.* The U.S. Department of

State will not issue visas to students enrolled in a program that is fully online, and the U.S.

Customs and Border Protection will not allow students to enter the U.S. if they are enrolled in a

school that is fully online.  *Id.*

While F-1 students attending a higher education institution adopting a hybrid model with a

mixture of online and in-person classes may be permitted to take more than one class or three

credit hours online and still retain their status, that exemption does not apply to F-1 students in

English language training programs or to any M-1 students.  *Id.*  As discussed *supra*, because

7

Pl's Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (4:20-cv-04592-JST)

1   IHEs have decided for public health purposes to offer only a small percentage of their classes in-

2   person, and even then, only for certain subject matter areas, many F-1 students may not be in a

3   position to take any in-person class due to capacity restrictions. Moreover, there is no safe harbor

4   for IHEs operating in the "hybrid" model that decide to switch to online-only classes in the

5   middle of the semester should the public health crisis demand it.  In that instance, the students are

6   "not permitted to take a full course of study through online classes," and students "must leave the

7   country or take alternative steps to maintain their nonimmigrant status such as transfer to a school

8   with in-person instruction."  *Id.* The July 6 Directive further states that students enrolled at IHEs

9   "whose schools of enrollment are only offering online classes" can maintain their active visa

10  status residing abroad, indicating that students enrolled at IHEs with hybrid-programs (i.e., not

11  offering *only* online classes) *cannot* maintain their status from abroad, even if they are enrolled in

12  only online courses. RJN Ex. 2

13      The July 6 Directive states that DHS will be publishing a Temporary Final Rule "in the near

14  future," without any indication that DHS or ICE will engage in notice and comment at any point.

15  *Id.* Nonetheless, the practical effects of this new policy are immediate. IHEs that plan to operate

16  entirely online are required to inform ICE of their plans by July 15, while all other IHEs must

17  inform ICE of their plans to operate solely in-person classes, delayed or abbreviated sessions, or

18  hybrid plans by August 1. By August 4, IHEs are required to update and reissue new Forms I-20

19  to each F-1 or M-1 student enrolled in the IHEs during the fall 2020 semester. *Id.* If a F-1 student

20  takes in-person classes, in order to retain their status, under the new policy, the higher education

21  institution must certify on the Form I-20 that: (a) the school's program is not entirely online; (b)

22  the student is not taking an entirely online course load; and (c) the student is taking the minimum

23  number of online classes required to make normal progress in the degree program.  *Id.*

24  **IV.   THE JULY 6 DIRECTIVE'S IMPACT ON CALIFORNIA IHES AND STUDENTS**

25      **A.   The July 6 Directive Harms California IHEs**

26      The July 6 Directive harms IHEs in at least three significant ways: (1) IHEs must devote

27  substantial resources to ensuring international students can retain their statuses, which requires

28

8

Pl's Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (4:20-cv-04592-JST)

expansion of in-person learning despite health risks; (2) California IHEs now have new administrative burdens; and (3) California IHEs' missions are frustrated.

### 1. The July 6 Directive Disrupts Long Completed Fall 2020 Plans

The July 6 Directive was issued only weeks before the fall semester was to start, after California IHEs had already extensively planned for fall online learning programs in reliance of the March 13 Guidance. Now that Defendants have rescinded that Guidance, California IHEs are pressured to reconfigure their fall plans so that their international students can enroll in at least one in-person class, because their initial falls would be too limited. Wrynn Decl. ¶ 21; Hetts Decl. ¶¶ 16-17; Miner Decl. ¶ 16; Rodriguez Decl. ¶ 20; Vurdien Decl. ¶¶ 12, 14, 23; Cornner Decl. ¶¶ 14, 17; Hope Decl. ¶¶ 10, 11, 13; Knox Decl. ¶ 23. California IHEs are thus considering whether they should add in-person classes or expand the capacity of existing in-person fall classes to ensure that these students can stay enrolled and within lawful status. Wrynn Decl. ¶ 21; Hetts Decl. ¶¶ 16-17; Miner Decl. ¶¶ 15-16 Rodriguez Decl. ¶ 20; Vurdien Decl. ¶ 23; Cornner Decl. ¶ 14; Hope Decl. ¶ 13. This would be extremely difficult to do, however, because at many schools, budgets have been finalized, fall registration has commenced,  and instructors have been assigned to courses; and schools must resubmit plans for how to safely deliver in-person courses. Wrynn Decl. ¶ 22; Vurdien Decl. ¶ 14; Cornner Decl. ¶ 14; Hope Decl. ¶ 12. Indeed, COVID-19 presents a major obstacle, because California IHEs must comply with physical distancing protocols and purchase personal protective equipment (PPE) for faculty, staff, and students. Wrynn Decl. ¶ 21; Rodriguez Decl. ¶ 20; Vurdien Decl. ¶ 11; Hope Decl. ¶ 13. The logistical planning required to implement a new fall plan at this point would be extremely burdensome.

More importantly, the expansion of in-person classes is accompanied by the definite risk of exposing people to COVID-19. RJN Ex. 11, 12; Watt Decl. ¶ 23; Rodriguez Decl. ¶ 21; Adams Decl. ¶ 11; Vurdien Decl. ¶ 18; Cornner Decl. ¶¶ 14, 16; Hope Decl. ¶ 13; Knox Decl. ¶ 19. Given that the disease is spread through close contact and actions such as speaking, students, staff members, or instructors risk contracting the disease through expanded in-person learning. Watt Decl. ¶¶ 9, 23. The risk is especially acute given that the rate of COVID-19 is escalating in

California such that there is already limited space at local hospitals. Hetts Decl. ¶ 14; Adams Decl. ¶ 10; Vurdien Decl. ¶ 18; Cornner Decl. ¶ 16; Watt Decl. ¶ 18. Relatedly, the July 6 Directive does not give IHEs flexibility to pivot to an online-only system if conditions worsen—which, given the current trajectory, is foreseeable —for if they do, their students would be left with the prospect of immediate departure or deportation, RJN Ex. 2.

### 2. The July 6 Directive Imposes Substantial Administrative Burdens

California IHEs have and will continue to expend significant administrative effort to mitigate the harms resulting from the July 6 Directive. Van Cleve Decl. ¶ 8; Hetts Decl. ¶¶ 15, 17; Miner Decl. ¶ 16; Rodriguez Decl. ¶¶ 18, 20; Vurdien Decl. ¶¶ 14-16; Cornner Decl. ¶ 14; Knox Decl. ¶¶ 16-17.  Just weeks before the fall semester is scheduled to begin, California IHEs have had to divert their attention to analyzing the impact of the July 6 Directive and identifying its applicability to their students, while simultaneously fielding inquiries from concerned students. Van Cleve Decl. ¶ 8; Hetts Decl. ¶ 15; Miner Decl. ¶ 14; Rodriguez Decl. ¶ 18; Cornner Decl. ¶ 14; Knox Decl. ¶ 16. In addition, the July 6 Directive requires California IHEs to comply with new, onerous—and imminent—SEVIS reporting requirements of re-issuing Forms I-20 to *all* of its international students by August 4, 2020. Van Cleve Decl. ¶ 11; Miner Decl. ¶ 17; Rodriguez Decl. ¶ 18; Vurdien Decl. ¶ 17; Cornner Decl. ¶ 15; Hope Decl. ¶ 14; Knox Decl. ¶ 18. Within a matter of weeks, staff must review each international student's record to ensure that they are enrolled in at least one in-person course, and monitor that enrollment on SEVIS. Van Cleve. Decl. ¶ 11. As an example of how time consuming this will be, Santa Monica College anticipates that this task alone will "require 19 full-time staff members to work a combined 570 overtime hours." Rodriguez Decl. ¶ 18.

### 3. The July 6 Directive Frustrates the Diversity and Educational Missions of the California Higher Education Institutions

Potentially thousands of IHEs' international students may be unable to comply with the July 6 Directive because they cannot feasibly enroll in the limited in-person course offerings. *See e.g.*, Miner Decl. ¶ 11; Rodriguez Decl. ¶ 28. This means that they will be forced to either transfer, depart the U.S. and resume their studies from their home country, or be deported. Either

10

1    way, it is likely that the California IHEs will lose many international students. This will be a

2    crushing blow to the California IHEs' missions to serve diverse individuals from local, national,

3    and global communities without regard to race, ethnicity, national origin, or immigration status.

4    Hetts Decl. ¶¶ 8, 23 & Ex. A; Wrynn Decl. ¶ 23; Miner Decl. ¶ 8; Rodriguez Decl. ¶ 9; Vurdien

5    Decl. ¶ 20; Cornner Decl. ¶ 8; Knox Decl. ¶ 8. International students hale from all over the world

6    and enrich the educational experiences of all students and faculty by contributing their diverse life

7    experiences and perspectives. Wrynn Decl. ¶ 18; Hetts Decl. ¶ 11; Miner Decl. ¶¶ 7, 9; Rodriguez

8    Decl. ¶ 10; Vurdien Decl. ¶ 8; Cornner Decl. ¶ 7; Hope Decl. ¶¶ 7-8; Knox Decl. ¶ 7. The

9    removal of these students necessarily makes these systems less diverse, which is a loss to the

10   IHEs and their student bodies. Hetts Decl. ¶ 23; Vurdien ¶ 20; Hope Decl. ¶ 16; Knox Decl. ¶ 15.

11        Moreover, the July 6 Directive deprives California IHEs of the scholarship of international

12   students, thereby harming their institutional missions and denying the community of their

13   innovations and research. *See* Cal. Educ. Code § 66010.4(a)(3), (b). As just a few examples of

14   students who would likely be unable to continue their studies under the July 6 Directive: one

15   student researches diseases such as diabetes, Parkinson's, pneumonia and other immune related

16   disorders, which is of critical import to COVID-19 developments; another student has

17   collaborated with U.S. NASA Joint Propulsion Laboratory (JPL) on sustainable energy research;

18   and one student focuses on cyber security and tutors college athletes. Winner Decl. ¶ 15.

19        Finally, the July 6 Directive will cause IHEs to suffer substantial financial losses due to

20   the loss of international students who will likely dis-enroll, either because they are transferring or

21   they decide not to continue their studies from abroad. Miner Decl. ¶ 18; Rodriguez Decl. ¶ 24;

22   Vurdien Decl. ¶ 19; Cornner Decl ¶ 17; Hope Decl. ¶ 15; Knox Decl. ¶ 20. CSU stands to lose

23   over $260 million in tuition fees due to dis-enrollment of international students who are unable to

24   comply with the Directive. Wells Decl. ¶ 7. The California Community College system projects a

25   loss of up to approximately $83 million in tuition and related fees. Hetts Decl. ¶ 10. This hit to

26   revenue comes at a time when California IHEs' resources are strained to respond to the disruption

27   caused by COVID-19, as well as state budget shortfalls. Wells Decl. ¶ 7; Hetts Decl. ¶ 22;

28   Rodriguez Decl. ¶ 24; Vurdien Decl. ¶ 19; Hope Decl. ¶ 15. All tuition revenue is reinvested

11

towards operational costs associated with the school, including staff salaries, as well as programs and services available to the student body as a whole. Wells Decl. ¶ 7; Hetts Decl. ¶ 21; Rodriguez Decl. ¶ 22. Dis-enrollment thus extends far beyond a financial loss, and affects the types of courses, educational program, services, and instruction IHEs are able to offer to all of its students, international and domestic. Rodriguez Decl. ¶ 22.

**B.    The July 6 Directive Harms International Students at Great Personal and Financial Cost**

The July 6 Directive penalizes international students for taking a full online course load, despite the fact that many have no other choice due to in-person capacity limits, limited course offerings in specific majors, or their underlying health issues. The Directive's impacts on these students' lives and wellbeing are vast and severe. Students have reported feeling alarm, fear, anxiety, and confusion due to the Directive. Rodriguez Decl. ¶ 27; Hope Decl. ¶ 18; Knox Decl. ¶¶ 16, 22; Winner Decl. ¶ 15; Kodur Decl. ¶ 25.

*First*, many international students relied on the March 13 Guidance as assurance that their status was not in jeopardy due to their IHE's decision to cease virtually all in-person classes for the duration of the emergency. Rodriguez Decl. ¶¶ 25-27 Vurdien Decl. ¶ 21.  In reliance on that Guidance, students signed leases in the U.S. expecting to continue to remain in the country while completing their online instruction. Rodriguez Decl. ¶ 26; Winner Decl. ¶ 11; Kodur Decl. ¶ 25. Now these students are being forced to uproot their lives and leave the U.S. or be subject to removal, and breach leases and other financial commitments they made under the assumption that they would be able to continue online coursework and remain in lawful status. Rodriguez Decl. ¶¶ 26-27; Hope Decl. ¶ 18. At the same time, in reliance on the March 13 Guidance, some students may have traveled back their home countries to continue online learning. Rodriguez Decl. ¶¶ 25, 28; Vurdien Decl. ¶ 21; Cornner Decl. ¶ 18. If these students are enrolled in hybrid programs, such as those at the California IHEs, and remain abroad taking an online course load, they may lose their status under the Directive. RJN Ex. 2. Thus, the July 6 Directive could have a perverse effect—forcing the IHEs' students who are already abroad to come back to the U.S. to take in-person courses, which may prove difficult for these students due to travel restrictions and

1 presents the same public health concerns as forcing students to leave the U.S.

2   *Second*, students have expressed deep reservations about enrolling in courses with in-

3 person components, as they fear contracting COVID-19, which could cause long-lasting physical

4 harm, or fatal consequences. Rodriguez Decl. ¶ 27; Kodur Decl. ¶ 23. The July 6 Directive makes

5 no exception to students with underlying conditions, for whom COVID-19 is especially

6 dangerous. RJN Ex. 2.

7   *Third*, students who return to their home countries face the exorbitant financial costs and

8 the health risk associated with traveling during a global pandemic, when international travel

9 options are severely limited. Hetts Decl. ¶ 20; Miner Decl. ¶ 21; Rodriguez Decl. ¶¶ 26-27;

10 Vurdien Decl.   ¶ 22; Hope Decl. ¶ 18; Knox Decl. ¶ 22; Winner Decl. ¶¶ 12-13, 15; Kodur

11 Decl. ¶¶ 19-20, 22, 24-25. For example, the second largest group of international students at the

12 CSU are from India, but there are currently no flights available from the U.S. to India. Wrynn

13 Decl. ¶ 19. A ticket to China right now is $7,000. Rodriguez Decl. ¶ 27. Yet, if students are

14 unable to timely depart the country, they risk being placed in removal proceedings.

15   Relatedly, for many students, continuing their education abroad is unfeasible. Students

16 may not have access to laptop devices or a free, uncensored, internet connection. Miner Decl.

17 ¶ 22; Rodriguez Decl. ¶ 26; Winner Decl. ¶¶ 9, 15; Kodur Decl. ¶¶ 17-19, 25. Still others fear

18 returning to home countries where they do not currently have any place to live and where they

19 could face famine or had escaped abusive situations. Rodriguez Decl. ¶¶ 26-27; Winner Decl. ¶

20 15.  Generally, students forced to depart will lose the educational opportunities attendant with

21 their residing in the U.S. For instance, F-1 students would be denied the opportunity to participate

22 in a pre-completion internship or other experiential learning opportunities. Wrynn Decl. ¶ 20;

23 Miner Decl. ¶ 23; Rodriguez Decl. ¶ 29; Hope Decl. ¶ 18.

24   *Finally*, the July 6 Directive is accompanied by the threat of serious immigration

25 consequences for failure to comply—namely, initiation of removal proceedings. RFJ directive_.

26 When an individual is ordered removed, they are inadmissible into the U.S. for ten-years. 8

27 U.S.C. § 1182(a)(9)(A)(ii). Even if not ordered removed, if the student fails to maintain status

28 while residing in the U.S. that student will be accruing unlawful presence, which can bar an

13

Pl's Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (4:20-cv-04592-JST)

1    individual from entry for many years. *Id.* § 1182(a)(9)(B)(i). A failure to maintain status while

2    residing in the U.S. can also render a person ineligible for adjustment of status in the future. *Id.*

3    § 1255(c)(8). These harsh consequences may befall students, who, through no fault of their own,

4    cannot attend in-person courses and also cannot leave the U.S.

5                                   **LEGAL STANDARD**

6         A preliminary injunction is appropriate when the plaintiffs establish that they are likely to

7    succeed on the merits, they are likely to suffer irreparable harm in the absence of preliminary

8    relief, the balance of equities tips in plaintiffs' favor, and an injunction is in the public interest.

9    *Winter v. NRDC*, 555 U.S. 7, 20 (2008). A preliminary injunction is "often dependent as much on

10   the equities of [the] case as the substance of the legal issues it presents." *Trump v. Int'l Refugee*

11   *Assistance Project*, 137 S. Ct. 2080, 2087 (2017). "[S]erious questions going to the merits and a

12   balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary

13   injunction," so long as the other preliminary injunction factors are met. *All. for the Wild Rockies*

14   *v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotations omitted).

15                                      **ARGUMENT**

16   **I.    PLAINTIFF IS LIKELY TO SUCCEED ON ITS APA CLAIMS**

17        **A.    The July 6 Directive is Arbitrary and Capricious**

18        Defendants' rescission of the in-person learning exemption for F-1 and M-1 students must

19   be set aside under the APA as an agency action that is "arbitrary, capricious, [and] an abuse of

20   discretion." 5 U.S.C. § 706(2)(A). Under the APA, an agency must engage in "reasoned

21   decisionmaking," by "examin[ing] the relevant data and articulat[ing] a satisfactory explanation

22   for its action." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29,

23   43, 52 (1983). Courts find agency actions to be arbitrary and capricious if the agency has, among

24   other things, "entirely failed to consider an important aspect of the problem" or "offered an

25   explanation for its decision that runs counter to the evidence before the agency." *Id.* at 43. In

26   addition, when changing policy, an agency must provide "a reasoned explanation . . . for

27   disregarding facts and circumstances that underlay or were engendered by the prior policy." *FCC*

28

14

Pl's Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (4:20-cv-04592-JST)

1    *v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). Any one of these defects would be

2    sufficient for setting aside Defendants' rescission of the COVID-19 in-person learning

3    exemptions as arbitrary and capricious. Here, all of these defects exist.

4              1.    **Defendants Failed to Consider Important Aspects of the Problem**

5              Defendants' one-paragraph explanation in the July 6 Directive of the rescission of the

6    COVID-19 in-person learning exemptions only reflects two considerations: (a) that the in-person

7    learning exemptions were granted "during the height" of the pandemic, which Defendants,

8    presumably (and incorrectly) believe has passed; and (b) that there is a "need to resume the

9    carefully balanced protections implemented by federal regulations" as "many institutions across

10   the country reopen." RJN Ex. 2. The July 6 Directive and the documents that were released

11   contemporaneously with the Directive, however, shows no consideration by Defendants of the

12   litany of problems that ensue from the agency's actions. *See State Farm*, 463 U.S. at 43.

13             To start, Defendants have not at all considered how the March 13 Guidance "engendered

14   serious reliance interests" for IHEs and students based on that Guidance's representation that the

15   COVID-19 in-person learning exemptions would be in effect for the duration of the pandemic.

16   *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *Fox Televisions*, 556

17   U.S. at 515). California IHEs relied on those representations as they spent months creating plans

18   to predominantly hold cases online. Wrynn Decl. ¶ 17; Miner Decl. ¶ 13; Rodriguez Decl. ¶ 16;

19   Vurdien Decl. ¶ 12; Cornner Decl. ¶ 13; Hope Decl. ¶ 11; Knox Decl. ¶ 14. Because of the March

20   13 Guidance, California IHEs were able to safeguard the health and safety of their students,

21   faculty, and staff, without concern that international students will suffer immigration

22   consequences as a result of these online learning plans. *Id*. The IHEs also made decisions on

23   course offerings and budgeting based on the expectation that international students will remain

24   enrolled while IHEs hold classes online during the pandemic. Wrynn Decl. ¶ 17; Rodriguez Decl.

25   ¶ 16; Vurdien Decl. ¶ 13; Cornner Decl. ¶ 13; Hope Decl. ¶ 12; Knox Decl. ¶ 14. Meanwhile,

26   students presently in the U.S. acted in reliance of the representations in the March 13 Guidance

27   by enrolling in classes, entering leases, or interviewing for jobs or internships on the expectation

28

15

Pl's Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (4:20-cv-04592-JST)

1    that they could continue their study in the U.S. irrespective of whether their school offers in-

2    person instruction during the pandemic. Rodriguez Decl. ¶ 26; Hope Decl. ¶ 12; Winner Decl. ¶

3    11, 15; Kodur Decl. ¶ 25. Other international students traveled to their home countries, relying on

4    the representations of the March 13 Guidance that they could take their classes online while

5    residing abroad. Rodriguez Decl. ¶ 25, 28; Vurdien Decl. ¶ 21; Cornner Decl. ¶ 18. Now these

6    students must attempt to travel back to the U.S. to take classes in-person if they are enrolled at an

7    IHE with a "hybrid" fall plan or they could lose their visa status.

8         The Supreme Court's recent decision in *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct.

9    1891 (2020), is instructive. In that case, the Court determined that before terminating the Deferred

10   Action for Childhood Arrival (DACA), a program which "conferred no substantive rights" and

11   provided only temporary benefits, DHS was required to consider the reliance interests of: (a)

12   DACA recipients; (b) the IHEs where DACA recipients studied or taught; and (c) the state and

13   local governments that benefitted from DACA recipients contributions to tax revenue. *Id.* at

14   1913-14. Likewise here, as discussed above, IHEs and international students developed reliance

15   interests based on the representations in the March 13 Guidance that those students could

16   continue to enroll in online classes for "the duration of the emergency" notwithstanding the

17   ordinary in-person learning regulatory requirements. *See supra* 15-16. Defendants were "required

18   to assess whether there were reliance interests, determine whether they were significant, and

19   weigh any such interests against competing policy concerns." *Regents*, 140 S.Ct. at 1915. There

20   is no indication that Defendants conducted that analysis, making the rescission of the COVID-19

21   in-person learning exemptions arbitrary and capricious on that basis alone. *See id.*

22        Defendants independently failed to meaningfully consider public health effects. While an

23   FAQ document claims that the new policy "carefully balance[s] public health concerns" and

24   "[t]he health and safety of all students is of the utmost importance," none of the documents

25   contemporaneously issued with the July 6 Directive even mention the substantial public health

26   risks posed by conducting expansive in-person learning. RJN Ex. 7; *see also* RJN Ex. 15.  The

27   documents further fail to consider that the public health crisis has escalated since the in-person

28   learning exemptions were first instituted on March 13. RJN Exs. 5-7. While Defendants claim

16

1   that the policy change is intended to "minmiz[e] the risk of transmission of COVID-19," RJN Ex.

2   2, the July 6 Directive increases the risk of transmission to international students and other

3   travelers by forcing both: (a) students within the U.S. to travel to their home country in the middle

4   of the pandemic; or (b) students abroad to come back to the U.S. to take in-person courses if their

5   IHEs are offering them, so that they can retain their status. Watt Decl. ¶ 24. The agency

6   documents also fail to consider the impact of forcing international students with underlying health

7   conditions to attend in-person classes, even though for them exposure to COVID-19 could be

8   fatal. *See id.* ¶ 23.  Even if Defendants purport to have considered health impacts generally, their

9   "explanation in no way addresses the[se] special vulnerability[ies]" to public health created by

10  Defendants' pressure for greatly expanded in-person learning. *E. Bay Sanctuary Covenant v.*

11  *Barr*, No. 19-16487, 2020 WL 3637585, at *16 (9th Cir. July 6, 2020) (asylum rule's failure to

12  account for the "vulnerability of unaccompanied minors" is arbitrary and capricious).

13      Defendants have further shown no consideration of the following problems raised by the

14  July 6 Directive:

15      • The July 6 Directive creates an unprecedented administrative burden on IHEs of

16         having to re-issue Form I-20s to all of their international students within a matter of

17         weeks. Van Cleve Decl. ¶  11; Miner Decl. ¶ 17; Rodriguez Decl. ¶ 18; Vurdien

18         Decl. ¶ 17; Cornner Decl. ¶ 15; Hope Decl. ¶ 14; Knox Decl. ¶ 18.

19      • The inevitable departure of international students from the U.S. as a result of the

20         July 6 Directive would result in a loss of enrollment, and thus, a loss of tuition

21         dollars that support the entire student body at a time when IHEs are facing severe

22         budget cuts. Wells Decl. ¶ 7; Hetts Decl. ¶ 22; Miner Decl. ¶ 18; Rodriguez Decl.

23         ¶ 24; Vurdien Decl. ¶ 19; Cornner Decl. ¶ 17; Hope Decl. ¶ 15; Knox Decl. ¶ 20.

24      • The loss of international students would significantly undermine the diversity and

25         academic and research missions of these IHEs. Hetts Decl. ¶ 23; Vurdien ¶ 20; Hope

26         Decl. ¶ 16; Knox Decl. ¶ 15.

27      • Some international students who are forced to leave the U.S. as a result of the July 6

28         Directive will be unable to do so due to U.S. and foreign travel restrictions,

17

potentially subjecting those students to immigration consequences if they remain in the U.S. Wrynn Decl. ¶ 19; Hetts Decl. ¶ 20; Miner Decl. ¶ 21; Rodriguez Decl. ¶¶ 26-27; Vurdien Decl. ¶ 22; Hope Decl. ¶ 18; Knox Decl. ¶ 22; Winner Decl. ¶ 13, 15; Kodur Decl. ¶¶ 19-20, 22; *see also* RJN Exs. 16-25.

- Similarly, some international students abroad may not be able to come back to the U.S. to take in-person courses at "hybrid" schools, because of these same travel restrictions, thus jeopardizing their status. Hetts Decl. ¶ 20; Miner Decl. ¶ 19; Rodriguez Decl. ¶ 25, 28; Vurdien Decl. ¶ 21; Cornner Decl. ¶ 18.

- Students who are forced to leave the U.S. because of their IHEs' predominately online programs may not be able to continue their education in their home countries, since those students may be without internet connectivity in their home country, and will face the challenge of having to take classes in far divergent time zones. Miner Decl. ¶ 22; Rodriguez Decl. ¶ 26; Winner Decl. ¶¶ 9, 15; Kodur Decl. ¶¶ 17-19, 25.

- The July 6 Directive will interrupt the education of many international students who are close to earning their degree, which can have devastating consequences on their ability to pursue future professional opportunities. Wrynn Decl. ¶ 20; Miner Decl. ¶ 23; Rodriguez Decl. ¶ 29; Hope Decl. ¶ 18; Winner Decl. ¶¶ 10-11, 15.

Defendants' failure to consider any one of these significant problems is enough to find the rescission arbitrary and capricious. *Regents*, 140 S. Ct. at 1913 (DHS's failure "alone" to consider a more narrow rescission of DACA was enough to "render[] [the] Acting Secretary['s] decision arbitrary and capricious").

### 2.   Defendants' Explanation for the Rescission Runs Counter to the Evidence Before the Agency

ICE's primary reasoning for rescinding the exemptions—that those exemptions were granted at the "height" of the pandemic—indicates ICE has determined that the pandemic is dissipating, and thus, believes IHEs should reopen. RJN Ex. 2. The Acting Deputy Secretary of Homeland Security Ken Cuccinelli recently acknowledged that this was the purpose of the

18

Pl's Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (4:20-cv-04592-JST)

1    rescission. RJN Ex. 26. That reasoning does not comport with reality, or even the federal CDC's

2    currently applicable guidance for IHEs. RJN Exs. 11, 12.

3         As discussed *supra*, the rate of positive cases has spiked dramatically across the country.

4    Between March 13, when the exemptions were granted, and June 26, there was no day in which

5    there were 40,000 or more new confirmed COVID-19 cases in the U.S. RJN Ex. 6. Since June 27,

6    there has not been one day in which there were *less than* 40,000 new confirmed COVID-19 cases.

7    *Id.* On July 6, the day that Defendants rescinded the exception, there were 57,186 confirmed

8    cases, ***the highest amount of new cases at that point since the start of the pandemic***. *Id.* Cases

9    have continued to increase since July 6, and more concerning, there has been an increase in

10   deaths attributable to COVID-19, which tends to follow an increase in positive cases. *Id.*

11   Although California has been cautious in its reopening, it, like the rest of the country, has

12   experienced a spike in new cases and deaths over the past several weeks. RJN Ex. 7.

13        Health experts report hospitals across the country being "overwhelmed" as a result of this

14   surge.[3] The Director of the National Institute of Allergy and Infectious Diseases, Dr. Anthony

15   Fauci said that these "disturbing" trends show that the U.S. was "not in total control" of the virus,

16   and anticipated that the U.S. could see over 100,000 new confirmed COVID-19 cases per day.

17   RJN Ex. 27. These recent spikes coincide with the reopening of businesses and public spaces,

18   prompting health experts, including Dr. Fauci, to advise that further reopenings should be

19   "pause[d]" in communities experiencing a surge in new confirmed COVID-19 cases. RJN Ex. 28.

20        This "evidence . . . contradicts the agencies' conclusion" that the COVID-19 pandemic is

21   easing, and that this is an appropriate time to expand in-person learning at IHEs. *E. Bay*

22   *Sanctuary Covenant*, 2020 WL 3637585, at *13. Indeed, these facts all dictate *against* a policy

23   that seeks to pressure IHEs to conduct more in-person learning. *Greater Yellowstone Coal., Inc. v.*

24   *Servheen*, 665 F.3d 1015, 1030 (9th Cir. 2011) (overturning agency decision where "considerable

25   data . . . point[ed] in the opposite direction" of the agency's decision). Since Defendants have not

26

27   ───────────────
     [3] Madeline Holcombe, *Expert warns the US is approaching 'one of the most unstable times in the*
28   *history of our country'*, CNN Health (July 11, 2020), https://www.cnn.com/2020/07/11/health/us-
     coronavirus-saturday/index.html.

(and cannot) provide a "rational connection between the facts found and the choice made," the

agency action must be set aside. *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc.*

*v. United States*, 371 U.S. 156, 168 (1962)).

> ### 3. The July 6 Directive Fails to Provide a Sufficient Explanation to Justify the Rescission's Change in Policy

Moreover, the rescission of the COVID-19 in-person learning exemptions departs from the

agency's past practice without a sufficient explanation. When an agency changes a policy, it must

"show that there are good reasons for the new policy." *Fox Television*, 556 U.S. at 515. Where, as

is the case here, the prior policy engendered "serious reliance interests," an agency must provide

"a more detailed justification than what would suffice for a new policy created on a blank slate."

*Id.* Defendants' suggestion that the exemptions in the March 13 Guidance are no longer necessary

because they were issued at the "height of the pandemic" cannot be justified by the record before

the agency. *See supra* 18-20. Defendants' other conclusory justifications, including that the

rescission of the exemptions is "need[ed] to resume the carefully balanced protections

implemented by federal regulations" or that it "carefully balance[d] public health concerns"

without explanation, falls "short of the agency's duty to explain why it deemed it necessary to

overrule its previous position." *Encino Motorcars*, 136 S.Ct. at 2126.

> ### B. Defendants Did Not Comply with Notice and Comment Procedures

Under the APA, the court must "hold unlawful and set aside agency action, findings, and

conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. §

706(2)(D). The APA requires that agencies comply with notice and comment procedures prior to

the issuance of a substantive rule. *Id.* § 553(b). Notice and comment requirements do not apply if

an agency is issuing an "interpretative rule[], general statement[] of policy, or rule[] of agency

organization, procedure, or practice," or if the agency establishes that there was "good cause" for

it to find that "notice and public procedure thereon are impracticable, unnecessary, or contrary to

the public interest." *Id.* § 553(b)(A),(B). Neither circumstance is present here.

*First*, the July 6 Directive is a substantive rule for which the APA's procedural

requirements apply because it has "the force and effect of law." *Chrysler Corp. v. Brown*, 441

20

Pl's Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (4:20-cv-04592-JST)

1   U.S. 281, 303 (1979) (quoting *Batterton v. Francis*, 432 U.S. 416, 425 n.9 (1977)); *accord. Perez*

2   *v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015). A substantive rule "narrowly limits

3   administrative discretion" or creates a "binding norm" so that "upon application one need only

4   determine whether a given case is within the rule's criterion." *Colwell v. HHS*, 558 F.3d 1112,

5   1124 (9th Cir. 2009) (quoting *Mada–Luna v. Fitzpatrick*, 813 F.2d 1006, 1013-14 (9th Cir. 1987))

6   (emphasis omitted).

7        Here, the July 6 Directive was written in "mandatory terms" and imposes immediate

8   obligations on both international students and IHEs. *Colwell*, 558 F.3d at 1125. As discussed

9   *supra*, the Directive compels IHEs to imminently undertake administrative actions that were not

10  required per the March 13 Guidance, and have never been required in the past. *See e.g.* Van Cleve

11  Decl. ¶ 11; Rodriguez Decl. ¶ 18. The force and effect of the July 6 Directive will also be felt by

12  the international students, who now must either risk their health by attending in-person courses to

13  maintain their status, depart the U.S. to continue studies at online-only IHEs in their home

14  countries, or face deportation. There is no indication in the Directive that enforcing officials have

15  the discretion to determine whether a student "is within the rule's criterion"—rather, the Directive

16  is clear that students cannot maintain their status if they cannot comply with these requirements.

17  *Colwell*, 558 F.3d at 1124 (quoting *Mada-Luna*, 813 F.2d at 1014). Tellingly, Defendants'

18  themselves appear to appreciate the substantive nature of the July 6 Directive, stating that they

19  would be publishing its requirements in a forthcoming, but yet to be issued, Temporary Final

20  Rule in the federal register, though this also will not be subject to notice and comment before

21  taking effect. *See* RJN Ex. 2.

22       *Second*, Defendants have not established—nor even articulated—that there is good cause to

23  circumvent rulemaking procedures. In order for the good cause exception to apply, the agency

24  must "incorporate[] the finding and a brief statement of reasons therefore in the rules issued." 5

25  U.S.C. § 553(b)(A),(B). The July 6 Directive contains no such statement, and that in itself renders

26  the exception inapplicable. Even if Defendants had included this statement, Defendants cannot

27  "overcome [the] high bar if it seeks to invoke the good cause exception to bypass the notice and

28  comment requirement," because they would face no harm if the March 13 Guidance remained in

21

Pl's Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (4:20-cv-04592-JST)

1    place during a notice and comment period. *United States v. Valverde*, 628 F.3d 1159, 1164 (9th

2    Cir. 2010); *Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982) (the exception only

3    applies when "delay would do real harm.") (internal quotations omitted). There is no exigency

4    requiring students to imminently attend in-person courses or depart the U.S while the pandemic

5    reaches levels unseen when the March 13 directive was issued. In the meantime, notice and

6    comment would have given IHEs, students, faculty, and staff, the opportunity to weigh-in on an

7    action that has profound health, educational, and financial impacts.

8    **II.    PLAINTIFF SATISFIES THE REMAINING FACTORS FOR A PRELIMINARY INUNCTION**

9         **A.    Plaintiff Will Suffer Irreparable Harm**

10        The July 6 Directive will have an immediate and detrimental impact on California IHEs'

11   missions and commitment to serving all student populations, and their limited financial resources

12   at a time they are experiencing unprecedented disruptions as a result of the COVID-19 pandemic.

13   The State has a strong interest in the well-being of its students, who are undeniably harmed by the

14   rescission. *See Washington v. Trump*, 847 F.3d 1151, 1159, 1169 (9th Cir. 2017) (states suffered

15   irreparable injuries due, in part, to injuries to university students stemming from a ban restricting

16   foreign nationals from seven countries from entering the United States).

17        As discussed *supra*, Defendants' actions threaten international students' ability to

18   continue their education, sometimes when they are just units away from graduation, which has

19   life-altering personal and professional consequences from which are difficult to recover. *See e.g.*,

20   Wrynn Decl. ¶ 20; Winner Decl. ¶¶ 10-11, 15. This "loss of opportunity to pursue one's chosen

21   profession constitutes irreparable harm." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th

22   Cir. 2017). The emotional and psychological injuries to students grappling with the sudden and

23   unexpected threat to their visa status and professional future, also constitute irreparable harm.

24   Rodriguez Decl. ¶ 27; Winner Decl. ¶ 15.; *see Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840

25   F.2d 701, 710 (9th Cir. 1988); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1192 (N.D. Cal. 2015).

26        While the majority of California IHEs plan to offer a small portion of in-person courses

27   this fall, these courses likely are not numerous enough to meet the in-person enrollment

28

requirements of all international students, and the plans to offering limited in-person planning did not account for the unexpected July 6 directive. *See e.g.*, Wrynn Decl. ¶ 21; Hetts ¶ 16-17. The loss of these students would impair Plaintiff's investment in its international students and the academic and research missions of the IHEs, including their mission to enrich their student bodies with a diversity of perspectives—injuries which are irreparable. *See e.g.*, Wrynn Decl. ¶ 23; Hetts Decl. ¶¶ 8, 23; *see also Washington*, 847 F.3d at 1159, 1168-69 (injuries to "teaching and research missions" of universities constituted substantial and irreparable injuries); *Regents of the Univ. of Cal. v. DHS*, 279 F. Supp. 3d 1011, 1046 (N.D. Cal. 2018), *rev'd in part on unrelated grounds*, *Regents*, 140 S. Ct. 1891 (2020 (university and entity plaintiffs "demonstrated that they face irreparable harm as they begin to lose valuable students . . . in whom they have invested" and harm to their "organization interests" from DACA rescission).

Additionally, injuries to "sovereign interests and public policies" are irreparable. *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001). The California Legislature established policies designed to make public higher education systems accessible to international students. *See, e.g.*, Cal. Educ. Code § 66015.7(a) (all IHEs in California are encouraged to "develop…programs that support…the exchange of Californians and international students and scholars"). California has created programs to provide specialized support and services to its international students, reflecting the commitment to provide a welcoming environment for those individuals. *See, e.g.*, *id.* § 66015.7; *see also,* Vurdien Decl. ¶ 8 Hope Decl. ¶ 8. Those investments are undermined if current international students cannot continue their education, or prospective students are dissuaded from applying or attending due to the July 6 Directive.

In order to avoid the irreparable harm caused by losing their international students, California IHEs would have to add additional in-person classes which come with the cataclysmic risk of COVID-19 exposure, which would also irreparably harm the State. Adams Decl. ¶ 11; Watt Decl. ¶ 23; *State v. Bureau of Land Mgmt.*, 286 F. Supp. 3d 1054, 1074 (N.D. Cal. 2018) (finding irreparable harm from agency rule that "will have substantial detrimental effects on public health"). Whatever choice California IHEs make, they will be harmed. *See Am. Trucking*

23

1    *Ass'n v. City of Los Angeles*, 559 F.3d 1046, 1057-58 (9th Cir. 2009) (forcing a Hobson's choice

2    on a party is irreparable harm).

3          The decisions made in the next few weeks by international students and California IHEs

4    will have irreparable consequences on their campus communities, including the immediate loss of

5    valued students and/or the public health risk of exposure to COVID-19. In this situation, "[a]

6    delay, even if only a few months, pending trial represents precious, productive time irretrievably

7    lost." *Chalk*, 840 F.2d at 710.

8          **B.     The Public Interest Weighs Heavily in Favor of Provisional Relief**

9          The final two *Winter* factors – balance of the equities and the public interest – merge where

10   the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In assessing these factors,

11   courts consider the impacts of the injunction on nonparties as well. *See League of Wilderness*

12   *Defs./Blue Mountains Biodiversity Project v. Connaughton,* 752 F.3d 755, 766 (9th Cir. 2014).

13   The public interest in curbing the COVID-19 pandemic weighs overwhelmingly in favor of an

14   injunction here. As discussed *supra*, the COVID-19 pandemic is worsening *daily* in the U.S.,

15   including in California. The July 6 Directive threatens mass exposure to COVID-19 by

16   compelling IHEs to expand in-person learning, and forcing students to attend courses in-person or

17   travel to their home countries. *See e.g.*, Watt Decl. ¶ 24; Kodur Decl. ¶ 24; Hope Decl. ¶ 13;

18   Miner Decl. ¶ 16; Rodriguez Decl. ¶ 21. Preventing the illness, or death, of an innumerable

19   amount of people in the State, nation, and worldwide is in the public interest.

20          Supporting students' education is also in the public interest. *Meyer v. Nebraska*, 262 U.S.

21   390, 400 (1923) ("The American people have always regarded education and acquisition of

22   knowledge as matters of supreme importance which should be diligently promoted."). Many

23   international students invested years in their educations in the U.S., and the July 6 Directive

24   deprives them of the opportunity to complete their studies. *See e.g.*, Winner Decl. ¶¶ 11, 15;

25   Kodur Decl. ¶13, The loss of international students' invaluable global perspective will reduce the

26   quality of all students' education. *See e.g.*, Rodriguez Decl. ¶ 10; Hope Decl. ¶ 8; Knox Decl. ¶

27   18. Fiscally, the loss of tuition from their disenrollment forces IHEs to make difficult choices

28

1    about courses and student services to cut for all students. *See e.g.*, Wells Decl. ¶ 9; Hetts Decl. ¶

2    21.

3         The public interest is further served by preserving the status quo. *Chalk.*, 840 F.2d at 704.

4    The March 13 Guidance is the status quo, *i.e.*, "the last uncontested status that preceded the

5    parties' controversy."  *Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*,

6    448 F. 3d 1118, 1124 (9th Cir. 2006). Nearly 24 CSUs and 114 community colleges prepared for

7    predominantly online instruction in reliance of that March 13 Guidance. *See e.g.*, Wrynn Decl. ¶

8    11; Rodriguez Decl. ¶ 16. And countless students relied on the March 13 Guidance in making

9    their plans for the fall semester. *See e.g.*, Rodriguez Decl. ¶ 25; Wrynn Decl. ¶ 19.

10        While the July 6 Directive has already created chaos and inflicted harm on international

11   students and IHEs alike, Defendants are in "no way harmed by issuance of a preliminary

12   injunction which prevents the [federal government] from enforcing restrictions likely to be found

13   [unlawful]." *See Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (internal

14   citations omitted). Here, an injunction prevents Defendants from enforcing an action that violates

15   the APA. *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) ("The public interest is served by

16   compliance with the APA . . ."). An injunction would only require Defendants to permit the same

17   exemptions for the "duration of the emergency" that it provided in the March 13 Guidance.

18   Preventing Defendants from enforcing their unlawful and arbitrary rescission of those exemptions

19   in the middle of an escalating pandemic weighs sharply in favor of provisional relief.

20                                    **CONCLUSION**

21        For the foregoing reasons, Plaintiff requests this Court grant its Motion.

22

23

24

25

26

27

28

1   Dated:  July 13, 2020                          Respectfully Submitted,

2                                                  XAVIER BECERRA
                                                   Attorney General of California
3                                                  MICHAEL L. NEWMAN
                                                   Senior Assistant Attorney General
4                                                  DOMONIQUE C. ALCARAZ
                                                   JASLEEN SINGH
5                                                  LEE I. SHERMAN

6

7                                                  */s/ Marissa Malouff*

8                                                  MARISSA MALOUFF
                                                   Deputy Attorneys General
9                                                  *Attorneys for Plaintiff*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pl's Notice of Mot. and Mot. for Prelim. Inj.; MPA in Supp. Thereof (4:20-cv-04592-JST)