1    XAVIER BECERRA
     Attorney General of California
2    MICHAEL L. NEWMAN
     Senior Assistant Attorney General
3    DOMONIQUE C. ALCARAZ
     LEE I. SHERMAN
4    JASLEEN SINGH
     MARISSA MALOUFF (SBN #316046)
5    Deputy Attorneys General
       300 S. Spring St., Suite 1702
6      Los Angeles, CA 90013
       Telephone: (213) 269-6467
7      Fax: (213) 897-7605
       E-mail: Marissa.Malouff@doj.ca.gov
8    *Attorneys for State of California*

9

10                   IN THE UNITED STATES DISTRICT COURT

11               FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                            OAKLAND DIVISION

13

14   **THE STATE OF CALIFORNIA,**                Civil Case No. 4:20-cv-04592-JST

15                              Plaintiff,       **APPENDIX OF DECLARATIONS IN**
                                                 **SUPPORT OF PLAINTIFF'S MOTION**
16            v.                                 **FOR PRELIMINARY INJUNCTION**

17
     **U.S. DEPARTMENT OF HOMELAND**
18   **SECURITY; U.S. IMMIGRATION AND**
     **CUSTOMS ENFORCEMENT; CHAD F.**
19   **WOLF, in his official capacity as Acting**
     **Secretary of the United States Department**
20   **of Homeland Security; and MATHEW**
     **ALBENCE, in his official capacity as Acting**
21   **Director of U.S. Immigration and Customs**
     **Enforcement,**
22
                              Defendants.
23

24

25

26

27

28

**DECLARATIONS IN SUPPORT OF PLAINTIFF'S MOTION FOR**

**PRELIMINARY INJUNCTION**

| Exhibit Number | Declarant | Entity |
|---|---|---|
| A | Alison Wrynn, Ph.D | California State University |
| B | Bradley Wells | California State University |
| **C** | Leo Van Cleve | California State University |
| D | John J. Hetts | California Community Colleges Chancellor's Office |
| E | Judy C. Miner | Foothill-De Anza Community College District |
| F | Teresita Rodriguez | Santa Monica Community College District |
| G | Johnnie Adams | Santa Monica Community College District |
| H | Rajen Vurdien, Ph.D | San Francisco Community College District |
| I | Ryan Cornner | Los Angeles Community College District |
| J | Laura L. Hope | Chaffey Community College District |
| K | Ramon L. Knox | San Diego Community College District |
| L | James Watt, MD, MPH | California Department of Public Health |
| M | Lark Winner | United Automobile, Aerospace and Agricultural Implement Workers of America, Local 4123 |
| N | Stephen Patrick Kodur | Student Senate for California Community Colleges |

1

EXHIBIT A

1    XAVIER BECERRA
    Attorney General of California
2    MICHAEL L. NEWMAN
    Senior Assistant Attorney General
3    DOMONIQUE C. ALCARAZ
    LEE I. SHERMAN
4    JASLEEN SINGH
    MARISSA MALOUFF (SBN #316046)
5    Deputy Attorneys General
     300 S. Spring St., Suite 1702
6     Los Angeles, CA 90013
     Telephone: (213) 269-6467
7     Fax: (213) 897-7605
     E-mail: Marissa.Malouff@doj.ca.gov
8    *Attorneys for State of California*

9

10            IN THE UNITED STATES DISTRICT COURT

11         FOR THE NORTHERN DISTRICT OF CALIFORNIA

12               OAKLAND DIVISION

13

| | |
|---|---|
| **THE STATE OF CALIFORNIA** | Civil Case No. 4:20-cv-04592-JST |
| Plaintiff, | **DECLARATION OF ALISON WRYNN IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| **U.S. DEPARTMENT OF HOMELAND SECURITY U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD F. WOLF, in his official capacity as Acting Secretary of Department of Homeland Security; and MATTHEW ALBENCE, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,** | |
| Defendants. | |

I, Alison Wrynn, declare as follows:

1.      I am a resident of the State of California.  I am the Associate Vice Chancellor, Academic Programs, Innovations and Faculty Development of the California State University (CSU).

2.      I make this declaration based upon my personal knowledge, a review of records and information kept in the regular course of CSU business and made available to me in the course of my duties at CSU, and information provided to me by CSU employees including those who work under my direction and supervision and those who do not.  If called as a witness, I could and would testify competently to the matters set forth below.

3.      I have been employed as the Associate Vice Chancellor of Academic Programs, Innovations and Faculty Development since July 2019.  Before serving as Associate Vice Chancellor, I served in an administrative capacity at the CSU Office of the Chancellor from 2016-2019; as an administrator at CSU, Fullerton from 2014-2016 and as a tenured faculty member at CSU, Long Beach from 2000-2014.

4.      As part of my regular job duties as the Associate Vice Chancellor of Academic Programs, Innovations and Faculty Development, I am responsible for ensuring systemwide compliance with academic policy, state and federal laws related to higher education, and university mission; building momentum for an innovative mindset within the CSU and developing processes to implement innovative pedagogy; providing guidance to Provosts and Assistant Vice Presidents of Academic Programs on academic policy matters and questions regarding general education, curriculum development, implementation, and maintenance; as well as other matters related to academic policy and practice.

5.      I have reviewed Immigration and Customs Enforcement's (ICE) policy entitled "COVID-19: Guidance for SEVP Stakeholders," published March 13, 2020 (March 13 Guidance), and am familiar with its contents.

6.      I have reviewed the Department of Homeland Security's Broadcast Message entitled "COVID-19 and Fall 2020," issued on July 6, 2020 (July 6 Directive) and am familiar with its contents.

**CSU's Response to COVID-19 Health Risks for Students, Staff, and Faculty**

7.      Like many higher education institutions across the country, CSU responded to the COVID-19 pandemic with a massive pivot to virtual instruction and administrative operations. The decision to undergo this change was informed by guidance from local, state, and federal public health officials, including the advice of epidemiologists and infectious disease experts. CSU's 23 campuses began their transition to virtual instruction in mid-March 2020.

8.      Transitioning more than 70,000 classes to virtual instruction required the coordinated efforts of the entire CSU community.  To prepare for, and support, this new method of instruction, CSU provided various resources such as webinars, coaching, and other supports to aid faculty in adapting to new technologies.  To ensure the academic continuity of our students and address the "Digital Divide," all 23 campuses purchased and distributed laptops and tablets to students who needed them.  This accounted for 5,500 pieces of new equipment in addition to the thousands of items already on hand in campus libraries, labs, and learning centers.

9.      Vital student support services such as student advising, disability accommodations, supplemental learning resources, mental health services, medical health services, IT help desks, and international student support also moved online.  For example, campuses reported that due to the COVID-19 pandemic, many students expressed increased stress, anxiety, loneliness, lack of motivation, disappointment, anger, and other mental health concerns.  To address this, the CSU staff continued to provide counseling and other health services through virtual channels.

10.      The campuses have continued to offer primarily virtual instruction in the summer term.

**CSU Made Plans for Fall 2020 In Reliance on the March 13 Guidance**

11.      After consulting with academic researchers and public health experts who predicted a surge of COVID-19 cases in the fall and an additional wave during the first quarter of 2021, CSU decided to create a primarily virtual learning plan for fall 2020.

12.      CSU moved forward with its fall 2020 plan on May 12, 2020 in order to give faculty and staff sufficient time over the summer to make necessary preparations to deliver a rich

2

1    educational experience in the fall.  In support of that objective, throughout the summer, CSU has

2    offered—and continues to offer—training and professional development to its faculty to

3    implement best practices in virtual learning based on data-driven planning and consultation with

4    university stakeholders.

5          13.    The primarily virtual learning plan allows for variability across the 23 campuses.

6    The learning plan at any individual campus will be dependent on local public health data and

7    whether appropriate exceptions can be made for in-person learning experiences given its

8    particular circumstances and the rigor of the necessary safety standards informed by CDC and

9    local, county and state public health authorities.  This data could include rates of infection or

10   hospitalizations, availability of testing or contact tracing and other epidemiological indicators.

11         14.    Exceptions for in-person learning experiences went through a process for approval

12   dictated by the CSU Policy, Procedure, and Considerations for 2020-2021 Academic Year

13   Planning in the Context of COVID-19 (CSU Policy).[1]  Each campus submitted a proposal

14   including a list of courses for in-person instruction along with plans for how to safely deliver

15   these courses on campus.  A team of senior-level administrators at the Chancellor's Office

16   (including me) reviewed the list to ensure compliance with the policy in accordance with

17   information provided by accrediting, credentialing, and licensing bodies with respect to the

18   manner in which courses needed to be taught (e.g., nursing students are required to take a certain

19   percentage of their courses in an in-person, clinical setting).  This review was also informed by

20   guidance from the CDC, Cal OHSA, the Governor's office, and state and county health officials.

21   This group then made recommendations to the Chancellor, who made the final determination.

22         15.    Most learning experiences that may be permitted to continue in-person are

23   concentrated in STEM, Allied Health, Education and Art disciplines.  A sample of the exceptions

24   allowing for an in-person learning experiences includes: essential science laboratory classes,

25   specific senior capstone projects, clinical nursing experiences, studio time for performing and

26

27         [1] California State University, CSU Policy, Procedure, and Considerations for 2020-2021
     Academic Year Planning in the Context of COVID-19 (May 25, 2020),
28   https://tinyurl.com/CSUCOVID19Policy (last visited July 10, 2020).

1    visual arts, and hands-on interactive simulators necessary for licensure and careers in maritime

2    industry.

3         16.     Across the 23 CSU campuses, the amount of in-person classes – which are

4    concentrated in the sample of disciplines noted above – are predominantly in the 1-10 percent

5    range.  The breakdown for all but three campuses, that await final approval for their plan for the

6    fall, is as follows:

7              a.   11 campuses will have five percent or less in-person classes;

8              b.   6 campuses will have five to 10 percent in-person classes;

9              c.   One campus will have 10.5 percent in-person classes;

10             d.   One campus will have 18.7 percent in-person classes; and

11             e.   One campus will have 34 percent in-person classes due to a high number of

12                  environmental, forestry and other science-based lab courses.

13   **The July 6 Directive Harms CSU's Student Body and Academic Mission**

14        17.     CSU specifically chose to move forward with a primarily virtual learning plan

15   because it would allow it to advance its academic mission while at the same time safeguarding the

16   health and well-being of their staff, students, and faculty.  Course selection was based on those

17   courses that were incapable of being offered virtually and that could be delivered safely in person.

18   In creating its fall 2020 plan, CSU relied on ICE's representations in the March 13 Guidance that

19   the COVID-19 in-person learning exemptions for F-1 students would be in effect for the duration

20   of the emergency. CSU had no reason to expect that ICE would rescind those exemptions as

21   pandemic continues, and COVID-19 cases rise throughout the United States, including in

22   California.  The July 6 Directive significantly disrupts CSU's fall 2020 plans, only weeks before

23   the academic year is scheduled to start as early as August 18, 2020.

24        18.     Prior to the July 6 Directive, an estimated 10,300 F-1 students were enrolled for

25   fall 2020, and the CSU anticipated 3,000 to 4,000 additional enrollments.  These invaluable

26   members of the 23 campuses come from all over the world; the top 10 most represented countries

27   are China, India, Vietnam, Kuwait, Saudi Arabia, South Korea, Japan, Taiwan, Germany, and the

28   United Kingdom.  These students enrich the educational experience of all CSU students.

4

19.     Students currently in the United States who, as a result of the July 6 Directive, will be forced to leave the CSU and likely the United States, may face significant barriers to return to their home countries.  The second largest group of F-1 students come from India.  Currently, there are no flights available to India, and India has a waitlist for evacuation flights from the U.S. back to India.  Other students from Europe may be unable to return to their home countries where travelers from the U.S. may be banned, resulting in a significant shortage of flights to these countries.  Yet, other students who may have traveled back to their home countries in reliance on the March 13 Guidance are now scrambling to change their courses and find flights back into the U.S., only to discover that they are unable to do either.

20.     CSU's international students will face significant disruption to the educational endeavors.  Students who have invested several years towards graduation are now at risk of not being able to complete their studies.  These students may also lose out on Optional Practical Training and other gainful employment opportunities upon graduating from one of the 23 CSU campuses.

21.     The July 6 Directive, pressures all 23 campuses to review course scheduling and capacity, and determine if adjustments can be made to on-campus plans so as to provide a greater number and selection of in-person course offerings, including those that are not in accordance with existing policy because they can be effectively and safely delivered in a virtual environment. The number and selection of approved in-person courses to be offered at each campus in the fall 2020 term took into account (among other things) the anticipated density level for a particular course as well as the effect that the course offering would have on overall density on campus, that is, how many persons would be present during a course and how many persons would be on the campus at one time.

22.     Last minute adjustments to in-person class options, as is contemplated by the July 6 Directive, in many academic disciplines will be extremely difficult, and perhaps realistically impossible to accomplish.  Adding in-person class options at this juncture would require each campus to revise and resubmit its plans for how to safely deliver in-person courses on campus and in the process, potentially reduce the number of previously approved courses to reduce

5

1    density or address space limitations.  Campus plans would once again need to be reviewed and

2    analyzed by the team of senior-level administrators at the Chancellor's Office before being

3    referred to the Chancellor for his approval.  Because of the difficulty in adding new classes at this

4    late juncture, and the added pressure on international students to attend in-person classes because

5    of the July 6 Directive, the consequence will be an increased demand for the relatively few in-

6    person classes that CSU campuses will be holding.  In order to accommodate this increased

7    demand for F-1 students to attend class in-person, CSU would need to approve classes with

8    greater density, which could pose a risk to the public health during the pandemic.

9        23.    The July 6 Directive impedes CSU's steadfast commitment to inclusive excellence

10    as it forces CSU to make the impossible choice in the face of a global pandemic between the

11    inclusion of its international students and the safety and health of all of its students, faculty, and

12    staff.

6

I declare under penalty of perjury under the laws of the United States and State of California that the foregoing is true and correct, and that this declaration was executed on July 13, 2020 in Long Beach, California.

_____

Alison Wrynn, Ph.D.

# EXHIBIT B

1   XAVIER BECERRA
    Attorney General of California
2   MICHAEL L. NEWMAN
    Senior Assistant Attorney General
3   DOMONIQUE C. ALCARAZ
    LEE I. SHERMAN
4   JASLEEN SINGH
    MARISSA MALOUFF (SBN #316046)
5   Deputy Attorneys General
      300 S. Spring St., Suite 1702
6     Los Angeles, CA 90013
      Telephone: (213) 269-6467
7     Fax: (213) 897-7605
      E-mail: Marissa.Malouff@doj.ca.gov
8   *Attorneys for State of California*

9

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                       OAKLAND DIVISION

13

14   **THE STATE OF CALIFORNIA,**                Civil Case No. 4:20-cv-04592-JST

15                              Plaintiff,       **DECLARATION OF BRADLEY WELLS
                                                 IN SUPPORT OF PLAINTIFF'S**
16              v.                               **MOTION FOR PRELIMINARY
                                                 INJUNCTION**
17
     **U.S. DEPARTMENT OF HOMELAND**
18   **SECURITY; U.S. IMMIGRATION AND**
     **CUSTOMS ENFORCEMENT; CHAD F.**
19   **WOLF, in his official capacity as Acting**
     **Secretary of Department of Homeland**
20   **Security; and MATTHEW ALBENCE, in**
     **his official capacity as Acting Director of**
21   **U.S. Immigration and Customs**
     **Enforcement,**
22
                             Defendants.
23

24

25

26

27

28

I, Bradley Wells, declare as follows:

1.      I am a resident of the State of California.  I am the Associate Vice Chancellor, Business and Finance, of the California State University (CSU).

2.      I make this Declaration based upon my personal knowledge, a review of records and information kept in the regular course of CSU business and made available to me in the course of my duties at CSU, and information provided to me by CSU employees including those who work under my direction and supervision and those who do not.  If called as a witness, I could and would testify competently to the matters set forth below.

3.      I have been employed by the California State University, Office of the Chancellor as Associate Vice Chancellor, Business and Finance since May 15, 2015.  Before serving at the Office of the Chancellor, I served as the Vice President for Finance and Administration and Chief Financial Officer at California State University, East Bay from 2011 to 2015.

4.       As part of my regular job duties as Vice Chancellor, I am responsible for developing and implementing systemwide policy and advising and supporting campus activities in the areas of budget, accounting, financing, risk management, capital development, information technology, and financial reporting.

5.      I have reviewed U.S. Immigration and Customs Enforcement's (ICE) policy entitled "COVID-19: Guidance for SEVP Stakeholders," published March 13, 2020 (March 13 Guidance), and am familiar with its contents.

6.      I also have reviewed ICE's Broadcast Message entitled "COVID-19 and Fall 2020," issued on July 6, 2020 (July 6 Directive), and am familiar with its contents.

7.      Prior to the issuance of the July 6 Directive, CSU estimated that approximately 14,000 international students would enroll in one of CSU's 23 campuses this fall.  The forecasted revenue from international students enrolled and expected to enroll in academic year 2020-2021 totaled over $260 million.  This revenue would have contributed approximately four percent of the total annual operating budget of the CSU system.  This loss is particularly significant, as it comes atop a state budget reduction of $324 million to the CSU system.  Tuition from international students is used by the CSU for the benefit of the whole campus community to pay

1

1   operating costs of the university including faculty and staff salaries and benefits, utilities,

2   information technology costs, library materials and services, general administrative costs, capital

3   debt service, and other typical administrative and operational expenses.

4          8.      The July 6 Directive casts significant uncertainty upon CSU's expected enrollment

5   of international students and their revenue streams.  While nearly all CSU campuses will operate

6   a combination of in-person and virtual instruction, most campuses have planned to, and will,

7   conduct 10 percent or less of their classes in-person.  Because of the limited number of scheduled

8   in-person classes, the existing risk of exposure to COVID-19 and the timing of the July 6

9   Directive, many F-1 students will not be in a position to attend an in-person class on their

10  campus.

11         9.      With the July 6 Directive coming just weeks before the start of the 2020-2021

12  school year, ICE's actions may result in the dis-enrollment of a substantial number of CSU's

13  international students, and consequently, the CSU stands to suffer a significant loss of revenue to

14  a budget that was signed by the governor on June 29, 2020.

15         10.     I have reviewed the Declaration of Leo Van Cleve in Support of Plaintiffs' Motion

16  for Preliminary Injunction and am familiar with its contents.  I have analyzed the administrative

17  burdens discussed by Mr. Van Cleve as a direct result of the July 6 Directive.  Given the timing of

18  the July 6 Directive, CSU is not able at this time to estimate the substantial number of work hours

19  that would be expended or the amount of costs that would be incurred.  However, rough estimates

20  of the time required for the tasks outline in Mr. Van Cleve's Declaration, including submitting

21  each campus's operational plan, inputting and monitoring student enrollment in in-person classes,

22  and re-issuing Forms I-20, suggests between three and five hours per international student.  At an

23  average administrative salary and benefit rate of $32.93 an hour, the cost of the imposed

24  administrative burden placed on CSU staff by the July 6 Directive is estimated to range from a

25  low of $1,460,000 to $2,433,000.  This estimate does not include the time that would be spent by

26  campuses revising their in-person instruction plans for fall 2020, nor the time required for the

27  Chancellor and his senior administrative team to review and consider any such revised plans.

28

1    I declare under penalty of perjury under the laws of the United States and State of

2    California that the foregoing is true and correct, and that this declaration was executed on <u>July 12</u>

3    <u>2020</u> in <u>Long Beach</u>, California.

4

5

6    _____

7    Bradley Wells

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT C

1   XAVIER BECERRA
    Attorney General of California
2   MICHAEL L. NEWMAN
    Senior Assistant Attorney General
3   DOMONIQUE C. ALCARAZ
    LEE I. SHERMAN
4   JASLEEN SINGH
    MARISSA MALOUFF (SBN #316046)
5   Deputy Attorneys General
     300 S. Spring St., Suite 1702
6    Los Angeles, CA 90013
     Telephone: (213) 269-6467
7    Fax: (213) 897-7605
     E-mail: Marissa.Malouff@doj.ca.gov
8   *Attorneys for State of California*

10          IN THE UNITED STATES DISTRICT COURT

11        FOR THE NORTHERN DISTRICT OF CALIFORNIA

12              OAKLAND DIVISION

| | |
|---|---|
| **THE STATE OF CALIFORNIA,** | Civil Case No. 4:20-cv-04592-JST |
| Plaintiff, | **DECLARATION OF LEO VAN CLEVE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| **U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD F. WOLF, in his official capacity as Acting Secretary of the United States Department of Homeland Security; and MATHEW ALBENCE, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,** | |
| Defendant. | |

I, Leo Van Cleve, declare as follows:

1.      I am a resident of the State of California.  I am the Assistant Vice Chancellor, International, Summer Arts, and Academic Senate of the California State University (ASCSU) Relations at the California State University (CSU).

2.      I make this Declaration based upon my personal knowledge, a review of records and information kept in the regular course of CSU business and made available to me in the course of my duties at CSU, and information provided to me by CSU employees including those who work under my direction and supervision and those who do not.  If called as a witness, I could and would testify competently to the matters set forth below.

3.      I have been employed as Assistant Vice Chancellor since July, 2016.  Before serving in this role, I served in various administrative positions at the CSU, Office of the Chancellor since August 1995 including as CSU's State University Dean of International Programs, Director of International Programs, and Associate Director of International Programs.

4.      As part of my regular job duties as Assistant Vice Chancellor, I am responsible for oversight of the systemwide International Programs, oversight of Summer Arts, providing policy advice on international issues, and acting as the Chancellor's liaison to the Academic Senate of the California State University.

5.      I have reviewed Immigration and Customs Enforcement's (ICE) policy entitled "COVID-19: Guidance for SEVP Stakeholders," published March 13, 2020 (March 13 Guidance), and am familiar with its contents.

6.      I have also reviewed ICE's Broadcast Message entitled "COVID-19 and Fall 2020," issued on July 6, 2020 (July 6 Directive), and am familiar with its contents.

**Administrative Burdens Caused by the July 6 Directive**

7.      The July 6 Directive disrupts the careful plans that CSU created for fall 2020, and imposes significant administrative burdens on the CSU.

8.      Staff must devote a great deal of time to understanding the new July 6 Directive, evaluating its applicability to students on their campus, and then educating students regarding the new policy so that the students' visas are not at risk.  All this is occurring within an impossibly

1

short time frame, not to mention during a global pandemic, given that the new ICE policy was issued only weeks before the start of the fall semester.  Staff have had to divert their time to respond to inquiries from students both still in the United States and abroad.  Students abroad had travelled back to their home countries in reliance on the March 13 Guidance exempting them from the regulatory in-person requirements for the duration of the pandemic, but now, their immigration status is uncertain just as the academic year is poised to start in August.

9.      As part of the July 6 Directive, each of the 23 campuses will need to submit an operational plan describing its plans for online and in-person instruction to ICE, by August 1.

10.      The CSU, like other higher education institutions, utilizes the Student & Exchange Visitor Information System (SEVIS) to monitor the enrollment of its international students, as required by the U.S. Department of Homeland Security.  SEVIS requires that students be enrolled full-time (equivalent to 12 units) and that higher education institutions input and monitor students' enrollment status.  The July 6 Directive now tasks CSU staff with additional monitoring responsibilities to ensure compliance with the new in-person course requirements set out in the Directive.  Staff will now be required—within a matter of weeks—to review each student's record to not only ensure that students are enrolled in a full-time course load, as normally required, but also to confirm that each international student has enrolled in an in-person course. Staff will then be required to periodically follow up with students to assure that the student has registered for the appropriate classes, and that they understand they may not drop the in-person class, or they would risk losing their visa status.

11.      ICE's July 6 Directive would require CSU to immediately take many additional administrative actions some of which can only be done on campus due to restricted access to databases remotely, at a time when most CSU employees are working from home in accordance with state public health orders.  The actions would include, but not be limited to, an individual evaluation of the status of every international student attending CSU's 23 campuses, in most cases re-issuing Forms I-20 by August 4, and addressing the needs of students who will lose legal status including any who may currently be barred from re-entering their home country.  Usually, the Form I-20 is issued by an institution to an incoming international student only once, with certain

2

exceptions, and the student is required to keep this form for the duration of their education in the country.  Never before has CSU had to re-issue Forms I-20 en mass to its international students.  Higher education institutions will have to divert financial resources—already limited by the COVID-19 economic crisis—and staff to quickly coordinate the re-issuance of the Form I-20 to their thousands of F-1 nonimmigrant students.  Additionally, in the event that a return to entirely virtual instruction is required by the pandemic at some point during the semester, students will be forced to immediately return to their home country pursuant to the July 6 Directive.  CSU's international student offices would have to advise and assist international students who are required to promptly leave the county—a task made exponentially more difficult with existing travel restrictions in place because of the global pandemic.

3

1         I declare under penalty of perjury under the laws of the United States and State of

2 California that the foregoing is true and correct, and that this declaration was executed

3 on __July 12_____, 2020 in __Long Beach_____, California.

4

5

6

7 _____

8                     Leo Van Cleve

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT D

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
DOMONIQUE C. ALCARAZ
LEE I. SHERMAN
JASLEEN SINGH
MARISSA MALOUFF (SBN #316046)
Deputy Attorneys General
  300 S. Spring St., Suite 1702
  Los Angeles, CA 90013
  Telephone: (213) 269-6467
  Fax: (213) 897-7605
  E-mail: Marissa.Malouff@doj.ca.gov
*Attorneys for State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **THE STATE OF CALIFORNIA,**<br><br>Plaintiff,<br><br>v.<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD F. WOLF, in his official capacity as Acting Secretary of the United States Department of Homeland Security; and MATHEW ALBENCE, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,**<br><br>Defendants. | Civil Case No. 4:20-cv-04592-JST<br><br>**DECLARATION OF JOHN J. HETTS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

1    I, John J. Hetts, declare as follows:

2      1.  I am a resident of the State of California.  I am employed by the Foundation for

3    California Community Colleges.  I have held this position since July 1, 2019.  The Foundation is

4    the official auxiliary organization of the Board of Governors, formed "for the purpose of

5    providing supportive services and specialized programs for the general benefit of the mission of

6    the California Community Colleges."  Cal. Educ. Code § 72670.5(a).  Under the terms of my

7    employment with the Foundation, I am serving as a Visiting Executive, Research and Data, in the

8    Educational Services and Support Division in the California Community Colleges Chancellor's

9    Office.

10     2.  My principal responsibilities include oversight and management of the California

11   Community College system's use of evidence and data, including: our accountability metrics and

12   dashboards; annual reporting; evaluations of programs and interventions; and other internal and

13   external data.  I assist the Chancellor's office in meeting the informational, research, and

14   evaluative needs of the California Community Colleges, aligning those efforts to support the

15   Board of Governor's Vision for Success, which strives to improve the outcomes for the millions

16   of students who attend the California Community Colleges.

17     3.  Before my current position, I served for five years as the Senior Director of Data

18   Science at Educational Results Partnership, which manages CalPASS Plus, a voluntary,

19   educational data system for the California Community Colleges that maintains information on

20   students from K-12 schooling through college and into the workforce.  My principal

21   responsibilities in that position involved helping to improve the availability, integrity, and

22   usability of this intersegmental data and providing research support for intersegmental

23   educational research on the impacts of educational interventions, pathways, and policies.  I

24   previously served as the Director of Institutional Research at Long Beach City College, with

25   similar responsibilities for a single college as those I now hold for the California Community

26   Colleges.  I hold a doctorate in Social Psychology with a specialization in Measurement and

27   Psychometrics from UCLA and a B.A. in Psychology from Stanford University.

28     4.  I make this Declaration based upon my personal knowledge, a review of records

1

1  and information kept in the regular course of the Chancellor's Office's business and made

2  available to me in the course of my duties at the Chancellor's Office, and information provided to

3  me by other employees at the Chancellor's Office, including those who work under my direction

4  and supervision and those who do not.  If called as a witness, I could and would testify

5  competently as to the matters set forth below.

6      5.      I have reviewed Immigration and Customs Enforcement's (ICE) policy entitled

7  "COVID-19: Guidance for SEVP Stakeholders," published March 13, 2020 (March 13

8  Guidance), and am familiar with its contents.  I have reviewed ICE's Broadcast Message entitled

9  "COVID-19 and Fall 2020," issued on July 6, 2020 (July 6 Directive), and am familiar with its

10  contents.

11  **California Community Colleges Mission and Governing Principles**

12      6.      The California Community Colleges are the largest postsecondary system in the

13  United States, with more than 2.1 million students attending one of 114 colleges with campuses

14  each year, and approximately 1.5 million students who enrolled in the spring 2020 semester.  Our

15  colleges are the state's most common entry point into collegiate degree programs, the primary

16  system for delivering career technical education and workforce training, a major provider of adult

17  education, apprenticeship and English as a Second Language courses, and a source of lifelong

18  learning opportunities for California's diverse communities.

19      7.      The community colleges' primary mission, as directed by California law, is to

20  offer academic and vocational instruction at a lower division level for both younger and older

21  students to enable those students to advance California's economic growth and global

22  competitiveness.  Cal. Educ. Code § 66010.4(a)(1) & (3).  The community colleges mission

23  includes providing remedial instruction for those in need, instruction in English as a Second

24  Language, adult noncredit instruction, and support services that help students succeed at the

25  postsecondary level of education.  *Id.* § 66010.4(a)(2)(A).  The core principle surrounding these

26  missions is that higher education should be available to all, which the community college system

27  implements through a longstanding policy of full and open access to its colleges.

28      8.      Consistent with that principle, the Board of Governors has declared that the

2

1   California community colleges are committed to serving all students who can benefit from a

2   postsecondary education, without regard to race, ethnicity, national origin, or immigration status,

3   and fully supports the promotion of programs, initiatives, and policies designed to implement

4   these values of community and inclusion.  *See* Resolution of the Board of Governors No. 2017-01

5   [January 17, 2017], a true and correct copy of which is attached as Exhibit 1.  Further, the

6   California Equity in Higher Education Act establishes the policy of the State of California to

7   afford all persons equal rights and opportunities in postsecondary educational institutions,

8   including the California Community Colleges.  Cal. Educ. Code §§ 66251, 68130.5.  The State's

9   and Board's commitment to diversity, inclusion, and open access to our colleges, is supported by

10   peer-reviewed academic research that indicates that students' college experiences and educational

11   outcomes are enhanced by attending institutions with a diverse student body.  *See, e.g.*, *"Does*

12   *Diversity Make a Difference?"* American Council on Education and American Association of

13   University Professors (2000), a true and correct copy of which is attached as Ex. B; Meera E.

14   Deo, Affirmative Action Assumptions (2019) 52 U.C. Davis L. Rev. 2407, 2433 ("empirical data

15   on students in elementary school through law school have illustrated how meaningful exposure to

16   diverse students and faculty results in personal, educational, and professional benefits").

17        9.        Due to its low costs, open admissions policy, commitment to diversity, and

18   convenient locations throughout the state, California's community college system is an appealing

19   option for students seeking to advance their education, skills, and employment potential.

20   **International Students Are Valuable Members of the System's Academic Community**

21        10.        International students are integral to California Community Colleges.  In fall 2019

22   alone, 21,754 F-1 and M-1 students enrolled into classes at one of the 114 community colleges

23   statewide, representing just over $83 million in enrollment revenue alone to the colleges in the

24   system.  This $83 million also constitutes these students' investment in their education in

25   California Community Colleges.  Moreover, prior to Fall 2019, these same students had

26   previously invested over $294 million, for a total of over $376 million invested in their education

27   at one of the California Community Colleges.

28        11.        International students enrich the learning experience by bringing their first-hand

3

1    cultural experience, circumstances, and knowledge from their home country, diversifying

2    conversations and thinking, thus contributing to learning for all students that translate

3    understanding of world cultural theory into first-hand experiences. The melting pot experiences

4    that international students bring to the United States contribute to the economic growth and the

5    global nature of commerce of our country.  International Students also become "ambassadors" for

6    our country when they return to their home countries, and many continue to maintain ties in the

7    United States.  Others have gone on to create jobs by founding or co-founding companies in the

8    United States, or to work to support innovative new startups, many in the technology and science

9    sector, helping to fill the gap in STEM-talent pipeline needed to maintain the United States' lead

10   in science and innovation globally.

11   **The COVID-19 Pandemic Has Presented Unprecedented Challenges to the California**

12   **Community College System and Its Students**

13          12.     Like other educational institutions, all of the California community colleges have

14   transitioned to online delivery or have implemented social distancing guidelines for services that

15   cannot be provided online due to the COVID-19 pandemic.  The Chancellor's Office and the

16   community colleges have already made significant efforts to address the severe disruptions

17   experienced by students to enable them to meaningfully participate in online instruction.  For

18   instance, the Chancellor's Office has been working with the telecommunications industry to

19   provide internet services at no or reduced cost and computers for students who need them.

20          13.     Because of the public health risks associated with in-person education and in an

21   effort to safeguard the health and safety of students, faculty, and staff, California's community

22   colleges continued to hold virtually all online courses in summer 2020.  On June 24, 2020, the

23   Chancellor's Office released the Report on the Safe Campus Reopening Workgroup (Report),

24   attached hereto as Exhibit 2.  The Report contains a comprehensive discussion of factors

25   community colleges should weigh when considering when and how to reopen, including giving

26   particular deference to county and local officials in determining when to begin reopening,

27   limiting in-person courses and implementing an online or hybrid mode of instruction, considering

28   staggered schedules, keeping some building unoccupied, prioritizing in-person instruction for

4

Decl. of John J. Hetts in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)

1    only those courses that require laboratory or clinical experiences, and close monitoring of any in-

2    person attendance.

3          14.     The timing of each college campus reopening remains highly uncertain, and the

4    prospect of reopening to begin the fall term are diminishing.  Because the public health threat of

5    the pandemic has not subsided, but is increasing (https://covid19.ca.gov/), most or all of

6    California's community colleges must plan to continue to operate on a primarily online basis for

7    the fall 2020 semester in order to provide educational continuity and protect public safety.  In

8    addition, individual community colleges will be subject to directives from local public health

9    officials who make determinations based on current health conditions in the city or county.

10   **ICE's Rescission of the COVID-19 In-Person Learning Exemptions for International**

11   **Students Has Created Confusion and Administrative Burdens for the Entire Community**

12   **College System**

13         15.     In the midst of reviewing and ascertaining approaches to return in-person

14   instruction for institutions of higher education in a manner that protects personal health and

15   prevents the spread of COVID-19, the July 6 Directive has added another layer of confusion and

16   uncertainty, and has required staff to expend significant hours to understand the implications of

17   the new policy, and to identify the level of impact it will have on the California Community

18   Colleges system.  The Chancellor's Office has held internal meetings, and responded by email

19   and in video and telephone calls to urgent inquiries from students, college representatives, the

20   legislature, the media, and others across the state, and has briefed the President and Vice

21   President of the Board of Governors regarding the implications of the July 6 Directive, and how

22   to respond to it.  The Chancellor's Office has also created and circulated a survey to the

23   community colleges in an effort to understand the impact of the June 6 Directive.  These activities

24   have involved staff in the Government Relations, Educational Services and Support, Workforce

25   and Economic Development, Facilities and Finance, and Communications Divisions, and the

26   Executive Office, and total approximately 200 hours of combined effort.

27         16.     Individual colleges are also grappling with how to respond to the July 6 Directive,

28   and many are reevaluating whether they are able to modify plans to conduct online-only programs

5

Decl. of John J. Hetts in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)

this fall so that their international students are not forced to depart the United States.  Balanced against an interest in reopening in order to preserve the status of international students, is the shortage of available personal protective equipment (PPE) supplies and other costs that will make online instruction a more feasible option, and state and local health guidelines regarding reopening of businesses.

17.     Across the California Community Colleges, leadership (VPs, administrators, and deans), faculty, and staff have had to expend, and anticipate continuing to have to expend, substantial resources and effort to accommodate the policy change.  According to the survey conducted by the Chancellor's Office, 64 colleges indicate that if they are permitted to reopen campuses by state and local health officials, they would have to make changes to their plans in order to ensure that F-1 and M-1 nonimmigrant students retain their status under the July 6 Directive .  In addition to the significant impacts of reduced enrollments, which require revision of all college-wide budgetary planning, additional efforts and costs include, among other things, admissions staff assisting students who are able to transfer to another institution, counseling staff working to ensure students enroll in hybrid classes, emergency course conversion to hybrid formats (opening spaces, arranging faculty, arranging staff for cleaning and sanitizing), impacts on ESL department planning and staffing, re-processing/updating all SEVIS/immigration documents and ensuring and monitoring ongoing compliance with the July 6 Directive, ongoing communication to continuing and new students about compliance, additional costs of arranging enough PPE and testing for students and staff, and legal analysis around liability exposure and costs to potential severe illness or death of staff and students.  Though the total costs cannot be fully assessed at this time and many of the system's colleges are still working to estimate the full impact, colleges across the system estimate the fiscal impacts of all of this additional effort to exceed $5,000,000 with significant unknowns remaining, including sizable liability risks to the colleges.

///

///

///

**The California Community College System and Its Students Will Be Harmed by ICE's Rescission of the COVID-19 In-Person Learning Exemptions**

18.   The exclusion of up to 21,754 international students from the California Community College system as a result of ICE's rescission of the COVID 19 in-person learning exemptions will have a harmful impact on the California Community College System, its students, and its educational mission.

19.   To begin with, the eligibility restrictions will likely harm enrollment throughout community colleges in California.  Because under the July 6 Directive, F-1 and M-1 students cannot take online-only coursework and remain in the United States, many will be required to return to their home country unless California Community Colleges, contrary to the advice of public health experts, hold more expansive in-person learning during the pandemic.  Some students may not be able to continue their education from their home country due to classes taking place in a different time zone, or lack of access to technology such as laptops and internet connection.  Colleges anticipate that this will result in the substantial majority of these students withdrawing from California's community colleges.

20.   In addition, students on F-1 and M-1 visas face an intractable catch-22 caused by the policy change:  the pandemic has caused the majority of college instruction to shift online, which under this policy would result in international students losing their eligibility to remain in the United States, while at the same time, the pandemic has created substantial travel restrictions for travel from the United States which will prevent these students from leaving the country.  Colleges throughout the system report that they already know of more than 5,000 F-1 and M-1 students unable to return home because of current travel restrictions due to the pandemic.  However, we believe that this number is much higher.  Based on the distribution of the home countries of students with F-1 and M-1 visas in the California Community Colleges, and current travel restrictions from the United States confirmed using the International Air Transport Association Travel Centre's COVID-19 Travel Regulations Map[1], as of July 10, 2020, more than

---

[1] International Air Transport Association, COVID-19 Travel Regulations Map, https://www.iatatravelcentre.com/international-travel-document-news/1580226297.htm (last visited July 10, 2020).

90% of F-1 and M-1 students (more than 20,000) would face significant travel restrictions preventing their return home, if they could not meet the July 6 Directive in-person course requirements.

21.     Loss in enrollment has a negative ripple effects on the state's community colleges because 70 to 90 percent of most colleges' funding is based on factors directly related to enrollment.  As a result, colleges with significant numbers of international students will be forced to scale back their offerings, causing a shortage of available course selections for students, reduced staffing, and reduced levels of support services.

22.     This would come at the same time that the COVID-19 pandemic has led to substantial projected cuts and deferrals to the system's budget and resources for the current fiscal year and FY 2020-21.  On May 14, 2020, Governor Newsom released the May revision for the State's budget for FY 2020-21, which detailed drastic budget adjustments for the State's higher education institutions, including the California Community Colleges.  When the Governor's budget was originally released on January 10, 2020, the budget projected a $5.6 billion surplus for FY 2020-21 and $21 billion in reserves.  The Governor's May 7 budget revision now projects a $41 billion decline in revenues by the end of FY 2020-21 with a $13 billion increase in health and human services program costs and other pandemic-related expenditures, resulting in a projected budgeted shortfall of $54 billion as compared to the January budget proposal.  The May 7 Revision reduced ongoing funding for the California Community Colleges system in FY 2020-21 by approximately $1.1 billion as compared to the January budget proposal.  These projected changes will not only have an immediate impact on the California Community Colleges' programs, but are expected to continue through the next fiscal year, if not longer.  The inevitable dis-enrollment of international students caused by the July 6 Directive will make the loss of funding based on enrollment particularly harmful.

23.     The forced departure and resulting loss of international students also harms the California Community Colleges system's commitment to diversity of perspective in the classroom, and mission to ensure that students from all backgrounds succeed in reaching their goals and improving their families and communities.  This lost enrollment will also undermine

8

1   the progress toward equitable goals declared in California Community Colleges' *Vision for*

2   *Success*, which was adopted by the Board in 2017 to provide clear goals for the California

3   Community College system.  *See* Vision for Success: Strengthening the California Community

4   Colleges to Meet California's Needs (2017), a true and correct copy of which is attached as

5   Exhibit 3.  Among the goals within the *Vision for Success*, are to: (a) increase by at least 20

6   percent the number of California community college students annually who acquire associate

7   degrees, credentials, certificates, or specific skill sets that prepare them for an in-demand job; (b)

8   reduce equity gaps across of the above measures through faster improvements among traditionally

9   underrepresented student groups; and (c) reduce regional achievement gaps across all of the above

10   measures through faster improvements among colleges located in regions with the lowest

11   educational attainment of adults.  In 2017, the Board adopted all of the goals as part of the

12   objectives of the California Community College system.  ICE's rescission of the in-person

13   learning exemptions will hinder the California Community Colleges' ability to meet those goals

14   by increasing the risk that students will dis-enroll or not reach high achievement levels, even after

15   significant individual, college, and system investments in their education.

16          24.     International students also contribute meaningfully to the local community where

17   they reside while attending college.  The funds that students pay for tuition, housing, meals, and

18   other services have direct and significant impact to local economies.  The loss of economic

19   contribution to local communities will further impact the current economic situation that

20   California and the rest of the country is experiencing.  Based on college estimates of the total cost

21   of education used for reporting to the US Department of Education's Integrated Postsecondary

22   Education Data System (IPEDS) for each community college, international student in the

23   California Community Colleges spend approximately $450,000,000 annually for living expenses

24   while attending college (approximately $281 million in food and housing, $40 million in books

25   and supplies, $33 million in health insurance, and $92 million in personal, transportation and

26   other expenses).  Adding the $170 million annually across the California Community Colleges in

27   student fees, the estimated loss of revenue to California from international students attending

28   community colleges alone amounts to approximately $620 million.  The potential economic

9

Decl. of John J. Hetts in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)

1  impact of removing international students poses a significant threat to a large number of our local

2  communities and to the economic health of the entire state.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Decl. of John J. Hetts in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)

1    I declare under penalty of perjury under the laws of the United States and State of

2    California that the foregoing is true and correct and that this declaration was executed on July 12,

3    2020 in Fullerton, California

4

5

6    _____
     John J. Hetts
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

11

# EXHIBIT 1

**Resolution of the Board of Governors**
**California Community Colleges**
**No. 2017-01**

WHEREAS, the California Community Colleges system is committed to serving all students who can benefit from a post-secondary education, without regard to race, ethnicity, religion, national origin, immigration status, age, gender, language, socio-economic status, gender identity or expression, medical condition or disability; and

WHEREAS, the California Community Colleges Board of Governors has adopted a strategic plan which states, in part: "All people have the opportunity to reach their full educational potential… The Colleges embrace diversity in all its forms … All people have the right to access quality higher education;" and

WHEREAS, California's diversity is a great source of innovation and industry, making California one of the largest economies in the world and an economic engine for the United States; and

WHEREAS, approximately one tenth of California's workforce is undocumented and contributes $130 billion annually to its gross domestic product, according to the California Assembly; and

WHEREAS, great uncertainty exists about what specific immigration and education policies will be pursued by the incoming administration, and immigrants and other populations within the community college system are fearful of policies that may result in deportation or forced registration based on their religion; and

WHEREAS, over the past several weeks, the California Community Colleges Chancellor's Office has reassured students and colleges that our campuses will remain safe, welcoming places for students of all backgrounds to learn; informed them that no changes have been made with regard to admissions or financial aid; informed students that financial aid for certain undocumented students is protected by state law; called on President-elect Donald J. Trump to preserve Deferred Action for Childhood Arrivals; and joined with the University of California, the California State University and the California Community Colleges to defend the right of all students to obtain a higher education in California; now, therefore, be it

RESOLVED that the California Community Colleges Board of Governors declare that all 113 community colleges remain open, safe and welcoming to all students who meet the minimum requirements for admission, regardless of immigration status, and that financial aid remains available to certain undocumented students; and be it further

RESOLVED that the California Community Colleges Board of Governors urges the incoming administration to continue the Deferred Action for Childhood Arrivals program, which grants "Dreamers" – people who were brought to this country as children by their parents – reprieve from deportation because California and the United States are stronger due to their contributions to our economy, to our communities and to our Armed Forces; and be it further

RESOLVED that the state Chancellor's Office will not release any personally identifiable student information related to immigration status without a judicial warrant, subpoena or court order, unless authorized by the student or required by law; and be it further

RESOLVED that the state Chancellor's Office will not cooperate with any efforts to create a registry of individuals based on any protected characteristics such as religion, national origin, race, or sexual orientation; and be it further

RESOLVED that the Board of Governors and the Chancellor's Office encourage our local community college districts to ensure that all students have an opportunity to receive an education in the community college system, regardless of immigration status and any other protected status; and be it further

RESOLVED that the Board of Governors and the Chancellor's Office encourage our local community college districts to consider our system's values when responding to any request to participate in joint efforts with other government agencies to enforce federal immigration law and when responding to requests for personally identifiable student information; and be it further

RESOLVED that the California Community Colleges Board of Governors and the state Chancellor's Office will vigorously advocate at every level of government to protect our students and our system's values.

# EXHIBIT 2

# REPORT OF THE SAFE CAMPUS REOPENING WORKGROUP

**California Community College**
**Updated: June 25, 202**

Bill Rawlings, Classified, Mt. San Antonio Colle
Brian King, Chancellor, Los Rios CC
Byron Breland, Chancellor, San Jose CC
Cheryl Aschenbach, Secretary, Academic Senate for CC
Danny Thirakul, President, Student Senate for CC
Francisco Rodriguez, Chancellor, Los Angeles CC
Joe Wyse, President/Superintendent, Shasta Colle
Martha Garcia, President/Superintendent, Imperial Colle
Pamela Luster, President, San Diego Mesa Colle

Review and Feedback b
CCCCO, C

# Table of Contents

EXECUTIVE SUMMARY / CHARGE OF THE WORKGROUP ................................................................. 2

ORGANIZATION OF THE REPORT ..................................................................................................... 2

I.   A framework around indicators of when to begin to open college campuses. .................... 3

II.   Recommendations around best practices for continuing instruction with social

distancing. .......................................................................................................................................... 4

III.   Recommendations on a framework of best practices for supporting classified staff and

faculty as we reopen college campuses. .................................................................................... 11

IV.   Recommendations to the Chancellor's Office on any changes to regulations impacting

space utilization that may be required due to the anticipated social distancing protocols .... 16

V.   Recommendations on how to position our advocacy efforts to support the rapid

workforce training necessary to get Californians re-employed. ................................................. 18

VI.   Recommendations on any other guidance, frameworks, or best practices that would be

applicable to position the system to support the recovery of our communities and state. ...... 23

CONCLUSION .................................................................................................................................. 26

Resource List as of June 25, 2020 ................................................................................................. 26

# EXECUTIVE SUMMARY / CHARGE OF THE WORKGROUP

With a strong recognition that the safe and responsible reopening of college campuses will require a substantial state investment and clear guidance from state public health officials, the report presents considerations for locally governed community college districts.

On April 29, 2020, Chancellor Eloy Ortiz Oakley requested that Joe Wyse, President of the Chief Executive Officers Board for California Community Colleges, "establish and appoint a chair to lead a high-level task force to develop guidance and recommendations for the Chancellor's Office to consider in supporting districts and colleges as they plan for reopening of their campuses." Chancellor Oakley also directed the Workgroup to provide updates on recommendations to the Consultation Council with recommendations due to the Chancellor's Office by May 22, 2020.

President Wyse promptly appointed a chair and a task force in response to the charge from Chancellor Oakley. The volunteer members of the Workgroup have met regularly since their appointment and have sought feedback and insights from a variety of important groups and individuals. The full Workgroup has met with Consultation Council and the CEO Board of the Community College League of California, and also has met with leaders from across the country in states where the reopening may be happening at a faster pace than in California. Individual members of the Workgroup have also met with a broad cross-section of individuals and groups and also received countless emails with questions and issues presented. Given the short timeline, members of the Workgroup have engaged as many stakeholders as possible and devoted countless hours to this important task.

Since the charge to create a Workgroup was presented on April 29, the landscape has continued to shift on a seemingly daily basis. Many community college districts have announced an intention to move the fall semester to a predominantly online modality, as has the entire California State University system. With this seismic shift in mind, the Workgroup has focused more intently on short-term issues involving the continued transition to remote operations and online instruction within the context of broader campus reopening now likely to happen later in 2020 or in early 2021. The Workgroup recognizes that today's report represents a moment in time, and that changing circumstances could quickly result in some of the recommendations becoming outdated or no longer practical.

# ORGANIZATION OF THE REPORT

The Charge from Chancellor Oakley included six key issues for the Workgroup to address. The Report is organized in response to the issues presented. One or more members of the Workgroup prepared a section of the Report in response to each of the six issues.

# I.  A framework around indicators of when to begin to open college campuses.

The decision of when to begin opening California's community college campuses will depend upon a complex array issues that are significantly local in nature. A multitude of considerations shape planning to reopen our colleges when State and local guidance allow. A key document for the state of California is the Update on California's Pandemic Roadmap. On May 20, 2020, the Workgroup learned that the California Office of Emergency Services (Cal OES) has determined that higher education will be included in Stage 3 of the modifications of the statewide stay at home order. Stage 2 reopening is under way and varies by county . The California Department of Public Health has issued a communication that indicates that the reopening of higher education for larger scale in-person operations is not permitted in Stage 2, which includes K-12, of the state's reopening.

In short, it appears broad reopening for in-person college operations will not be permitted until a county is determined to be in Stage 3. Not all counties will move to Stage 3 at the same time as is the case in counties currently moving to Stage 2. As is the case with so many issues involving COVID-19, the criteria to allow for the transition from Stage 2 to Stage 3 are not entirely clear and continue to evolve. In addition, some on-campus activities might qualify as Stage 2 activities, so additional clarification will be needed.

In addition to the state guidance coming from OES and Governor Newsom, FEMA provides high level federal guidance in this Fact Sheet. OSHA also has guidance that can be found here. County and local officials will be crucial in the determination of when to begin the reopening process within the framework of state guidelines from the Governor and legislature as outlined in the Update on California's Pandemic Roadmap.

The following is a non-exhaustive list of items for a potential framework to consider when planning for reopening a college when a county has entered Stage 3:

1. Consider staff/faculty[1] continuing to work from home, perhaps on staggered shifts/days on site in light of the need to spread out workstations to maintain 6 feet between cubicles/work spaces.
2. Plan for a portion of employees to continue to work remotely. Employees over 65 years of age and those with underlying medical conditions will likely work remotely longer than others. An explanation of underlying medical conditions can be found on in Appendix A of the CDC's Community Mitigation Strategy.

---

[1] References to faculty throughout the report are inclusive of part-time and adjunct faculty.

3. Plan for time between uses of spaces (class offerings, use of offices, etc.) for cleaning. The CDC's has guidance for cleaning facilities on its website.
4. Evaluate the potential to add glass/plexi-glass partitions in work spaces, including labs. Such mitigation may allow faculty can oversee two rooms at once while better accommodating social distancing.
5. Plan for potential exposures of students/employees and resulting two weeks of isolation that follows.  Consider in the first stage of reopening to keep a portion of buildings unoccupied in order to shift use should an exposure occur in a newly reopened building.
6. Consider online and hybrid formats to courses, with alternating days to use larger rooms for more course sections.
7. Finally, plan for the longer term and the potential change in the situations over the coming months.  There is potential for a resurgence of the virus in the fall.  The CDC has numerous links to forecasting models. Some are suggesting social distancing may need to be in effect for 12 to 18 months. For example, see an article on the National Science Foundation's website.

## II.   Recommendations around best practices for continuing instruction with social distancing.

As the California Community College system prepares to ensure that quality instruction continues during the pandemic, the safety of students and employees is our top priority.  The following recommendations should be considered by colleges within their unique local contexts, including district collective bargaining and implemented as appropriate to their regional situations and guidance by local public health authorities.

These guidelines are based on information about COVID-19 that is known today with the understanding knowledge is evolving quickly. The guidelines are purposely broad for universal use and written with the understanding that colleges will deploy finite resources to implement guidelines.  California Community Colleges should view these guidelines and evaluate the feasibility of these recommendations in the light of their own institutional environment, community resources, public health capacity, demographics, internal resources and risk tolerance.

General considerations as suggested by the American College Health Association (ACHA) should include, but are not limited to:

- Prioritization of in-person instruction for courses with academic outcomes that cannot be measured or achieved virtually, such as performance, laboratory, and clinical experiences.

- Implementation of an online or hybrid mode of instruction for the foreseeable future. Remote options should be planned for and available in the event that a rebound in local infections necessitates continued physical distancing and to support vulnerable students and staff, students in quarantine or isolation, and students and staff who cannot physically return to campus.
- Limitation of the number of attendees for in-person courses/sections. In most cases, all in-person courses/sections should be limited and also utilize other physical distancing measures.
- Implementation of close monitoring and tracking of in-person attendance and seating arrangements to facilitate contact tracing in the event of an exposure.
- Development of a physical distancing plan for each course that includes:
  o Number of students and faculty present in each session;
  o Length of session;
  o Nature of activities;
  o Mechanisms to conduct student and faculty symptom checks;
  o Public health practices: face coverings, 6 feet of physical distancing; cough/sneeze etiquette, hand hygiene;
  o Provisions for hand sanitizer and enhanced cleaning;
  o Instructions to participants on the course-specific physical distancing protocol; and
  o Availability of remote options.
- Development of specialized plans for students who are at increased risk due to the occupational nature of their studies. Examples include health professional students and students engaged in out-of-classroom or community-based instruction. Ensure students are provided with adequate Personal Protective Equipment, supervision, and other protections based on their risk.
- Expansion of simulation experiences (if approved by accrediting body) to create clinical scenarios for health professional students to practice technical, diagnostic, and exam skills.
- Development of attendance and excuse policies that acknowledge and support students who become ill without creating barriers and without requiring unnecessary visits to health facilities for documentation of illness.
- Encourage faculty-student communication regarding health status and any changes in their ability to complete coursework and academic responsibilities.
- Identification of resources for students with learning disabilities or difficulties with remote learning platforms.

The Academic Senate for California Community Colleges in collaboration with the other stakeholders, has developed recommendations that enable colleges to offer limited face-to-face instruction safely and tactically.  In addition, specific considerations should be made depending on the discipline being taught.

In order to resume instruction securely and strategically the following considerations should be contemplated:

- Plan to limit face-to-face instruction by utilizing online and hybrid instruction. Engage with faculty to evaluate expected offerings to determine what courses must be at least partially taught on campus;
- Ensure student, faculty, and staff have access to technologies needed, including laptops, Internet access, and necessary applications, as well as IT support and training for the technologies;
- Determine feasibility of various scheduling methods for resuming instruction in courses that must have on campus elements;
- Close or restrict common areas on campus, using barriers, or increasing physical distance between tables/chairs to discourage students from congregating in high traffic areas such as bathrooms, hallways, and stairwells;
- Develop a plan for flow of students to, from, and within physical class spaces for each class hosting students;
- Maintain safety precautions in the classroom; and
- Each discipline that is difficult to convert to virtual instruction should be considered distinctly when developing a plan to safely return to campus.

**Career Technical Education**
- Review accrediting, licensure, certification, or industry requirements for performance of hands-on skills, practicum, and clinical experience;
- Evaluate the degree to which students can achieve performance-related course outcomes using at-home versus in-class materials and equipment; and
- Consider whether equipment or materials may be made available for use at home rather than in class.

**Lab Sciences**
- Review lab outcomes to determine which must be completed in an on-campus lab setting versus those that can be completed at home, simulated online or via recordings;
- Consider major prep lab courses versus general education:
  - The need for on-campus labs may be greater for major prep lab courses versus those in primarily general education courses;
- For major prep lab courses, consider beginning versus advanced lab courses:
  - Hands-on performance of key labs may be more critical in advanced lab courses while skills developed in beginning lab courses may be reviewed and reinforced in a later class; and
- Consider whether equipment or materials may be made available for use at home rather than in class.

**STEM**

- Evaluate the degree to which students can achieve course outcomes online versus in class on campus;
- Evaluate the degree to which instructional support can be provided online versus in class on campus;
- Offer proctored assessments in small groups or waves for courses where online assessment creates inequity or integrity issues;
- Consider whether necessary equipment or materials may be made available for use at home rather than in class;
- Consider phased approach to on-campus instructional support services when feasible; and
- As reopening progresses, consider use of hybrid approach for lecture delivery to spread on-campus attendance of a class of students out across two to three days (similar to science and CTE labs) while also having a portion of class delivered online.

**Visual/Performing Arts and Kinesiology**
- Evaluate the degree to which students can achieve course outcomes online versus in class on campus;
- Evaluate the feasibility of providing appropriate amounts of performance feedback in an online environment;
- Consider the needs of major requirements versus general education requirements and offering of beginning versus advanced courses;
- Consider whether equipment or materials may be checked out or purchased for use at home rather than in class; and
- As reopening progresses, consider use of hybrid approach for lecture delivery to spread attendance of a class of students out across two to three days (similar to science and CTE labs) while also having a portion of class delivered online.

**Humanities and Social Sciences**
- Evaluate the degree to which students can achieve course outcomes online versus in class on campus;
- Evaluate the degree to which instructional support can be provided online versus in class on campus;
- Consider phased approach to on campus instructional support services when feasible; and
- As reopening progresses, consider use of hybrid approach to lecture delivery to spread attendance of a class of students out across two to three days (similar to science and CTE labs) while also having a portion of class delivered online.

It is essential to determine the feasibility of various scheduling methods for resuming instruction to accommodate social distancing in courses that must include face-to-face elements. Some contemplations are depicted in this section:
- Options are dependent on faculty load and compensation considerations;

- Utilizing student attendance split across a distributed hybrid schedule (for example, 10 students each MWF @ 9am while others engage asynchronously online). May limit students to one attendance per class per week. Requires lab be set up 2-3 times each week; however, allows more time to clean between classes;
- Schedule on campus and virtual labs across a two to three-week period to limit total number of students in class at a time (for example, 1/3 of students would attend a face-to-face lab in a week while 2/3 of the students will work on a different simulated lab). May limit students to one attendance per class every 2-3 weeks.
- Schedule small group student appointments for a lab that is scheduled for an extended period on one day only. Lab setup for only a day with reset and sanitization between groups.
- As risks of transmission gradually are reduced, schedule courses (or sections of courses) back onto campus.

It is important to develop a plan for flow of students to, from, and within class spaces for each class hosting face-to-face students.  Some guidelines to consider are:
- Plans should be specific to each class and classroom space;
- Evaluate direct pathways between parking lots and classroom spaces and establish directional hallways and passageways for foot traffic, if possible, to eliminate students from passing by one another;
- Identify parking locations, waiting spaces, entry doors, exit doors and designate separate routes for entry and exit into class or classroom spaces to help maintain social distancing
- Utilize door signs and ground markers to clearly guide students, faculty, and staff safely;
- When evaluating space for 6-ft distancing, collaborate with faculty to determine the amount of individual student movement within a workstation or lab space before measuring out 6 feet;
- Consider installing plexi-glass or other dividers, utilize large tables, or use outdoor space to create physical barriers between students and between students and faculty; and
- Minimize student movement beyond workstation or lab space (for example: provide supplies at each station rather than in a central location in classroom).

It is critical to maintain safety precautions in the classroom and on site to limit a surge of COVID-19 cases on campus. Consider the following:
- Conduct health self-screenings before students and faculty leave home or conduct health screenings upon arrival to campus in a centralized location;
- Utilize masks, handwashing, and social distancing as recommended by state and local departments of public health and other guidance organizations;
- Limit sharing of equipment during a class session, and if items must be shared, then disinfect between each use;

- Include sanitation supplies in all classrooms and offices and have regular decontamination procedures for public places, including classroom and office furniture, door handles and bathroom stalls;
- Sanitize equipment and workstation or lab space between classes or when utilized by different students;
- Minimize or prohibit any student-to-student contact/interaction within the classroom environment that would necessitate less than 6 feet of spacing between participants. Have students work independently rather than in pairs or small groups;
- Embed performance of updated requirements for equipment and workstation sanitation as part of curriculum (when consistent with procedures in related industries);
- Utilize plexi-glass or other dividers and spacing between instructor station or lectern and students, and between staff and students in support services offices; and
- Determine at-home load/assignments for at-risk and immunocompromised faculty and staff (may mean splitting partial class loads between faculty).

There are a multitude of considerations to address when planning to reopen, dependent on State and local guidance.  Some additional considerations include, but are not limited to:

- Impacts of lower class sizes and use of multiple lab sessions for small groups of students as part of hybrid delivery on faculty load;
- Impacts of varied on-campus and online asynchronous class attendance requirements on student schedules;
- Needs for resources (time, personnel, equipment, supplies) to facilitate social distancing and disinfection of campus equipment and facilities when providing on-campus instruction and student services;
- Needs for expanded mental health services for students, faculty (including part-time and adjunct faculty), and staff, including online services;
- Provision or requirement of masks, gloves, and other safety equipment, is necessary to enhance the safety and well-being of students and employees; and
- Campus safety plans should address how to respond to and follow-up on occasions when students, faculty, or staff have COVID-19 symptoms, including occasions when such persons refuse to leave the class or campus.

**Comprehensive Student Support Services**

As we continue to adapt to our current environment, campus-wide preparation is the key to an organized, effective, safety-focused process of reopening. Ensuring quality instruction is offered to our students is pivotal.  However, providing comprehensive student support services play a key role in student success.  This effort will require the ongoing innovation and engagement of campus stakeholders that directly provide these services.  The following guidelines are suggested:

- Create a campus **advising** plan that leverages existing campus technologies and adopts a wraparound student services philosophy.

- Create an online clearinghouse for best practices in providing **virtual support services** and **universal design, accessibility, and accommodations** for online instruction and student services.
- Provide training for students on how to succeed in an online class and how to access virtual advising, tutoring, testing and other academic and student support services.
- Provide wrap-around services that address food and housing insecurity.
- Mental and health services are critical during this period.
- Ensure all students have access to online tutoring.
- Ensure all student support staff have access to online interaction technologies like Zoom and CraniumCafe.
- Provide robust access to online library services.
- Reconfigure library support areas and computer resources to comply with social distancing protocols, if these areas will be available to students.
- Replace paper forms with online forms that can be submitted via email or technologies.

**Access to Technology**

The COVID-19 health emergency exacerbates inequities, especially for the most vulnerable student populations, who were already under-resourced before the pandemic.  Student, staff and faculty (including part-time and adjunct faculty) access to technology is critical.  The following guidelines are provided for contemplation:

- Implement a survey of campus technology needs, with a key focus on students' needs.
- Create outdoor hotspots and partner with businesses to provide internet access; provide lists of access points to students.
- Loan laptops that meet required specifications to students in need.
- If safe, consider opening up computer labs for general use; follow cleaning and social distancing protocols.

The California School Employees Association has developed the following recommendations and considerations to ensure institutions can safely hold in-person classes and other activities when colleges reopen. While some consideration may be influences by future state guidance, many can be evaluated locally following district-level procedures.

**Cleaning and Disinfecting**

- When choosing disinfecting products, using those approved for use against COVID-19 on the Environmental Protection Agency (EPA) List N: Disinfectants for Use Against SARS-CoV-2 and follow product instructions.
- Review the CDPH guidance for K-12 schools (e.g. types of cleaning products and frequency of cleaning) https://covid19.ca.gov/pdf/guidance-schools.pdf specifying campuses should intensify cleaning, disinfection, and ventilation.
- Ensure that ventilation systems and fans operate properly and increase circulation of outdoor air as much as possible by opening windows and doors and other methods.

- Take steps to ensure that all water systems and features (e .g., drinking fountains, decorative fountains) are safe to use after a prolonged facility shutdown to minimize the risk of diseases associated with water.

**Outside Visitors**
- Review facility use agreements and establish common facility protocols for all users of the facility.
- Evaluate whether and to what extent external community organizations can safely utilize the site and campus resources. Ensure external community organizations that use the facilities also follow the college's health and safety plans and CDPH guidance.

**Staffing and Training**
- Consider staffing level needs to ensure they are sufficient to meet local facility cleanliness, physical distancing, student learning, and health and safety needs to address COVID-19.
- Campuses can locally develop and provide staff training or, should it become available, utilize state-provided training on:
    o Disinfecting frequency and tools and chemicals used in accordance with the Healthy Colleges Act, CDPR guidance, and Cal/OSHA regulations. For staff who use hazardous chemicals for cleaning, specialized training is required.
    o Symptom screening, including temperature checks.
    o Confidentiality around health recording and reporting.
    o Where applicable, training for college health staff on clinical manifestations of COVID-19 and CDC transmission-based precautions.
- District may consider designating a staff liaison or liaisons to monitor COVID-19 state and county guidance and monitor COVID-19 concerns. If such a liaison is designated, employees should know who they are and how to contact them.

## III. Recommendations on a framework of best practices for supporting the classified staff and faculty as we reopen college campuses.

The learning needs related the rapid conversion to remote instruction and services have had a significant impact on community college faculty (including part-time and adjunct faculty), classified professionals, administrators and students. In order to succeed in the current environment, and successfully return to campus,  the system must support robust assistance to all groups.

Faculty have had a daunting challenge in terms of the sudden conversion to online and remote instruction, in that for most, the courses were not designed nor being taught in that format

when the closure of colleges commenced. Colleges have ramped up support for faculty in various ways by temporarily canceling courses and offering workshops, created just in time modularized support, assigned mentors to faculty to assist in the conversion and other curated and specific approaches. Statewide professional learning opportunities have been offered through @One, 3CSN and CVC-OEI along with proprietary assistance through LMS programs. What is needed is a coordinated and specific approach statewide to address a myriad of needs. In order to create successful learning experiences, the system must braid together its current resources to provide a much larger and comprehensive support system that will:

1) Create opportunities for discipline faculty to coordinate and partner on virtual instruction. Utilize Academic senate regions and discipline structures to pair faculty with @one experts across and within disciplines.
2) Provide clearly communicated expectations for remote learning in courses that are not specifically identified as distance education.
3) Provide adequate support for courses that require demonstration of skills in a face to face format. (Sciences, CTE, Arts)
4) Assist faculty in designing flexible formats such as hybrids, all online and face to face that could potentially happen for a single course all in one semester.
5) Suspend unnecessary administrative procedures related to course approval.
6) Create a safe return to campus plan that considers physical distance, classroom design, classroom materials and faculty/student interaction from a teaching and learning perspective.

In discussions with faculty senate, 3CSN and @one, it has been noted that this is an opportunity to have faculty spend time not just discussing remote learning, but in fact improving practices across the board. In essence, the need for flexibility also lends itself to thinking about learning in all formats. Further work is necessary to assess these needs, pull together faculty experts, and launch a group that will successfully address these recommendations.

Similarly, classified professionals have the need to find tools and experiences that create equitable support for their remote work. The following are areas identified by classified professionals:

**A. Recommend Online Professional Development for classified to help with key skill building to help students and our colleges during and beyond COVID-19**: As the COVID-19 pandemic has affected in-person professional development opportunities (conferences, trainings, meetings, etc.) professional development specific to dual-platform delivery of student support services and what those services are

1. On-the-ground and in-person orientations, mentorship, advising, referrals to resources, answer questions, etc.
2. Virtual orientations, mentorship, advising, referrals to resources, answer questions, etc.

- Training related to supporting colleagues and students who have personally been affected by COVID-19 and how it impacts work and studies.
- Sensitivity training regarding COVID-19 and how differences in opinion, political affiliations, and personal experiences have shaped employees and students and how to respect our differences.
- Online professional development through Franklin Covey such as "7 Habits of Highly Effective People" or "Leading at the Speed of Trust" or similar organizations and training. Allow for extended training throughout the semester.
- Statewide online focused statewide discussion for Classified Professionals focused on best practices in areas such as student success, equity, wraparound services, etc.
- Opportunities to learn about creating healthy daily working routines, workplace set-up, and handling difficult work situations alone.

**B. Recommend advancing technology support so that classified can better serve our students.**

- Microsoft Teams, Cranium Café, Jabber, Zoom, and a host of other technology tools so that our employees can stay connected and our students can access our employees remotely.
- When we return to the campus meetings should still be held virtually when possible, so continue to build on this and strengthen our online remote working skills and tools. When we do return to the campus, in-person meetings may still be disrupted. We will need to further train our classified on remote working technology and the colleges will need to continue to look to strengthen technology tool offerings to help with serving our students, faculty and the campus community.
- Working remotely requires more effective communication, and collaboration. Support to enhance these skills in individuals may be necessary.
- Invest in software that will eliminate lines in key services (A&R, counseling, financial aid) and will send a text to the student when they are at the front of the queue.
- Increased bandwidth to support increased online presence and services.
- Training and professional help with software learning and graphic production and compliance for special populations.

Students too are significantly impacted in multiple ways in this learning environment. In a recent survey, the Student Senate surveyed students to assess their reactions and needs. By far the highest issue related to remote learning is the isolation and concomitant mental health issues, and the lack of resources or basic needs support to persist. Recommendations in the student arena are:

1) Communicate widely support for students, push intrusive student support through the LMS, through email and if available text. Create multiple live and static outreach campaigns through social media and create opportunities for feedback.
2) Create and maintain community through virtual affinity group experiences (Puente, Umoja, Next UP, Veterans, etc.)

3) Sustain operations that assess technology gaps and work with students to loan, give or make available levels of technology commensurate with expectations.
4) Create learning modules that assist students to use Canvas and other tools that will assist them in focusing on content, rather than barriers of technology.
5) Through student health systems, create open and accessible opportunities for appointments, group drop-ins and online resources for community mental health assistance.
6) Work with local student government associations to partner on messaging, support and advocacy for students.
7) Continue to advocate for financial aid reform, Cal Grant reform to provide adequate and equitable funding for community college students.

**C. Recommend online distance learning/distance student experience Professional Development for Faculty, Classified and Administrators (our entire campus community) to better serve our students.** We have been thrust into this online learning, online college experience very quickly. Many faculty have experience using Canvas for their online course offerings and some have good experience teaching online. However, the full experience of assisting students in distance learning is far beyond the class and Canvas. Considerations include:

- Develop Best Practices discussions, professional development training, and online resource guides on how to best assist our students from classroom to campus in a virtual environment. If we find the employees and the faculty returning to the campus, but the students remain mostly online, we will need to build upon our skills to best serve the students remotely to provide parallel student support and intervention services to DE learners that we provide to traditional face-to-face learners.
- Continued online training in the usage of Skype, zoom, Microsoft Teams, Cranium Café, NETTutor, etc.
- Address via survey how institutions are meeting/have met the hardware & Internet needs of students and workers. Create a plan for future semester(s).
- Software/Training: As above, with focus on gathering resource listings for both students and staff. This has been done to some degree but can be expanded.

**D. Recommend more dynamic online web presence experiences for students to find information and access to assistance.** Students are shopping around for their classes and need information quickly. A virtual campus experience that helps students navigate the campus and easily find assistance via the college website.

- Dynamic department directory.
- Add information to include Cranium Café, zoom office hour, etc. for easy access by students.
- Student self-scheduling options.
- Directory of open online office hours.
- Daily COVID updates and messages to students and employees.

**E. All Other Recommendations**

- Recommend software support to expedite in-person processes to allow for social distancing.
- Allow employees to continue working remotely or hybrid work schedule, depending on job duties.
- Schedule appointment times for students to come in, in addition to counseling services and provide Plexiglas or similar windows for key student traffic areas (A & R, Counseling, Financial Aid). The intention is for short-term use only until it is safe to remove and resume regular public contact.
- Space inventory of workspaces for adequate distancing.
- Support for staff who enforce distancing regulations (with students/community).
- Set up lounge/waiting room spaces with appropriate distancing.
- Safety communications on-campus via freestanding signs, floor decals, magnetic signs for doors, etc.
- Stagger employee work schedules to ensure people/space ratio is low and providing a safe working environment (Example: Employee A works M/W, Employee B work T/Th with rotating Fridays. Other days are remote work from home).
- Space/office inventory to determine if unused offices can be utilized for student service areas.
- Increase phone, Skype, zoom, etc. for communication between colleagues.
- Increase virtual methods in working with students.
- Ensure employees have the resources and technology to support working from home.
- Review how the distribution of CARES funds and other sources have been utilized, including response to notices over email, social media, text messaging, general adverts. Create plan for optimization.
- Increase hand sanitizer dispensers or provide additional. Add handwashing stations throughout the campus.
- Sanitation supplies/stations and proper training (as needed with equipment) available in offices for regular cleaning of surfaces.
- Provide PPE for employees. The Chancellor's Office has made a request to CalOES to provide an initial supply of face-masks to each district while local procurement efforts are implemented and while supply aligns with demand.

Further, labor partners, including the Community College Association, have provided the following recommendations and considerations to further support faculty as colleges develop and implement plans for the safe reopening of campuses. While work remains to seek statewide industry guidance, many issues can be evaluated through local shared governance and collective bargaining procedures.

**Student Experience/Equity**

- To assure student safety, PPE should be provided or available to all students when physically attending courses.
- Guidance for student safety should be considered include practices which require students to follow county healthy guidelines. Such an example can be seen in a Napa MOU which requires students to wear PPE.
- Campus areas of high student utilization should be evaluated and made available with safety protocols, including food services for students on campus, access to physical areas for studying, schoolwork, etc. (library, student center, cafeteria) and access to learning tools such as Wi-Fi, computer labs, etc.

**Collective Bargaining Issues**

Many issues surrounding the safe reopening of college campuses are subject to local collective bargaining, including but not limited to:

- Faculty (including part-time faculty) compensation for prep time for a distance learning course that is ultimately cancelled.
- Part-time faculty compensated for training and professional development.
- Faculty teaching conditions, including not requiring teaching in-person formats if faculty do not feel safe or are a high-risk population or care for people who are high-risk, at least until the state enters Stage Four of the State's plan for reopening.

## IV. Recommendations to the Chancellor's Office on any changes to regulations impacting space utilization that may be required due to the anticipated social distancing protocols

One of the units within the California Community Colleges Chancellor's office is the Facilities Planning Unit, which assists and supports the California Community Colleges' 73 districts in matters related to infrastructure and capital outlay. In short, capital outlay is money dedicated to acquiring, maintaining, building, repairing or upgrading fixed assets such as land, facilities, machinery and the like.  As part of the facilities planning, this unit maintains a Space Inventory Handbook. Within this handbook is outlined the way in which space utilization is tracked and measured, which in turn affects the eligibility of individual district's access to state bond funding for new or remodeling of facilities.

With the decisions regarding remote learning during this global pandemic, questions will arise about the way in which space utilization is tracked and measured, and the needs of colleges for physical space.  For example, will more traditional face-to-face lecture courses remain in synchronous or asynchronous formats than prior to the pandemic, either through hybrid or fully on-line formats?   If so, should this affect space utilization calculations?   Will social distancing be required/needed for more than the 2020-21 academic year?  If so, should this

need for more space per student affect space utilization calculations?  These and other questions are important to be analyzed, however, we must keep in mind that facilities planning is necessarily a long-term view – up to a 50-year horizon – as the life of a physical asset such as campus buildings are planned for decades of use.  Therefore, this Workgroup cautions that any contemplated decisions must look beyond the current crisis and anticipate the long history of operations before the crisis and examine any lasting changes to facilities needs over the next few years before making substantive changes to current facilities planning processes and regulations.

Overall, two areas are looked at in more detail below:  1) Broad issues surrounding social distancing measures and space utilization, and resulting considerations for changes to facilities planning and space utilization for the future of the community college system, and 2) broad suggestions for consideration for districts in planning for reopening campuses as safely as possible while maintaining the perspective that all operations involve managing risk.

**Social Distancing and Space Utilization**

The Center for Disease Control and Prevention's explanation of social distancing includes staying at least six feet from other people, not gathering in groups and staying out of crowded places and mass gatherings. If going out, it is recommended to wear a cloth face covering. Strict application of this guidance has dramatic effect on the ability to use many facilities and office spaces on college campuses.  Most regular classroom settings capacity drops to 25% or lower of current capacity when social distancing measures between seats and egress paths are established.  Others can drop to 10% when seating is fixed, such as in large theatre style lecture halls.  Science labs often are set up with common station areas for four to six students, which could drop to one student per area. Some office areas are designed as cubical offices, without six feet of space between them.  Other examples could be given. The following is a non-exhaustive list of considerations of the impact of social distancing on space utilization and operational costs:

1. The expected temporary application of social distancing requirements means that
   a. Space utilization goes down as students are spread out
   b. Cap/load ratio for lecture and lab space are increased
   c. Cap/load ratio for office space are increased
   d. Student areas in libraries, tutoring centers and other common areas are impacted
2. There is a request submitted prior to this crisis to the DOF to change the standard square foot per student from 15 to 20 when considering classroom space utilization, which should be approved.
3. Over time, the amount of on-line instruction and its impact on the need for classroom space should be evaluated, in balance with projected growth of enrollment over time. CTE and other lab course space utilization needs are not expected to change significantly over time as this space largely serves courses not easily done—or not

possible to do—via remote learning.  The need for common areas such as library, tutoring, and study space for students may increase, especially areas made available with high speed internet connection for students.

4. The investment into programs such as the Student Equity and Achievement Program have made investments into more student support staff and faculty.  A request was submitted prior to this crisis to the DOF to increase the office space square foot per full-time equivalent instructional staff member by 25 percent. The Workgroup recommends approval of this request by the DOF.

5. Furniture, fixtures, and equipment costs associated with construction projects may increase, as districts may plan for design changes to mitigate operational effects of future pandemics. For example, utility/internet and electronic queuing system infrastructure may be further enhanced as new and remodeling of facilities is planned.

6. Student housing needs may rise as a priority need even above current levels of discussion.  Including potential student housing for districts desiring to pursue this model may be part of future funding requests. Design of student housing may change to address potential future pandemics.

7. Finally, it should be noted that equipment and maintenance expenditures for facilities, and for districts in general, will likely rise.  Such things as regular change of HVAC filters will be accelerated, plexi-glass and other partitions built into design, barricades/gates at entrances for better access control, and costs for sanitation/cleaning supplies will increase.

This Workgroup recognizes the complexity involved in evaluating and recommending changes to space utilization regulations and procedures.  It is best not to make a hurried judgement in the midst of the crisis.  However, over the coming months, it is appropriate to task the existing facilities division of the CCCCO to engage with stakeholders to evaluate thoroughly the changes that may be needed to this important area of our system's resource planning that may be of a more permanent nature in order to make the wisest recommendations possible.

## V. Recommendations on how to position our advocacy efforts to support the rapid workforce training necessary to get Californians re-employed.

Colleges and universities have been essential partners in our nation's defense against the community spread of COVID-19 by essentially transitioning fully to distance teaching and learning, student services and business operations since mid- to late March 2020.  Our community colleges will also be essential to this state's and nation's economic recovery, and our system must leverage every resource, including robust and coordinated advocacy efforts in Sacramento and in Washington, D.C., to ensure that our role as regional economic drivers is understood, and that our voice and influence are present to continue the investment in higher education when it is needed the most.

How quickly things can change for California.  What was once projected as a historic surplus of $5.6 billion in January 2020 is now a projected historic budget deficit of $54 billion.  The budget news for California is sobering and clearly points to the unprecedented and devastating impact of the COVID-19 pandemic public health emergency on our State's challenging financial condition.  Our System Administration and every community college district are now engaged with reviewing and analyzing the 2020-21 anticipated state budget actions and its potential impact to our system of 115 community colleges, which serves 2.2 million students, and the anticipated threats to our traditional tenets of access, equity and affordability.

The COVID-19 health emergency exacerbates inequities, especially for the most vulnerable student populations, who were already under-resourced before the pandemic.  Student basic needs, such as food security, housing, employment, mental health, access to technology, and technology tools, emergency aid, have become more prevalent and disproportionately impact underserved students and communities.

In addition, we must all advocate for policies and resources that allow for the safe reopening of our community colleges in the era of COVID-19 to improve our preparedness and responsiveness that includes putting in place the infrastructure for testing, surveillance, contact tracing and our capability to handle a surge, and isolate each and every new case at the state's community colleges.

As Congress continues to work to address the COVID-19 pandemic and its economic impacts, federal investment in a comprehensive national workforce development strategy that supports workers to reenter the workforce after job loss, businesses to minimize further job loss and business closures, businesses to create new jobs, and the preparation of workers and students for both today's in-demand jobs and those leading to economic growth after the pandemic.  Reemployment, upskilling and reskilling for in-demand, living-wage jobs will be critical during the pandemic and its aftermath to ensure the best outcomes for workers and employers across the state and country.

We must engage in collective advocacy efforts for California community colleges through an equity lens and an equity mindfulness that aims to bridge the pervasive equity gap for under-resourced students and communities that is only compounded as a result of the COVID-19 pandemic.

The recommendations below serve to position our advocacy efforts to support the rapid workforce training necessary to get Californians re-employed, and to strengthen the stability and responsiveness of our system of community colleges.

**Recommendations**

1. Establish an advocacy strike team to coordinate efforts and advance key messages on behalf of the California Community Colleges that is representative of the various constituency groups, stakeholders and interests – a multi-stakeholder collaboration comprised of the state's education, government, workforce development, business, labor and community leaders.  This system is committed to developing a robust and comprehensive economic and workforce development system to meet the employment and educational needs of communities severely impacted by the pandemic, with the intent of leveraging the collective assets of its partners to create career pathways to living-wage jobs and to improving the economic and social mobility of California workers.

2. Advocate for the federal government to invest an additional $5 billion in Carl D. Perkins V funding to provide critical support to Career Technical Education (CTE) programs and allow the development of alternative online instructional modalities that integrate Artificial Intelligence solutions and Augmented/Virtual Reality technologies.  CTE programs will be essential for retraining dislocated workers and this additional funding would allow rapid delivery of this training and secure future CTE efforts to ensure workforce readiness for in-demand jobs.

3. Advocate for a comprehensive national workforce development strategy that supports workers to reenter the workforce after job loss, businesses to minimize further job loss and business closures, businesses to create new employment opportunities, and the preparation of workers and students for both today's in-demand jobs and those leading to economic growth and prosperity after the pandemic.

4. Support safety net recipients access to training and employment in family-supporting jobs and direct federal agencies to waive work requirements for accessing benefits under Temporary Assistance for Needy Families (TANF), Medicaid and other means-tested programs to ensure recipients have time to upskill and re-skill to get back into good, family-supporting jobs - including suspending a new rule that would make it harder for workers to access Supplemental Nutrition Assistance Program (SNAP) benefits for Able-Bodied Adults Without Dependents (ABAWDs).

5. Advocate for the federal government to reinvest $5 billion in the TANF Emergency Contingency Fund (TANF ECF), modernizing the program to ensure workers with the greatest skill needs have access to subsidized jobs and training to prepare for in-demand industries so recipients can receive the training and employment assistance to succeed in good, family-supporting jobs.

6. Advocate for the federal government to make an additional investment of $9 billion to the Workforce Innovation and Opportunity Act (WIOA) to ensure our public workforce

system can best serve and respond to workers and employers impacted by the pandemic.

7. Create jobs through workforce investments as part of infrastructure projects that includes workforce training and re-employment funding in federal infrastructure proposals to include comprehensive training and support services with a focus on those who have been disproportionately impacted by racial inequities in education and labor policy.

8. Support local business-led workforce strategies to avert layoffs by expanding the Work Opportunity Tax Credit (WOTC) to provide businesses with tax credit of up to $10,000 for costs associated with on-the-job learning and skills training for incumbent workers and expanding Short-Time Compensation for workers whose employers are forced to cut hours so employers can retain workers while still reducing costs and allows workers to maintain income levels without needing to access their full Unemployment Insurance benefit to which they'd be eligible if laid off completely.

9. Advocate for the federal government to incentivize higher education to respond to student, worker, and employer needs by investing $6 billion in Trade Adjustment Assistance (TAA) Community College Training Partnership grants over the next 3 years to support effective community college/business partnerships for in-demand training, including establishing apprenticeship programs and developing short-term credentials that allow for rapid re-employment. Moreover, in this time of crisis, community colleges stand ready to train the nurses, radiological technicians, respiratory therapists, EMTs, paramedics, and many others who are needed in the recovery and work on the front lines to fight COVID-19.

10. Expand access to Pell grants for high-quality short-term credentials in in-demand industries and increase the number of community college student state and federal financial aid applications through a coordinated, social media, public outreach and marketing campaign, thereby increasing the eligibility for state and federal financial aid.

11. Advocate for additional federal grants through the Department of Education and Department of Labor, that could serve as additional revenue streams for Hispanic-Serving Institutions (HSI), Minority-Serving Institutions (MSI) and workforce development and training.

12. Research and advocate for additional and potential federal legislation, such as the CARES Act II, Food for Thought Act and HEROES Act, or tax credits that could serve as additional revenue streams for student basic needs, adult workforce development, and dislocated worker employment and training.

Other general advocacy recommendations include:

13. Assure California Community College districts receive the $130.1 proposed property tax backfill, as proposed in the May Revise. the essential education functions and supports our system provides are not protected against revenue estimates that fall short. We request an automatic increase to the California Community College General Fund to backfill any shortfalls in apportionments, property taxes, and enrollment fees. Further, we seek reimbursement of enrollment fees refunded as a result of the COVID-19 pandemic.

14. Advocate for additional statutory flexibility at the state level to mitigate the adverse impacts of COVID-19, specifically to:

    a. **Student Centered Funding Formula** (SCFF)
       1. Reflect the revised 2019-20 Student Centered Funding Formula rates.
       2. Further utilize past-year data sources that have not been impacted by COVID-19 within the SCFF.
       3. Assure the extension of the SCFF hold harmless provisions for an additional two years.
       4. Require reductions to the SCFF that are necessary to balance the budget to be proportionately applied.

    b. **Student Fees**: Allow the three public segments of California higher education to use restricted fund balances, except State Lottery balances, to address COVID-19 related impacts and the loss of revenue from enterprise functions.
    c. **50 Percent Law**: Exempt direct COVID-19 related expenses incurred by Districts from the 50 Percent Law.
    d. **Career Technical Education**: Suspend procedures regarding the development of short-term career technical education courses and programs to accelerate the development and offering of these programs and courses.

15. Institute emergency and temporary regulations for maximum flexibility for meeting in-person requirements and use of remote learning and other innovative modalities to satisfy allied health accreditors, including nursing, certified nursing assistant, respiratory therapy, veterinary technology, dental hygiene, mortuary science, police and fire academies, and in-home health care providers.

16. Advocate for additional resources to improve internet functionalities and ensure enhanced broadband bandwidth capacity, robust online course delivery of virtual labs, support services, and the purchase of equipment to enable faculty and staff to move operations to an online/remote learning modality, and strengthen the core infrastructure and provide a reliable and secure platform for the increased

online/remote learning activities.  As California community college (CCC) districts and colleges transition classes and student services online in response to the COVID-19 pandemic, districts and colleges need a cohesive online infrastructure that is additive to existing infrastructure that support students, faculty, and staff.

17. Advocate for the increased funding of student basic needs such as housing and food insecurity as well as other basic needs such as transportation and childcare for under resourced members of our student community.

18. Promote more consistent access to statewide and national elected officials with a focus on providing focused and more open communication so on-going legislation will more likely be reflective of critical workforce training and recovery needs for under-served students and communities.

19. Continue to advocate for portable financial aid packages whereby a student can continue their education or job training out of state by utilizing any remaining state financial aid awards. For instance, this type of portability could be useful for African American students desiring to attend an HBCU (all HBCUs are out of state); primarily located in the southern region of the U.S.

20. The COVID-19 crisis has further exacerbated the need to provide mental health support services students. Such an need can be meet by securing ongoing mental health funding  from Proposition 63 for community colleges.

## VI.   Recommendations on any other guidance, frameworks, or best practices that would be applicable to position the system to support the recovery of our communities and state.

The following section provides some general guidance and best practices as they relate to positioning the California community college system to best create synergy, during and post COVID-19 recovery, amongst the communities it is charged to serve. The community college system is quite possibly the best strategic investment made by the state of California. They are well-positioned to provide quality education and job training opportunities to the majority of Californians. As such, these recommendations are made with the following assumptions: that risks will be reduced as there needs to be a focus on reopening safely; that we will make the recovery inclusive for the communities identified as the most vulnerable; that partnerships with business and industry should not only be strengthened but should also

be made more sustainable to better withstand the downturns; and that the recovery will need to be built upon a foundation that supports innovation as we move toward the 'new normal'.

Moreover, at the core of implementing these recommendations, an equity lens needs to be maintained as recovery work progresses and subsequent outcomes are measured. Specifically, there needs to be an approach that consistently considers, supports, and evaluates recovery strategies with a particular focus on our most vulnerable and under-served communities: low-wage workers, working poor, undocumented immigrants, seniors, and communities of color. Finally, these recommendations must be considered with the understanding that a recovery effort of this magnitude cannot be the sole responsibility of one sector and that everyone must contribute to rebuilding our communities and state, along with fortifying key public health supports and their requisite infrastructure.

**Recommendations**

1. As a best practice, the state should invest in innovative education programs, online instruction coupled to holistic student supports, career pathway-embedded credentials, and work-based learning for credit that equips students to 'earn while they learn' that can help position community college graduates to meet local workforce needs;

2. As a best practice, the state should invest more in what is currently working by providing significant capacity-building resources to community colleges across the state, opening the door for new programs and better support services;

3. As a guideline, the state should place a priority on the student success of individuals from under-resourced communities. Partnerships with social service providers can help ensure persons hardest hit by the pandemic have what they need to not only survive the virus but to thrive post – COVID-19;

4. Create consistent guidelines for employee and student self-testing, as well as establish the conditions necessary for employees to return to work or for students to return to campus after exposure to COVID-19 or recovery from illness;

5. Establish guidelines to encourage colleges to focus on brand, quality, and innovation across the system given the new virtual environment and the increased competition for California community college student enrollment in the 'on-line' market;

6. Create statewide guidelines, in partnership with labor unions, that outline best practices for flexibility for high risk employees due to them having either a pre-existing condition or working in an area of high exposure as an essential worker;

7. As a best practice encourage the development of staggering timelines for staff to return to work earlier than students in order to run through cleaning and sanitization cycles as well as proper use of PPE;

8. As a best practice, create system standards for digital transformation (e-signatures; expense management; performance evaluations, etc.) and overall remote workforce needs to set the pace for modernization and the expectations that should accompany such progress;

9. As a best practice, maintain a high-level advisory group that is composed of education, business, government and civic leaders to continually monitor the recovery efforts – current efforts are too bifurcated and can create a feeling of "information and 'webinar' overload" for community leaders;

10. As a system framework, review strategic plan (Vision for Success Goals) – what should we 'stop doing' and what should we 'start doing' in the post COVID19 environment? What should we do differently? How can we plan more for short term outcomes? For instance, there may be more immediate value in planning 6 months out rather than the traditional planning of 3 years or 5 years out;

11. As a best practice, create a dashboard that will track economic recovery efforts as they pertain to the progress made by racially minoritized and low-income populations that are shouldering the brunt of the COVID-19 impact;

12. As a guideline, utilize the strategic locations of community colleges, support the establishment of COVID19 test centers on college campuses system wide; placing a priority of communities where access to health care is limited.

13. The state and Governor's commitment to procure PPE for K-12 schools should also include an equally strong commitment to community colleges and should be funded outside of Proposition 98. Such a commitment will ensure PPE is provided for all students, faculty and staff on campus.

14. With looming budget reductions and deferrals, state leaders should partner and support California Community by creating statewide standards and consistency where

possible that are funded for implementation. Absent funding progress for a safe reopening is further delayed.

## CONCLUSION

The COVID-19 pandemic has forced California's community college to make more dramatic changes in a shorter timeframe than at any time in the history of our system. The Safe Campus Reopening Workgroup hopes that this Report provides helpful, practical information and guidelines to consider in the coming months as colleges begin the challenging process of slowly re-engaging students, employees and community members face-to-face. The Workgroup also recognizes that the Report may be in some ways dissatisfying to the extent that leaders were anticipating definitive, detailed and specific guidance on a broad array of complicated issues. The reality as of the date of the Report is that we simply do not know the answers to all the questions. In addition, the answers to the difficult questions will vary depending on local conditions.

As challenging as the last few months have been for our colleges, the day will come when we will once again be able to gather together. The road ahead will be difficult, but the planning underway and the willingness to collaborate and engage all stakeholders will allow us, as Governor Newsom frequently states, to "meet the moment."

## Resource List as of June 16, 2020

The following links are to resources as of the date of the Report. Recommendations based on these resources will be updated as the guidance evolves. Be sure to look for updated guidance and resources in this rapidly changing situation.

American Association of Community Colleges Resource Page:
https://www.aacc.nche.edu/publications-news/covid-19-updates-resources/

American College Health Association's Considerations for Reopening Higher Education Institutions:
https://www.acha.org/documents/resources/guidelines/ACHA_Considerations_for_Reopening_IHEs_in_the_COVID-19_Era_May2020.pdf

California Community College Chancellor's Office (CCCCO) Resource Page:
https://www.cccco.edu/About-Us/Chancellors-Office/Divisions/Communications-and-Marketing/Novel-Coronavirus

CCCCO Space Inventory Handbook:  https://www.cccco.edu/-/media/CCCCO-Website/Files/Finance-and-Facilities/x_space-invntry-hndbk-2007-ada.ashx

California Community College Student Senate survey on COVID-19: https://www.studentsenateccc.org/communication/covid-19-survey-report.html

California Department of Public Health website: https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx

California Department of Public Health, COVID-19 INDUSTRY GUIDANCE: Schools and School-Based Programs: https://covid19.ca.gov/pdf/guidance-schools.pdf

California Department of Public Health – Guidance for the Use of Face Coverings https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Guidance-for-Face-Coverings_06-18-2020.pdf

Community College League of California's resource page:  https://www.ccleague.org/novel-coronavirus-2019-covid-19

CDC guidance on Reopening Colleges and Universities: https://www.cdc.gov/coronavirus/2019-ncov/community/colleges-universities/considerations.html

https://www.cdc.gov/coronavirus/2019-ncov/community/colleges-universities/considerations.html

CDC Community Mitigation Strategy (appendix A has a list of underlying medical conditions): https://www.cdc.gov/coronavirus/2019-ncov/downloads/php/CDC-Activities-Initiatives-for-COVID-19-Response.pdf

CDC's Interim Guidance to Colleges and Universities: https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-administrators-college-higher-education.pdf

CDC's Guidance on Cleaning Facilities https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html

CDC's Explanation of Social Distancing: https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html

CDC's Explanation of cloth face coverings: https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/diy-cloth-face-coverings.html

CDC's Forecasting webpage: https://www.cdc.gov/coronavirus/2019-ncov/covid-data/forecasting-us.html

FEMA Resource Website: https://www.fema.gov/coronavirus

FEMA Fact Sheet on Planning Considerations for Organizations in Reconstituting Operations during the COVID-19 Pandemic: https://www.fema.gov/news-release/2020/04/30/planning-considerations-organizations-reconstituting-operations-during-covid

National Science Foundation website: https://www.nsf.gov/discoveries/disc_summ.jsp?cntn_id=300334&org=NSF

Occupational Safety and Health Administration (OSHA) COID-19 website: https://www.osha.gov/SLTC/covid-19/

OSHA Guidance on Preparing Workplaces for COVID-19: https://www.osha.gov/Publications/OSHA3990.pdf

State of California  COVID-19 website: https://covid19.ca.gov/

# EXHIBIT 3











# Vision for Success
## STRENGTHENING THE CALIFORNIA COMMUNITY COLLEGES TO MEET CALIFORNIA'S NEEDS

### EXECUTIVE SUMMARY

With low tuition and a longstanding policy of full and open access, the CCCs are designed around a remarkable idea: that higher education should be available to everyone. The CCCs are equally remarkable for their versatility. They are the state's primary entry point into collegiate degree programs, the primary system for delivering career technical education and workforce training, a major provider of adult education, apprenticeship, and English as a Second Language courses, and a source of lifelong learning opportunities for California's diverse communities.

The CCCs have made significant strides in the last five years through sustained reform efforts in the areas of student success, transfer, and career technical education. The colleges are now well-poised to build on this success and accelerate the pace of improvement.

### At the same time, the CCCs face very serious challenges today:

    

| | | | | |
|---|---|---|---|---|
| Most students who enter a community college never complete a degree or certificate or transfer to a 4-year university. Researchers project that California's public higher education system is not producing nearly enough educated graduates to meet future workforce needs. | CCC students who do reach a defined educational goal such as a degree or transfer take a long time to do so, often accumulating many excess course credits along the way. | Older and working CCC students are often left behind in the system, lacking services and financial aid that suit their needs. | CCCs are more expensive than they appear—both to students and taxpayers— because of slow time-to-completion and a lack of financial aid to cover students' living expenses. | Serious and stubborn achievement gaps persist across the CCCs and high-need regions of the state are not served equitably. |

## LOOKING AHEAD:
## GOALS FOR MEETING CALIFORNIA'S NEEDS

The success of California's broader system of higher education and workforce development stands or falls with the CCCs. To meet California's needs, the CCC system should strive to achieve the following goals by 2022:

- Increase by at least 20 percent the number of CCC students annually who acquire associates degrees, credentials, certificates, or specific skill sets that prepare them for an in-demand job.

- Increase by 35 percent the number of CCC students transferring annually to a UC or CSU.

- Decrease the average number of units accumulated by CCC students earning associate's degrees, from approximately 87 total units (the most recent system-wide average) to 79 total units—the average among the quintile of colleges showing the strongest performance on this measure.

- Increase the percent of exiting CTE students who report being employed in their field of study, from the most recent statewide average of 60 percent to an improved rate of 69 percent—the average among the quintile of colleges showing the strongest performance on this measure.

- Reduce equity gaps across all of the above measures through faster improvements among traditionally underrepresented student groups, with the goal of cutting achievement gaps by 40 percent within 5 years and fully closing those achievement gaps within 10 years.

- Reduce regional achievement gaps across all of the above measures through faster improvements among colleges located in regions with the lowest educational attainment of adults, with the ultimate goal of fully closing regional achievement gaps within 10 years.

In order to reach the ambitious system-wide goals proposed above, each college will need to do its part. Many colleges have already set goals as part of a system-wide or local effort and do not need to start from scratch—they should continue to use their goals as planned. However, every college should ensure their goals are aligned with the systemwide priorities and goals above, to ensure that the entire system is moving in a consistent direction.

## A VISION FOR CHANGE

Achieving these goals will require a combination of strategies and the coordinated efforts of tens-of-thousands of individuals both inside and outside the CCC system.

Below are **seven core commitments** the community college system can make to achieve these ambitious goals and realize its full potential to meet the future workforce needs of California:

**1 | Focus relentlessly on students' end goals.**

Getting students to their individual educational goals—whether a degree, certificate, transfer, or specific skill set—should be the explicit focus of the CCCs. More than just offering courses, colleges need to be offering pathways to specific outcomes and providing supports for students to stay on those paths until completion.

**2 | Always design and decide with the student in mind.**

Colleges need to make it easy for all students, including working adults, to access the courses and services they need. Students should not bear the burden of misaligned policies between education systems.

**3 | Pair high expectations with high support.**

Students should be encouraged to go "all in" on their education, with support to meet their personal and academic challenges. Assessment and placement practices must be reformed so that students are placed at the highest appropriate course level, with ample supports to help them succeed.

**4 | Foster the use of data, inquiry, and evidence.**

Data analysis should be a regular practice used for improving services at all levels, not a compliance activity. Decisions should be based on evidence, not anecdotes or hunches.

**5 | Take ownership of goals and performance.**

The CCC system should be rigorously transparent about its performance, own its challenges, and adopt a solution-oriented mindset to those things it can control. Goals should be used to motivate and provide direction, not punish.

**6 | Enable action and thoughtful innovation.**

Moving the needle on student outcomes will require calculated risk, careful monitoring, and acceptance that failures will sometimes happen. Innovation should be thoughtful and aligned with goals; results should be tracked early and often.

**7 | Lead the work of partnering across systems.**

Education leaders across the education systems and workforce development systems need to meet much more frequently, in more depth, and with more personnel dedicated to the task. By working together these systems can strengthen pathways for students and improve results.

In each of these areas, there are clear steps for the CCC Chancellor's Office to lead and support the work of the colleges, from modeling the kinds of organizational changes and behaviors expected at the college level to advocating for CCC students at the highest levels of state government.

## JOIN THE VISION FOR SUCCESS

The *Vision for Success* document was developed through an extensive process of research, interviewing experts and key stakeholders, and inviting all Californians to participate in a Virtual Town Hall, which led to written submissions from approximately 550 individuals. Many who participated said they believe this moment offers an opportunity for transformational change in the CCCs.

Still, this opportunity will not be realized without collective action. All personnel in the college system can embrace the seven commitments and make changes big and small that help move the system closer to its goals. All stakeholders—indeed all Californians—should also lend their support to the effort, because the success of the CCCs is essential to the success of our state as a whole.



FOUNDATION *for* CALIFORNIA
COMMUNITY COLLEGES








# VISION FOR SUCCESS

**STRENGTHENING** THE
CALIFORNIA COMMUNITY COLLEGES
TO MEET CALIFORNIA'S NEEDS



# Message from the Chancellor

It has been an honor and privilege to assume leadership of the California Community Colleges (CCCs). I appreciate the hard work of every faculty member, classified staff member, manager, and administrator in our system – your dedication to our more than 2.1 million students is inspiring. As Chancellor, my hope is to lay out a clear vision for our system, with clear goals that are centered on the current and future needs of Californians, and to lead our system toward greater success. This document, *Vision for Success*, is intended as a first step.

To create this document, our partners at the Foundation for California Community Colleges engaged a team of community college experts to review existing research and literature on the CCCs and gather input from a wide array of experts and stakeholders (SEE DETAILS ON PAGE 6). We also invited all interested Californians to participate in our Virtual Town Hall and more than 550 of you responded—including many CCC faculty, staff, and administrators who took the time to write in-depth comments. Our team read every comment and incorporated many of your thoughts and ideas into this document. Your input made it clear that our greatest asset is a committed, engaged workforce that is passionate about helping students succeed. I thank every person who participated in the development of this Strategic Vision. Your insights were invaluable.

Through these activities, the message we received is that California cares deeply about the future of its community colleges. The CCCs are seen as the state's engine of social and economic mobility. Our supporters want us to continue to afford opportunities to all who seek them, but also want us to step up the pace of improvement. They know that today's students are tomorrow's workforce, citizens, and leaders and they are worried that too few students are making it through college and achieving their dreams. I share these concerns and am ready to take bold action.

This document aims to give a clear-eyed, honest look at our performance as a system, both where we are excelling and where we are falling short. It sets out very clear goals for improvement. It also lays out a vision for success, framed as a series of seven commitments that we must make to California and to our students in order to improve—including concrete steps that I must take as Chancellor. I fully endorse the seven commitments and pledge to take the actions recommended in this document.

This Vision for Success is just the first step. In future months, I will work with the Board of Governors, my staff at the Chancellor's Office, college administrators, faculty, staff, students, trustees, and external stakeholders to translate this vision into action. I invite you to stay involved and continue to lend your voice and action toward our collective goals for improvement. We are counting on your help.

Sincerely,

Eloy Ortiz Oakley

# Acknowledgments

The Foundation for California Community Colleges is grateful to The James Irvine Foundation, the Bill & Melinda Gates Foundation, and College Futures Foundation for their generous support of this project.

This project reflects the hard work and input of many. The Foundation for California Community Colleges thanks the following individuals for their contributions:

## PROJECT LEADERS

- **Sandra Fried,** *Executive Director, Success Center for California Community Colleges,* Foundation for California Community Colleges

- **Camille Esch,** *Co-author and project manager*

- **Amy Supinger,** *Co-author and project manager*

## PROJECT ADVISORS

- **Lande Ajose,** *Executive Director,* California Competes, and *Chair,* California Student Aid Commission

- **Julie Bruno,** *President,* Academic Senate for California Community Colleges

- **Hans Johnson,** *Director,* Higher Education Center, Public Policy Institute of California

- **Alejandro Lomeli,** *Former Student Trustee,* Long Beach Community College District

- **Mojdeh Mehdizadeh,** *President,* Contra Costa College

- **Tim Rainey,** *Executive Director,* California Workforce Development Board

- **Erik Skinner,** *Deputy Vice Chancellor,* California Community College Chancellor's Office (CCCCO)

## CONTRIBUTING RESEARCHERS

- Amber Cruz-Mohring
- Brock Grubb
- Darcie Harvey
- Brian Martin-Rojas

## EXPERTS AND STAKEHOLDERS

- **Julie Adams,** *Executive Director,* Academic Senate for California Community Colleges

- **Lande Ajose,** *Executive Director,* California Competes, and *Chair,* California Student Aid Commission

- **Juliana Barnes,** *President,* Cuyamaca College

- **Jeff Bell,** *Program Budget Manager for Education,* California Department of Finance

- **Kathy Booth,** *Senior Research Associate,* WestEd

- **Julie Bruno,** *President,* Academic Senate for California Community Colleges

- **Michelle Doty Cabrera,** *Healthcare & Research Director,* SEIU California

- **Kathleen Chavira,** *Assistant Vice Chancellor for Advocacy and State Relations,* California State University Chancellor's Office

- **Laura Coleman,** *Statewide Lead,* Centers of Excellence for Labor Market Research

- **Debra Connick,** *Vice Chancellor for Technology, Research and Information Systems,* CCCCO

- **Eman Dalili,** *Student Member,* California Community Colleges Board of Governors

- **Dolores Davison,** *Professor,* Foothill College, and *Secretary,* Academic Senate for California Community Colleges

- **Cecilia Estolano,** *President,* California Community Colleges Board of Governors

- **Paul Feist,** *Vice Chancellor for Communications,* CCCCO

- **Stacy Fisher,** *Senior Director, Policy Development,* Foundation for California Community Colleges

- **John Freitas,** *Treasurer,* Academic Senate for California Community Colleges

- **Chris Ferguson,** *Principal Program Budget Analyst,* California Department of Finance Education Unit

- **Stephen Handel,** *Associate Vice President, Undergraduate Admissions at the Office of the President,* University of California

- **Judy Heiman,** *Principal Fiscal & Policy Analyst,* Legislative Analyst's Office

- **Monica Henestroza,** *Special Assistant to Speaker of the California State Assembly Anthony Rendon*

- **Robbie Hunter,** *President,* State Building & Construction Trades Council of California

- **Hans Johnson,** *Director,* Higher Education Center, Public Policy Institute of California

- **Hasun Khan,** *Student Trustee,* Berkeley City College, and *Student Member,* California Community Colleges Board of Governors

- **Brian King,** *Chancellor,* Los Rios Community College District

- **Michael Kirst,** *President,* California State Board of Education

- **Stewart Kwoh,** *President and Executive Director,* Asian Americans Advancing Justice

- **Erika Li,** *Assistant Program Budget Manager,* California Department of Finance

- **Alejandro Lomeli,** *Student Trustee,* Long Beach Community College District

- **Julia Lopez,** *Former Executive Director,* College Futures Foundation

- **Mark Martin,** *Consultant,* California Assembly Budget Subcommittee on Education Finance

- **Ana Matosantos,** *Fiscal and Policy Consultant,* Matosantos Consulting

- **Jose Medina,** *California Assemblymember*

- **Mojdeh Mehdizadeh,** *President,* Contra Costa College

- **Laura Metune,** *Vice Chancellor for External Relations,* CCCCO

- **Bryan Miller,** *Vice President of Communications and Technology,* Foundation for California Community Colleges

- **Lark Park,** *Senior Advisor for Policy,* Office of Governor Jerry Brown, and *Regent,* University of California

- **Glen Price,** *Chief Deputy,* California Department of Education

- **Tim Rainey,** *Executive Director,* California Workforce Development Board

- **David Rattray,** *Executive Vice President, Center for Education Excellence & Talent Development,* Los Angeles Area Chamber of Commerce

- **Kimberly Rodriguez,** *Senior Education Consultant to California State Senate pro Tempore Kevin de Leon*

- **Francisco Rodriguez,** *Chancellor,* Los Angeles Community College District

- **Mario Rodriguez,** *Vice Chancellor of College Finance and Facilities Planning,* CCCCO

- **Jessie Ryan,** *Executive Vice President,* Campaign for College Opportunity

- **Alma Salazar,** *Senior Vice President,* Center for Education Excellence & Talent Development, Los Angeles Area Chamber of Commerce

- **Cleavon Smith,** *Professor;* and *President,* District Academic Senate President, Peralta Community College District; and *Area B Representative,* Academic Senate for California Community Colleges

- **Erik Skinner,** *Deputy Vice Chancellor,* CCCCO

- **Paul Steenhausen,** *Principal Fiscal & Policy Analyst,* Legislative Analyst's Office

- **Theresa Tena,** *Vice Chancellor for Institutional Effectiveness,* CCCCO

- **Mollie Quasebarth,** *Analyst,* California Department of Finance Education Unit

- **Van Ton-Quinlivan,** *Vice Chancellor for Workforce and Economic Development,* CCCCO

- **Maritza Urquiza,** *Analyst,* California Department of Finance Education Unit

- **Pam Walker,** *Vice Chancellor of Educational Services,* CCCCO

- **Joe Wyse,** *Superintendent/President,* Shasta-Tehama-Trinity Joint Community College District

- **Jeannette Zanipatin,** *Legislative Staff Attorney,* Mexican American Legal Defense and Educational Fund

- **Allan Zaremberg,** *President and CEO,* California Chamber of Commerce



DE ANZA COLLEGE

CALIFORNIA'S COMMUNITY COLLEGES:
# Engine of Social and Economic Mobility

> **We are training the people who will do our jobs when we retire. Our future depends on these students having the skills they need for our workforce.**
>
> — **Cecilia Estolano**
> President, California Community Colleges Board of Governors

> **As a statewide system, we need to be doing our part to educate and create responsible citizens.**
>
> — **Dolores Davison**
> Professor, Foothill College and Academic Senate Leader

California is known throughout the world for its spirit of innovation and ground-breaking ideas. So it is no wonder that the Golden State is home to the California Community Colleges (CCCs), the most open and accessible system of higher education in the world. With low tuition and a longstanding policy of full and open access, the CCCs are designed around a remarkable idea: that higher education should be available to everyone. For centuries around the world, higher education was reserved for social elites. College was a means of reinforcing the social hierarchy and people's roles in it. California's Master Plan for Higher Education, in contrast, did something entirely different: make college fully accessible through the CCCs and provide advanced degrees through two public systems, the California State University (CSU) and the University of California (UC).

## UNIQUELY IMPORTANT TO CALIFORNIA'S FUTURE

Other states have community colleges, but California's are unique in several ways. Compared to other states, California's public higher education system relies more heavily on community colleges. Sixty percent of California undergraduates attend community colleges—14 percent more than the national average.[1] Compared to other states, California ranks 5th in the proportion of recent high school graduates who enroll in community colleges, and 47th in the proportion who enroll in 4-year universities.[2] Our system of public higher education was explicitly designed for most degree-seeking students to get their start at a CCC, making the transfer process between CCCs and public universities critically important to the overall output of the broader California system. The CCCs are also important beyond California's borders. One in five American community college students

attends a CCC, making the system a vital source of training and education for the nation's future workforce.[3]

The CCCs are equally remarkable for their versatility. In addition to being the primary entry point into **collegiate degree programs**, the colleges are also the primary system for delivering **career technical education and workforce training** to Californians, preparing individuals for skilled jobs in an ever-changing labor market. The CCCs are also a major provider of **adult education, apprenticeship, and English as a Second Language**, offering thousands of valuable work and life skills courses to adults seeking to improve their lives or reenter the education system. Finally, the colleges are a source of **lifelong learning**, offering recreation, enrichment, and exercise to California's diverse communities. These opportunities for learning, training, and civic engagement together make the CCCs a rich source of opportunity for all Californians.

Collegiate degrees, career technical education, adult education—each of these is a massive enterprise on its own. Together, they make the CCCs indispensable to California's workforce, economy, and overall welfare.

## MORE IMPORTANT NOW THAN EVER

If you are reading this document, chances are good you already hold a college degree. If you are middle aged or older, it is also likely you earn more than your parents did. For those fortunate enough to be in these circumstances, it can be easy to forget that many people today are not. Income inequality in America is growing, and compared to previous generations, fewer people are able to achieve greater economic success

than their parents.[4] The modern-day mission of the CCCs was established in 1960 by California's Master Plan for Higher Education, when upward mobility was more accessible to more people. Now, major worldwide forces like automation and globalism have permanently changed our economy and workforce, eliminating many unionized jobs that guaranteed middle-class wages but didn't require any college. Today's students face a very different job market compared to their counterparts in 1960. Now more than ever, students need quality higher education to penetrate those sectors of the job market that offer secure employment and wages sufficient to support a family.

Because they are situated at the nexus of workforce training and higher education, the CCCs are essential to preparing California's young people for this future and for helping middle-aged and older Californians navigate the changing environment of the present-day workforce. Given its size, scope, and multiple missions, the CCC system is essential to California's success as a state. With the sixth largest economy in the world, California needs well-educated workers to propel our economy forward. Just as important, California needs engaged, well-informed citizens to participate in our thriving democracy and tackle the complex issues of our state. Because of their size and reach, and the educational programs they provide, the CCCs play a critical role in preparing our citizens for these important roles.

> "The community colleges are the **premier workforce training provider** in the state. For quality training that is accessible and affordable, the CCCs can't be matched."
>
> — **Tim Rainey**
> Executive Director,
> California Workforce
> Development Board

> "Above all else, we must see the [community colleges] as the **hub of California's growth.** The vision of the future needs to recognize how central the [community colleges] are to the state's overall development as well as the individual's personal growth toward success."
>
> — **Instructor from Clovis Community College**
> via the Virtual Town Hall

## Developing the Vision

To develop this document, the Foundation for California Community Colleges engaged two experienced community college policy experts as project leaders and charged them with crafting a strategic vision that incorporated extensive input from a wide variety of sources. These sources included:

- Relevant research reports, policy analyses, and conceptual frameworks on community college reform and success, both from California and national sources;

- Approximately 50 interviews with stakeholders and experts inside and outside the CCC system, including:
  - » College CEOs;
  - » College faculty leaders, including members of the statewide Academic Senate for the CCCs;
  - » Students;
  - » Representatives of business and industry;
  - » Representatives of the state workforce development system;
  - » Representatives of social justice and advocacy groups;
  - » State Legislators and policy and finance staff at the state level;
  - » Higher education researchers; and
  - » The CCC Chancellor, Vice Chancellors, and the CCC Board of Governors President;

- Previous surveys conducted by the Chancellor's Office.

- A Virtual Town Hall, which offered all interested parties an opportunity to provide input online during the months of April and May 2017. To promote the Virtual Town Hall, the Foundation for California Community Colleges launched a social media campaign resulting in over 800,000 impressions on Facebook and other networks, over 58,000 views of the video soliciting Town Hall feedback, 12,000 unique clicks linking to the video and Town Hall submission page, and approximately 550 individuals submitting electronic comments to the Virtual Town Hall. Each of these submissions was read and coded by the research team. The key themes from these comments were included throughout this document, along with quotes from respondents' written submissions.

Prior to publication, the document was reviewed by seven project advisors (LISTED ON PAGE 2) who provided valuable feedback and advice, as well as the Chancellor and Chancellor's Office executive team and staff at the Foundation for California Community Colleges.

### HOW THIS DOCUMENT IS ORGANIZED

This document presents a vision for the future of the California Community Colleges. The first section begins with an accounting of current system performance, reviewing major achievements while also taking a hard look at the greatest challenges. The next section introduces specific goals for future improvement, focusing on the handful of outcomes that could drive needed change throughout the system. This section also discusses a number of important milestones that colleges can set and monitor at the local level.

The following section is a comprehensive vision for change, framed as a set of seven commitments that taken together can move the college system in the right direction to collectively reach our goals. The final section issues a call to action, asking the entire community of CCC stakeholders to join in this Vision for Success.



CITY COLLEGE OF SAN FRANCISCO

# Major Achievements, Major Challenges

This section strives to present a clear-eyed accounting of the current performance of the CCC system, first reviewing the system's strengths and major achievements, then continuing with a hard look at its greatest challenges.

## STRENGTHS AND ACHIEVEMENTS

The **size and scope** of the CCC system is nothing short of incredible. There are 114 CCCs across California, which last year served approximately 2.1 million students.[5] As points of comparison, the California State University (CSU) system served 465,686 students in 2015-16 and the University of California system (UC) served 251,714 students that year.[6] In the next most populous state, Texas, the public community college system served a little over 700,000 students during the same time period. By any comparative measure, the CCC system is massive.[7]

The CCCs also have one of most **diverse** student bodies of any higher education system, roughly matching the demographics of the state. According to the CCC Chancellor's Office, in 2015-16:

- 42.5 percent of students identified as Hispanic;

- 27.4 percent as White;

- 6.4 percent as African American;

- 11.6 percent as Asian;

- 3.2 percent as Filipino or Pacific Islander; and

- 3.7 percent as multi-ethnic.[8]

CCC students are diverse in many other ways too. They vary in age: about one-quarter of students are fresh out of high school and close to one-third are between the ages of 20 and 24 years old. Another one-quarter are between the ages of 25 to 39, and about 16 percent are over age 40.[9] Roughly 25 percent of CCC students are first-time students to their college while about 11 percent are returning after one or more terms of being absent.[10]

> " The most promising aspect of our California Community Colleges is the diversity—of thought, culture, experience, immigration story, sexual orientation, economic status, physical ability, and overall world view that our students bring with them to our institutions. The California Community College is a context that provides **so many different types of opportunities:** from a second chance for under-educated students to the opportunity for training in a second career. The California Community College is really a place of great opportunities for anyone who attends, regardless of the student's educational starting point. "
>
> — **Teresa Meléndrez**
> Student Services Professional,
> City College of San Francisco,
> via the Virtual Town Hall

"On the healthcare side, Community Colleges are instrumental in training our allied health professionals and for providing the career pipeline of professionals we represent. We really value the Community Colleges more than some of the private and for-profit institutions that are involved in this work. Community Colleges are a more **trustworthy institution of higher learning** because the profit motivation isn't there."

— **Michelle Cabrera**
Healthcare and Research Director,
SEIU State Council

In 2016, 42 percent of CCC students were the first in their family to attend college.[11]

CCC students also vary greatly in terms of their individual goals and reasons for stepping onto a CCC campus in the first place. Some are seeking just a few classes to build new specific skills and knowledge to qualify for a promotion, while others are starting over and looking to enter an entirely new profession. Some CCC students are returning from military service and starting their next chapter as civilians in the workforce. Some are newcomers to our country, seeking to learn English and civic competency. Still others are community members seeking everything from parenting classes, recreation and exercise, visual and performing arts, and enrichment. Not surprisingly, this broadly diverse student body arrives at the campus with varying levels of academic preparation for college. Some freshmen are just as prepared as their counterparts starting at a University of California (UC). Other CCC students are reading at an elementary-school level. While UC and CSU accept only the top performing students in the state, the CCCs accept all students, often proudly referring to their student body as the "top 100 percent."

Like their students, community colleges themselves are highly diverse. Colleges range dramatically in size and location, from urban colleges like Santa Ana College in Orange County with 62,000 students to small rural colleges like Feather River College in Quincy or Lassen College in Susanville, which serve fewer than 3,350 and 4,400 students respectively.[12] Each college in the system faces unique challenges. Small colleges sometimes struggle to implement new initiatives due to the size of their faculty, staff, and administrative teams. Colleges in large cities are often grappling with complicated community politics and tensions in addition to the normal work of teaching and learning. Churn in leadership and baby boomer retirements are a challenge in many community colleges and districts, with hiring in some areas further complicated by shallower pools of qualified applicants.

As a system, the CCCs historically have been successful at making higher education **accessible and affordable**. CCC tuition has always been among the lowest in the nation. At an annual rate of $1,380 for a full-time course load,[13] California fees are currently the lowest in the nation, with New Mexico coming in second at $1,664.[14] Even then, only about 52 percent of students pay fees;[15] the remainder qualify for means-tested Board of Governors fee waivers. This has made CCCs the most popular choice for low-income Californians: those making less than $30,000 a year are more likely to start at CCCs than other institutions.[16] The low tuition has also helped California's more advantaged populations, by making college degrees and quality technical training affordable and widely available across the state.

Because of the affordability of the CCC system, **California sends more young people to college** than other states. At last count in 2013, 46 percent of 18– to 24–year old Californians were enrolled in post-secondary education, more than the national average of 43 percent.[17]

The CCCs have also provided a **strong academic foundation** for students who go on to earn 4-year degrees at a California public university. Over half of CSU graduates and close to a third of

UC graduates started at a CCC.[18] CCC students who transfer to a CSU or UC persist and graduate at rates similar to those students who start at our public universities as freshmen.[29]

In addition to these core strengths, the CCCs have made significant strides in the last five years through **sustained reform efforts** in the areas of student success, transfer, and career technical education. With the Student Success Task Force report in 2012, the CCCs embarked on a concerted, system-wide shift toward prioritizing student outcomes. In 2010, the CCCs began a partnership with CSU to establish Associate Degrees for Transfer, which grant CCC students guaranteed admission to specific majors in the CSU system, with junior status, if they complete required coursework in defined majors and areas of emphasis. Also in 2012, the CCCs launched the *Doing What Matters for Jobs and the Economy Framework* to focus on core strategies for closing the job skills gap in California. This work was followed by the Strong Workforce initiative, which provided recommendations and strategies for an annual state investment of $200 million to bolster career technical education and aligned various funds, metrics, and data in support of the effort.

These foundational activities have provided direction to the system and resulted in a long list of positive changes. In 2017, the nonpartisan Legislative Analyst's Office listed these improvements and accomplishments in a report to the state Legislature:

- Policies to increase the number of students receiving orientation, assessment, and education plans;

- Clearer statewide transfer pathways in more than 40 majors;

- More counselors and other student success personnel;

- More student support services and student equity efforts;

- Adoption of evidence based models of basic skills assessment and instruction;

- New technology systems that help students explore careers and develop education plans; access counseling, tutoring, and student services; and track their progress toward completion; and

- Streamlined CTE pathways, support services, and contextualized basic skills instruction under the new workforce program created in 2016.[20]

These efforts have led to slow but steady upticks on indicators like course completion, persistence, and transition from remedial education to collegiate-level coursework.[21] While to date these increases in student outcomes have been incremental, the colleges are now well-poised to build on this success and accelerate the pace of improvement.

## SYSTEM-WIDE CHALLENGES

Despite the notable achievements described above, the CCCs face very serious challenges today. Despite its great size and scope, the system's overall performance lags far behind what California needs for an educated workforce and future citizenry. The world is changing dramatically around us, demanding that colleges change too. There is no doubt that educators across the CCC system are working tirelessly to teach their students and help them get ahead.

But looking across our system as a whole, there are striking signs of trouble:



### MOST COMMUNITY COLLEGE STUDENTS NEVER REACH A DEFINED END GOAL

At last count, only 48 percent of students who entered a CCC left with a degree, certificate, or transferred *after six years*.[22] (Even this rate is overstated: CCC students earning less than 6 units or students who did not attempt a math or English course within three years are not counted in this calculation.)[23] This anemic completion rate is a troubling sign for the overall health of California's higher education and workforce development system.

Several research organizations have attempted to quantify California's "degree and certificate gap"—meaning the projected shortfall between the number of educated workers needed and the number that California's institutions are expected to produce. Estimates of the gap vary due to different starting assumptions, but there is widespread agreement that California's public education system is substantially behind the curve in meeting future demand for educated workers. The Public Policy Institute of California anticipates a gap of 1.1 million bachelor's degrees by 2030.[24] If California wants to maintain a competitive edge nationally, the gap is even more stark. To be among the top ten states in educational attainment, California would need to close a gap of 2.4 million technical certificates, associates degrees, and bachelor's degrees combined by 2025.[25] Using more conservative measures of baseline degree production, the Lumina Foundation estimates California would need 3.7

million more associates and bachelor's degrees by 2025 to be internationally competitive.[26]

Across these various estimates, experts agree that too few individuals are receiving post-secondary education and training at CCCs and too few are transferring to a CSU or UC. Certainly, the state's K-12 and 4-year university systems are equally responsible for doing their part to close the degree gap, but without improvement in the all-important CCC system, California simply will not have enough educated and trained workers to sustain its future economy.



### STUDENTS WHO DO REACH GOALS TAKE A LONG TIME TO DO SO

Students who complete an associate's degree on average take 5.2 years to do so (the median time is 3.8 years). The average length of time for CCC students to transfer to a university or complete a certificate is not currently known. Because students come to the CCCs with a variety of educational goals and life circumstances, there is no specific timeframe for completion that is appropriate for every student. Still, the system-wide average is considerably longer than the two-year timeframe for degrees and transfer preparation that was expected by the architects of the system and is still envisioned by many students and their parents today. When students stay in community college for many years, they delay their entry into the workforce and miss out on income, both in the short term and over the course of their lifetimes.

Just as problematic, students often accumulate far more course units than they need to reach their identified end

goal of a degree, certificate, or transfer. While some amount of academic exploration is part of the education process, excessive accumulation of units is frequently a sign of trouble: it can mean that students could not enroll in the classes they needed for their degree or transfer, or that they lacked sufficient guidance to enroll in the right courses or find a clear academic direction in the first place. Excess units create inefficiencies and drive up costs for both the student and California taxpayers, the latter of which heavily subsidize all CCC enrollment. The more students take courses that do not move them closer to their desired degree, certificate, or transfer, the more they crowd out and slow down other students who need those same courses for reaching their own educational goals.



### OLDER AND WORKING STUDENTS ARE OFTEN LEFT BEHIND

Although open to all Californians, the CCCs were initially designed primarily to serve young people just out of high school. Adults of other ages present unique challenges and today represent a significant portion of the community college student body: over 40 percent are age 25 or older. Working adults can typically attend college only part-time. Many are bread-winners juggling the demands of work, childcare, and household, with limited time to get to school, attend class, and study at home—much less see a counselor or find a tutor. Some are transitioning back to civilian life after serving in the military (nearly 42 percent of California veterans receiving GI benefits attend a CCC).[28] Others, nearly 8 percent of CCC students, are immigrants here as legal permanent residents.[29]

Adult learners are a highly diverse group facing a wide range of challenges, from relatively common difficulties like finding child care or transportation, to much more daunting issues such as food and housing insecurity, mental health issues, and serious learning disabilities. This range of challenges requires an array of policy and programmatic responses. As a start in the right direction, many colleges have expanded access to working adults by offering courses throughout the day, week, and year, as well as offering student services and courses online. Moving forward, CCCs need systematic ways to identify the needs of adult learners and connect them with the right services on and off campus.

Improved services for working adults are not just important for the population currently enrolled in CCCs. Across California, an estimated 15 percent of working age adults, about 4.5 million people, have participated in higher education at some point but stopped out before completing a program of study.[30] In order for California to close its degree and certificate gap, this group must be recruited back into college. Likewise, adults who never entered college need multiple avenues back into education, as well as support to address the challenges that led them to leave and avoid returning to school in the first place.

One important group of adults in the CCCs are "skills builders"—adults who improve their earnings by attending community colleges for one or more courses, but don't necessarily intend to earn degree or certificate. Recently, the CCC Chancellor's Office has recognized skills builders as a unique group and has worked to track successful outcomes among them.

> " We won't close our degree attainment gap with 18-year-olds alone, and one population we haven't paid enough attention to is adults who have partially completed a degree or certificate. We don't offer financial aid for people over 28—that's an arbitrary cut off, and we need to help older adults to complete degrees and certificates. That's how you address inter-generational poverty. Educated parents will support their children's educational aspirations. "
>
> **— Lande Ajose**
> Chair, California Student Aid Commission

> " There should be no reason why enrollment in districts is either static or declining when poverty rates are increasing. Our relevance will be severely compromised unless we step back and ask why segments of the adult population are not being served. "
>
> **— Jonathan Lightman**
> Executive Director, Faculty Association of California Community Colleges, via the Virtual Town Hall

> " Look at the number of students in the community college system from underrepresented groups, especially Black and Latino students. The K-12 system already fails these students; the CCCs must provide **student-centered resources to ensure opportunities and successful outcomes** for these students. We can't afford to fail – doing so is unacceptable. "

— **Jeannette Zanipatin**
Legislative Staff Attorney, MALDEF

> " The idea the legislature has of a community college student is focused on traditional students who have just graduated from high school and are living with their parents. But our community college students are burdened with **massive non-tuition costs** like transportation, housing, and textbooks. Community colleges educate 65 percent of California's college students but only receive seven percent of Cal Grant dollars. Our students need more resources to be successful. "

— **Eman Dalili**
Student Member, California Community Colleges Board of Governors

Understanding the diverse educational goals and outcomes among adult learners is the first critical step in providing tailored coursework and services to meet their needs.



## COMMUNITY COLLEGES ARE MORE EXPENSIVE THAN THEY APPEAR

California's community colleges offer one of the least expensive tuition rates in the country. Still, the total amount of money spent by students and taxpayers to attain a particular outcome at a community college can be quite high because the average student takes several years to complete a credential, degree, or transfer and commonly accumulate many excess units along the way.

Another significant problem for students is the high cost of living in California and the limits of financial aid for CCC students. While about half of CCC students have their tuition waived, few qualify for financial aid to cover their living expenses such as transportation and textbooks. Approximately 46 percent of CCC students receive need-based financial aid, compared to about two–thirds of resident undergraduate students at UC and CSU.[31] One reason for this is that many state and federal student aid programs are structured to help full-time students and many community college students attend part time. In addition, California's CalGrant Program is less generous to CCC students, irrespective of full – or part-time status. Examining college costs around the state, The Institute for College Access and Success (TICAS) found that after factoring in financial aid, the net cost of community college was actually more expensive for students than UC or CSU in seven of the nine regions studied.

Nowhere was the CCC found to be the least expensive option.[32]

This problem creates a trap: students need to work and can't enroll full time, but part-time enrollment drags out their education, disqualifies them for certain financial aid benefits, and can contribute to a lack of focus and motivation. Working adults who support their households face even greater challenges. These students need appropriate financial aid supports as well as other fixes described elsewhere in this report.



## SERIOUS AND STUBBORN ACHIEVEMENT GAPS PERSIST

In the community college system, certain student groups are much less likely to reach a defined end goal such as a degree, certificate, or transfer. Specifically, completion rates are lower among African-American students (36 percent), American Indian/Alaskan students (38 percent), Hispanic students (41 percent), and Pacific Islander students (43 percent), compared to stronger completion rates of Asian students (65 percent), Filipino students (57 percent) and White students (54 percent). In general, these gaps are lessened among students who come to college more academically prepared and do not need remediation. Unfortunately, remediation is also the area where some of the most troubling achievement gaps are found. For example, among African-American students, only 20 percent passed a collegiate-level math course after taking remedial math compared to 39 percent of White students and 48 percent of Asian students.[33]

These statistics are problematic today and will only grow in importance as California's population continues to evolve. The proportion of working-age people from non-White groups is projected to grow to 70 percent in 2060. The increase in racial and ethnic diversity will be even more evident in the younger age cohorts that will populate the CCCs.[34]



### HIGH-NEED REGIONS OF THE STATE ARE NOT SERVED EQUITABLY

Researchers have found significant disparities in basic CCC service coverage and penetration in different regions of the state. Areas with the lowest college attainment of adults and the lowest median household income also have the lowest CCC enrollment per capita.[35] In other words, the CCC's valuable education and job-training services are not always reaching those parts of the state where they are most needed. This is particularly an issue in the Central Valley and the Sierras, the Inland Empire, and the Far North regions of the state.[36] While regional disparities in college-going rates also exist for the UC and CSU systems, the pattern is especially troubling in the CCCs because they are specifically intended to be a local, fully accessible source of postsecondary education for all Californians.

Individually and together, these indicators are very troubling. Despite some modest gains in student outcomes, the CCC system is not performing at the level needed to reliably provide students with opportunities for mobility and to meet California's future workforce needs. As described above, the success of California is intertwined with the success of the CCCs. For the fiscal health of our state and the well-being of our society and democracy, we must collectively embrace aggressive goals for strengthening the CCCs. It is imperative to increase degree and certificate attainment, workforce outcomes, and transfers. It is also essential to reduce the unnecessary amount of time and units students accumulate on their way to attaining a degree, certificate, transfer, or workforce outcome, so that more resources are freed up to serve more students. Finally, it is critical to make headway among underserved groups of students and those living in underserved areas of the state—this is a moral imperative that matches our California ideals of social justice and equality. The next section outlines specific goals that address these needs.

> "There is no actual college in our rural area, only online. Students need to have a car to get to [the nearest college which is] 50 miles away in order to take lab [classes] or engage in actual classroom conversation."
>
> — **Member of the public**
> via the Virtual Town Hall

> "The biggest challenge facing the CCC system today is **improving the outcomes and completion rate of students**, particularly those of students from communities historically underrepresented and underserved in post-secondary education. We must take responsibility for and address the inequitable outcomes for students of color across all our colleges."
>
> — **Linda Collins**
> Executive Director, Career Ladders Project, via the Virtual Town Hall



CITRUS COLLEGE

LOOKING AHEAD:

# Goals for Meeting California's Needs

The success of California's broader system of higher education and workforce development stands or falls with the California Community Colleges (CCCs). While many other players are involved—K-12 schools, public and private colleges and universities, county offices of education, and workforce investment boards—the CCCs are the linchpin to meeting California's civic and economic needs. For this reason it is vitally important that the CCC system regularly assess how its performance stacks up against those needs.

Goals have other important purposes. They help establish a shared vision, which is particularly important at this moment when substantial state dollars are coming into the system, new initiatives are being launched, and a new Chancellor is at the helm. They serve as a goalpost, pointing all parties in the same direction and establishing a shared destination to reach.

Of course, setting goals is also a very challenging task for any system of education. For the CCCs, the task is more complicated given its multiple missions and vast array of offerings (SEE SIDEBAR ON PAGE 15). Moreover, many of the results CCCs desire for their students are not entirely in the control of the colleges themselves. For instance, student outcomes in college are in part dependent on student's preparation at the K-12 level. Successful transfers require available slots in universities. Employment and wage gains after graduation are subject to labor market conditions. The performance of all levels of public education is influenced by the availability of funding, which is too often volatile and scarce.

In previous years, this shared responsibility and lack of full control has made all of California's education systems hesitant to hold themselves accountable for results. While this stance is understandable, it is not productive, especially in a state like

California that has no central oversight of higher education. To improve on measures that require shared effort, the systems themselves need to step up and agree to cooperate. As the linchpin of the broader system of higher education, the CCCs are well suited to take the first step and accept responsibility for improving functions that cut across systems. Ideally, California's other education systems will partner with the CCC system and adopt aligned goals for improvement.

> " We're measuring too many things—this is one of the challenges we have—all of the different metrics that we're required to use. IEPI has metrics that we were required to set; ACCJC has its own metrics that we're reporting on annually; we have goals in our equity plans and student success plans. Can't we just focus on three or four big goals and align our programs to these? "
>
> **— Mojdeh Mehdizadeh**
> President, Contra Costa College

## SYSTEM-WIDE GOALS

For 2.1 million CCC students—and the health of the broader system of higher education and workforce development—the CCC system must embrace a handful of clear, aggressive goals that reflect the most urgent needs of the moment. Based on a review of current literature and research and interviews with approximately 50 experts inside and outside the system, these urgent needs are defined as increasing the number and percentage of students who reach a defined educational goal and decreasing

the amount of time and cost it takes them to do it, while addressing critical achievement gaps across students and regions.

To meet California's economic and social needs, the CCC system should aim to reach the following *system-wide* goals by 2022—five years from the publication of this document:

**1 | Increase by at least 20 percent the number of CCC students annually who acquire associates degrees, credentials, certificates, or specific skill sets that prepare them for an in-demand job.** This increase is needed to meet future workforce demand in California, as analyzed by the Centers of Excellence for Labor Market Research. This goal is consistent with the recommendations of the California Strategic Workforce Development Plan. Equally important to the number of students served will be the type of education they receive: programs, awards, and course sequences need to match the needs of regional economies and employers.[37]

**2 | Increase by 35 percent the number of CCC students system-wide transferring annually to a UC or CSU.** This is the increase needed to meet California's future workforce demand for bachelor's degrees, as projected by the Public Policy Institute of California. (In California, occupations requiring bachelor's degrees are growing even faster than jobs requiring associate's degrees or less college.) Meeting this aggressive goal will require the full engagement and partnership of CSU and UC. While ambitious, the pace of improvement envisioned in this goal is not unprecedented: between 2012-13 and 2015-16 (a three-year period), CCC to CSU transfers increased by 32 percent and between Fall 1999 and Fall 2005 (a six-year period), CCC to UC transfers increased by 40 percent.[38]

## Measuring the success of multiple missions

The system-wide goals on this page focus on recognized completions like degrees, industry-recognized certificates, and transfers to university. Of course, some portion of community college students are "skills builders"—students aiming to gain job skills through just a few courses—or students who are aspiring to other goals such as learning English or developing parenting skills. The impact of this kind of education is harder—but not impossible—to measure.

As the CCCs move ahead with more widespread education planning for all students, the aim is to be accountable for helping each student meet his or her individual goals. This may require new methods and tools for gathering information, whether annual surveys of CCC graduates that capture the full impact of the CCC experience on students' lives or more sophisticated techniques that can follow students into the workforce or ultimately even measure the intergenerational effects of higher education. A better understanding of how different community college offerings impact students' lives will help the CCC system hone it priorities and ensure that it is adding real value as an engine of economic mobility.

# Rethinking how we measure performance at the system level

At the system level, outcomes are commonly reported for cohorts of students followed over six years.[42] This lengthy timeframe takes into account the large percentage of students who attend a CCC part-time and appropriately gives colleges credit for successful completions among students who need significant time to reach their goals. However, many observers interviewed for this report believe that six years is too long to wait before reporting on outcomes for cohorts of students. They argue that more information is needed sooner to get an up-to-date, complete look at how well the system is performing and to provide information that can stimulate action. In addition, many students and families expect to spend less than six years earning a degree or transfer eligibility and the 6-year metric obscures the likelihood of doing so.

To address these shortcomings, the CCC system should supplement its 6-year cohort reports with 2-, 3-, 4- and 5-year cohort reports, to provide more transparency and more complete information about how students are progressing. This kind of reporting will help students and families know what to expect and will illuminate areas where more improvement and support is needed.

**3** | **Decrease the average number of units accumulated by CCC students earning associate's degrees, from approximately 87 total units (the most recent system-wide average) to 79 total units—the average among the quintile of colleges showing the strongest performance on this measure.** (Associate's degrees typically require 60 units.) Reducing the average number of units-to-degree will help more students reach their educational goals sooner, and at less cost to them. It will also free up taxpayer dollars that can be put toward serving more students.[39]

**4** | **Increase the percent of exiting CTE students who report being employed in their field of study, from the most recent statewide average of 60 percent to an improved rate of 69 percent— the average among the quintile of colleges showing the strongest performance on this measure in the most recent administration of the CTE Outcomes Survey.** Improvements on this measure would indicate that colleges are providing career education programs that prepare students for available jobs and offering supports that help students find jobs.[40]

**5** | **Reduce equity gaps** across all of the above measures through faster improvements among traditionally underrepresented student groups, with the goal of cutting achievement gaps by 40 percent within 5 years and fully closing those achievement gaps for good within 10 years.

**6** | **Reduce regional achievement gaps** across all of the above measures through faster improvements among colleges located in regions with the lowest educational attainment of adults, with the ultimate goal of closing regional achievement gaps for good within 10 years.

## COLLEGE-LEVEL GOALS

In order to reach the ambitious system-wide goals proposed above, each college will need to do its part. Of course, many colleges have already set goals as part of a system-wide or local effort. Colleges with established performance goals do not need to start from scratch—they should continue to use their goals as planned. However, every college should make sure they have goals that address the system-wide priorities captured in the goals above, to ensure that the entire system is moving in a consistent direction. This means that all colleges should have goals for **increasing degrees and certificate completion, increasing transfers, improving time to completion, increasing job placement in field of study, and narrowing achievement gaps** across all these measures. If colleges have already developed these goals as part of another initiative, they should review them to ensure they are ambitious enough and aligned with the five-year system-wide goals articulated above. This should be done through the local participatory governance process and with input from the Chancellor's Office, to ensure that the local context as well as broader regional and state needs are taken into account.

> " The **achievement gap** between lower income, ethnically diverse students and higher income, mostly White and Asian American students is clear and pronounced at most community colleges. As the system most devoted to open access, we must address this gap fully and effectively. "
>
> — **Community College Dean**
> via the Virtual Town Hall

Different goals are appropriate at different levels. The system-wide goals above are intended to focus only on the highest-order outcomes. Colleges

will also want to take a close look at finer-grain measures and indicators that show progress toward desired outcomes. For instance, colleges should regularly be looking for improvements in **student persistence, completion of 30 units, progress toward transfer-level coursework in the first or second year**, as indicators of progress toward degrees and transfers. Colleges should also monitor and aim to grow **full-time enrollment (15 units per semester)** and **continuous enrollment**. Of course, not all students can attend full-time and continuously, such as working adults who need to learn and earn at the same time. Still, colleges can and should encourage more students to attend full time than currently do, especially those who are young and not financially supporting others.

Colleges should also monitor and set goals related to the employment and earnings of graduates such as **wage gains** or **percent of graduates attaining a living wage**. These measures are commonly used to monitor outcomes specifically among graduates of career technical education programs, but it is also appropriate to monitor them for all students, so that colleges have a clear picture of students' lives after they leave a CCC.

## USING GOALS TO DRIVE CHANGE

Just as important as setting goals is the way they are used. Presently, the CCC Board of Governors (BOG) is required by state law to identify performance measures and develop annual performance targets that are "challenging and quantifiable."[41] While the CCC system has identified these performance measures, in the past the Chancellor's Office and Board of Governors have not used them

consistently to drive change. Moving forward, the BOG should embrace the more aggressive goals outlined in this document and use them to update its strategies for improvement. Progress toward the goals should be reviewed at least annually, on a predictable schedule.

Additionally, the BOG should call on all college districts to do the same: focus on a set of clear, consistent goals and return to them at least annually to mark progress and correct course as needed. As discussed in greater detail below, this is an essential strategy for maintaining focus among all of the competing activities and initiatives that are part of normal operations.

> " If we don't set accountability standards in terms of seeing an increase, or setting a minimum threshold, then there's no way to know whether progress is being made. "
>
> **— Hasun Khan**
> Student Member, California Community Colleges Board of Governors



"The needs are great, the resources are adequate, and the momentum is building. It is time for leadership to assert itself. It will take a new generation of passionate, talented, dedicated and empowered community college leaders to transform the old model to meet both the needs of today and tomorrow."

**— Dr. William Scroggins**
President and CEO,
Mt. San Antonio College,
via the Virtual Town Hall

# A Vision for Change

The goals set forth in this document are very ambitious and there is no easy path to reach them. Achieving these goals will require a combination of strategies and the coordinated efforts of tens-of-thousands of individuals both inside and outside the California Community Colleges (CCCs). Not only will California need the talent and perseverance of college presidents, administrators, faculty, staff, trustees, and students, it will also need the support and engagement of the Governor, Legislature, University of California (UC) and California State University (CSU) systems, workforce development system, K-12 education system, business and labor organizations, philanthropists, and community and civic groups. It will take a sustained effort by the CCC Chancellor, the Board of Governors, and the entire staff at the system level to lead the charge, support the hard work of the colleges, and help maintain focus and morale. There is no denying this is a tall order, but California and its students deserve no less.

Below are **seven core commitments** the CCC system as a whole can make to achieve these ambitious goals and realize its full potential to meet the future workforce needs of California:

**1 |** **Focus relentlessly on students' end goals.**

**2 |** **Always design and decide with the student in mind.**

**3 |** **Pair high expectations with high support.**

**4 |** **Foster the use of data, inquiry, and evidence.**

**5 |** **Take ownership of goals and performance.**

**6 |** **Enable action and thoughtful innovation.**

**7 |** **Lead the work of partnering across systems.**

Together these seven commitments reflect a fresh mindset that will be needed to carry the CCCs forward as a unified system. The pages that follow elaborate on these commitments: the problems they are intended to address, what must be done to fulfill the commitments, and how specifically the Chancellor and the Chancellor's Office can lead the way.

"The colleges need to **put student success at the forefront of all decisions** made at all levels of the college, not just pay lip-service to the success agenda. Student success needs to permeate every committee, task force, and class of employees…Change needs to be radical and transformational. Every college policy, rule, procedure and practice needs to be scrutinized and reformed immediately if it provided a barrier to student success and completion. The teaching-learning environment has to be rebuilt to focus on research driven strategies that prove successful with students…Student success should become EVERYTHING at all 113 colleges.""

— **Bill Piland**
Professor Emeritus,
San Diego State University,
via the Virtual Town Hall



## COMMITMENTS

| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|





COLLEGE OF THE CANYONS

## COMMITMENT 1:
# Focus relentlessly on students' end goals.

As a state, we have long prioritized open access to college as a core value—it's one of the greatest strengths of the CCCs. But that priority, combined with multiple statutory missions and a problematic funding mechanism that drives rapid expansion in boom times and abrupt contractions during recessions, has led to sprawling catalogs of courses for students that do not necessarily match either California's or students' needs. For those new to the college environment, the number of choices can be more overwhelming than exciting. When students cannot see a clear path from start to finish, the task of completing college is daunting.

The challenges of today require that we focus much more intentionally on getting every student to his or her defined end goal, whether a credential, degree, certificate, transfer, or specific skill set. This focus on students' end goals should be the "North Star" of all reform efforts at every level of the system. This will require both a shift in mindset and a shift in the way colleges and the system do business. More than just offering courses, colleges need to be offering pathways to specific outcomes—whether transfer or success in the workplace—and providing sufficient supports for students to stay on those paths until completion.

### FULFILLING THE COMMITMENT
In navigating toward the North Star, the system needs a simple but comprehensive framework that can be easily communicated and evaluated across colleges. At the state level, the Chancellor's Office plans to use the Guided Pathways initiative as an organizing framework to align and guide all initiatives aimed at improving student success. This $150 million one-time state investment over five years will give colleges the means and motivation to spur large-scale change across the system and bring together other existing categorical funds and apportionment dollars in a coordinated fashion.

> " In and of itself, community college is not a destination. What matters is where students are going in life and how we are helping them get there. "
> — State-level
>   higher education official

The Guided Pathways model engages college administration, faculty, and staff to enact comprehensive changes across an entire college. In general, the model used across the country is organized around four key concepts, listed below. In California, Guided Pathways will be tailored to the unique environments of the CCCs.

- **Clarifying the path for students.** All courses are designed as part of a coherent pathway with a clear outcome, either transfer or a career outcome. Students understand what a given path will require of them, how the courses in a pathway are connected into a logical sequence that will prepare them for their end goal, what milestones they will meet along the way, and what outcomes they can expect at the end of the path.

- **Helping students get on a path.** Students explore career and/or transfer options before they begin college and extensively in their first year. Multiple measures are used to assess student academic needs. Students receive contextualized, integrated academic support to pass gateway courses.

- **Helping students stay on their path.** Students can easily track their own progress and receive ongoing, intrusive advising. Data systems monitor student progress. Students are provided support or redirected if they fall off track.

- **Ensuring students are learning.** Learning outcomes for every course and program are clear to the student and tied to a specific transfer, completion, or workforce outcome. Systems are in place for the college and students to track mastery of outcomes. Students are engaged in active, collaborative learning experiences. Faculty are leading efforts to improve teaching practices.[43]

Colleges can use the Guided Pathways framework to bring about transformational change, ultimately braiding various funding streams in service of a singular, coherent plan for improvement. Some colleges have already begun this transformation and the entire system is expected to adopt Guided Pathways over time.

> " Guided pathways with its evidence-based, whole systems approach to aligning efforts across a college to support students in achieving their academic and career goals is the most promising initiative I've seen in my 30+ years working in community colleges. "
>
> — **Rock Pfotenhauer**
> Chair, Bay Area Community College Consortium
> via the Virtual Town Hall

Colleges that are not yet ready to launch a major transformation should still be working to sharpen their focus on students' end goals. In addition to planning for full Guided Pathways implementation, colleges can take steps in a number of areas. For instance:

- Colleges should be striving to reach the Board of Governors goal of having **100 percent of students complete an education plan** to help students get focused on a clear path from the beginning. Equally important is the quality and frequent updating of those education plans.

- Colleges should augment and enhance student services to **monitor student progress more closely and intervene more assertively**, with strategies such as online tools to help students clearly see their own progress toward their educational goals, alerts that remind students of upcoming deadlines, and automatic flags for intervention when students miss an enrollment deadline or fail a class. Some colleges across the state have also begun to shift to yearly course registration in order to provide students with a predictable course schedule and lessen the possibility of dropping out mid-year.

- Colleges can also take steps to **foster deeper, more personal relationships between faculty and students.** For example, employing more full-time faculty, improving working conditions and pay for adjuncts to improve retention, and implementing instructional programs and strategies that lead to enhanced quality interactions between students and faculty are all good places to start. In fact, virtually anyone on campus— from department chairs to maintenance workers—can make a difference simply by genuinely interacting with students and asking about their goals, plans and progress on a regular basis.

- Colleges can strive to **carve out more time for faculty to work together to define clear, relevant learning outcomes** in every course and pathway that are aligned to the appropriate career or transfer outcome. Along similar lines, colleges can prioritize **professional development** that helps faculty better assess learning outcomes, communicate learning outcomes to students, and use data to make instructional and program improvements. Colleges can build on the learning outcome structure already in use through the accreditation process.

Collectively, these many actions big and small can help colleges fulfill the commitment to focus relentlessly on students' end goals.

> " Do not forget the students and focus on what we would need. Ask [students] from time to time: What is it that we can do to benefit you? "
>
> — **Community College Student Trustee**
> via the Virtual Town Hall

## HOW THE CHANCELLOR'S OFFICE CAN LEAD THE WAY

At the state level, the Chancellor should **introduce and continually reinforce the concept of a singular North Star for the system**: helping every student meet his or her defined end goal. Administratively, the Chancellor's Office can use the **Guided Pathways framework to roll out consistent messaging, expectations, strategies, and professional development** that supports successful implementation. In addition, the Chancellor's Office should strive to align the work of other state-level initiatives with the pillars of Guided Pathways, including the Institutional Effectiveness Partnership Initiative (IEPI), the Student Success and Support Program/Student Equity (SSSP/SE), Extended Opportunity Programs and Services (EOPS), Strong Workforce Program and related workforce categorical programs, Adult Education Block Grant (AEBG), Apprenticeship, education technology programs such as the Online Education Initiative and Common Assessment Initiative, and the forthcoming Innovation Awards. Doing so will bring greater coherence across initiatives.

As part of this commitment, the Chancellor, working with the Board of Governors as needed, should also seek to **amend regulatory and reporting requirements that add little value, do not provide needed information on performance, or even impede colleges' ability to focus relentlessly on students' end goals.** This was a major theme emerging from a recent Chancellor's Office survey of college presidents and in interviews with college personnel: Please help clear burdensome requirements that play no role in improving student success. In addition, the Chancellor should work with the Legislature and Administration to address statutory requirements that present the same problem.

> " The term 'Pathways' may sound buzzy, but it opens the door for us to truly **transform our institutions**. The Pathways model calls on us to assess ourselves and the values and beliefs upon which our institutional systems were built. Through the redesign of our systems, we have the opportunity to **exponentially improve student success** and equity. There's a comprehensiveness to this model and it will be sobering for us to look in the mirror. "
>
> **— Dr. Julianna Barnes**
> President, Cuyamaca College



SAN DIEGO MESA COLLEGE

COMMITMENT 2:
# Always design and decide with the student in mind.

> " We have to continue to **put students at the center** of the conversation. How we get there is always a matter of debate, but we should at least agree on that particular goal. "

— **Francisco Rodriguez**
Chancellor,
Los Angeles Community College District

Community colleges need to focus much more on the student experience when designing services, programs, and policies. Just as businesses make it easy to find and buy their products, colleges need to make it easy for students to identify the programs, courses, and services they need and to access them at the right time. Too often, this is not the case.

One place where the student experience frequently breaks down is when students are interfacing with multiple departments or offices on a campus, when they are attending more than one community college, or—most challenging to solve—when they are transition from one education system to another. For instance, recent high school graduates entering a community college for the first time can be surprised to learn that they may not be considered ready for entry into collegiate-level coursework, despite perhaps having passed A-G courses in high school or scoring "college ready"

on their 11th grade assessment. Often, the problem leading to this situation is the failure of institutions to align their definitions and expectations; not a failure of the student. When unexpected requirements, hurdles, and delays are sprung on students, it harms the college-student relationship, and more importantly, decreases a student's odds of success.

Another set of challenges lies with today's working students, many of whom are commuting enormous distances between home, job, and college—a fragile situation that can easily be thrown off by a family, job or transportation problem. Just as we all have come to rely on digital conveniences to make our lives easier, students are also seeking greater electronic access to everything the CCCs have to offer. Working students in particular need to be able to learn and earn at the same time and access services and information 24 hours a day, from any location. Presently there

are multiple student-facing portals and services, but they do not always line up seamlessly. Online coursework, though expanded in recent years, has yet to become a viable option for all students.

> **Students are like customers** in that we need to pay attention to what they are doing and how we are serving them. Colleges should have to look in the mirror and answer the question 'Are we doing all we can for our customers?'
>
> — **Allan Zaremberg**
> President and CEO,
> California Chamber of Commerce

## FULFILLING THIS COMMITMENT

To repair and maintain the student experience, colleges and system- and state-level policy makers must **always decide and design with the student in mind.** The CCCs should systematically examine policies and tools at all levels and ask hard questions about how easy community colleges are for students to access and use.

Within the context of a single college, leaders need to **forge greater connectedness across different programs and services** so that they appear seamless to students. When glitches arise, colleges and policy makers must make every attempt to **favor the student's interests,** helping students move forward toward their end goals, not holding them up.

As a system, the community colleges need to **make and keep clear promises to students.** For many first-generation students, the path into and through higher education can be a long and uncertain journey. At all education

levels, this uncertainty should mitigated by very clear messages about what students need to do to prepare for college and what they can expect in return—an underlying principle of well-designed College Promise programs that combine financial support, aligned college preparation expectations and supports between K-12 and postsecondary institutions, consistent messaging to students about college and affordability, and clear academic pathways.

In instances where there's not yet a seamless transitional path or well-developed Promise program, education leaders across disciplines and departments, colleges and sectors, should **adopt a default "hold harmless" policy** for students who are caught between misaligned policies, whether between two colleges or between multiple districts or education sectors. The idea is simple: when students do what is expected of them at the sending institution, the receiving institution should honor it and deliver on what the student is expecting. As a bold example, 12th graders who meet the eligibility standards of UC and CSU (i.e. completing the A-G course pattern and achieving a minimum grade point average) should be automatically eligible for transfer-level courses when they enroll at a community college. If a clear pattern of under-preparedness is apparent, that indicates a need for the college to work urgently with its local K-12 partners to align expectations. Students, however, should be able to access collegiate courses as expected and services to help them catch up.

> There is a sizable population of students who have stopped out of community college even though they are close to completion. We should be helping them get their Associate's degree. Colleges should be helping them to **finish their credential** by conducting routine degree audits and removing barriers, for example, by waiving small administrative hurdles like library fines or parking fees.
>
> — **Alma Salazar**
> Senior Vice President,
> Los Angeles Area Chamber of Commerce

Finally, as a system the CCCs should expand efforts to **meet the needs of working adults.** To reach California's future workforce demand, it is critical to attract more working adults into college. This will require changes in how, when, and where courses are offered and student services provided. Stackable credentials allow students to gain knowledge and skills that build toward a long-term workforce outcome while offering multiple exit points to employability along the way. Instructional designs that provide on-ramps and off-ramps allow working students to hold down jobs or even stop out temporarily without derailing their forward progress. Recognizing prior learning and releasing students from seat-time in courses is another avenue to providing more flexible access to returning and working adults. Finally, CCCs can continue to foster and strengthen multiple points of entry, whether through bridges from

# More ways to step up service to students

Community college stakeholders are brimming with ideas for how campuses can improve service to students. Many Virtual Town Hall respondents and interviewees offered examples of practices that are making it easier for students to enroll in classes, take advantage of campus services, and complete their programs of study, including:

- Physically locating services together and cross-training staff so that students experience a one-stop shop, not a bureaucratic maze.

- Greater sharing of data, so that students' records can be easily accessed at the right time by the right person (similar to the strides healthcare has made in making medical records instantly available to every doctor a patient sees).

- Meeting the needs of students who attend multiple colleges, by consolidating course catalogs and schedules across multiple campuses in same district, and providing greater portability of credits across districts.

- Holding more classes at times and in ways that work for students, including weekends, evenings, summer sessions, and online.

- Block-scheduling courses in a given pathway so that students have a convenient and predictable schedule they can plan around.

- Exploring alternative calendars and course formats that are not bound by the traditional 15-week academic calendar.

- Adding more student success courses.

- Expanding the use of open education resources to keep down costs for students and allow faculty to better customize course content.

- Expanding work based learning, employability skills, and job placement supports for students who are exiting into the workforce.

adult education to CTE and general education programs, or through partnerships with local workforce development agencies. Ideally, there should be "no wrong door to knock" when students are seeking job training and education.

> The community college system should eliminate ineffective and inefficient regulations that particularly do not drive students to completion, and develop regulations that do. **Completion and accountability can be enhanced** through the redesign of new regulations.
>
> **— Charlie Ng**
> Vice President of Business
> and Administrative Services,
> Mira Costa Community College District,
> via the Virtual Town Hall

> Sometimes it feels like we've set up processes to comply with so many different requirement that I don't even know why we do what we do anymore.
>
> **— Joe Wyse**
> Superintendent/President,
> Shasta College

## HOW THE CHANCELLOR'S OFFICE CAN LEAD THE WAY

The Chancellor's leadership position and office should be used to **raise awareness of how CCC students are harmed by misaligned policies** across sectors. The Chancellor should actively advocate to resolve cross-sector and state-level policies that unintentionally penalize students as they move across systems. Additionally, the Chancellor should continue to strengthen partnerships with leaders in other education sectors and workforce development agencies to ensure that students are receiving consistent messages and support regardless of their point of entry (for more on the topic of cross-sector leadership, see Commitment #7).

The Chancellor's Office should do its part to **assist and support colleges in putting students first**, focusing more on outcomes and less on monitoring inputs. At present, colleges have to meet endless requirements and produce myriad proposals, plans, and reports—for accreditation, categorical programs, grant funding, and other purposes. Moving forward, the Chancellor's Office should work to **streamline reporting and other requirements** where possible to help cut through the "noise," focus on outcomes, and support colleges in holding a singular vision for improvement. Along the same line, the Board of Governors should **prioritize flexibility and results over front-end regulation** when possible. In the past, Board of Governors regulations have occasionally exceeded the law in unhelpful ways. In the future, the Chancellor's Office should help colleges see and utilize the full range of options for serving students best while meeting the law.

The Chancellor's Office should strive to adopt a **stronger customer service mindset** to improve relationships and service to campuses. This should include clear communication from the Chancellor to all staff on system goals and priorities, and clarification that the role of Chancellor's Office staff is to help colleges meet those goals. Like colleges, the Chancellor's Office should strive to **better integrate its own services across traditional siloes**, to achieve more **consistent communication** with colleges and to align mutually reinforcing policies and programs. Feedback received from interviews and Virtual Town Hall respondents reinforced this as a top priority.

The Chancellor's Office should **review its entire education technology portfolio** with the goals of enhancing students' abilities to easily access services and information, and maximizing the ability of faculty and staff to use those systems to serve students effectively. Currently many of the CCC system's technology platforms are managed separately, under different contracts, including the systems used for the college application process, education planning, student learning outcomes and assessments, curriculum inventory, student transcripts, course management and other purposes. The Chancellor's Office should assert greater oversight of these various technologies to ensure they are functioning in alignment with one another and in service of students.

> **[The CCCs should]** **simplify the way we do things** so the student can witness, first hand, an organization that wants to serve them.
>
> **— College Health Services Assistant** via the Virtual Town Hall

> There is tension among our many missions including workforce development, transfer, and serving adult learners. We need to **serve all students in a holistic way.** It feels disjointed now... and if we are asking colleges to break down siloes, the Chancellor's Office should do it too.
>
> **— Julie Bruno** President, Academic Senate for California Community Colleges





SANTIAGO CANYON COLLEGE

COMMITMENT 3:

# Pair high expectations with high support.

Many students come to the CCC system with significant academic and personal challenges. Those who are not academically ready to succeed in collegiate-level courses need assistance to strengthen their basic skills. Historically, the system's approach has been to test incoming students for college readiness in English and math and place them into remedial courses if they fail to reach a specified threshold score. While the CCC system has been moving towards the use of "multiple measures" for some time—meaning the use of additional measures of academic readiness—some colleges continue to heavily emphasize test scores for placement. The intentions behind this approach are good: students need to be ready for the rigors of college-level coursework. At the same time, there is compelling evidence that these traditional assessment methods (even when paired with other measures) can sometimes lead educators to misplace students into remedial education who could, with proper supports, succeed in a collegiate-level course.[44] This pattern of over-placing students into remedial education unnecessarily delays students' progress and can be discouraging to those who are already at risk of dropping out entirely.

Students themselves are often unaware of the significance of assessment exams and do not realize how placement in remedial courses will impact their trajectory through college. One thing is clear: Lengthy, traditional remedial sequences are not effective for most students. By the most recent figures, only about 45 percent of students taking remedial English ultimately move up and pass a collegiate-level English class. In math, only about 33 percent do so.[45] In the interviews conducted for this Strategic Vision, many stakeholders identified remedial education as a top, urgent concern that demands full attention at all levels of the CCC system.

> "Remediation takes a lot of resources, using classroom space, instructor salaries, and the cost of student support services like tutoring and instructional support supplies. Remediation also has the effect of discouraging students from completing their educational goal when they realize they will take much more than two years to obtain transfer level math and English."
>
> — **Fermin Ramirez**
> Financial Aid Outreach Coordinator,
> San Bernardino Valley College,
> via the Virtual Town Hall

> " How do we design or envision a new system? A colleague of mine says 'We always talk about college readiness in K-12, but we never ask colleges if are they student ready.' If we shift that mindset it will fundamentally change how we deliver our student supports and how we design our system of remediation. "
>
> — **Jessie Ryan**
> Executive Vice President,
> Campaign for College Opportunity

Just as challenging for colleges is the daunting array of personal challenges that many students are facing. Many people of privilege remember college as a carefree, unburdened chapter in their lives, but this is not the reality for most CCC students. Many live below the poverty line and some struggle with exceptional challenges like homelessness, mental illness, food insecurity, recent emancipation from foster youth services, and challenges associated with returning from military service. Concern about the depth and breadth of students' needs was a pervasive theme among those responding to the Virtual Town Hall, particularly among those who serve on CCC campuses.

Another issue that contributes to students' slow progress through college is that many enter community college without enough guidance to establish a clear timeline or sense of direction. They may not be informed about the significant down sides of taking a prolonged time to earn a degree/certificate or transfer, both in opportunity cost of delaying entry into the job market, and the actual cost of supporting themselves for a lengthy period of study. As a result, students often do not think to advocate for higher placements, opportunities to retake placement exams, credit for prior learning, transfer of credits earned at other institutions, and so on. Even if they do think of it, these things are often difficult to accomplish in a bureaucratic environment with multiple offices involved.

## FULFILLING THIS COMMITMENT

In order to establish high expectations and high support for students coming from high school, community colleges and K-12 districts must work together to **address gaps in basic skills *before* students arrive** at the college campus. This includes better aligned college readiness expectations in the classroom, as well as college planning and interventions for struggling students.

At the college level, there are a number of promising strategies for addressing the problems of remedial education. For example:

- Colleges can continue to **de-emphasize the use of high-stakes tests for placement** and where possible **use more reliable measures of readiness** for collegiate-level coursework, e.g. high school transcripts for students coming directly from high school or examining prior learning for students coming from the military.

- When tests are used for placement, colleges should **help students better prepare for exams**, by communicating clearly and in advance about the content and stakes of the test, providing opportunities for students to take a short refresher course, and offering opportunities to retake tests to improve scores. The system should also consider **allowing students to place themselves**—this can be done using guided self-placement analyses.

- Colleges can also continue to **expand options for students to strengthen basic skills while simultaneously enrolled in collegiate-level courses.** For example, using such tools as tutoring, supported or supplemental instruction, and/or in-class aides has shown promising results.

- For those students who truly require remediation before they can succeed in a collegiate-level course, the system should **continue to refine and expand accelerated and innovative instructional models**, to avoid the years-long remedial sequences that most students never exit, and bolster the use of **contextualized basic skills** to ensure that students see the connection between mathematics, English, and their chosen pathway.

Colleges can also take steps to address students' personal and life challenges in ways that support their in-class learning. For example, colleges can:

- Offer **wraparound supports** to help vulnerable students whose responsibilities and life challenges can interfere with progress toward their end goals. Tutoring, counseling, or help with childcare or transportation are all examples.

- **Create better linkages with county social services agencies** to help eligible students access resources such as food assistance programs, health care, and mental health services, among others.

- **Provide special resources for high-need populations** such as military veterans, former foster youth, and others.

To communicate high expectations to students and encourage them to make efficient progress toward their end goals, colleges can:

- Advise students (especially recent high school graduates) about the benefits of **staying continuously enrolled and taking 15 units per semester**, or even adding one extra course per semester if 15 units is not feasible. This can be facilitated through early enrollment incentives, yearlong course registration, use of summer and intersessions, and block scheduling of, or automatic enrollment in, the courses in a pathway. Wrap-around supports such as those

mentioned above can help students stay continuously enrolled or succeed in taking one extra class. While many older and working students are unable to attend full-time, that should not preclude colleges from helping as many students as possible to do so.

- Encourage **early career exploration** in high school, and as early as middle school, to help students gain context for their studies and a clearer sense of direction.

- Help returning students get back on track if they have left college for a period of time, by **auditing accumulated units, assessing prior learning**, and **designing customized education plans** that get students started as close to the finish line as possible. Additionally, many of the scheduling and enrollment options noted above are also particularly helpful to returning students.

Of course, as colleges strive to get students to the goal line as quickly as possible, student learning must not suffer. Ensuring that students are learning is at the core of the community college mission, the accreditation process, and one of the pillars of the Guided Pathways framework described in Commitment #1.

> " We must realize that many, if not most, of our CCC students have wellness challenges that, unless met, might lead them to fail, drop out or withdraw from a class/ their classes...or college altogether. These ARE our students, and we must be prepared to do what it takes if we want them to be successful. "
>
> **— Public Health Nurse and Community College Nurse**
> via Virtual Town Hall

## HOW THE CHANCELLOR'S OFFICE CAN LEAD THE WAY

The Chancellor should **immediately upgrade the urgency of improving remedial education**. At the leadership level, the Chancellor and system office can support, publicize, and direct resources to effective initiatives that move students through remedial education more efficiently and expeditiously. This may include innovative and accelerated basic skills programs, contextualized instruction, and expanded instructional supports both inside and outside the classroom. Additionally, the Chancellor's Office should provide the needed tools and resources for colleges to revamp assessment and placement practices and policies. The key is to transform assessment, placement, and basic skills instruction in ways that propel students into collegiate level coursework and do not derail their progress. In short, this issue deserves the full attention of system-wide office and must receive it.

The Chancellor should additionally use the high profile nature of the position to **call attention to the immense personal and economic challenges faced by many students** in the CCC system and **advocate for additional resources** to provide the support these students need to succeed academically. The Chancellor can also engage with state lawmakers and officials in health and social services to help better connect CCC students with other public resources that can support them.

The Chancellor should also lead the charge in **communicating with California students their own critical role in their success**. The Chancellor should consistently communicate to K-12 students and families—both directly and through state level policy—that community college requires collegiate-level effort and preparation. The Chancellor should encourage prospective and current students to attend full time if they can, while emphasizing that services and opportunities are available to everyone. Finally, the Chancellor should **advocate for additional state financial aid resources and reforms** that accommodate older/working students as well as expanded support for younger students who can attend college full-time.



LOS ANGELES PIERCE COLLEGE

COMMITMENT 4:
# Foster the use of data, inquiry, and evidence.

We live in a world where massive amounts of data are collected and analyzed to learn about human behavior, drive decision-making, and create products and services. Compared to many sectors, education has been slower to adopt data as a rich source of information to improve services, in part because it is expensive to update data systems and in part because this practice is not central to the institutional culture of higher education. While colleges do collect and report a great deal of data, often it is seen as a compliance activity rather than an opportunity for self-reflection and improvement. Lacking good data, policy makers and educators at all levels often make decisions based on convention, hunches, or anecdotes.

There are a variety of barriers to using data effectively for program improvement in the colleges. Many colleges do not have strong institutional research capacity. College personnel may have limited time and many have not been well trained to use data for improvement. In college districts and at the state level, multiple data systems tied to different initiatives and departments often do not connect. They may have outdated programming and platforms and require new software.

Lacking a statewide student information system, the Chancellor's Office also faces challenges when aggregating data from district-level information systems across the state. In some instances, varying decision rules and data definitions across districts impede analysis, and the Chancellor's Office does not have sufficient capacity to track down and resolve discrepancies, limiting its ability to research important topics beyond required reports and analyses. Other problems begin at the state or federal level: categorical funding streams often require specific data metrics to be collected, but often they are not in harmony with each other, or with the metrics reported by other education sectors, making it difficult to draw conclusions over time or across silos.

> "Data-driven decision making is more valuable than ever. **Objective facts must guide our strategic investments** to improve student outcomes."
>
> **— Hans Johnson**
> Director, PPIC Higher Education Center and Senior Fellow, Public Policy Institute of California

> " Performance metrics are only helpful if institutions have the capacity to effectively use them for planning. "
>
> — CCC Faculty Member

The central office is also hindered by a time lag because it must rely on uploads of data from colleges at designated times, such as the end of the term or end of the year. As a result, the Chancellor and the CCC system office can never access a "real-time," up-to-the minute snapshot of performance across the system. This limitation (common in most education sectors) unfortunately sets the stage for the data-reporting process to be more of a compliance activity for colleges and a retrospective activity for the Chancellor's Office. Given the prohibitive cost and politics associated with establishing a new statewide system, the CCC system will likely need to find other ways to change the collective mindset around data collection and reporting. Far more than being a compliance activity, good data and analysis is needed to drive decision-making, discussion, and change at all levels.

## FULFILLING THIS COMMITMENT

To make substantive progress towards the goals outlined earlier in this document, the community college system needs a culture shift that puts data, inquiry, and evidence at the center of planning and decision-making. This culture shift has already begun, but it will be critical to bolster institutional research capacity on campuses to ensure that all colleges can fulfill this commitment.

When designing any new program or policy (or determining the need for one) colleges and policy makers at all levels should always **look first at relevant student data to understand the problem** and inform the development of promising solutions. Likewise, colleges can use student outcome data to determine which investments are less impactful. While it can be painful and controversial to retire programs that are no longer relevant or effective, good data can at least ensure that all parties are operating from the same set of facts.

At every level of the system, all parties should have **regular opportunities to review relevant data on program effectiveness**. College districts can review program data in the course of regular Board meetings, on a set schedule. Colleges can set aside time and provide professional development to help faculty and administrators analyze their data. Or, colleges can bring together the full campus community for annual "all-hands" meetings that involve every department on campus—including student support services, human resources, and operations (e.g., facilities, bookstore, foodservice)—to hear an honest reporting on campus performance and participate in developing strategies to improve student outcomes that are appropriate to each department's unique role.

## HOW THE CHANCELLOR'S OFFICE CAN LEAD THE WAY

The system-level office has an especially large role to play in fulfilling this commitment. The Chancellor and system office should **review their own internal data systems and determine how to integrate them** in service of greater transparency, better administration of programs, and better service to both colleges and students. The Chancellor's Office should also explore options for boosting its internal research capacity, ensuring that there are sufficient personnel, and sufficient leadership and direction from the Chancellor to support data-driven decision-making.

Likewise, the Chancellor's Office should review the full array of metrics that colleges are required to report for different purposes, **striving to avoid redundancy and maximize the utility of these data for improving performance**. This work is already underway thanks to similar recommendations made by The Strong Workforce Task Force and adopted by the CCC Board of Governors, which led the Chancellor's Office to administratively rationalize all workforce metrics and pass legislation to reduce dissonance across data definitions. As part of its review of metrics, the system-wide office should also review the official Student Success Scorecard to ensure that it provides a full picture of campus progress toward system-wide goals and is useful in helping colleges focus on the practices and behaviors that will lead to greater student success.

The Chancellor can also routinely **present student outcome data to the Board of Governors** at regular meetings, both to engage the Governors in analysis of particular issues and generally to model good governing board behavior.

Because of the CCCs' unique role at the nexus of the secondary, post-secondary, and workforce development systems, the Chancellor's Office should also look to **expand its role in brokering data-sharing protocols and agreements across those systems**, engaging when necessary at the highest leadership levels to resolve cross-sector data misalignments that are barriers to understanding student outcomes.

The Chancellor's Office should foster inquiry by **embedding data-driven processes into all programs** it administers, building on the momentum of IEPI's inquiry approach and utilizing the data visualization tools and training associated with the Launchboard. By providing or brokering technical assistance to colleges, the Chancellor's Office can help campuses build their capacity to understand their own data and use it for program improvement purposes. As part of their efforts to assist colleges in using data effectively, the Chancellor's Office should also seek ways to leverage the self-reflection already built in to the accreditation process and **avoid unnecessary duplication with other reporting and planning requirements**.



BAKERSFIELD COLLEGE

COMMITMENT 5:
# Take ownership of goals and performance.

> "The community college system needs to change its culture to **care about student outcomes without blaming the students themselves.** The job of the community colleges is to figure out how to educate the students who walk through their doors."
>
> **— Julia Lopez**
> Retired President and CEO,
> College Futures Foundation

The interviews and Virtual Town Hall responses analyzed for this project revealed frustration both inside and outside the colleges around the themes of accountability, capacity, and the pace of change.

Many stakeholders across the state are looking for California's public system of higher education to step up and unambiguously commit to improvement in student success rates. Among this group, some are aware that the CCC system has goals, but do not find them ambitious enough. Others are frustrated by what they perceive as a victim mentality among the colleges. They do not want excuses for middling results, but rather a solution-oriented mindset that takes responsibility for improving those things that are in the colleges' control. Perhaps more than anything else, they want a sense of urgency.

At the same time, other stakeholders—mostly internal to the colleges—paint a very different picture. Many faculty and CEOs report having a sense of "initiative fatigue," and no wonder: the last few years have seen an influx of $500 million for special programs and purposes—ranging from the Student Success and Support Program, to the Student Equity Program, to a new Online Education Initiative to the creation of the IEPI, all with their own sets of goals and performance indicators. All this change and incoming money, they argue, is a recipe for conflict. They want time for reflection and relationship-building before jumping into a new reform strategy. On the topic of accountability and goals, this group does not want to be criticized for outcomes they cannot control. They raise substantive grievances about the K-12 system failing to prepare students adequately, the State of California underfunding colleges and the Chancellor's Office, and students not taking their education seriously enough.

This disconnect among stakeholders divides people who otherwise share a similar desire and vision for improvement. In a system that relies heavily on shared governance, it can grind progress to a standstill.

## FULFILLING THIS COMMITMENT

Moving forward, the CCC system must find a way to resolve this disconnect, get behind a shared set of goals, and make the most of available resources.

At both the local and state levels, the CCCs need to **take ownership of goals, and use them to motivate, not punish**. Statewide K-12 education leaders have pursued this kind of supportive, non-punitive approach for the past several years and have found it a refreshing change from the "shame and blame" approach from earlier times. Colleges and local governing boards can similarly pursue a supportive approach by acknowledging the fatigue and anxiety that many faculty, staff, and administrators feel, by limiting and consolidating the burdens placed on faculty by burgeoning state and local initiatives, and by freeing up faculty from non-classroom obligations that are not productive towards helping students meet their end goals. At the same time, the CCC system should embrace ambitious performance goals that signal a real sense of urgency and commitment, and invite all parties to the table to develop robust solutions.

At both the system and college levels, there should be a **clear vision for improvement, including clear goals** for improved student outcomes. The CCC system needs to embrace a small number of high-level statewide goals (SEE PAGE 13) while colleges need to develop and own a more detailed set of goals that are aligned with the statewide goals but appropriate to the local context. Likewise, the system's leadership can establish a broad vision for change while local colleges can develop their own, more detailed plans of action. Leaders at both levels should strive to leverage all incoming funding streams to implement their vision for change, not distract from it.

At the system and college level, leaders must **take responsibility for college performance and student outcomes**. Certainly, there are factors beyond the control of the college. At the same time, colleges enjoy significant latitude. Each community college district has its own locally elected board and local academic senate, which together have broad authority to control what happens on campuses. CCCs also have established processes for making decisions in consultation with all internal stakeholders. Compared to community college systems in other states (and the other public higher education sectors in California), the CCC system is largely decentralized, with relatively light oversight from the state or system level and greater oversight at the local level. CCCs also enjoy vastly more autonomy than California's K-12 system, where the State Board of Education sets curriculum standards, chooses assessments, and can identify and intervene in underperforming districts. Given these freedoms and the tradition of shared governance in the CCC system, CCCs have every reason to take ownership and full responsibility for their own goals and performance.

## CONTRASTING VIEWS ON THE URGENCY FOR REFORM:

> I've lost my patience. We need to say 'times up' to colleges. You have to fix it.
>
> — **State-level education leader**

> It's about slowing down, having conversations, preserving trust. There is a lot of distrust between faculty and classified staff, faculty and administration, etc. We need to bring different perspectives to the table.
>
> — **Community college faculty leader**

> " The system will do a better job holding itself accountable if the participants on all levels (faculty, staff and administration) do a better job of holding themselves accountable. The challenge is how to measure? It should be simple and clear and connected to the student's success because education is the core. "

**— College Science Lab Coordinator**
via the Virtual Town Hall

## HOW THE CHANCELLOR'S OFFICE CAN LEAD THE WAY

With a new Chancellor in place, the system office is well positioned to revisit existing goals. As proposed earlier (SEE PAGE 13), adopting a handful of clear, ambitious goals at the system level can help orient the colleges toward a shared set of high priorities. The Chancellor's Office and Board of Governors can reinforce these goals by routinely using them to evaluate system-wide progress and adjust course. The Board of Governors can also do more to recognize and celebrate colleges or programs that meet an objective threshold of success that aligns with the system-wide outcome goals. The Strong Workforce Stars and Rising Stars recognition for colleges reaching specified outcomes is a current example of this.

The Chancellor can also model the kind of behaviors and attitudes that would be helpful at the college level. For instance, the Chancellor should **model a solution-oriented mindset**, focusing on factors within the system's control and **taking the lead instead of waiting** for the Legislature, Governor, or another education sector to initiate change that affects the CCCs. The Chancellor and system office team should also model good leadership practices such as sticking to a clear vision, focusing on priorities while avoiding distractions, and aligning resources with goals. The steady, focused implementation of recommendations from The Student Success Task Force is a good example of this. Looking forward, Guided Pathways presents another good opportunity for the Chancellor's Office to model these leadership practices.

Finally, the Chancellor can promote and **adhere to a policy of rigorous transparency** in reporting at every level. Data definitions and rules ought to provide the fullest picture of student achievement possible, even when it is not especially flattering. Wherever possible, the community college system should strive to make all outcome data public-facing and easily accessible, so that any stakeholder can see a clear and complete picture of college and system performance. As a good example, the Strong Workforce Program publicly posts all uses of funds online.[46] The CCC system already has a reputation as an **honest broker of information** in higher education, and the Chancellor can build on it further by committing to being a strong partner to the Administration and Legislature as they seek to understand the performance of the colleges.



COLLEGE OF THE SISKIYOUS

## COMMITMENT 6:
# Enable action and thoughtful innovation.

Moving the needle on student outcomes will require calculated risk, careful monitoring, and acceptance that failures will sometimes happen. Too often the system has adopted a risk-averse stance because it is afraid of criticism or penalties, but students deserve more. The CCC system as a whole needs a culture shift that values action over inaction, innovation over the status quo. This change will require creativity and openness among people who are more accustomed to rules and regulation. Rather than asking "why?" decision-makers and gate-keepers at the college and state levels will need to start asking "why not?"

At the same time, policy makers at all levels need to sharpen and refine the way they think about innovation. Like any industry, it is easy to latch on to the latest "shiny new object," but it is critical for colleges to avoid adopting a new technology or methodology merely because it is new. It needs to be part of a coherent overall plan.

**FULFILLING THIS COMMITMENT**

Moving forward, colleges should **think carefully about which innovations will track closely with state and local goals**. For instance, those innovations that help students learn better and reach their goals, help faculty assess learning outcomes, or help student services personnel monitor student behavior are all worthy of calculated risk.

Of course, the varying approaches to innovation must be both **thoughtful and deliberate**, with leaders first looking at the data to determine the underlying problems, then choosing among potential solutions. **Results should be tracked early and often**, with colleges adjusting course when necessary. If new strategies don't work, they should be viewed as opportunities to learn and improve. As a system, it is crucial to reward action and thoughtful innovation, not point fingers when results are less than anticipated.

> " There is an opportunity in every moment, if you choose to **seek the vision and act on it**. The only thing restricting change is to not change. "
>
> **— Member of the public**
> via the Virtual Town Hall

# Examples of Promising Innovations

Across California, colleges are pushing forward on many fronts, launching innovative programs and using new technologies to improve student success, such as:

- Using improved assessment and diagnostic tools in targeted, specific ways to support student learning, such as pinpointing basic skills gaps and using the information to assign individualized skill-building exercises to students.

- Using predictive analysis of students' grades and high school courses to inform placement of students into collegiate-level coursework.

- Developing new methods for assessing the prior learning of adult learners by allowing older students to count valuable skills and knowledge gained in other settings (e.g. the military or workplace) toward their desired degree, credential, or transfer.

- Facilitating regional coordination among colleges to address labor market gaps in the region and prepare students for the workforce.

Additionally, by request of the Governor, the CCC system over the coming year will explore establishing a fully online community college to provide full and open access to the opportunities of the CCCs.



SOUTHWESTERN COLLEGE

> " When the economy sours, enrollment spikes and funding drops…It is difficult to plan any long term plans or identify a future vision when there is so much uncertainty in funding and there is a huge lack of planning that is probably stemming from these factors. I see this as the largest challenge to success in the California Community College system today. "
>
> **— Community College Vice President**
> via the Virtual Town Hall

At the state level, it is critical for California to think beyond technological innovations for improving the CCC system, and additionally consider **policy and funding innovations**. Many individuals interviewed for this project or participating in the Virtual Town Hall pointed to the limitations of traditional models of enrollment accounting and "seat time" funding. They noted that these models often restrict colleges from implementing promising new practices, fail to target resources effectively, and create funding volatility that impedes long-term planning. Correcting these structural flaws is not a simple matter, nor one that the Chancellor's Office can tackle alone. A systemwide conversation is needed to consider how current funding mechanisms interfere with CCC performance. Even long-standing policies must be reconsidered if it's clear they are getting in the way of progress.

## HOW THE CHANCELLOR'S OFFICE CAN LEAD THE WAY

The Chancellor should make it clear that the system office should **enable, not stifle, innovation on the ground**. The Chancellor can commit to fostering a culture of open-mindedness and creativity to support colleges that want to try a promising new idea. The Chancellor can also commit to providing political back-up to thoughtful innovators, **offering support, not blame**, when experiments fall short despite good planning.

Additionally, the Chancellor should encourage the Board of Governors to seek ways to **use flexibility as a tool for motivating change and best practices** when possible. For instance, the Chancellor's Office should explore ways to **loosen or waive those categorical program requirements** that are barriers to thoughtful innovation. The Chancellor should work with partners in state government to explore policy and funding innovations that would provide greater flexibility in exchange for demonstrated success, exemptions from rigid seat-time requirements in certain instances that stimulate improved student outcomes, and solutions to address the volatility and instability of enrollment-driven funding.

The Chancellor's Office should continue its work to understand how to **take innovations to scale effectively and rapidly**. As an example, the Doing What Matters for Jobs and the Economy initiative has quickly scaled a program that addresses employer concerns over the lack of "soft skills" among graduates, starting with a network of 10 colleges at first, then expanding to 22 the following year and 35 the year after that. Lessons learned from this approach can benefit the Chancellor's Office as it implements other reform strategies.

Finally, the Chancellor's Office should **shine a spotlight on good ideas** by creating peer-to-peer forums that foster sharing of best practices, including examining and highlighting successful regional models for practices that can potentially be scaled system-wide.

> " We could do a much better job if we could have more control over our colleges, how we spend our money, and how we meet the needs of our students. We have incredibly talented faculty, staff and administrators at our colleges, but they spend much of their time trying to work around regulations that get in the way, rather than **focusing on the true issues that will move the needle** on student success and completion. "

— **Jane Harmon, Ph.D.**
Interim Chancellor,
Yosemite Community College District,
via Virtual Town Hall



COMMITMENT 7:
# Lead the work of partnering across systems.

> "When looking for change, we don't have a united voice. As education systems we are doing a lot of things in opposition to each other. We can do a lot more good when **advocating for change together.**"
>
> — **Alejandro Lomeli**
> Student Leader

On the natural, education systems build toward self-sustenance and autonomy. This is good for systems and the institutions within them, but not always good for students. As documented by numerous studies, students experience significant barriers and disconnects when moving from one system to another.[47] Without strong linkages between K-12 schools and community colleges, the state is limiting access and opportunity for students. Without strong linkages to UC, CSU, and the workforce development system, community colleges are unintentionally hampering students' future prospects. The task now is to reverse engineer California's public education system to make it work better for students, even if that means giving up a piece of turf or control.

Unlike other states, California doesn't have a coordinating body or central authority at the state level to oversee higher education, meaning that postsecondary education leaders must themselves drive the many cross-sector discussions and negotiations needed to function as a connected system of higher education. Some regions are doing this effectively, but most are not. At the state level, there is some activity to coordinate across sectors. For instance, a few years ago the CCC and CSU systems collaborated closely on Associate Degrees for Transfer, an important reform for streamlining transfer pathways for students. More recently, workforce system leaders have engaged with the community colleges to develop a framework for regional collaboration, as required by state and federal policies. And this year, the Board of Governors and the K-12 State Board of Education have activated a Joint Advisory on Workforce Pathways to discuss shared policy imperatives. These are all steps in the right direction, but not sufficient or systemic enough to address the array of cross-system issues that need attention.

## FULFILLING THIS COMMITMENT

Moving forward, education leaders need to meet across education systems much more frequently, in more depth, and with more personnel dedicated to the task. This is true at both the state and regional levels.

There are at least three major cross-system issue areas that need attention:

- The first is **continued work between the CCCs and partners at UC, CSU, and private universities to simplify transfer pathways for students**. As an overarching design principle, all parties should strive to simplify the process rather than create elaborate communications and counseling systems to help students navigate an overly complicated path.

- A second area is **ongoing feedback between CCC technical education programs, workforce development programs, and employers**. These activities should also be coordinated with K-12 and the other post-secondary education systems, to provide consistent messaging to students and avoid a cacophony of requests to businesses and industry groups.

- A third area for emphasis is forming an **active partnership with the K-12 system to align messaging, expectations, and policy**. Collectively, we need to enhance the way we communicate about community college readiness and the need for early career exploration to students, families, and educators. The state must seek productive ways for CCC and K-12 faculty to work together across sectors to break down an "us versus them" mentality and make real progress on aligning expectations and curriculum. Each party must accept responsibility for building these linkages and also for fixing problems that arise from failures to communicate and partner effectively.

## HOW THE CHANCELLOR'S OFFICE CAN LEAD THE WAY

The Chancellor's Office should **model the kind of cross-sector collaboration and leadership at the state level** that needs to be seen at the local level. To this end, the Chancellor should initiate joint meetings with peers at the UC, CSU, workforce development, and K-12 systems to address priority issues.

The Chancellor should also **call on the leaders of other education sectors to help address issues that affect students transferring from CCCs**, such as impaction policies that limit the enrollment of transfer-ready CCC students or institutions not honoring Associate Degrees for Transfer as expected. The Chancellor should also encourage both UC and CSU to join in adopting the global principle of holding students harmless for poor alignment and communication across the sectors (SEE PAGE 21). Additionally, the Chancellor should work with other education sector leaders to share student data safely and securely, allowing CCCs to better understand which students are moving into other systems and whether they are persisting and succeeding.

Finally, the Chancellor should **lead a statewide conversation about the collective impact of our higher education system** on social and economic mobility, taking the same, rigorously transparent approach proposed for the community college system. The Chancellor should work with partners in K-12, CSU, UC, and the workforce development system to set long-term goals for improvement. By setting and owning goals together, collectively, California's education segments can skip the finger-pointing and move ahead with finding shared solutions.

# Join the Vision for Success

In interviews and the Virtual Town Hall, many stakeholders commented that this moment represents a ripe opportunity for the California Community Colleges (CCCs). They cited a growing national awareness about income inequality and the need for accessible opportunities for upward mobility. They mentioned California's relatively robust investments in CCCs in recent years and the Governor's and Legislature's continued interest in supporting change and improvement in the colleges. Finally, they mentioned the leadership potential of the new Chancellor. To many individuals inside and outside the CCC system, this moment represents an opportunity for transformational change.

Still, this opportunity will not be realized without collective action. This document lays out ambitious goals and a set of comprehensive commitments to achieve those goals. Together these commitments are a call to action that extends to every individual in the college system. All personnel in the college system can embrace the seven commitments and make changes big and small that help move the system closer to its goals. The CCCs have always strived to help their students reach their full potential. Now is the time for the colleges themselves to reach their full potential as California's engine of social and economic mobility. It will take courage and persistence, but California's students deserve no less.

This call to action must extend beyond the colleges as well, to all Californians, because the success of the CCCs is essential to the success of our state as a whole. For those who work outside the CCC system, there are plenty of ways to stay involved and contribute. You can, for example:

- Attend your local college district board meetings and ask questions about the district or college's goals, performance, and plans for improvement.

- Watch the state level Board of Governors meetings online. Write to the Board about your concerns.

- Write to your state legislator and voice your support for the CCCs.

- Talk to the community colleges students you know and ask them about their educational and life goals. Support them—emotionally, academically, or financially—as they work towards those goals.

- Attend a community college graduation ceremony to celebrate the hard work of CCC faculty, administrators, and students themselves.

Regardless of one's role inside or outside of the colleges, every individual can join in the commitments, follow the collective progress of community colleges, and hold our system leaders accountable. No less than California's future is at stake.

> "The CCC system should deliberate, discuss, and engage in discourse with all Californians with regard to the topics discussed here. Without dialogue, truth cannot present itself. With **continuous dialogue** with all stakeholders, California will benefit."
>
> **— Member of the public**
> via the Virtual Town Hall

# References

1   Legislative Analyst's Office. *2016-17 Budget: Higher Education Analysis* (February 26, 2016).
    http://www.lao.ca.gov/Publications/Report/3372

2   Public Policy Institute of California Higher Education Center. *Higher Education in California* (April 2016).
    http://www.ppic.org/content/pubs/report/R_0416HEBKR.pdf

3   National Center for Education Statistics. Table 308.10: "Total 12-month enrollment in degree granting post-secondary
    institutions, by control and level of institution and state or jurisdiction: 2013-2014" (2015).
    https://nces.ed.gov/programs/digest/d15/tables/dt15_308.10.asp?current=yes
    Notes: Total U.S. enrollment in public 2-year colleges in 2013-14 (most recent year of data available) was 9,798,621.
    Total California enrollment in public 2-year colleges in 2013-14 was 2,104,251.

4   Chetty, R., Grusky, D., Hell, M., Hendren, N., Manduca, R., and Narang, J. *The Fading American Dream: Trends in Absolute
    Income Mobility Since 1940* (The Equality of Opportunity Project; December 2016).
    http://www.equality-of-opportunity.org/assets/documents/abs_mobility_summary.pdf

5   California Community College Chancellor's Office. "California Community Colleges Key Facts" (2017).
    http://californiacommunitycolleges.cccco.edu/PolicyInAction/KeyFacts.aspx

6   California State University Budget Office. Table: "Total Headcount Enrollment by Term, 2015-16 College Year" (2016).
    http://www.calstate.edu/budget/enrollment_sufrev/2015-2016/?table=tbl_1
    and
    University of California Infocenter. Table: "University of California Fall Enrollment Headcount by Level and Residency"
    (2016).
    https://www.universityofcalifornia.edu/infocenter/fall-enrollment-headcounts
    Note: UC enrollment figure does not include students in medical residency.

7   Texas Higher Education Coordinating Board, compiled by the Texas Association of Community Colleges.
    Table: "Fall Enrollment" (November 2016).
    http://www.tacc.org/uploads/tinymce/data%20and%20info/enrollment/fall%202016%20enroll.pdf

8   California Community College Chancellor's Office. "California Community Colleges Key Facts" (2017).
    http://californiacommunitycolleges.cccco.edu/PolicyInAction/KeyFacts.aspx

9   California Community College Chancellor's Office. *2017 Student Success Scorecard* (statewide report).
    http://scorecard.cccco.edu/scorecardrates.aspx?CollegeID=000

10  California Community Colleges Chancellor's Office, Management Information Systems Data Mart. "Enrollment Status
    Summary Report" (options selected: Fall 2016, enrollment status; accessed June 2017).
    http://datamart.cccco.edu/Students/Enrollment_Status.aspx

11  California Community College Chancellor's Office. *2017 Student Success Scorecard* (statewide report).
    http://scorecard.cccco.edu/scorecardrates.aspx?CollegeID=000

12  California Community College Chancellor's Office, Management Information Systems Data Mart. "2015-16 Annual Student
    Headcount." http://datamart.cccco.edu/Students/Student_Term_Annual_Count.aspx

13  Legislative Analyst's Office. *2016-17 Budget: Higher Education Analysis* (February 26, 2016).
    http://www.lao.ca.gov/Publications/Report/3372

14  The College Board. Table: "Average Published Tuition and Fees by State in Current Dollars and in 2016 Dollars, 2004-05 to
    2016-17," in *Trends in Higher Education* (no date; accessed online April 2017).
    https://trends.collegeboard.org/college-pricing/figures-tables/tuition-fees-sector-state-over-time

15  California Community Colleges Chancellor's Office, Management Information Systems Data Mart. "Financial Aid Summary
    Report" (accessed online June 2017).
    http://datamart.cccco.edu/Services/FinAid_Summary.aspx

16  Public Policy Institute of California Higher Education Center. *Expanding College Access* (April 2016).
    http://www.ppic.org/content/pubs/report/R_0416HEBKR.pdf

17  Legislative Analyst's Office. *2016-17 Budget: Higher Education Analysis* (February 26, 2016).
http://www.lao.ca.gov/Publications/Report/3372

18  Community College League of California. "Fast Facts 2015" (March 2015).
http://www.faccc.org/wp-content/uploads/2015/04/ff2015.pdf

19  Source of data: California State University Office of Analytics, Fall 2010 cohort, and University of California Institutional Research and Academic Planning, Fall 2009 cohort. Source of analysis: Public Policy Institute of California, by special request. Notes: Among CSU freshmen that persist to junior year, 79 percent graduate within four additional years. Among community college transfers to CSU, 72.8 percent graduate within four additional years. Among UC freshmen that persist to sophomore year, 88.5 percent graduate within four additional years. Among community college transfers to UC, 86.1 percent graduate within four additional years.

20  Legislative Analyst's Office. *The 2017-18 Budget: Higher Education Analysis* (February 16, 2017).
http://lao.ca.gov/Publications/Report/3559#top

21  California Community College Chancellor's Office. *2016 State of the System Report* (2016): 6.
http://californiacommunitycolleges.cccco.edu/Portals/0/Reports/2016-SOS-Report-ADA.pdf

22  California Community College Chancellor's Office. *2017 Student Success Scorecard* (statewide degree/transfer report: completion).
http://scorecard.cccco.edu/scorecardrates.aspx?CollegeID=000

23  California Community College Chancellor's Office. "Methodology for College Profile Metrics" (January 2017).
http://extranet.cccco.edu/Portals/1/TRIS/Research/Accountability/ARCC2_0/Profile%20and%20College%20Specs%20jan%202017%20draft.pdf

24  Johnson, H., Cuellar Mejia, M., and Bohn, S. *Will California Run Out of Graduates?* (Public Policy Institute of California, October 2015).
http://www.ppic.org/content/pubs/report/R_1015HJR.pdf

25  California Competes. *Mind the Gap: Delivering on California's Promise for Higher Education* (December 2015), 7-8.
http://californiacompetes.org/wp-content/uploads/2015/12/Mind-the-Gap.pdf

26  California Competes. *Credential Crunch* (2013), 7.
http://californiacompetes.org/wp-content/uploads/2012/06/CaCompetes_Credential_Crunch.pdf

27  Foundation for California Community Colleges. "California Community College Facts and Figures" (accessed online June 2017).
http://foundationccc/About-Us/About-the-Colleges/Facts-and-Figures

28  Foundation for California Community Colleges. "California Community College Facts and Figures" (accessed online June 2017).
http://foundationccc/About-Us/About-the-Colleges/Facts-and-Figures

29  California Community Colleges Chancellor's Office, Management Information Systems Data Mart. "Citizenship Status Summary Report" (accessed online June 2017).
http://datamart.cccco.edu/Students/Citizenship_Status_Summary.aspx

30  Lumina Foundation. "California's Progress Toward the Goal" in *A Stronger Nation: Learning beyond high school builds American talent* (accessed online June 2017).
http://strongernation.luminafoundation.org/report/2017/#state/CA

31  Legislative Analyst's Office. *2016-17 Budget: Higher Education Analysis* (February 26, 2016).
http://www.lao.ca.gov/Publications/Report/3372

32  The Institute for College Access and Success. "What College Costs for Low-Income Californians" (February 2017).
http://ticas.org/content/pub/what-college-costs-low-income-californians

33  California Community Colleges Chancellor's Office. *2017 Student Success Scorecard* (Statewide Report, Remedial/ESL).
http://scorecard.cccco.edu/ADA_scorecard.aspx

34  Committee for Economic Development. *Boosting California's Postsecondary Education Performance: A Policy Statement and Call to Action* (Washington, DC: November 2013): 11.
http://www.ltg.ca.gov/docs/CED%20California%20Rpt6.pdf

35  California Competes. "Community College Completion" (November 19, 2013).
    http://californiacompetes.org/news_and_events/cccmap/

36  California Competes, by special request (2017).
    Notes: Central Valley and Sierras region includes the counties of Alpine, Amador, Calaveras, Fresno, Inyo, Kern, Kings, Madera, Mariposa, Merced, Mono, San Joaquin, Stanislaus, Tulare, and Tuolumne. Inland Empire region includes the counties of Riverside and San Bernardino. Far North region includes the counties of Butte, Colusa, Del Norte, Glenn, Humboldt, Lake, Lassen, Mendocino, Modoc, Nevada, Plumas, Shasta, Sierra, Siskiyou, Tehama, and Trinity.

37  Source of analysis: Centers of Excellence for Labor Market Research, by special request (2017).
    Notes: According to the Centers of Excellence for Labor Market Research, there were 102,761 associates degrees, certificates, credit and noncredit awards in career technical fields awarded in the CCCs in 2015-16. Meeting this goal will require attention to whether the number and types of awards issued are a good match for the labor market. Unfortunately this cannot be easily assessed using currently available data sources. However, the number of awards issued, in combination with the goal on employment in field of study, will provide evidence about whether the goal is being met. Increased wage gains among skills-builders would also be evidence of the goal being met. Because of forthcoming changes in the way the state projects job openings, the Chancellor's Office should revisit and revise this goal as appropriate in the coming years.

38  Source of analysis: Johnson, H. "Testimony: Closing California's Workforce Skills Gap" (Public Policy Institute of California Higher Education Center, May 18, 2016). http://www.ppic.org/main/blog_detail.asp?i=2050
    Additional analysis by Public Policy Institute of California, by special request (2017).
    Source of statement about growth in occupations requiring bachelor's degrees: Centers of Excellence for Labor Market Research, by special request (2017).
    Source of CCC to CSU transfer data: California State University. "California Community College Transfers, By Institution of Origin" (options selected: "all" in all categories; accessed online June 2017).
    http://asd.calstate.edu/ccct/2015-2016/SummaryYear.asp
    Source of CCC to UC transfer data: University of California. "Transfer fall admissions summary" (options selected: transfer enrollees, residency, CA community colleges; accessed online June 2017).
    https://www.universityofcalifornia.edu/infocenter/transfer-admissions-summary
    Notes: The most recent year of available transfer data for *both* UC and CSU is 2015-16, showing that there were 13,549 CCC transfers to UC in Fall 2015 and 58,272 CCC transfers to CSU in 2015-16. (Note: UC data for Fall 2016 were available at the time of this publication and showed a promising increase in the number of transfers. CSU data for 2016-17 were not yet available at the time of publication.)

39  Source of analysis of statewide average and top quintile average: Foundation for California Community Colleges, by special request (2017).
    Source of raw data: California Community College Chancellor's Office, by special request (2017).
    Notes: Analysis based on most recent year of data, 2015-16. Analysis includes total units for all students, excluding those student records showing degree attainment with less than 60 units, on the rationale that virtually all 2-year associate degrees require at least 60 units and the excluded records likely reflect a record-keeping anomaly.

40  Source of analysis of statewide average and top quintile average: Santa Rosa Junior College, administrator of the CTE Outcomes Survey.
    Notes: The most recent administration of the CTE Outcomes Survey was 2016, with 68 colleges participating. (In future administrations, all colleges will participate.) Survey respondents are former CCC students who received a CTE award or who took at least 9 units of CTE coursework, including at least one non-introductory course. Respondents counted as having employment in their field of study if they reported their job was "very closely" or "closely" related to their CTE coursework. Percentage calculation includes in the denominator respondents who were unemployed at the time of the survey, but excludes students who had transferred to a 4-year university and were pursuing studies, students who reported taking their CTE coursework for non-employment reasons (e.g. personal enrichment), and students who skipped the question on the survey. For more information on the CTE Outcomes Survey, see https://cteos.santarosa.edu/

41  California Education Code Section 84754.6 as amended by Chapter 687, Statutes of 2014.

[42] California Community College Chancellor's Office. *2016 State of the System Report* (2016): 6.
http://californiacommunitycolleges.cccco.edu/Portals/0/Reports/2016-SOS-Report-ADA.pdf

[43] Adapted from:

American Association of Community Colleges. "Guided Pathways: Planning, Implementation, Evaluation" (February 2017).
http://www.aacc.nche.edu/Resources/aaccprograms/pathways/Documents/AACCPathways_Planning_Implementation_Graphic_FINAL.pdf
and
Stobel, N. and Christian, S. *What is the "Guided Pathways Model?"* (Bakersfield College, November 15, 2016).
http://extranet.cccco.edu/Portals/1/ExecutiveOffice/Board/2017_agendas/January/Item-3.3-Attachment-1-Pathways.pdf

[44] Hodara, M., Jaggars, S., and Karp, M. *Improving Developmental Education Assessment and Placement: Lessons from Community Colleges Across the Country. Working Paper No. 51* (Columbia University, Teachers College, Community College Research Center; 2012).

Hughes, K., and Scott-Clayton, J. *Assessing Developmental Assessment in Community Colleges. Working Paper No. 19* (Columbia University, Teachers College, Community College Research Center; 2011).

Rodríguez, O. *Increasing Access to College-Level Math: Early Outcomes Using the Virginia Placement Test. Brief No. 58* (Columbia University, Teachers College, Community College Research Center; 2014).

Henson, L., and Hern, K. "Let Them In: Increasing Access, Completion, and Equity in College English." *Perspectives*: November/December (The Research and Planning Group for California Community Colleges; 2014).

Scott-Clayton, J., Crosta, P., and Belfield, C. "Improving the targeting of treatment: Evidence from college remediation." *Educational Evaluation and Policy Analysis* 36, 371–393; 2014).

[45] California Community College Chancellor's Office. *2016 State of the System Report* (2016): 6.
http://californiacommunitycolleges.cccco.edu/Portals/0/Reports/2016-SOS-Report-ADA.pdf

[46] Note: See doingwhatmatters.cccco.edu/StrongWorkforce/2016_17PlansAndAnalytics.aspx

[47] See, for example:

Career Ladders Project and Jobs for the Future. *College to Career Pathways: Getting from Here to There on the Roadmap for a Stronger California Economy* (Prepared for the CCC Task Force on Workforce, Job Creation and a Strong Economy; April 10, 2015).
http://doingwhatmatters.cccco.edu/portals/6/docs/SW/Structured%20Pathways%20&%20Support%20Support_Part%201-042015.pdf

Little Hoover Commission. *A New Plan for a New Economy: Reimagining Higher Education* (October 2013).
http://www.lhc.ca.gov/studies/218/Report%20218.pdf

Tierney, W. and Rodriguez, B. *The Future of Higher Education in California: Problems and Solutions for Getting In and Getting Through* (Pullias Center for Higher Education, Rossier School of Education, University of Southern California; April 2014).
http://www.uscrossier.org/pullias/wp-content/uploads/2014/06/The-Future-of-Higher-Education-in-CA-Monograph.pdf

Venezia, A., Bracco, K., and Nodine, T. *One Shot Deal? Students Perceptions of Assessment and Course Placement in California's Community Colleges* (Wested; 2010).
https://www.wested.org/resources/one-shot-deal-students-perceptions-of-assessment-and-course-placement-in-californias-community-colleges/



# EXHIBIT E

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
DOMONIQUE C. ALCARAZ
LEE I. SHERMAN
JASLEEN SINGH
MARISSA MALOUFF (SBN #316046)
Deputy Attorneys General
  300 S. Spring St., Suite 1702
  Los Angeles, CA 90013
  Telephone: (213) 269-6467
  Fax: (213) 897-7605
  E-mail: Marissa.Malouff@doj.ca.gov
*Attorneys for State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **THE STATE OF CALIFORNIA,**<br><br>Plaintiff,<br><br>v.<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD F. WOLF, in his official capacity as Acting Secretary of Department of Homeland Security; and MATTHEW ALBENCE, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,**<br><br>Defendants. | Civil Case No. 4:20-cv-04592-JST<br><br>**DECLARATION OF JUDY C. MINER IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

I, Judy C. Miner, declare as follows:

1. I am a resident of the State of California. I am Chancellor of the Foothill-De Anza Community College District (FHDA or the District).

2. I make this Declaration based upon my personal knowledge, a review of records and information kept in the regular course of FHDA business and made available to me in the course of my duties at FHDA, and information provided to me by FHDA employees including those who work under my direction and supervision and those who do not. If called as a witness, I could and would testify competently to the matters set forth below.

3. I have been employed as Chancellor since August 1, 2015. I have worked as a higher education administrator since 1977 and in the California Community Colleges (CCCs) since 1979. I have held numerous administrative positions in instruction, student services, and human resources at City College of San Francisco, the CCCs Chancellor's Office, De Anza College, and most recently Foothill College, where I served as president from 2007-2015.

4. As part of my regular job duties as Chancellor, I am responsible for guiding an effective long-range planning process; working with the presidents of Foothill and De Anza colleges in focusing on the colleges' primary roles of teaching and learning; providing leadership for the role of technology in higher education; advancing the district's commitment to diversity and cultural pluralism; overseeing district and college budgets; supporting the district's commitment to participatory governance; advocating for the educational and financial needs of the district to local, state, and federal government officials; strengthening existing ties and developing new sustainable partnerships with business, industry, local communities, other colleges and universities, K-12 schools, and other entities; and working with the Foothill-De Anza Foundation to raise funds.

5. I have reviewed Immigration and Customs Enforcement's (ICE) policy entitled "COVID-19: Guidance for SEVP Stakeholders," published March 13, 2020 (March 13 Guidance), and am familiar with its contents.

6. I have reviewed ICE's Broadcast Message entitled "COVID-19 and Fall 2020," issued on July 6, 2020 (July 6 Directive), and am familiar with its contents.

1

**International Students at FHDA**

7.    The District has a long history of hosting international students for more than 30 years.  Recently, FHDA had 2,256 distinct F-1 students enrolled during the spring 2020 term, the second largest population of international students at a CCC district.  This includes 700 F-1 students enrolled at Foothill College and 1,692 F-1 students enrolled at De Anza College (some students are cross enrolled).  Our F-1 students come from approximately 90 countries, the top ten countries being China, Indonesia, South Korea, Taiwan, Japan, Vietnam, Malaysia, Hong Kong, India and Brazil.

8.    International students' presence on FHDA campuses furthers our mission which declares: "The mission of the Foothill-De Anza Community College District is student success.  We are driven by an equity agenda and guided by core values of excellence, inclusion, and sustainability.  Every member of our district contributes to a dynamic learning environment that fosters student engagement, equal opportunity, and innovation in meeting the various educational and career goals of our diverse students.  We are committed to providing an accessible, quality undergraduate education dedicated to developing a broadly educated and socially responsible community that supports an equitable and just future for California."

9.    The vibrancy and diversity of our international student population are key contributors to sustaining our core values of excellence and inclusion.  Their global perspectives and experiences enhance the learning experience for all of our students, and the international students are an integral part of the fabric of the FHDA communities.  The high transfer rates of FHDA international students to four-year universities are a testament to the educationally rich environment in which international students share their talents and perspectives.

**FHDA Response to COVID-19**

10.    In light of the public health threat posed by COVID-19, FHDA moved to virtual learning on March 16 for all classes, except for those that could not be adequately completed without an in-person component—such as studio arts, science laboratories, physical activity courses, automotive technology, and allied health clinicals.  This shift coincided with the last week of classes for the winter quarter 2020, followed by one week of finals and one week of

2

spring break.  Instruction for spring quarter 2020 was delayed by one week in order for FHDA to provide professional development for all employees to prepare for 100 percent virtual learning as of April 13.

11. On May 27, I sent a message to all employees regarding FHDA's decision for summer and fall 2020 plans, which comprised 100% online classes and very limited hybrid classes that would be required to follow health and safety guidelines.  The highest priority for hybrid courses were and continue to be our allied health programs because they train essential workers.

12. On the same day this message was sent, FHDA formed a districtwide Consultation Task Force to effectuate planning for the summer and fall 2020 quarters.  I chaired the task force. About 25-30 individuals have attended two meetings including two student body presidents, three Academic Senate Presidents, three Classified Senate Presidents, two college presidents, three vice-chancellors, eight vice-presidents, 10 union presidents and their chief negotiators, and four meet-and-confer representatives.  The planning process lasted two months.  We met twice where we discussed the results of a student and staff survey, discussions at senate meetings and governance councils, and public health data and guidelines regarding COVID-19.  After recommendations were given to the task force by the Chancellor's Cabinet, it agreed to proceed with a fall 2020 plan that embodied the abundance of caution necessary in the face of a global pandemic.

13. In creating the District's fall 2020 plan, FHDA relied upon the representations in ICE's March 13 Guidance that its in-person learning exemptions for F-1 students would be in effect for the duration of the COVID-19 emergency.  Because of the March 13 Guidance, FHDA was able to create a plan of predominantly online instruction that safeguarded the health and safety of all of the District's students, staff, and faculty without concern that the District's international students will lose their status.

**The July 6 Directive Harms FHDA**

14. The July 6 Directive significantly disrupts FHDA's fall 2020 plans as we must now redirect time and effort away from other major initiatives—including but not limited to

3

general obligation bond projects in support of housing, capital construction, and energy management; likely budget reductions by the State of California; and workforce and economic development partnerships to benefit students and local businesses—that we normally take in preparation for the new school year toward considering whether to modify our fall 2020 plan we have already spent months creating.  Because this work is in addition to what we planned for, we will incur added expenses, yet to be calculated.

15.    FHDA is assessing possible modifications to assist international students in the registration system and their attendant costs in light of the July 6 Directive.  We may need all remaining 11 weeks before the start of fall 2020 to fully implement any necessary changes —if we determine we can safely accommodate them.  The ultimate timing is dependent on faculty availability, the courses they might offer, and the required effort to create or modify existing courses.

16.    The task force will meet again on July 16 to continue preparations for the fall 2020 term and discuss what—if any—changes FHDA can make to support its international students. We continue to evaluate how much in-person instruction can be safely offered given the increase of COVID-19 cases in Santa Clara County.  Public data provided by Santa Clara County shows the number of new and cumulative cases of COVID-19 and related deaths over time.  In Santa Clara, the COVID-19 pandemic continues.  In the last month, FHDA had an employee test positive for COVID-19.  This required FHDA to devote extensive resources to conduct sanitization and contact tracing for exposure to fewer than 10 people.  Based on that one instance, it is unclear whether FHDA would have the resources to take similar actions if a large segment of the campus population were infected as a result of the more expansive in-person learning FHDA is contemplating because of the July 6 Directive.

17.    In addition to reassessing fall 2020 plans, FHDA staff are required to re-issue new Forms I-20 to each student certifying that the District is not operating entirely online, that the student is not taking an entirely online course load for the fall 2020 quarter, and that the student is taking the minimum number of online classes required to make normal progress in their degree program.  To meet this new requirement, we believe all nine of the district's Designated School

4

Decl. of Judy C. Miner in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)

Officials (DSOs) (three of whom are full-time immigration advisors, the other six of whom are DSOs in addition to a full slate of other responsibilities) will need to dedicate a full three weeks of time to the project—working beyond normal office hours (likely including evening and weekends).  Never before has FHDA had to re-issue Form I-20s en masse to all of its international students.

18.    Given that FHDA may not be able to change fall 2020 plans to accommodate all of its international students, it anticipates a significant number of its international students will dis-enroll because they will be unable to comply with the July 6 Directive.  FHDA's community stands to lose invaluable members of its educational communities.  Additionally, FHDA stands to lose approximately $26,000,000 from loss of revenue from disenrollment of international students.  International students pay the full cost of their education, with no subsidy from the state.  This contributes additional funding that allows us to better support instruction and services for all students, beyond the funding provided us by the state.

**The July 6 Directive Harms FHDA's Students**

19.    Students who returned to their home countries in reliance on the March 13 guidance, have expressed to FHDA that they may be unable to return to the United States due to international travel restrictions, and the inability to secure necessary transit visas due to consular closures.  Other students have expressed reticence to travel in the middle of an active global pandemic, fearing that returning to the United States during this time period may put their health at risk.

20.    While we are still awaiting clarity on this aspect of the July 6 Guidance, our understanding is that students who are unable to return to the United States may not be able to maintain their F-1 visa status even if FHDA can offer a sufficient number of in-person classes.

21.    If the District is unable to offer the necessary number of in-person courses for all F-1 students in the United States, these students would be forced to return to their home countries or transfer to another school.  Many students have communicated to our staff that they may be unable to leave the United States due to extremely high flight costs, flight cancellations, the inability to obtain the transit visas necessary to return home due to consular closures, and travel

5

restrictions.  They have also expressed fear of traveling internationally during an active global pandemic.

22.     If international students are able to return to their home countries, there may be additional challenges to studying online from outside of the United States, including time zone differences and technology barriers.

23.     If the July 6 Directive goes into effect, some of our international students will face a significant disruption to their educational endeavors.  This is particularly harmful to those students who have invested years in their education and expected to graduate soon.  These students also may lose the opportunity to participate in Optional Practical Training or other gainful employment.

I declare under penalty of perjury under the laws of the United States and State of California that the foregoing is true and correct, and that this declaration was executed on July 12, 2020 in San Francisco, California.

Judy C. Miner

Decl. of Judy C. Miner in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)

# EXHIBIT F

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
DOMONIQUE C. ALCARAZ
LEE I. SHERMAN
JASLEEN SINGH
MARISSA MALOUFF (SBN #316046)
Deputy Attorneys General
  300 S. Spring St., Suite 1702
  Los Angeles, CA 90013
  Telephone: (213) 269-6467
  Fax: (213) 897-7605
  E-mail: Marissa.Malouff@doj.ca.gov
*Attorneys for State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **THE STATE OF CALIFORNIA,**<br><br>Plaintiff,<br><br>v.<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD F. WOLF, in his official capacity as Acting Secretary of Department of Homeland Security; and MATTHEW ALBENCE, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,**<br><br>Defendants. | Civil Case No. 4:20-cv-04592-JST<br><br>**DECLARATION OF TERESITA RODRIGUEZ IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

I, Teresita Rodriguez, declare as follows:

1.      I am a resident of the State of California.  I am the Vice President, Enrollment Development at the Santa Monica College Community College District (SMC or the College).

2.      I make this declaration based upon my personal knowledge, a review of records and information kept in the regular course of SMC business and made available to me in the course of my duties at SMC, and information provided to me by SMC employees including those who work under my direction and supervision and those who do not.  If called as a witness, I could and would testify competently to the matters set forth below.

3.      I have been employed as Vice President, Enrollment Development since January 1, 2007.  Before serving at SMC, I served as Student Service Coordinator, Student Affirmative Action at Humboldt State University from 1990-1992, then Director of Admissions at California State University, San Marcos from 1992-2000 before beginning at SMC as Assistant Dean, Enrollment Services in 2001 then Dean and ultimately Vice President in 2007.

4.       As part of my regular job duties as Vice President, Enrollment Development, I am responsible for admission, onboarding, graduation and enrollment reporting.  Specifically, the Offices of Admissions & Records, Financial Aid and Scholarships, Student Success and Engagement, Outreach, Welcome Center and International Education all report to the Division of Enrollment Development.

5.      I have reviewed Immigration and Customs Enforcement's (ICE) policy entitled "COVID-19: Guidance for SEVP Stakeholders," published March 13, 2020 (March 13 Guidance), and am familiar with its contents.

6.      I have reviewed ICE's Broadcast Message entitled "COVID-19 and Fall 2020," issued on July 6, 2020 (July 6 Directive), and am familiar with its contents.

**International Students at SMC**

7.      SMC enrolls the largest number of international students at any community college in the State of California and is the third highest in the country.  At its high, SMC enrolled over 3,400 F-1 visa students per semester.

1

8.     Each spring, SMC completes an annual census of our international students based on fall enrollment.  This census is submitted to the Institute of International Education (www.iie.org) which produces an annual Open Doors report on international education in the United States.  The report is sponsored by the U.S. Department of State (https://www.iie.org/Research-and-Insights/Open-Doors).  According to our fall 2019 census, there were 2,714 students from 99 countries enrolled at SMC.  Exhibit 1 attached hereto sets forth the countries of origin of SMC students for fall 2019.

9.     SMC has a long-standing commitment to contributing to the global community as evidenced in its Global Citizenship initiative and as reflected in its Mission Statement, which states:

> "Students learn to contribute to the local and global community as they develop an understanding of their relationship to diverse social, cultural, political, economic, technological, and natural environments. The College recognizes that each individual makes a critical contribution to the achievement of this mission.
>
> Santa Monica College's academic programs and support services are intended to serve diverse individuals from local, national, and global communities who are seeking high-quality, affordable undergraduate education."

10.     SMC has been a leader in international education since the 1980's and has won awards for internationalization.  International students are an integral part of the College.  The diversity of thoughts and experiences that the F-1 visa students bring to the classroom helps all SMC students grow and learn how to become global citizens even if they are unable to travel. The College has invested heavily in growing and supporting its international student population.

**SMC's Response to COVID-19**

11.     Through its Emergency Operations Team (EOT), SMC began to monitor the COVID-19 outbreak closely in January with the travel ban that threatened the beginning of our spring term.  Many international students who had traveled home for winter break were unable to return to the United States in time to begin their spring courses.

2

12.     On March 4, Los Angeles County declared a public health emergency followed by Governor Newsom's declaration of a state of emergency.  On March 9, the college repurposed its institutional flex day to provide training for faculty and staff on the use of online technologies in preparation for a move to remote instruction and service delivery.  On March 11, SMC announced the move to remote instruction, with classes cancelled temporarily from March 13-17 and instruction resuming online on March 18.  Student support services followed and all in-person activities and travel were cancelled.  On April 7, the College announced that due to the ongoing global health crisis, it would remain online through summer 2020.  Finally, on April 30, SMC announced that it would continue in remote format through fall 2020.

13.     Prior to the July 6 Directive, SMC planned to operate a hybrid model with predominately online instruction for the fall 2020 semester.  This hybrid model only permits a narrow exception to provide in-person classes for SMC's nursing program.  Planning for resuming in-person nursing program began in early May.  On May 27, the EOT issued a draft eight-page draft "Summer Nursing Program Hybrid Pilot" that was carefully developed and summarized in the introductory paragraph: "The purpose of this document is to outline protocols and procedures for the implementation of a limited hybrid on site class involving 36 students and associated faculty/staff.  The Summer Clinicals (N2L) will begin on June 22, 2020 and end August 15, 2020.  They will consist of four sections each meeting for 12 hours on an assigned day. No two groups will be on site at any time and the group will consist of nine students, one faculty member and two faculty/staff safety monitors."   In addition, we needed to secure approval from the Los Angeles County Public Health, which was obtained on June 19, 2020.  In our public announcements, we indicated that we would consider other in-person classes if allowed by public health considerations.

14.     SMC decided to remain operating predominantly online after consultation with the Los Angeles County Public Health Department, health orders from the California Governor, and the Center for Disease Control.  The College's EOT also includes a health care professional and the College's Risk Manager.  The public health risks to reopening weighed heavily in the decision

3

Decl. of Teresita Rodriguez in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)

1  making.  COVID-19 is a highly contagious virus and it is impossible to conduct in-person classes

2  while maintaining social distancing given the size of our classrooms.

3       15.     SMC implemented the remote learning for spring 2020 consistent with the March

4  13 Guidance, which allowed international students present in the United States to lawfully remain

5  while studying entirely online.  The guidance further allowed international students who either

6  could not enter the United States due to the enactment of the ban on foreign travel or had chosen

7  to return home, to remain in status while pursuing a full-course of study from abroad.

8       16.     SMC relied upon ICE's March 13 Guidance's representation that its in-person

9  learning exemptions would be in effect for the duration of the COVID-19 emergency, in creating

10  the college's fall 2020 plan.  Because of the March 13 Guidance, SMC was able to create a plan

11  that safeguarded the safety and health of all SMC's students, staff, and faculty, without the fear

12  that SMC's international students will lose their status.  Based on those expectations, SMC

13  created its fall 2020 fiscal projections and enrollment plan, which would include 100 percent of

14  online classes with the exception of in-person classes for 36 nursing students.  As part of its

15  enrollment plan, SMC expected to retain those students currently in the United States and a large

16  portion of the students who left the United States but were actively maintaining their F-1 visa

17  status from abroad.

18       17.     Throughout the planning process on whether to continue with predominantly

19  remote instruction in fall 2020, the College engaged in robust training of faculty and staff on the

20  use of technology to deliver instruction and support services.  The college also provided

21  significant support to faculty and students alike with loaner Chromebooks and laptops, access to

22  free internet sources, and a drive-through food pantry for students, including our international

23  students.

24  **The July 6 Directive Harms SMC**

25       18.     The July 6 Directive significantly disrupts SMC's thoughtfully considered and

26  designed fall 2020 plans, only weeks before the academic year is scheduled to start on August 31,

27  2020.  The new Directive would impose a heavy administrative burden on SMC.  To comply with

28  the Directive, SMC's International Education Center will need to shift all student support

4

resources to reissuing Form I-20s to over a thousand students and SEVIS compliance protocols. This will require 19 full-time staff members to work a combined 570 overtime hours to meet the new compliance mandates by the prescribed deadline of August 4, 2020.  This requirement to re-issue Forms I-20 in mass is unprecedented for the College.

19.     SMC would need at least 12 months to adequately prepare to meet the SEVIS mandates imposed by the July 6 Directive and to prepare in-person course options.  It took SMC over 45 days to plan for in-person nursing instruction for 36 students.  Substantially more time would be required to organize logistics to serve all of our international students.  Every space utilized by students needs to reconfigured by the College's EOT.

20.     Holding more in-person courses in the midst of a global health care emergency also exerts additional administrative costs and burdens on SMC.  The only in-person courses SMC decided to offer in fall 2020 are nursing program courses limited to a cohort of students already enrolled in the program.  These classes would be insufficient to enroll all of its F-1 students.  The July 6 Directive has forced SMC to explore whether it can safely offer a minimal number of in-person classes to meet the needs of F-1 students present in the United States.  However, exploring this option is not easy.  In-person courses will need to comply with social distancing protocols and SMC will need to purchase PPEs for faculty, staff, and students, and implement deep cleaning protocols to sanitize classrooms, administrative offices, and public spaces.  International students have expressed deep reservations about being put in courses with in-person components.  They fear getting sick.  The new ICE Directive forces them to choose between remaining in status or risking their health.

21.     Conducting in-person learning in order to accommodate the July 6 Directive would place the entire SMC community at risk.  SMC does not have classroom spaces that would enable adequate social distancing.  And recently confirmed cases of COVID-19 in Los Angeles County have begun to rise again.  Increasing the risk of transmission of COVID-19 through in-person learning will ultimately increases the risk of community spread in Los Angeles County, exacerbating the current health crisis.

22.     SMC has always included international students in its programming, course offerings and budget allocation process.  All tuition revenue is reinvested in the college, which enables SMC to offer more course sections and student services than are funded from the state. The loss of the tuition revenue will adversely affect not only the international students in question, but also the domestic students.  The college would have to scale back course offerings and student support services that are available to all students.  Domestic students will have their education disrupted by the reduction in services and courses as well.

23.     Prior to the July 6 Directive, SMC anticipated a five to 10 percent decline in continuing students and a larger drop in new students due to COVID-19 global travel restrictions. The July 6 Directive will result in a much larger drop in our international student enrollment.

24.     The global pandemic has already created a fiscal emergency for SMC.  In order to adopt a budget with an adequate fund balance, SMC has slashed spending, imposed furloughs and pay freezes on our management and classified staff, and re-opened collective bargaining negotiations with the faculty union. The 2020-21 Tentative Budget, which was prepared prior to the July 6 Directive and approved by the Board of Trustees on July 7, 2020, anticipates an ending fund balance of $14,303,142.  Should the July 6 Directive be implemented, SMC will likely lose over 50 percent of its international student population and incur over $9,500,000 decline in revenue for Fiscal Year 2020-21.  The loss of international enrollment will be catastrophic and require major reductions in personnel to continue operations.

**The July 6 Directive Harms SMC's Students**

25.     A review of SEVIS travel records show that 1,052 SMC international students relied on the March 13 Guidance, as well as SMC's announcement that it would remain predominantly online for fall 2020.  Based on this announcement, and the concern that students reported of not being able to return home to their families for the foreseeable future because of travel restrictions, these students returned to their home countries to take their online courses from there.  Given the current travel restrictions, especially with regard to China, where more than 1/3 of our international students are from, they cannot currently travel back to the U.S. to take in-person classes because of travel restrictions.  If their visas are terminated because they

6

1  cannot comply with the July 6 Directive, over 1,000 SMC students will be barred from potentially

2  completing their educational goals as they will likely not be able to reenter the United States at a

3  later point.

4      26.    Students are very concerned about having to leave the United States if SMC

5  instruction remains predominantly online.  Many of the students point out that they have

6  commitments here – lease agreements, employment/internships, or simply that they are close to

7  completing their degrees and transferring for which a sudden move would be very disruptive.  For

8  others, there are travel restrictions or political unrest within their home countries and cannot

9  reenter at this time.  Still others cite the time zone difference, technology/internet limitations or

10  censorship that exist in their home countries that would make attempting to study online from

11  there impossible.  Unfortunately, many of these students have left unsafe situations to which the

12  thought of returning is a serious cause for fear.  Finally, all of our students are concerned about

13  exposure to COVID-19 through travel, as well as through in-person instruction.  If SMC remains

14  online, the 1,229 students who remained here in the United States will lose their visa and be

15  forced to depart or risk deportation.

16      27.    Since the July 6 Directive was issued, the College has been inundated with calls

17  and emails from our international students.  On July 10, 2020, SMC held a forum for our

18  international students with over 250 participants.  Overall, our students are alarmed, afraid, and

19  have numerous questions about the implications of the July 6 Directive.  Many expect that we

20  should have answers for them, which is impossible given the lack of warning for the July 6

21  Directive.  Below are some of the responses that we have received from our international

22  students:

23      •   W.X. is deeply concerned.  A ticket to China costs $7,000 and most flights are

24          cancelled.  There are no flights to China until the fall.  In addition, Chinese

25          students cannot immediately return home based on government restrictions.  He

26          states, "if SMC does not open some offline courses to international students, we

27          will be caught in the middle by the government and airline tickets. We can only

28          wait for the cancellation and repatriation of I-20."

7

Decl. of Teresita Rodriguez in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)

1       • K.C. wants to urgently know if she will return home how will she keep up with her
2         classes.  She is scared and anxious.  She is a straight A student and is afraid that
3         these regulations are unfair and hurtful.

4       • A.O. is very concerned about his lease.  He is scared that he may not be able to live
5         up to his obligations.  He is hoping for in-person classes so that he can come back
6         to the United States and continue his studies.

7       • X.X. is scared and confused by the July 6 Directive and is desperate to know if he
8         can continue his studies at SMC and save his F-1 status.  He does not know if
9         returning home is an option and he wants to know if he can transfer to another
10       country to finish his education.

11       • L.S. only has a few classes left to graduate.  She is scared that if she departs the
12       United States she will not be allowed to reenter to complete her studies.  She states
13       that she does not have a place to stay should she return home.

14       • E.M. is from Brazil.  He is afraid to lose his F-1 status and be forced to return
15       home.  It will be difficult for E.M. to arrange travel to Brazil.  E.M is scared and
16       confused.  He fears losing his visa and being unable to complete his studies.

17       • S.Y. is uncertain of his future.  He is anxious about returning to his home country.
18       He came to the United States to learn English and being forced to go home will
19       uproot him and prevent him from completing his goals.

20       • A.G. is very worried about the July 6 Directive.  She wants to know if there will be
21       any in-person classes so that she can remain in the United States.  She fears being
22       deported.

23       • I.B. is very concerned about the July 6 Directive.  She is worried that if she is
24       forced to leave, there will be no flights to her home country of Germany.  She feels
25       her life is being uprooted and thrown into turmoil.

26       • A.F. wants to know what the College's response to the July 6 Directive will be. He
27       is very worried of having in-person classes in the middle of a pandemic.  With fall
28       just around the corner, he is scared and anxious.

- A.T. would face extremely difficult circumstances if forced to return to and resume his studies in his home country of Lebanon. There is a famine in Lebanon and he lost his residency in Saudi Arabia. He has no place to go. He is hopeful that he can take online courses and maintain his visa.

- M.N. is worried that if forced to return home, her apartment lease cannot be cancelled. She needs immediate help.

- J.M. cannot make plans for the summer or fall. He is afraid to sign a new lease. He does not know what to do. He is anxious and scared.

- M.P. states that going back to Russia would be terrible for him. He promises to study hard and commit himself to his studies if allowed to stay. He wants to be trusted and allowed to remain in the United States.

- W.F. is scared and does not want to be deported. She is hoping that SMC can offer in-person class options to allow her to remain. She pleads with SMC to help.

- A.S. courageously escaped an abusive family situation that she would have to return to under the July 6 Directive. She is now 20 and has done very well at SMC.

28.     A portion of SMC students will be at risk of losing their visa status, regardless of whether SMC remains predominantly online or increases its in-person class offerings. Approximately half of SMC's international students are in jeopardy of losing their visas no matter what SMC does given the July 6 Directive. A review of SEVIS travel records show that 1,052 SMC international students relied on the previous March 13 Guidance, as well as SMC's announcement that it would remain predominantly online for fall that was made based on that guidance, and returned to their home country to take their online courses from there. The remaining 1,229 international students enrolled at SMC remained here in the United States. If SMC increases it's in-person course offerings in order to assist the estimated 1,229 students to comply with the July 6 Directive, then the 1,052 students that are taking their classes from their home country are at risk of losing their visas and will have to not only reapply, but pay the filing fees for reinstatement. Given the current travel restrictions and higher scrutiny on visas, some

9

1    may not be successful in their attempt for reinstatement.  If SMC does not increase its in-person

2    course offerings, the 1,229 students who remained here in the United States will lose their visas

3    and be forced to depart or risk deportation.

4           29.    Many F-1 visa students plan to participate in Optional Practical Training at the

5    conclusion of their studies and this disruption robs otherwise eligible students from availing

6    themselves of those opportunities.  This disruption will also delay them from entering the

7    workforce or transferring after completing their degrees as they will be unable to complete their

8    studies in a timely manner.

9               I declare under penalty of perjury under the laws of the United States and State of

10   California that the foregoing is true and correct, and that this declaration was executed on July 11,

11   2020 in Santa Monica, California.

12

13

14   _____

15              TERESITA RODRIGUEZ

16

17

18

19

20

21

22

23

24

25

26

27

28

10

# EXHIBIT 1

Santa Monica College
Fall 2019 International Student Census

| Country | Students | Country | Students |
| --- | --- | --- | --- |
| Algeria | 5 | Laos | 1 |
| Argentina | 4 | Lebanon | 2 |
| Aruba | 1 | Lybia | 1 |
| Australia | 6 | Macau | 7 |
| Austria | 1 | Malaysia | 15 |
| Azerbaijan | 1 | Mexico | 13 |
| Bangladesh | 2 | Moldova | 1 |
| Belarus | 3 | Mongolia | 15 |
| Belgium | 1 | Montenegro | 1 |
| Brazil | 81 | Morocco | 10 |
| Bulgaria | 2 | Myanmar (Burma) | 11 |
| Burundi | 2 | Nepal | 2 |
| Cameroon | 2 | Netherlands | 4 |
| Canada | 26 | New Zealand | 2 |
| Chile | 6 | Nigeria | 4 |
| China | 813 | Norway | 47 |
| Colombia | 12 | Oman | 2 |
| Congo, Democratic Rep | 4 | Pakistan | 7 |
| Costa Rica | 1 | Paraguay | 2 |
| Cote d'Ivoire | 4 | Peru | 4 |
| Croatia | 1 | Philippines | 4 |
| Cyprus | 2 | Poland | 14 |
| Dominican Republic | 1 | Portugal | 2 |
| Ecuador | 4 | Qatar | 1 |
| Egypt | 4 | Russia | 40 |
| El Salvador | 3 | Saudi Arabia | 10 |
| Ethiopia | 4 | Serbia | 1 |
| Finland | 2 | Singapore | 15 |
| France | 65 | Slovakia | 2 |
| Gabon | 1 | Slovenia | 3 |
| Germany | 14 | South Africa | 6 |
| Greece | 1 | Spain | 10 |
| Guatemala | 1 | Sri Lanka | 1 |
| Hong Kong | 47 | Sweden | 293 |
| Hungary | 2 | Switzerland | 9 |
| Iceland | 1 | Taiwan (Rep. of China) | 65 |
| India | 18 | Tanzania | 1 |
| Indonesia | 96 | Thailand | 21 |
| Iran | 5 | Tunisia | 11 |
| Ireland | 1 | Turkey | 58 |
| Israel | 9 | Turkmenistan | 1 |
| Italy | 22 | Ukraine | 10 |
| Japan | 339 | United Arab Emirates | 2 |
| Jordan | 3 | United Kingdom | 19 |
| Kazakhstan | 27 | Uzbekistan | 1 |
| Kenya | 3 | Venezuela | 5 |
| Korea, South | 274 | Vietnam | 17 |
| Kosovo | 1 | Yemen | 2 |
| Kuwait | 4 | Zimbabwe | 1 |
| Kyrgyzstan | 6 | | |

EXHIBIT 1

# EXHIBIT G

1    XAVIER BECERRA
     Attorney General of California
2    MICHAEL L. NEWMAN
     Senior Assistant Attorney General
3    DOMONIQUE C. ALCARAZ
     LEE I. SHERMAN
4    JASLEEN SINGH
     MARISSA MALOUFF (SBN #316046)
5    Deputy Attorneys General
       300 S. Spring St., Suite 1702
6      Los Angeles, CA 90013
       Telephone: (213) 269-6467
7      Fax: (213) 897-7605
       E-mail: Marissa.Malouff@doj.ca.gov
8    *Attorneys for State of California*

9

10                   IN THE UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                          OAKLAND DIVISION

13

| | |
|---|---|
| **THE STATE OF CALIFORNIA,** | Civil Case No. 4:20-cv-04592-JST |
| Plaintiff, | **DECLARATION OF JOHNNIE ADAMS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| **U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD F. WOLF, in his official capacity as Acting Secretary of the United States Department of Homeland Security; and MATHEW ALBENCE, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,** | |
| Defendant. | |

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    I, Johnnie Adams, declare as follows:

2        1.    I am a resident of the State of California.

3        2.    I make this Declaration based upon my personal knowledge, a review of records

4    and information kept in the regular course of Santa Monica Community College District (SMC)

5    business and made available to me in the course of my duties at SMC, and information provided

6    to me by SMC employees including those who work under my direction and supervision and

7    those who do not.  If called as a witness, I could and would testify competently to the matters set

8    forth below.

9        3.    I am Chief of Police of the SMC Police Department.  I have been a law

10   enforcement professional since 1983.  I began my career in law enforcement at the UCLA Police

11   Department, where I served as a student Community Service Officer, police officer, sergeant,

12   lieutenant, and captain.  In 2013, I was appointed deputy chief of operations at the University of

13   Southern California, where I served until being appointed Chief of Police at Santa Monica

14   College in 2016.

15       4.    I coordinate the Emergency Operations Team at SMC (EOT).  The EOT has been

16   responding to the novel coronavirus (COVID-19) global pandemic since late February 2020.

17       5.    I have reviewed U.S. Immigration and Customs Enforcement's (ICE) policy

18   entitled "COVID-19: Guidance for SEVP Stakeholders," published March 13, 2020 (March 13

19   Guidance), and am familiar with its contents.

20       6.    I have reviewed ICE's Broadcast Message entitled "COVID-19 and Fall 2020,"

21   issued on July 6, 2020 (July 6 Directive), and am familiar with its contents.

22   **SMC's Response to COVID-19**

23       7.    On March 17, 2020, the Board of Trustees of the SMC declared the existence of a

24   local emergency as a result of the outbreak and spread of COVID-19.

25       8.    The EOT coordinates all districtwide responses to the COVID-19 emergency.  The

26   EOT is responsible for recommending action plans to the Superintendent and President.  In

27   response to the COVID-19 and concerns about the highly transmissible nature of the virus, the

28   EOT developed plans to transition to exclusively remote (online) learning in spring 2020.  On

1

Decl. of Johnnie Adams in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)

March 11, 2020, our Emeritus College program, which serves older adults, was transitioned to online instruction and the balance of our courses started online instruction on March 18, 2020. Some spring 2020 courses were cancelled because they could not be conducted remotely.  With state and local stay-at-home orders issued on March 19, 2020, we announced on April 7, 2020, that summer 2020 would be conducted online and on April 30, 2020, that fall would be conducted online, although we indicated that some hybrid classes might be offered.  To date, the only on-campus courses approved for in-person classes are our nursing program.  These classes began in summer 2020.

9.      All aspects of our EOT planning take into account the anticipated impacts on our employees and students, and in planning our response to COVID-19, we have had numerous discussions concerning how particular policies would impact our large population of international students.  In developing plans for our summer and fall sessions, we relied upon the March 13 Guidance from ICE that the exemption to participate in online instruction would be in effect for the duration of the emergency.  In developing our fall plans, we took into account the visa status of our international students.  In light of the March 13 Guidance from ICE, we concluded that our plans to offer an entirely online program in fall 2020 would have no adverse impact on visa status.

**Impact of the July 6 Directive**

10.      As soon as the July 6 Directive was announced, the EOT began consideration of how to safeguard the education of all of our international students.  Unfortunately, this action is occurring at a time when community spread of COVID-19 is on the rise.  The EOT's response to COVID-19 has been driven by available data, and the team is data driven and has been tracking COVID-19 cases in Los Angeles County since the first case was announced on March 3, 2020. That information is recorded by Los Angeles County Public Health, and may be accessed online at: http://dashboard.publichealth.lacounty.gov/covid19_surveillance_dashboard/.  Reports from Public Health indicate increased community spread in recent weeks as reflected in the below chart from its website

11.     The EOT is gravely concerned about the implications of the ICE action at a time when community spread of COVID-19 is increasing.  In light of these concerns, we had previously determined that, with the exception of our small nursing program which requires hand-on clinical training, SMC will be offering online classes for the fall.  However, given our duty to all our students, including our international students, due to the July 6 Directive we are now forced to balance preventing the removal of our students from the United States—which may require offering additional in-person courses, while at the same time keeping our campus community safe.  We are particularly concerned about offering additional in-person classes because of the transmissible nature of COVID-19.  Adding in-person classes to SMC's fall semester would put our students, facility, and staff at unnecessary risk of exposure to coronavirus.  Were it not for ICE's July 6 Directive, SMC would have been able to continue its plan to conduct an online-only program—which EOT and the District decided would be the safest option for SMC students—without the risk of losing any of its student body.

1       I declare under penalty of perjury under the laws of the United States and State of

2   California that the foregoing is true and correct, and that this declaration was executed on July 10,

3   2020, in Santa Monica, California.

4

5

6   _____

7                JOHNNIE ADAMS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

# EXHIBIT H

Xavier Becerra
Attorney General of California
Michael L. Newman
Senior Assistant Attorney General
Domonique C. Alcaraz
Lee I. Sherman
Jasleen Singh
Marissa Malouff (SBN #316046)
Deputy Attorneys General
  300 S. Spring St., Suite 1702
  Los Angeles, CA 90013
  Telephone: (213) 269-6467
  Fax: (213) 897-7605
  E-mail: Marissa.Malouff@doj.ca.gov
*Attorneys for State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **THE STATE OF CALIFORNIA,**<br><br>Plaintiff,<br><br>v.<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD F. WOLF, in his official capacity as Acting Secretary of the United States Department of Homeland Security; and MATTHEW ALBENCE, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,**<br><br>Defendants. | Civil Case No. 4:20-cv-04592-JST<br><br>**DECLARATION OF RAJEN VURDIEN, Ph.D., IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

1    I, RAJEN VURDIEN, Ph.D., declare as follows:

2    1.    I am a resident of the State of California.  I am the Chancellor and CEO of the San

3    Francisco Community College District (hereinafter, "SFCCD" or "College").

4    2.    I make this Declaration based upon my personal knowledge, a review of records

5    and information kept in the regular course of SFCCD's business and made available to me in the

6    course of my duties at the SFCCD, and information provided to me by SFCCD employees

7    including those who work under my direction and supervision and those who do not.  If called as

8    a witness, I could and would testify competently to the matters set forth below.

9    3.    I have been employed as Chancellor and CEO since July 1, 2020.  Before serving

10    at the SFCCD, I served as the Superintendent/President of Pasadena City College.

11    4.    As part of my regular job duties as Chancellor and CEO, I am responsible for the

12    overall day-to-day operations of the SFCCD.

13    5.    I have reviewed Immigration and Customs Enforcement's ("ICE") policy entitled

14    "COVID-19: Guidance for SEVP Stakeholders," published March 13, 2020 ("March 13

15    Guidance"), and am familiar with its contents.

16    6.    I have reviewed ICE's Broadcast Message entitled "COVID-19 and Fall 2020,"

17    issued on July 6, 2020 ("July 6 Directive") and am familiar with its contents.

18    **International Students at SFCCD**

19    7.    There are 545 F-1 visa (international) students enrolled with SFCCD.  There are

20    over 80 countries represented with F-1 students, with the top ten being China (106), Brazil (51),

21    Vietnam (37), South Korea (30), Thailand (25), Colombia (23), Myanmar (19), Mexico (18),

22    Turkey (15), and Taiwan (14).

23    8.    SFCCD's international students contribute to a broad mosaic of multi-ethnic

24    students studying in San Francisco.  This diversity among the student body is mirrored in the

25    College's faculty and staff who provide an enriching environment for their studies.  The College

26    operates an Office of International Programs whose mission is to: (1) support and assist

27    international students in successfully achieving their educational goals; (2) provide seamless

28    coordinated services to current and prospective students in a friendly, supportive, and

1

professional manner; (3) ensure that all SFCCD international students are in compliance with F-1 visa regulations; (4) promote international/global awareness and intercultural understanding through development and implementation of programs that integrate international students into the SFCCD community, and (5)  provide a respectful and safe learning environment that is founded on respecting racial and social justice commitment to international students.

**SFCCD's Response to COVID-19**

9.      As a result of the COVID-19 pandemic, and in response to the shelter-in-place order issued by San Francisco Mayor London Breed on March 16, 2020, the SFCCD ceased in-person operations, closed all of its facilities and buildings, and went to conducting the day-to-day operations via remote operations, with employees telecommuting.  As a result, approximately two weeks after SFCCD ceased in person operations, SFCCD's instruction moved to virtual learning, where all courses taught in person were converted to online instruction.

10.      Most of SFCCD's Fall 2020 classes will be taught remotely through distance education.  Certain courses that cannot be completed remotely will be held in-person following strict safety protocols.  Courses have been prioritized for in-person instruction based on outside accreditation requirements and course content requiring the use of College facilities.  Examples include the College's Aircraft Maintenance program (approved by the Federal Aviation Administration), Registered Nursing program (approved by the California Board of Registered Nursing), and the Automotive Maintenance program (where learning requires hands-on instruction).  Overall, the College's current plan is to offer 95% of its classes remotely, with the remaining 5% in-person.  The College created a Return to Instruction Task Force, comprised of administrators, the College's academic senate, and union leadership, to prioritize programs for in-person instruction.  The Return to Instruction Task Force began its work in late April 2020 and completed prioritization within a few weeks.  While some international students may be enrolled in programs that are being prioritized, these priorities are program-specific, and the current plans for in-person instruction are not sufficient to guarantee coverage across all international students.  Registration for Fall 2020 is currently underway.  Most student services will also be conducted remotely for Fall 2020.  There may be select areas that are absolutely necessary to provide limited

2

1   in-person services, such as services for disabled students and students that may need assistance

2   using technology to access remote instruction, but those areas will be determined closer to the

3   start of the Fall Semester.

4        11.   SFCCD reached its decision to conduct remote operations based on its adherence

5   to the City & County of San Francisco Department of Public Health guidelines in planning for a

6   return to campus for students and employees.  The decision to operate predominantly remotely is

7   also consistent with other neighboring community colleges and other public and private

8   institutions of higher education.  The College will not require employees to return to campus

9   unless and until it can do so in compliance with recommended guidelines, i.e., ensuring social

10  distancing can occur, providing Personal Protective Equipment ("PPE") for employees,

11  disinfecting common areas, etc.  Effective June 1, 2020, the College began a ***gradual*** return to

12  campus only for those employees whose jobs cannot be done remotely.  A gradual return to

13  campus started with training for all employees and identifying COVID-19 "safety monitors" for

14  each work area.  SFCCD needs to ensure employees who return to campus can do so consistent

15  with the social distancing requirements of the Center for Disease Control and City and County of

16  San Francisco Department of Public Health.  The College will continue to work with those

17  employees who are unable to return to campus due to their own health reasons or because they are

18  caretakers for at-risk family members.  Those employees who are able to work remotely, will

19  continue to do so until further notice.

20       12.   SFCCD relied upon ICE's March 13 Guidance and its representation that its in-

21  person learning exemptions would be in effect for the duration of the COVID-19 emergency, in

22  making the decision to transition to remote learning, and to continue to conduct predominantly

23  remote learning as part of the Fall 2020 Safety and Return to Instruction ("Plan").  The March 13

24  Guidance exempted F-1 students from in-person course requirements.  The College's reliance on

25  this guidance impacted decision-making in the prioritization of in-person instruction, resulting in

26  a program-specific focus on those programs that are approved by outside accreditors and involve

27  hands-on instruction, rather than planning a broad-based selection of in-person classes across the

28  curriculum or for international students specifically.  Planning for Fall 2020 began in late April,

3

1   so that faculty would have clear direction and could use the summer months to prepare for remote

2   or in-person instruction, as applicable. Early planning was also required so that the College could

3   plan and provide required training to approximately 800 faculty.  Because the COVID-19

4   emergency is ongoing, consistent with the March 13 Guidance, SFCCD created the Plan to ensure

5   that SFCCD established protocols to protect the health and safety of all employees and students,

6   without the concern that SFCCD's international students will lose their status.  The primary

7   objectives of the Plan are as follows: (1) keep all employees, students and their family members

8   safe by reducing the spread of the COVID-19; (2) support our local community by doing our part

9   to flatten the curve of the virus; (3) decrease the impacts that could potentially exist to employees

10  who are working on site, (4) protect all individuals who are at a higher risk due to identified

11  demographics (such as age) or underlying health conditions; and ensure compliance with Order of

12  the Health Officer of the City of San Francisco, C19-07d (Order), and requirements therein.

13         13.    SFCCD is offering a Fall 2020 schedule that would mirror the transitional

14  educational plan that was developed after March 13, 2020, when most or all colleges and

15  universities in the United States transitioned to remote and/or online learning.  In making plans to

16  continue remote and/or online learning through the end of Fall 2020, SFCCD understood from the

17  March 13 Guidance that no immigration penalty would befall its international students for making

18  this decision. This was critical because many of the College's F-1 visa students could not return

19  to their home countries due to the COVID-19 pandemic.  The class schedule has already been

20  developed, faculty assignments have been offered, faculty have begun work on the needed

21  adjustments to their coursework to support remote instruction, and students have already enrolled

22  in the courses based on SFCCD's plan that was created with the expectation that international

23  students would be enrolled and able to predominantly take classes online.

24  **The July 6 Directive Harms SFCCD**

25         14.    The July 6 Directive will result in a great deal of chaos and significant uncertainty

26  for our students and campus community, only weeks before the 2020-21 academic year is

27  scheduled to begin on August 15, 2020.  The July 6 Directive would require the District to add

28  more in-person classes to the schedule to offer to international students.  However, because the

4

1   College has a fixed dollar budget for classes and the amount of classes has already been

2   determined for the Fall Semester adding in-person classes now would require cancelling other

3   online classes.  As a result, SFCCD will not have enough time to adapt its schedule in response to

4   the July 6 Directive.

5          15.    Making drastic changes to the Fall 2020 class schedule at this point in the summer

6   would result in major discord and disruption for our students, faculty, and staff.  There would be

7   an added burden of strategically scheduling courses while ensuring safety protocols are followed

8   such as ensuring health and safety standards in College facilities, social distancing, and the

9   availability of PPE's for all faculty and staff.

10          16.    The College would need at least four to six weeks to drastically amend its Return

11   to Campus Plan in response to the July 6 Directive, as well as to prepare College facilities for the

12   staff, students and faculty that would return.

13          17.    The July 6 Directive will also require SFCCD to re-issue Forms I-20 to all of its

14   international students.  Re-issuing Form I-20s will be a monumental task that will require two to

15   three weeks of time for our limited staff.  Even though there is anticipated monetary loss from

16   international student enrollment as a result of the July 6 Directive, the staff would nevertheless

17   need to initiate this process before the start of the semester, regardless of whether the student may

18   have to leave the country.

19          18.    The potential risks to students, faculty, and staff to offer more in-person is

20   significant.  Many members of these groups are in the at-risk population due to COVID-19.  If

21   there is an outbreak on campus, this could severely affect the safety of our campus community,

22   and worse yet, lives might be lost.  Due to limited medical resources and space available in many

23   local medical facilities, an outbreak in our campus community with further burden those in the

24   local medical community.

25          19.    As a result of the July 6 Directive, the financial loss to SFCCD of losing its F-1

26   visa students is approximately $4 million annually in tuition and fees.  Alternatively, if SFCCD

27   adds in-person classes and therefore increases the staff and faculty presence on campus needed

28   for instruction of these courses, the College would expend $1 million in costs for other staff,

including time and a half for custodial and other employees to prepare facilities, security, stationary engineers, costs for extra supplies, such as PPE, to maintain a safe campus environment that would protect students, faculty and staff from exposure to COVID-19.  The significant loss in revenue for the College, or the alternative additional costs that may be incurred, in an already tight budgetary climate due to the COVID-19 related loss of state and local revenue would be catastrophic for the college.

20.     Finally, and importantly, one of the tenets of SFCCD's mission and vision is to inspire participatory global citizenship grounded in critical thinking and an engaged, forward thinking student body.  Requiring F-1 students to depart to their home countries will diminish the institution's status as a forward-thinking institution that values diversity, inclusivity, social and racial justice, and equitable access for all.  It will also undermine the infrastructural investment of staff and resources.  The services of the Office of International Programs will be rendered unnecessary if SFCCD's international students are unable to continue their education.  SFCCD is working diligently to provide F-1 visa students with information about the impact of the ICE Directive.  The College is doing its best to find solutions to ensure that SFCCD F-1 visa students can maintain their status as full-time students.  SFCCD also reaffirms that its administration, faculty, staff, and students stand together with our international students and condemn this profoundly troubling policy.  In addition to taking steps to assist our students, the College is actively advocating against this unjust requirement.  The College recognizes that many of our international students are far from home and may feel isolated, and the College will offer its support to them.  The College understands that many of its international students will have further questions and concerns during this stressful time, and the College will continue to have opportunities for international students to connect with the College and its community.  The College's international students have always been, and will continue to be, welcome here.

**The July 6 Directive Harms SFCCD's Students**

21.     As a result of the March 13 Guidance, at least 30 F-1 visa students left the United States to study in their home countries.  There is no guarantee that these students will be able to

obtain a visa and re-enter the United States to complete their studies at CCSF, and many may be prevented from leaving their home country due to international travel restrictions.

22.    If SFCCD were to keep its mostly online model, students who would have to return to their home country may not be allowed in due to COVID-19 restrictions or may face other perils due to social and civil unrest, domestic violence, technological difficulties, and sexual orientation.

23.    As a result of the July 6 Directive, a good portion of SFCCD international students will be at risk of losing their visa status if SFCCD is unable to offer enough in-person courses in which international students may enroll to keep their lawful status.

7

1
2
3

I declare under penalty of perjury under the laws of the United States and State of California that the foregoing is true and correct, and that this declaration was executed on July 13, 2020 in San Francisco, California.

4
5
6
7

_____

RAJEN VURDIEN, Ph.D.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Decl. of Rajen Vurdien, Ph.D., in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)

# EXHIBIT I

1   XAVIER BECERRA
    Attorney General of California
2   MICHAEL L. NEWMAN
    Senior Assistant Attorney General
3   DOMONIQUE C. ALCARAZ
    LEE I. SHERMAN
4   JASLEEN SINGH
    MARISSA MALOUFF (SBN #316046)
5   Deputy Attorneys General
      300 S. Spring St., Suite 1702
6     Los Angeles, CA 90013
      Telephone: (213) 269-6467
7     Fax: (213) 897-7605
      E-mail: Marissa.Malouff@doj.ca.gov
8   *Attorneys for State of California*

9

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                      OAKLAND DIVISION

13

14  **THE STATE OF CALIFORNIA,**                   Civil Case No. 4:20-cv-04592-JST

15                              Plaintiff,          **DECLARATION OF RYAN CORNNER
                                                    IN SUPPORT OF PLAINTIFF'S**
16              v.                                  **MOTION FOR PRELIMINARY
                                                    INJUNCTION**
17
    **U.S. DEPARTMENT OF HOMELAND
18  SECURITY; U.S. IMMIGRATION AND
    CUSTOMS ENFORCEMENT; CHAD F.
19  WOLF, in his official capacity as Acting
    Secretary of the United States Department
20  of Homeland Security; and MATHEW
    ALBENCE, in his official capacity as Acting
21  Director of U.S. Immigration and Customs
    Enforcement,**
22
                               Defendants.
23

24

25

26

27

28

---

I, Ryan Cornner, declare as follows:

1.      I am a resident of the State of California.  I am the Vice Chancellor for Educational Programs and Institutional Effectiveness for the Los Angeles Community College District (LACCD or District).

2.      I make this Declaration based upon my personal knowledge, a review of records and information kept in the regular course of LACCD business and made available to me in the course of my duties at LACCD, and information provided to me by LACCD employees including those who work under my direction and supervision and those who do not.  If called as a witness, I could and would testify competently to the matters set forth below.

3.      I have been employed as Vice Chancellor since January of 2016.  Before serving at LACCD, I served as Associate Vice President of Strategic Planning for Pasadena City College and Dean of Institutional Effectiveness for East Los Angeles College.

4.       As part of my regular job duties as Vice Chancellor, I serve as the Chief Instructional and Chief Student Services Officer for the District and oversee districtwide planning, accreditation, research and records.

5.      I have reviewed Immigration and Customs Enforcement's (ICE) policy entitled "COVID-19: Guidance for SEVP Stakeholders," published March 13, 2020 (March 13 Guidance), and am familiar with its contents.

6.      I have reviewed ICE's Broadcast Message entitled "COVID-19 and Fall 2020," issued on July 6, 2020 (July 6 Directive), and am familiar with its contents.

**International Students at the LACCD**

7.      LACCD educates nearly 1,400 international students annually, with 1,386 international students attending LACCD in fall 2019.  These students predominately attend under an F-1 visa.  Historically, students come from nearly 100 different countries with the largest segment coming from China.

8.      LACCD is dedicated to fostering student success for all individuals seeking advancement, by providing equitable and supportive learning environments at our nine colleges. International students enhance the learning environment and allow students a unique opportunity

1

to learn diverse perspectives and gain an understanding of cultures from around the world.  The District has consistently supported students coming to the United States for educational advancement and has embraced the benefit they bring to the educational setting and broader community.

**LACCD's Response to COVID-19**

9.      In March, the District transitioned all courses to remote learning.  Prior to the pandemic, the District operated with approximately 18 percent of its classes online.  Through the course of two weeks, all courses were either brought online or suspended until County public health guidance would safely allow their return.  The District was able to complete almost all spring courses through the remote modalities.  The District continued to enhance academic and student support services through enhanced technology and targeted business practices.  These efforts included advanced training for faculty on learning management systems and online pedagogy.  The District has continued to expand these efforts in support of summer and fall instruction.

10.     Los Angeles County is the epicenter of the pandemic in the State of California.  The District established an Emergency Operation Center (EOC) at the beginning of the pandemic for the purpose of responding to COVID 19, providing policy guidance for the District and developing all plans to ensure safety and business continuity.  The EOC has continued to utilize this structure to manage the response to COVID-19.  The EOC consistently and frequently coordinates with the County Department of Public Health and adheres to all health guidelines.

11.     Currently, County guidelines do not allow for full reopening of colleges and universities.  The District's EOC, informed by these guidelines, has put in place plans for fall instruction that ensure the safety of students and employees, and that provide appropriate learning experiences for our students. These plans included extensive work with the District governance groups, collective bargaining units, and executive leadership team.  In collaboration with the County Department of Public Health, the District established plans that meet County guidance, the current state of infectious spread, and the needs of LACCD students and employee groups.

2

This planning effort has been ongoing since the establishment of the EOC in March and has continued to evolve based on the best intelligence of the moment. Based on Los Angeles County Department of Public Health guidance on in-person activities, the District began with a fall schedule that included only courses that could be fully completed online and that would not necessitate on campus instruction. In late June, the County guidance was modified to allow a small number of classes to return that fall in select fields, such as health care, public safety, transportation and utility infrastructure that cannot practically be taught online.

12. The District has been working to implement the return of these courses and has developed policy and safety advisories on the manner in which these courses can return to campus. The policy stipulates that the District will limit the number of in-person classes to only those courses that cannot take place online in order minimize the potential for community spread, and so that the district can effectuate appropriate safety guidance, protocols for personal protective equipment (PPE), social distancing, testing, and contact tracing. Any course that can be completed online will be maintained through online instruction. The District will only allow in-person instruction for courses that must meet one or more of the following criteria: 1) course or program objectives and activities cannot be done at home in a remote learning environment; 2) course requires supplies or equipment not available or unable to be reproduced in a virtual format; 3) course requires in-person hours to be completed for employment, licensing, employment or articulation purposes for external boards; or 4) course requires in-person training for safety or skills abilities when entering the field for apprenticeships or internships.

13. Before the July 6 Directive, fall 2020 classes would have primarily occurred through an online modality with less than five percent of classes occurring in person. Given the current escalation of cases in Los Angeles County, the District is proceeding with on campus offerings with caution and with primary consideration to the health and safety of students, employees and the community. District policy requires full adherence by all LACCD faculty, students, and staff to all Los Angeles County public health guidelines and protocols regarding PPE and cleaning supplies.

In creating the District's fall 2020 plan, LACCD relied upon the representations in ICE's March 13 Guidance that its in-person learning exemptions for F-1 and M-1 students would be in effect for the duration of the COVID-19 emergency.  Because of the March 13 Guidance, LACCD was able to create a plan of predominantly online instruction that safeguarded the safety and health of all of the District's students, staff, and faculty without concern that the District's international students will lose their status.  This provides a safe venue for students to participate in academic programs without risk to their health.  With regard to international students, the District expected that they would be treated with the same consideration as our local students and be able to choose an educational path that matches their unique healthcare, social, and academic needs.

**The July 6 Directive Harms LACCD**

14.     The July 6 Directive significantly disrupts LACCD's fall 2020 plans, only weeks before the academic year is scheduled to start on August 31. Whereas the original fall plan determined in-person class offerings based on health and pedagogical standards, the District is now forced to consider other factors to ensure that international students have an opportunity to enroll in in-person classes.  The District is contemplating creating additional in-person courses to meet the requirements for international students to continue their educational programs.  This is in conflict with the priority for student safety and will require detailed administrative review from personnel across all nine colleges.  Any decision to add or expand the capacity of in-person courses must be weighed against what is best for student health and for the entirety of the academic program at our campuses.  Expanded  in-person classes results in additional students on campus and presents a severe health risk to students and staff alike.  This will include a need for extensive coordination to adjust schedules to meet the new requirements, just weeks before the start of the semester and despite LACCD's fall schedule already set.  In addition, international students would be forced to choose between COVID-19 exposure whilst attending in-person classes and their ability to retain their student visa.  This is a devastating forced choice which will have unknown impact on student enrollment and the plans of individual students to retain enrollment in our colleges.

15.     Given that the District is adopting a hybrid model of (limited) in-person classes and online classes, the July 6 Directive will also require District to re-issue Forms I-20 to all of its international students.  Never before has LACCD had to re-issue the Forms I-20 at such a large scale and in such a short amount of time.

16.     With the escalation of COVID-19 cases, hospitalizations, and deaths in Los Angeles County, the provision of additional in-person courses to accommodate 1,300 students represents a threat to the health of these students, those they come in contact with, and members of the community.  Furthermore, the County has indicated that three positive tests on the campus within a 14 day period will be considered an outbreak and require coordination with the County to determine if in person activities may continue.  LACCD understands, however, that under the July 6 Directive, if an institution changes its operational stance in the middle of the semester due to a more severe outbreak, and as a result, international students are only permitted to take online classes, those students' statuses is at risk and they will be required to leave the country.  The forced expansion of in-person classes for the duration of the semester, without regard to local health conditions, will risk the entirety of our academic program and the health of our students and employees.

17.     If international students are unable to enroll in the limited in-person courses available and must return to their home country, there is a potential loss of revenue of up to $9 million for the 2020-2021 fiscal year and incalculable revenue loss in future years from the loss of reputation caused by the inability to offer a safe academic program to students.

**The July 6 Directive Harms LACCD Students**

18.     Some international students left the country based on the expectation that the March 13 Guidance would be maintained for the duration of the COVID-19 emergency, and they would be able to keep their student visa while completing instruction in their home countries. These students may not be able to return to the United States due to travel restrictions, or costs or concerns about their own health.

5

19.     A significant portion of LACCD students will be at risk of losing their visa status, whether because they cannot return to their home country, or because LACCD colleges only have limited in-person course offerings—only those pertaining to healthcare and other essential services—in which all its international students may not be able to enroll.

6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

      I declare under penalty of perjury under the laws of the United States and State of California that the foregoing is true and correct, and that this declaration was executed on July 12, 2020, in Los Angeles California.

Ryan Cornner

# EXHIBIT J

1   XAVIER BECERRA
    Attorney General of California
2   MICHAEL L. NEWMAN
    Senior Assistant Attorney General
3   DOMONIQUE C. ALCARAZ
    LEE I. SHERMAN
4   JASLEEN SINGH
    MARISSA MALOUFF (SBN #316046)
5   Deputy Attorneys General
      300 S. Spring St., Suite 1702
6     Los Angeles, CA 90013
      Telephone: (213) 269-6467
7     Fax: (213) 897-7605
      E-mail: Marissa.Malouff@doj.ca.gov
8   *Attorneys for State of California*

9

10              IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                      OAKLAND DIVISION

13

| | |
|---|---|
| **THE STATE OF CALIFORNIA,** | Civil Case No. 4:20-cv-04592-JST |
| Plaintiff, | **DECLARATION OF LAURA L. HOPE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| **U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD F. WOLF, in his official capacity as Acting Secretary of Department of Homeland Security; and MATTHEW ALBENCE, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,** | |
| Defendants. | |

I, Laura L. Hope, declare as follows:

1.      I am a resident of the State of California.  I am the Associate Superintendent, Instruction and Institutional Effectiveness for Chaffey Community College District ("Chaffey" or "the College").

2.      I make this Declaration based upon my personal knowledge, a review of records and information kept in the regular course of Chaffey's business and made available to me in the course of my duties at Chaffey, and information provided to me by Chaffey's employees, including those who work under my direction and supervision and those who do not.  If called as a witness, I could and would testify competently to the matters set forth below.

3.      I have been employed as Chaffey's Associate Superintendent, Instruction and Institutional Effectiveness for approximately eighteen (18) months.  Before serving at Chaffey, I worked as the Executive Vice Chancellor for Educational Services at the California Community Colleges Chancellor's Office.

4.       As part of my regular job duties as Chaffey's Associate Superintendent, Instruction and Institutional Effectiveness, I am responsible for comprehensive planning and implementation of Chaffey's educational agenda and Chaffey's accreditation and licensure standings.

5.      I have reviewed Immigration and Customs Enforcement's (ICE) policy entitled "COVID-19: Guidance for SEVP Stakeholders," published March 13, 2020 (March 13 Guidance), and am familiar with its contents.

6.      I have reviewed ICE's Broadcast Message entitled "COVID-19 and Fall 2020," issued on July 6, 2020 (July 6 Directive), and am familiar with its contents.

**International Students Are Vital Members of Chaffey's Community**

7.      Chaffey currently enrolls approximately two-hundred (200) international students from fifty-seven (57) countries from around the globe.  Representative countries include Iran, Pakistan, Nigeria, China, and Venezuela.  Chaffey has maintained an active International Student Program for over twenty-five (25) years.  Chaffey's International Student Program strives to fulfill Chaffey's institutional goals by providing guidance and administrative support to our

1

Decl. of Laura L. Hope in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)

international student population.  This includes routinely offering guidance on federal and state immigration requirements, matriculation requirements, establishing educational goals, transfer processes, and advice on career pathways.  Chaffey's Executive Leadership Team has and continues to be fully committed to supporting our international student population.

8.     Chaffey's International Student Program supports the College's mission through its efforts to diversify and strengthen campus culture.  The International Student Program provides an opportunity for Chaffey students, faculty, and staff to engage with citizens from a broad range of countries and global communities.  International students have established and fostered an appreciation and understanding of other cultures, which prepares all students to collaborate and function more effectively in a global society.  International students are also an integral part of Chaffey's student government organizations, clubs, athletics, and other campus and community volunteer programs.  Additionally, international students contribute economically to the local community, in which they live and thrive.

**Chaffey's Response to COVID-19**

9.     In March 2020, Chaffey quickly mobilized to protect the health and safety of the entire Chaffey community as the COVID-19 pandemic spread throughout the State.  Among other things, on March 16, 2020, Chaffey decided to transition virtually all of its operations online for the remainder of the spring 2020 semester.  Chaffey's decision to move to remote operations came after consultation with Chaffey leadership, community health experts, and other public health advisors.  In addition, Chaffey continually monitored the Center for Disease Control and Prevention (CDC) and the San Bernardino Department of Public Health for guidelines and information to help protect the Chaffey community during the COVID-19 pandemic.

10.    The COVID-19 pandemic did not improve in San Bernardino County.  As evidenced from the San Bernardino County COVID-19 Response Online Dashboard, from March to April, San Bernardino County saw a steady increase in new COVID-19 cases, confirmed COVID-19 cases, and deaths attributed to COVID-19 (and those numbers have progressively gotten alarmingly worse).  Accordingly, in or around April 2020, Chaffey made the decision to continue to operate remotely for the fall 2020 semester.  Because there are some courses that

2

Chaffey cannot offer online (e.g., career technical labs and clinicals), Chaffey created a fall addendum, which offers a very limited number of in-person courses. Chaffey is offering these in-person courses solely for a few programs that require in-person learning and cannot be carried out online. The in-person courses constitute less than six (6) percent of the courses offered by Chaffey in fall 2020—ninety-four (94) percent of Chaffey's classes will be online. Chaffey's decision to continue its remote operations came after consultation with Chaffey leadership, community health experts, and other public health advisors. Chaffey has also continued to regularly monitor the CDC and the San Bernardino Department of Public Health for guidelines.

**The July 6 Directive Harms Chaffey**

11. In creating the District's fall 2020 plan, Chaffey relied upon the representations in ICE's March 13 Guidance that its in-person learning exemptions for F-1 students would be in effect for the duration of the COVID-19 emergency. Because of the March 13 Guidance, Chaffey was able to create a plan of predominantly online instruction that safeguarded the safety and health of all of its students, staff, and faculty without concern that its international students will lose their status or face potential removal from the country.

12. Course registration for fall 2020 commenced on June 1, 2020. International students have already enrolled in online courses for fall, and Chaffey has started staffing those courses based on enrollment.

13. Chaffey's fall 2020 plan did not contemplate the need or requirement that international students must take in-person instruction, nor can Chaffey shift gears and create a new plan that would allow for international students to participate in in-person instruction in the fall 2020 semester. Doing so would not only present extraordinary administrative and labor relations obstacles that cannot be overcome, but the increase in the number of people on campus to accommodate the July 6 Directive would pose substantial and unnecessary health and safety risks to the Chaffey community in the middle of a pandemic. If Chaffey were required to move to in-person instruction for the fall semester, Chaffey would not be able to carry out its stringent protective health and safety measures that it will be implementing for the few in-person lab and clinical courses that it is offering in the fall. For example, increasing in-person instruction

1    beyond the current level of six (6) percent would not allow Chaffey to proceed with course

2    splitting to reduce human interaction (half of the students are in class, the others watch live online

3    via streaming), enforce strict social distancing rules, or ensure compliance with its rigid hygiene

4    and face covering guidelines.  Nor would Chaffey have the ability to disinfect every classroom

5    after each use, which is a precautionary measure that Chaffey is taking in the fall with the limited

6    number of in-person courses it is offering.  The very reason that Chaffey shifted to online learning

7    for fall 2020 was to mitigate these health and safety risks while allowing students to continue

8    their education.  Sending the students (and staff) back into the classrooms would turn these safety

9    precautions on their head.

10        14.    Given that Chaffey will operate a very limited hybrid fall program with the

11    majority online classes – the July 6 Directive will also require Chaffey to re-issue Forms I-20 to

12    all of its international students.  This creates an administrative and financial burden associated

13    with this re-issuance, as significant staff would be required to coordinate the re-issuance of these

14    forms in a short period of time.  Never before has Chaffey have to re-issue Forms I-20 in mass to

15    its international students.

16        15.    Chaffey fully expects to face a sudden and significant loss of international students

17    because of the July 6 Guidance.  This loss will cause harm to the Chaffey community and disrupt

18    the College's mission of advancing diversity.  Additionally, Chaffey stands to lose approximately

19    $1.5 million in international student tuition and apportionment funding as a result of the July 6

20    Directive.  This is particularly concerning given Chaffey's projected budget shortfalls for the

21    2020-2021 year due to the COVID-19 pandemic.

22        16.    The loss of international students caused by the July 6 Directive undermines

23    Chaffey's commitment to international students and the infrastructural investment that Chaffey

24    has put into the programs and services offered through the International Student Program.

25    **Chaffey's International Students Are Harmed by the July 6 Directive**

26        17.    Chaffey's international students now confront the harsh reality of potentially being

27    removed from the United States simply because ICE has decided, unexpectedly, to significantly

28

4

limit the options that international students have to remain in the country while completing coursework in the midst of a pandemic.

18.     Since ICE announced its July 6 Guidance, Chaffey has witnessed its international students face disturbing levels of stress and uncertainty due to, among other things, their: (1) fear of being removed from the country; (2) deep concern of not being able to continue their academic endeavors at Chaffey or that their Chaffey coursework will not be transferable to an academic institution in their home country; (4) disappointment at the prospect of losing out on Optional Practical Training or other future gainful employment upon the completion of their studies; (5) worry about the economic hardships (breaking of home and auto leases, costs of returning to their home country, etc.) that they may face with an abrupt removal from the country; and (6) apprehension of having to return to their home countries for no reason other than being an international student.  Following the unexpected July 6 Directive, Chaffey assigned staff to work extensively with its international students to provide support, counseling, and guidance on the implications of ICE's callous action.


I declare under penalty of perjury under the laws of the United States and State of California that the foregoing is true and correct, and that this declaration was executed on July 12, 2020 in San Bernardino, California.

_____
Laura L. Hope

5

Decl. of Laura L. Hope in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)

# EXHIBIT K

1   Xavier Becerra
    Attorney General of California
2   Michael L. Newman
    Senior Assistant Attorney General
3   Domonique C. Alcaraz
    Lee I. Sherman
4   Jasleen Singh
    Marissa Malouff (SBN #316046)
5   Deputy Attorneys General
      300 S. Spring St., Suite 1702
6     Los Angeles, CA 90013
      Telephone: (213) 269-6467
7     Fax: (213) 897-7605
      E-mail: Marissa.Malouff@doj.ca.gov
8   *Attorneys for State of California*

9

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                     OAKLAND DIVISION

13

| | |
|---|---|
| **THE STATE OF CALIFORNIA,** | Civil Case No. 4:20-cv-04592-JST |
| Plaintiff, | **DECLARATION OF RAMON L. KNOX IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| **U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD F. WOLF, in his official capacity as Acting Secretary of the United States Department of Homeland Security; and MATHEW ALBENCE, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,** | |
| Defendants. | |

1      I, RAMON L. KNOX, declare as follows:

2      1.     I am a resident of the State of California.  I am the Interim Vice Chancellor of

3 Student Services for the San Diego Community College District (SDCCD or District), a district

4 of the California Community Colleges.

5      2.     I make this Declaration based upon my personal knowledge, a review of records

6 and information kept in the regular course of SDCCD's business and made available to me in the

7 course of my duties at SDCCD, and information provided to me by SDCCD students and

8 employees including those who work under my direction and supervision and those who do not.

9 If called as a witness, I could and would testify competently to the matters set forth below.

10     3.     I have been employed as the Interim Vice Chancellor of Student Services of

11 SDCCD since April 1, 2020.  From my first day at this job, I was tasked with managing the

12 District's response to policies and decisions as they impact students, including its COVID-19

13 response.  That included and still includes receiving and implementing regular communications

14 from the State Chancellor's office and daily communications with the Vice Presidents of Student

15 Services in each of SDCCD's colleges and the Continuing Education school.  Before serving at

16 SDCCD, I served as the Dean of Student Support Services at Long Beach City College District

17 for about three and a half years.

18     4.     As part of my regular job duties as Interim Vice Chancellor of Student Services at

19 SDCCD, I serve as an executive member of the Chancellor's Cabinet within a multi-college

20 district housing the largest non-credit school in California.  My responsibilities include

21 coordinating, facilitating, and providing leadership for a variety of districtwide student services

22 programs serving 100,000 students, in the areas of admissions and records, student records

23 evaluation, counseling, financial aid/EOPS, DSPS, registration, attendance accounting,

24 international programs, and administrative support.

25     5.     I have reviewed the Immigration and Customs Enforcement's (ICE) policy entitled

26 "COVID-19: Guidance for SEVP Stakeholders," published March 13, 2020 (March 13

27 Guidance), and am familiar with its contents.

28

6.        I have reviewed ICE's Broadcast Message entitled "COVID-19 and Fall 2020," issued on July 6, 2020 (July 6 Directive), and am familiar with its contents.

**International Students at SDCCD**

7.        SDCCD—within its three colleges, San Diego City, Mesa, and Miramar College—has approximately 196 international students enrolled for the fall 2020 semester.  The District's international students come from 38 different countries around the world (Australia, Brazil, Canada, Central African Republic, China, Colombia, Costa Rica, Cuba, Ecuador, France, Germany, India, Indonesia, Iran, Italy, Japan, Jordan, Kazakhstan, Kuwait, Lao People's Democratic Republic, Mexico, Mongolia, Myanmar, Peru, Philippines, Republic of Korea, Republic of Moldova, Russian Federation, Saudi Arabia, Slovakia, South Africa, Spain, Sweden, Taiwan Province of China, Thailand, United Arab Emirates, Venezuela, and Vietnam).

8.        SDCCD celebrates the great diversity and globalism of its district, campuses, its faculty, staff, and students.  SDCCD offers two-year Associates degree programs with the option to transfer to a four-year institution.  Through its comprehensive international program and services, international students are integrated on campus through cultural competency and humility immersion approach; which fosters global awareness within the classroom and throughout the community.

**SDCCD's Response to COVID-19**

9.        On March 11, 2020, COVID-19 was classified by the World Health Organization (WHO) as a pandemic.  In response to this reclassification, SDCCD held a special meeting of the SDCCD Board of Trustees.  Effective Monday, March 16, all on-campus classes were suspended. During the week of March 16 to March 20, the District took actions to convert operations and instruction to be delivered remotely.  Then on March 19, 2020, Governor Gavin Newsom and the California State Public Health Officer ordered everyone in the state to "stay home or at their place of residence," except as necessary to protect public health.  In accordance with that order, SDCCD suspended classes for a week.  Starting the week of March 23, 2020, all SDCCD

2

Decl. of Ramon L. Knox in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)
CONFIDENTIAL COMMON INTEREST PRIVILEGE

1    instruction was provided remotely and 100 percent of classes resumed and were taught in a

2    remote modality for the remainder of the spring and summer terms.

3         10.    Only select campus operations remain open to support critical infrastructure and to

4    meet emergency needs of students.  These include campus police and facilities staff, as well as

5    time-limited services such as food delivery and laptop distributions.  The health clinics have

6    closed, but some health services have continued through telephone and online modalities.

7         11.    COVID-19 has totally disrupted operations at SDCCD, with significant impacts on

8    our students, faculty, staff, and broader community.  Certain hands-on classes, such as the

9    culinary and fashion continuing education programs, have resorted to distributing "kits" that

10   students can use at home in lieu of in-class demonstrations.  Many of our classes in the sciences,

11   career-technical fields, and healthcare needed to extend instruction some weeks into the summer

12   in order for students to complete their required in-person course work.  Miramar College

13   cancelled its spring in-service (e.g., First Responder) courses because they must be completed in-

14   person.  Due to the transition to online learning, I regularly receive communications from

15   students and staff regarding the challenges students are facing as my office works with our

16   colleges to try to address their needs.

17        12.    In creating its fall 2020 plans, the District had the primary goals of: 1) ensuring the

18   health and safety of its students and employees; and 2) ensuring the continuity of its educational

19   and operational promises.  Approximately 90 percent of SDCCD's course sections will operate

20   primarily online this fall, as SDCCD would never compromise the health and safety of our

21   students or employees.  SDCCD has planned for a few exceptions for hard to convert classes,

22   which will be offered on-campus, while observing social-distancing and all other health

23   protocols. Hard to convert classes are those classes in programs that may require technical

24   machinery, hands-on applied instruction, specific work, or laboratory environments, or may not

25   be viable without some face-to-face instruction.  Hard to convert classes include those in industry

26   sectors of essential critical infrastructure workers in the State of California.  These sectors include

27   healthcare, transportation and logistics, energy, and communications and information technology.

28   The Electrician program (City College), Animal Health Technology program (Mesa College) and

3

1    Fire Protection Technology and Medical Laboratory Technology (Miramar College) are among

2    the limited courses that will return to campus in the fall.  Each course must have a reduced class

3    size, practice social distancing, wear personal protective equipment, and pass self COVID-19

4    screening questions.  SDCCD identified these hard to convert courses as some licensing agencies

5    and curriculum guidelines had not been adjusted due to COVID-19.

6         13.    This decision surrounding the fall 2020 plan was determined in consultation with

7    other industry partners, California Public Health and San Diego Public Health orders.  A San

8    Diego County Public Health Order, effective June 19, 2020, stated that colleges and universities

9    shall not hold classes or other school activities where students gather on the school campus except

10   for research-related activities and where necessary to train students who will serve as essential

11   workers.  In addition, COVID-19 infections and death rates in California continue to increase and

12   another spike is expected during the fall semester.

13        14.    In creating the colleges' fall 2020 plans, SDCCD also relied upon the

14   representations in ICE's March 13, 2020, Guidance that its in-person learning exemptions for F-1

15   students would be in effect for the duration of the COVID-19 emergency.  Because of the March

16   13 Guidance, SDCCD was able to continue to safeguard the health and safety of its community,

17   without the risk of losing its international student population.  SDCCD's fall plans also budgeted

18   for tuition revenue received from its international students in reliance of the expectation that those

19   students would be enrolled at SDCCD for the fall semester.

20   **The July 6 Directive Harms SDCCD**

21        15.    The July 6, 2020 Directive significantly disrupts SDCCD's fall 2020 plans, only

22   weeks before the academic year is scheduled to start on August 17, 2020.  The SDCCD had

23   already planned its fall course schedule based on the March 13 Guidance.  Under the July 6

24   Directive, the District's students who are not enrolled in its in-person courses, would not be

25   allowed to continue with their educational journey.  The potential loss of its international student

26   population is a tremendous loss to SDCCD's educational mission as its global student population

27   enriches learning for the entire study body.  Student disenrollment not only deprives students of

28

4

Decl. of Ramon L. Knox in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)
CONFIDENTIAL COMMON INTEREST PRIVILEGE

academic enrichment and economic opportunity, but also undermines SDCCD's commitment to providing access and education to as inclusive and diverse student body as possible.

16.     In addition to the staff time dedicated to evaluating and interpreting these new guidelines, this sudden change has created a high level of fear, anxiety, and uncertainty for SDCCD's international students.  SDCCD has dedicated additional time to assessing the impact through reviewing the SEVP policy guidelines by attending NAFSA: Association of International Educators legal forums, participating in San Diego Professional International Educators Roundtable (PIER) meetings, and attending webinars hosted by the state Chancellor's Office interpreting recent policy.  SDCCD has also continued to address students, faculty, and staff concerns through extensive communication and live forums.

17.     Staff attention has also been redirected to address the overwhelming increase in traffic on the CANVAS International Connection Platform, which is SDCCD's virtual International Student Center.  Over the past week, SDCCD's International Student Program team has devoted a majority of their time to allay student fears and convey support, in addition to their regular job duties preparing for the upcoming academic year.  SDCCD will continue examining its options to continue its promise in supporting international students on their educational journey.

18.     Given that SDCCD will operate a hybrid fall program – with a small portion of in-person classes, and majority online classes – the July 6 Directive will also require SDCCD to re-issue Forms I-20 to all of its international students. This creates an administrative and financial burden associated with this re-issuance, as significant staff would be required to coordinate the issuance of these forms.  SDCCD has never before had to re-issue the Forms I-20 in mass to all of its students at once.

19.     There is currently no vaccine to prevent COVID-19 or a best medical practice in treatment.  The Center for Disease Control states the best way to prevent illness is to avoid being exposed to the virus.  The virus is believed to spread mainly from person-to-person.  According to the CDC, the risk of spreading is heightened between people who are within six feet of one another, through respiratory droplets produced when an infected person, symptomatic or

asymptomatic, coughs, sneezes or speaks.  These droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs.  The traditional in-person classroom setting can increase exposure of faculty, staff and students, to COVID-19.

20.     The District also stands to incur financial loss if international students cannot enroll in one of the District's limited in-person class offerings.  SDCCD's international student population would account for over $749,896 of tuition revenue for fall 2020, of at least $1.5 million for 2020-2021 academic year.  These losses would have a detrimental impact on the District's ability to continue with its educational mission in face of the negative economic impact COVID-19 has had on the state's economy.

21.     Moreover, given that approximately 90 percent of the colleges' funding is based on student enrollment, any threat to that number puts its academic course offerings, staffing, and student services at risk.  As a result, SDCCD's uncertainty about enrollment in the near future also creates a great deal of uncertainty regarding the District's budget.  This makes it difficult to plan for the number of course offerings that we will be able to provide, or to budget for faculty, staff, and other needs.

**The July 6 Directive Harms SDCCD's Students**

22.     The July 6 Directive has increased anxiety, stress, and fear among SDCCD's international student population.  Many are confused as they had already secured plans to remain in the United States to continue their education.  Now, fears of deportation consume their thoughts and energies.  Some of SDCCD's international students are unable to return to their home countries because in the face of the COVID-19 pandemic, many countries have closed borders to travelers originating from the United States.  Others do not possess the financial resources to secure a return flight home; and others find their consulates closed and unable to communicate with their home countries.  Collectively, they feel abandoned and confused as to what can be done.

23.     Additionally, the limited in-person courses that will be offered in fall 2020 are generally science related courses, and may not fall within some international students' majors; some students may enroll in those classes to stay in the country, but may not do well in the

6

courses.  Because international students are required to maintain certain academic progress to remain in lawful status, students who enroll in the limited in-person classes now, but do not do well in them may nevertheless be in jeopardy of losing their lawful status later in the semester.

7

1     I declare under penalty of perjury under the laws of the United States and State of

2  California that the foregoing is true and correct, and that this declaration was executed on

3  July 13      , 2020 in Long Beach, California.

4

5

6                                   _____
                                         Ramon L. Knox
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8

# EXHIBIT L

1   XAVIER BECERRA
    Attorney General of California
2   MICHAEL L. NEWMAN
    Senior Assistant Attorney General
3   DOMONIQUE C. ALCARAZ
    LEE I. SHERMAN
4   JASLEEN SINGH
    MARISSA MALOUFF (SBN #316046)
5   Deputy Attorneys General
      300 S. Spring St., Suite 1702
6     Los Angeles, CA 90013
      Telephone: (213) 269-6467
7     Fax: (213) 897-7605
      E-mail: Marissa.Malouff@doj.ca.gov
8   *Attorneys for State of California*

9

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                      OAKLAND DIVISION

13

14  **THE STATE OF CALIFORNIA,**                Civil Case No. 4:20-cv-04592-JST

15                              Plaintiff,      **DECLARATION OF JAMES WATT, MD,
                                                MPH IN SUPPORT OF PLAINTIFF'S**
16              v.                              **MOTION FOR PRELIMINARY
                                                INJUNCTION**
17
    **U.S. DEPARTMENT OF HOMELAND**
18  **SECURITY; U.S. IMMIGRATION AND**
    **CUSTOMS ENFORCEMENT; CHAD F.**
19  **WOLF, in his official capacity as Acting**
    **Secretary of the United States Department**
20  **of Homeland Security; and MATHEW**
    **ALBENCE, in his official capacity as Acting**
21  **Director of U.S. Immigration and Customs**
    **Enforcement,**
22
                              Defendants.
23

24

25

26

27

28

---

I, JAMES WATT, MD, MPH, declare as follows:

1.      I am over the age of 18, a United States citizen, and a California resident. I know the following facts of my own personal knowledge, and if called upon as a witness, I could and would testify competently thereto.

2.      I have been serving  as the Acting Deputy Director of the Center for Infectious Diseases and Interim State Epidemiologist at the California Department of Public Health (CDPH).  I completed that assignment on July 12, 2020.

3.      As the Acting Deputy Director of the Center for Infectious Diseases and Interim State Epidemiologist at CDPH, I coordinated the CDPH's epidemiologic response to disease outbreaks and emerging health threats.

4.      Prior to my role as Acting Deputy Director of the Center for Infectious Diseases, I was the Chief of the Division of Communicable Disease Control from 2010 until 2019, and Deputy State Epidemiologist from 2012 until 2019 at CDPH.  I returned to my role as Chief of the Division of Communicable Disease Control on July 13, 2020.

5.      My background is in epidemiology.  I completed my residency in pediatrics in 1993 and obtained a Master of Public Health degree in Maternal and Child Health in 1995.  In 1996, I joined the California Department of Health Services (CDHS) as a Public Health Medical Officer II.  In 1999, I joined the federal Centers for Disease Control and Prevention (CDC) as an Epidemic Intelligence Service Officer in the Respiratory Diseases Branch.  In 2001, I became an Assistant Scientist in the School of Public Health at Johns Hopkins University. In 2006, I joined the CDPH as a Public Health Medical Officer III (Epidemiology) and became Chief of the Tuberculosis Control Branch in 2008 and Chief of the Division of Communicable Disease Control in 2010.  In 2012, I became Deputy State Epidemiologist at the CDPH.  I am an Associate at the Johns Hopkins University School of Public Health and Clinical Professor at the University of California, San Francisco, School of Medicine.  I have also served on a variety of advisory panels at, among others, the CDHS, CDC, and World Health Organization.

1

6.      CDPH is one of seventeen departments and offices within the California Health and Human Services Agency and its fundamental responsibilities include infectious disease control and prevention, food safety, environmental health, laboratory services, patient safety, emergency preparedness, chronic disease prevention and health promotion, family health, health equity and vital records and statistics.  Our mission is to advance the health and well-being of California's diverse people and communities.

7.      The Center for Infectious Diseases protects the people in California from the threat of preventable infectious diseases and assists those living with an infectious disease in securing prompt and appropriate access to healthcare, medications and associated support services.

8.      I have been intimately involved with the statewide COVID-19 response since January 2020.  My role is to oversee analysis of statewide data on COVID-19 cases and trends in disease activity.  Since January, I have been working full time for approximately 60-70 hours per week to address the pandemic.  I am familiar with the State of California Executive Orders N-33-20 and N-60-20, which are attached as Exhibits A and B, respectively, and the orders and guidance issued by the CDPH, including the March 19, 2020 Order of the State Public Health Officer, the May 7 Order of the State Public Health Officer, and the guidance available at coivd19.ca.gov (the State Health Officer Orders).

9.      There is widespread consensus among epidemiologists that the virus that causes COVID-19 is thought to spread mainly from person to person, mainly through respiratory droplets produced when an infected person coughs or sneezes.  Other activities such as speaking, shouting and singing can produce respiratory droplets as well.   These droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs.  The role of other transmission pathways such as through aerosols that may travel long distances or through contaminated surfaces has been suggested and is still being researched.

10.     There is widespread consensus among epidemiologists that COVID-19 can spread quickly.  A person with COVID-19, on average, infects approximately two people.  Unchecked, COVID-19 spreads exponentially and over 10 transmission cycles, one person could be responsible for 1,024 other people contracting the virus.  Physical distancing interventions have

2

1    been successful in reducing the number of persons infected by each case and changing the

2    exponential pattern of case increases.  That is why these interventions are so important for

3    controlling COVID-19 in California.  Physical distancing measures include staying home and

4    remaining at least six feet away from others when outside the home.

5        11.    Individuals who leave their homes are at an increased risk of contracting the disease.

6    The more people interact outside the home, the more likely they will be to increase the spread of

7    COVID-19 in their communities and any other communities they visit.  When an individual is

8    exposed to and contracts the novel coronavirus, there is a high likelihood that he or she will

9    spread COVID-19 to other individuals in his/her community, and in some cases perpetuate the

10   infection rates across county lines.

11       12.    Spread is more likely when people are in close contact with one another (within about

12   six feet).  COVID-19 is currently spreading in the community (community spread) in many

13   affected geographic areas.  An area is experiencing community spread when residents are

14   becoming infected with the virus in community settings, and it is not possible to identify the

15   source of exposure in some cases.

16       13.    In light of evidence of widespread COVID-19 transmission in communities across the

17   country, CDC recommends that people wear a cloth face covering to cover their nose and mouth

18   in the community setting.  This is an additional public health measure people should take to

19   reduce the spread of COVID-19 in addition to, not instead of, physical distancing, frequent hand

20   cleaning, and other everyday preventive actions.  A cloth face covering is not intended to protect

21   the wearer but may prevent the spread of virus from the wearer to others.  This would be

22   especially important in the event that someone is infected but is not aware of their illness and is

23   not self-isolating.  A cloth face covering should be worn when people must go into public settings

24   and especially if they expect to have difficulty maintaining physical distancing, such as when

25   going to the grocery store.  However, wearing a mask or frequently washing one's hands will not

26   prevent completely the spread of the disease.  Those measures are only designed to reduce the

27   risk of transmission when distancing is not possible.

28

Decl. of James Watt MD, MPH in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)

14.     People with COVID-19 have had a wide range of symptoms reported – ranging from mild symptoms to severe illness.  A large number of people with COVID-19 have no symptoms.  People who have no symptoms can, however, still spread COVID-19.  COVID-19 can cause severe disease, including death.  Older adults and people of any age who have serious underlying medical conditions are at higher risk for severe illness from COVID-19.  Public records that I regularly rely on to perform my duties reflect that, as of July 13, 2020, there have been: (1) 329,162 confirmed COVID-19 cases in the state, (2) 6,485 hospitalized patients (currently admitted with confirmed cases), and (3) 7,040 fatalities.

15.     The purpose of the state's current health and safety rules is to protect vulnerable people from infection with the coronavirus that causes COVID-19 (SARS-CoV-2) and to reduce the spread of that virus in the community.  By reducing community spread, we can protect persons at increased risk of severe disease and prevent critical infrastructure, particularly health care facilities, from being overwhelmed.  As geographical areas become less susceptible to being overwhelmed by a potential community spread and areas demonstrate the ability to test and trace consistent with relevant guidelines, other health and safety rules may be promulgated to allow more sectors of the economy to operate.

16.     To reduce the incidence of community spread, the state adopted a staged reopening plan, starting first with opening lower-risk businesses and activities, based on what is known about the transmission of the virus.  Such an approach reduces the chance that the state and local capacity that has been developed to respond to outbreaks is not overwhelmed as the state moves to reopening all sectors and activities, with modifications.

17.     This staged reopening can vary between different counties depending on their rates of infection and medical capacity.  Regions with low infection rates may move through the various reopening stages more rapidly than regions with higher infection rates.  If a county reopens and its infection rate increases, the reopening will be reassessed and possibly slowed or stopped.  In fact, as of July 10, 2020, 26 California counties have met criteria for reassessment of reopening, established by CDPH, related to elevated disease transmission, increasing hospitalization, and

1    limited hospital capacity that require the counties to reimpose restrictions on certain higher risk

2    sectors that had previously reopened.

3         18.    The future path of the COVID-19 virus is highly uncertain. Many states, including

4    California, have recently recorded significant spikes in new cases and hospitalizations. It is not

5    known how long COVID-19 will pose a significant risk to public health in California, but it is

6    likely that the risk will continue until a vaccine is available to prevent infection.

7         19.    Based on the best information currently available, it does not appear likely that there

8    will be a widely available, reliable vaccine for COVID-19 by the end of the calendar year.

9         20.    I have reviewed the July 6, 2020 announcement by Immigration and Customs

10   Enforcement related to the Student and Visitor Exchange Program (SVEP). I understand that, as a

11   result of the change in policy reflected in the announcement, individuals with a student visa will

12   not be able to remain in the United States to study in vocational or English language training

13   programs offered by a university or college if they participate in any part of the program online. I

14   further understand that individuals with a student visa enrolled in other educational programs

15   offered by a university or college will not be able to remain in the United States if they participate

16   in the program entirely online.

17        21.    As we are seeing in other sectors, it is reasonably foreseeable that, in order to

18   continue serving their students while protecting the public health of their students, employees,

19   and the surrounding community, California's universities and colleges will need to adjust and

20   adapt their approaches for serving students during the upcoming academic term in response to

21   data and trends in their local communities.  Based on local conditions, these adaptations may

22   include adopting entirely online programs or limiting in-person classes.

23        22.    I believe that forcing universities and colleges to commit to delivering instruction in-

24   person for the duration of the upcoming academic term and limiting their ability to adapt based on

25   public health conditions without jeopardizing the ability of their students to remain in the country

26   is likely to undermine the state's ability to plan and protect public health effectively in the face of

27   the COVID-19 pandemic.

28

Decl. of James Watt MD, MPH in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)

23.   I further believe that any requirements for in-person learning at universities and colleges, without regard to state and local conditions, will undermine state and local efforts to decrease the risk of spreading COVID-19.  COVID-19 is particularly transmissible in crowded, indoor settings.  The risk of contracting the disease will increase not just for the students, faculty and staff, but also for community members with whom they interact.  Additionally, requiring in-person instruction for individuals with a student visa will jeopardize the health of such students with underlying conditions that make contracting COVID-19 especially dangerous.

24.   Additionally, forcing students to leave the country, whether now or mid-term if the school alters its instructional approach, will create an increased risk of disease transmission by requiring them to travel to airports or other transit hubs, increasing the chance that they will be exposed to the virus or will expose others while traveling if they are positive.

I declare under penalty of perjury under the laws of the United States and State of California that the foregoing is true and correct and that this declaration was executed on July 13, 2020 in Albany, California.

_James Watt_
_____
JAMES WATT, MD, MPH

6

Decl. of James Watt MD, MPH in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)

# EXHIBIT M

1  XAVIER BECERRA
   Attorney General of California
2  MICHAEL NEWMAN
   Senior Assistant Attorneys General
3  DOMONIQUE C. ALCARAZ
   LEE I. SHERMAN
4  JASLEEN SINGH
   MARISSA MALOUFF (SBN #316046)
5  Deputy Attorneys General
     300 S. Spring St., Suite 1702
6    Los Angeles, CA 90013
     Telephone: (213) 269-6467
7    Fax: (213) 897-7605
     E-mail: Marissa.Malouff@doj.ca.gov
8  *Attorneys for State of California*

9

10            IN THE UNITED STATES DISTRICT COURT

11         FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                    OAKLAND DIVISION

13

14  **THE STATE OF CALIFORNIA**                Civil Case No. 4:20-cv-04592-JST

15                             Plaintiff,    **DECLARATION OF LARK WINNER IN
                                             SUPPORT OF PLAINTIFF'S MOTION
16            v.                             FOR PRELIMINARY INJUNCTION**

17
    **U.S. DEPARTMENT OF HOMELAND
18  SECURITY U.S. IMMIGRATION AND
    CUSTOMS ENFORCEMENT; CHAD F.
19  WOLF, in his official capacity as Acting
    Secretary of Department of Homeland
20  Security; and MATTHEW ALBENCE, in
    his official capacity as Acting Director of
21  U.S. Immigration Immigrations and
    Customs Enforcement,**
22
                             Defendants.
23

24

25

26

27

28

1    I, Lark Winner, declare as follows:

2         1.      I am a resident of the State of California.  I am over the age of eighteen and if

3    called as a witness, I could and would testify competently to the matters set forth below.

4    I am the current Vice President of United Automobile, Aerospace and Agricultural Implement

5    Workers of America, Local 4123 ("UAW 4123" or "Union"), which represents Academic Student

6    Employees—tutors, readers, and teaching assistants—across the California State University

7    ("CSU") system.  I have held this position since May 8, 2018.  I work closely with many foreign-

8    born Academic Student Employees, who are members of UAW 4123, and have been involved in

9    the Union's support and advocacy for international Academic Student Employees on the CSU

10   campuses.  In my role as Vice President, I represent and advocate on behalf of our student

11   workers.  I am also familiar with the specific circumstances of a number of Union members who

12   are international students.  I have learned this information from my communication with our

13   membership.

14        2.      I make this Declaration based upon my personal knowledge, a review of records

15   and information kept in the regular course of UAW 4123 business and made available to me in

16   the course of my duties at UAW 4123, and information provided to me by UAW 4123 students.

17        3.      I have reviewed Immigration and Customs Enforcement's ("ICE") policy entitled

18   "COVID-19: Guidance for SEVP Stakeholders," published March 13, 2020 ("March 13

19   Guidance"), and am familiar with its contents.

20        4.      I have reviewed ICE's Broadcast Message entitled "COVID-19 and Fall 2020,"

21   issued on July 6, 2020 ("July 6 Directive") and am familiar with its contents.

22        5.      CSU is the nation's largest four-year public university system with 23 campuses

23   statewide and an enrollment of more than 480,000 students per year.  Whenever any of these

24   students become employed by CSU as Teaching Associates (title codes 2309, 2324, 2353, 2354,

25   and 2453), Graduate Assistants (title codes 2355, 2325 and 2326) and Instructional Student

26   Assistants (title codes 1150, 1151, 1152 and 1153), they come under the representation of our

27   Union.

28

6.      A large number of UAW 4123 members are international students, who study and work in the United States on an F-1 visa.  I am personally familiar with international student Union members from India, China, Vietnam, Iran, Brazil, Canada, Spain, Sri Lanka, and Malaysia, among others.

**The Impact of the July 6 Directive on UAW 4123 Members**

7.      UAW 4123 members have been adversely affected by the July 6 Directive rescinding the exemption from the in-person learning requirement for nonimmigrant F-1 visa holders, announced on July 6, 2020.

8.      Since the July 6 Directive was issued, Academic Student Employees have expressed to UAW 4123 concerns about its impacts on their work and studies at and for CSU, their careers beyond the University, and their families.  Due to the COVID-19 pandemic, university campuses in the CSU system have been and will continue to conduct a majority of classes remotely.  International students who have planned on resuming their own studies and teaching undergraduate courses as teaching assistants at CSU universities in the coming fall semester are now faced with the possibility that their right to study, work, and reside in the United States will be terminated, and they will be required to return to their home countries.

9.      Most international students will suffer immediate negative consequences if they are suddenly forced to leave the United States due to the July 6 Directive.  Many students will be forced to return to their home countries where they do not have reliable access to the internet, or other educational resources for them to study remotely.  Students from countries such as India or Vietnam will be unable to attend virtual classes or office hours due to the huge time difference with California.  For these students, it will be extremely difficult to maintain their course loads from abroad, and they may be forced to disenroll entirely.  Further many students who depart may be unable to return to the United States due to the prohibitive cost of traveling and relocating.

10.      If students fail to maintain their visa statuses, they may never be able to obtain another visa due to legal and/or administrative obstacles.  In all, many will be unable to complete their education, which is particularly devastating for those students who have already invested

2

many years of their life and immense effort and resources towards obtaining their degrees, and are on the verge of graduating.

11. Many international students will also suffer severe financial hardship if they are forced to leave the United States. They will lose their scholarships, fellowships, and educational grants which are conditioned on their continued progress towards graduation, their attendance of in-person classes, or their residency in the United States. They will also lose the income they would have earned as Academic Student Employees. International students will lose their internship placements and any other current employment, as well as future job positions and professional opportunities, which depend on completion of their educational program. Many students have already made living arrangements in California and have signed binding leases for apartments where they intended to reside for the coming year, in some cases with their partners/spouses and children.

12. Students will be forced to risk their health through international travel. Many of these students will have no alternative other than to live in close quarters with parents and older family members who are vulnerable to infection.

13. Other international students have come from countries which have now closed their borders to most or all international flights, such as India. If they are required to leave the United States on short notice due to the July 6 Directive, they will be unable to return to their home country. Because these students cannot return home, but also cannot remain legally in the United States, they could be detained and deported.

14. Numerous international students are involved in medical, scientific, and public health research, which is directly or indirectly related to treating and containing the spread of COVID-19 in California and the United States. If they are forced to leave the United States due to the July 6 Directive, they will be unable to continue contributing to the development of the knowledge and methods necessary to combat the pandemic.

15. I have learned the following specific information from communications with UAW 4123 student members:

a.     One international student from Pakistan is in her senior year of study for her undergraduate degree in Biological Sciences, with a concentration in Systems Physiology and a minor in Chemistry.  Ordinarily, this student would expect to complete her degree by spring 2021.  If she is forced to leave the United States due to the July 6 Directive, this student will be unable to complete her degree.  This student's university has previously announced that it would be conducting most classes online.  Since the announcement of the July 6 Directive, her university has indicated it will offer hybrid classes to enable some international students to remain in the United States, but it is unclear whether this will apply to this student's situation.  As part of her final year of study, this student must conduct laboratory research, and gather, analyze and present the data she obtains to a panel of committee members in spring 2021.  She will not be able to carry out this work because she is not enrolled in laboratory-based courses, and is required to perform this research on her own time.  As a result, her laboratory work will not qualify as in-person course credit.  This student's academic work involves two research labs focused on diseases such as diabetes, Parkinson's, pneumonia and other immune related disorders, which is critically important to California and the United States during the COVID-19 pandemic.  If this student cannot find the requisite in-person classes in which to enroll, she will be forced to depart the country.  Consequently, she will be unable to conduct her research in her university's labs and attend remote classes due to the 12-hour time difference between Pakistan and California.  This student's difficult circumstances are exacerbated by the fact that her family no longer lives in Pakistan, and resides in the United Arab Emirates (UAE).  However, because her UAE visa has expired, she will still be forced to return to Pakistan during a spike in COVID-19 infections, where she will have to stay with strangers and be exposed to additional risk and hardship.  This student reports that she has experienced psychological stress as a result of the current situation.

b.     Another international student from Iran is in her senior year of study for her undergraduate degree in Chemistry-Materials Science.  Ordinarily, this student would expect to complete her degree by spring 2021.  If she is forced to leave the United States due to the July 6 Directive, this student will be unable to complete her degree.  Due to the current political, social, and economic situation in Iran, this student would not be able to access the internet in

order to attend online classes, on top of the challenge posed by the 11.5-hour time difference between Iran and California.  She will irretrievably lose the tens of thousands of dollars and many years of work she has expended to obtain her degree.  Her financial difficulty will be exacerbated further by the economic situation in Iran, where her family is experiencing significant hardship.  If she returns to Iran, her travelling increases her exposure to the highly transmissible coronavirus, and because this student's only option is to stay with her mother—who is vulnerable to COVID-19 infection due to her age—she will be risking exposing her own mother to COVID-19.  California and the United States would also lose the benefit of her academic work, which includes collaboration with the NASA Joint Propulsion Laboratory (JPL) on sustainable energy research.  As an Academic Student Employee, this student works as a peer mentor and tutor at the College of Natural Sciences and Mathematics at her university.  If she is forced to leave the United States, she will be unable to continue in this position, and she is one of very few chemistry majors that works as a student assistant at the tutoring center.  This student reports that she and her family have suffered severe anxiety as a result of the current situation.

          c.     Another international student from India is in his junior year of study for his undergraduate degree in Computer Studies.  Ordinarily, this student would expect to complete his degree by December 2021.  If he is forced to leave the United States due to the July 6 Directive, this student will be unable to complete his degree.  All Computer Science classes will be taught online, but this student will not have access to the necessary internet infrastructure in India to be able to study online, in addition to the challenge of attending classes when there is a 12.5-hour time difference between India and California.  It is unlikely that this student would be able to return to the United States in the future and finish his degree, even though he is only a year and a half away from graduation, due to his limited financial resources.  This student's work and research is focused on internet security and defense against computer hacking, fields which are particularly important to California and the United States given the unstable international situation and the COVID-19 pandemic, which has required many people to work remotely.  He is also currently interviewing for a job placement which would enable him to work in this field after.  However, this student's prospective employer has indicated that this offer is contingent on

the student's availability to work in-person the fall.  As an Academic Student Employee, this student tutors university student athletes in calculus.  Many of his fellow math tutors are also international students, and the university is certain to face a shortage of student instructors if they are forced to leave the United States.  Further, India is facing a catastrophic surge in COVID-19 cases, so this student will be exposed to severe risk if he is forced to return.  At the same time, India has restricted international travel, so this student faces the possibility that he will be required to leave the United States, but will be unable to return home, making him potentially subject to detention and deportation.  This student reports that the stress of the current situation has made it difficult for this student to focus on his day-to-day activities.

16.    The foregoing are only a few examples of the many international students in our Union who will be potentially impacted by the July 6 Directive.

6

1    I declare under penalty of perjury under the laws of the United States and State of

2  California that the foregoing is true and correct, and that this declaration was executed on July 13,

3  2020 in Riverside, California.

4

5

6  _____

7                      Lark Winner

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Decl. of Lark Winner in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)

# EXHIBIT N

1  Xavier Becerra
   Attorney General of California
2  Michael Newman
   Senior Assistant Attorney General
3  Domonique C. Alcaraz
   Lee I. Sherman
4  Jasleen Singh
   Marissa Malouff (SBN #316046)
5  Deputy Attorneys General
     300 S. Spring St., Suite 1702
6    Los Angeles, CA 90013
     Telephone: (213) 269-6467
7    Fax: (213) 897-7605
     E-mail: Marissa.Malouff@doj.ca.gov
8  *Attorneys for State of California*

9

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                       OAKLAND DIVISION

13

| | |
|---|---|
| **THE STATE OF CALIFORNIA** | Civil Case No. 4:20-cv-04592-JST |
| Plaintiff, | **DECLARATION OF STEPHEN PATRICK KODUR IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| **U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; CHAD F. WOLF, in his official capacity as Acting Secretary of Department of Homeland Security; MATTHEW ALBENCE, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,** | |
| Defendants. | |

I, Stephen Patrick Kodur, declare as follows:

1.  I am a resident of the State of California, over the age of 18 and competent to testify herein.

2.  I am the President of the Student Senate for California Community Colleges (SSCCC) which represents and advocates for the over 2.1 million students on California Community Colleges (CCCs).  I make this declaration based upon my close working relationship with international students within the CCCs and my communications with them since ICE rescinded its exemptions for F-1 and M-1 students' in-person course visa requirements.  If called as a witness, I could and would testify competently to the matters set forth below.

3.  I have reviewed Immigration and Customs Enforcement's (ICE) policy entitled "COVID-19: Guidance for SEVP Stakeholders," published March 13, 2020 (March 13 Guidance), and am familiar with its contents.

4.  I have reviewed the Department of Homeland Security's Broadcast Message entitled "COVID-19 and Fall 2020", issued on July 6, 2020 (July 6 Directive) and am familiar with its contents.

**International Students Are Valuable Members of the CCCs' Student Bodies**

5.  There were approximately 22,000 international students enrolled in the CCC system during the fall 2019 semester and 33,000 international students enrolled during the spring 2020 semester.

6.  Many of the experiences shared below are on behalf of international students who have served as student leaders on their respective campuses and within our nonprofit organization, SSCCC.

7.  The visa process for international students is complicated and strict.  International students generally must spend hours to complete the necessary documentation along with an interview to gain access to study in the United States.  Once admitted to study in the United States and admitted to a school, they often pay higher tuition than domestic students because they are ineligible for federal student aid.  International students must also abide by specific enrollment requirements to retain their visa status.  These brave students attend college in a new country

1

where they are required to maintain a minimum GPA, adapt to a new environment and culture, establish residency, find a job, and much more.

**CCC International Students Are Adversely Affected by the July 6 Directive**

8.      Under normal circumstances, before the COVID-19 pandemic, students under the SEVP were restricted to a maximum of one course online or three credit hours online and required to take their remaining courses in-person.  However, in March 2020, when the COVID-19 pandemic happened, all CCCs switched to online instruction.  This change was at no fault of international students and entirely out of their control.

9.      Due to the closures, on March 13, the SEVP, pursuant to the March 13 Guidance, instituted an exemption regarding in-person courses that it said would be in effect "for the duration of the [COVID-19] emergency."  This policy permitted nonimmigrant students to take more online courses than normally permitted by federal regulation without jeopardizing their nonimmigrant status.

10.      The transition to online learning was and continues to be challenging for all students, though students understand it is a necessary precaution to combat the virus and protect the health and safety of themselves and the larger campus communities.  But on top of this challenge, international students are now faced with an additional stressor: take classes in-person or leave this country.  Changing the rules on them during a global pandemic is unfair and cruel. If international students do not go back to their home countries or cannot find an in-person courses, they will be in the country illegally in the eyes of ICE and may face deportation, which will significantly affect their education.

11.      Although some international students at some colleges will have the option to take a hybrid mixture of online and in-person courses in the fall 2020 semester, the vast majority of classes remain online due to the COVID-19 pandemic.  With only one month before the fall 2020 semester begins and registration well underway, access to in-person classes is extremely limited and nearly impossible.

2

Decl. of Stephen Patrick Kodur in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)

**There Are Extremely Limited In-Person Course Offerings Due to the Pandemic**

12.   CCCs have worked very hard to ensure students stay on the path to complete their education by taking courses that lead them to transfer to four-year universities as quickly as possible.  These measures are evident in the creation of the Guided Pathways program and required student education plans.  The Guided Pathways program provides students with clear, educationally coherent program maps that include specific course sequences, progress milestones, and program learning outcomes. The program keeps students on a course track to graduate from their respected programs within two years if they do not deviate from the course map created.  To graduate on track, it is imperative that students can take classes within their major.

13.   Because of the limited in-person class offerings at their community colleges due to COVID-19, students are having difficulty finding in-person courses that fit within their major. ICE's July 6 Directive will force students to take courses that do not apply towards their majors just so they can take courses that offer in-person instruction and be permitted to stay.

14.   As an example, one CCC student says the only way she can stay in the United States and continue her education is by risking her own health and taking an Exercise Education class which might be taught in person during the fall 2020 semester.

15.   At least two students expressed that they may have to enroll in a class that is not in their major in order to be able to stay.  Not only does this disrupt their education plans but it also forces them to risk their health when they otherwise would not have.

16.   Another student who recently graduated high school was frustrated because they did not have access to in-person courses and therefore could not attend their chosen college this fall quarter.

**Not Every International Student Can Continue their Education Abroad**

17.   Some international students who may be forced to return to their home countries, say they will no longer be able to continue their education due to lack of resources, time zone differences, or lack of educational supports.

18.   An international student from Russia expressed that it would be very difficult to take online classes in a different time zone with poor internet connectivity and academic support.

3

19.     A Jordanian student shared that he will be forced to travel back to Jordan, but Jordan's airports are closed indefinitely due to COVID-19. The student expressed that even if he could get back to Jordan, it will cost him a lot of money and he will not have access to internet or other essential items like electricity or water.  Even if he had the basic necessities to continue his education in the Middle East, the time difference from California would require him to take classes at 2:00 in the morning for 16 weeks straight.

**Some International Students Cannot Return to Their Home Countries**

20.      There are many CCC international students who may be unable to travel home because of the expensive costs of tickets or availability of flights due to the ongoing global pandemic.

21.     One student's mother called her from Vietnam to console her and try to find flights, but none were available.

22.     Two other students (one from Brazil and one from Peru) attempted to find flights to go back to their home countries in the worst case scenario but in most cases, flights were not even available because the United States has now become one of the countries with the highest COVID-19 infection rates in the world.

**International Students Fear Risking their Health**

23.     The July 6 Directive has also caused international students distress and fear because the change requires them to take in-person classes if they want to stay in the United States.  These students are now concerned about their health and being exposed to COVID-19.

24.     Students also are concerned about risk of exposure to COVID-19 while traveling home, and then potentially transmitting the virus to their family members. One student stated that if she were to go back to her home country she will have to live with her grandmother and thus potentially expose her to COVID-19.

**International Students Are Experiencing Deteriorating Mental Health**

25.     Since the July 6 Directive was announced, SSCC has received various messages from students expressing their stress, anxiety, fear, disappointment, and other emotions caused by

ICE's abrupt change to the COVID-19 in-person learning exemptions.  One student's message to the SSCCC summarizes these feelings.  Below is the student's statement in its entirety:

> "I would like to express my feelings of disappointment, frustration, and anger towards the new law regarding F-1 and M-1 visa students that was passed on 6th July. Little about the international students' background that I feel people fail to understand is that we come to the United States and try to get admission in our dream colleges with the dream in our eyes to have a good education and graduate and go back to our countries making our parents proud. When I received the opportunity to study here in the States, I was really grateful for the opportunity because after hours of doing all the paperwork, studying for endless nights to give SAT and finally getting approval from the university, we came here.

> After the new guidelines were announced on July 6, my family and myself got worried sick, anxious, frustrated, mad and so many emotions on what to do next as leaving the country and education halfway was never a thought that came across in our mind. I am in the last year and about to graduate and transfer to university, I should be happy about the transition but instead now I am worried and uncertain what will happen next or will I be even able to graduate? There are 1.5 million active F-1 and M-1 students enrolled in United States schools, colleges and universities. Students impacted by these arbitrary changes are subjected to the impossible decision between abandoning their studies or facing severe legal consequences that would impact any future they/myself hope to have in the United States. Myself and other international students forced to return to their countries of origin may be returning to unstable learning environments, no internet connection, or educational resources, disruptive time differences and potentially unsafe health conditions in the middle of the global pandemic.

I have student loans from my country that have helped me study here and just like me there are students who have taken out loans from their home country and now are stuck with a loan they don't need or can't use but have to refund it in future. What about the apartment lease here in the US that has already been signed for the coming semester and /or academic year? Currently getting out of a lease or finding someone to take over a lease is almost impossible since the demand is declining. Other students like me who are to enter in their last academic year would not be able to graduate as they planned causing further mental as well as financial distress.

Moreover, my visa is about to expire in August and I was planning to extend and stay here in the United States with my active I-20 but I won't be able to renew it. Just like me there are other international students whose visas will expire after this academic year who may not be able to renew their visa making it impossible for students to continue their studies and graduate. Lastly, since ICE made their announcement only a few weeks before the beginning of the semester, it's really frustrating as we don't have enough time to transfer into another college or university that's providing in-person classes. There is not even a single college in my region that is providing in-person classes due to fear of COVID which automatically makes it impossible to even transfer. We are given two options either leave or transfer but either way it's the dead end for us risking our health and safety while travelling during the global pandemic. There are so many underlying issues that we have to deal with but people fail to understand making me and other international students more mad and angry as some of the borders are closed making students from Russia, Peru, Columbia, India, etc. unable to go back to their countries even if we are forced to. I really hope the government understands the struggle we international students face

Decl. of Stephen Patrick Kodur in Supp. of Pl.'s Mot. for Prelim. Inj. (4:20-cv-04592-JST)

1  and allow us to stay and continue our studies and graduate without having to

2  think about being incompetent towards our parents and ourselves. I also hope

3  this matter is taken really seriously and helps us all out with the resources in the

4  future."

5  26.    International students need to be granted the same COVID-19 pandemic

6  exemptions that were granted by SEVP at the onset of the pandemic.  The pandemic has not

7  ended and international students need to be allowed to continue their education in the United

8  States whether or not their schools are conducting in-person learning.

9  I declare under penalty of perjury under the laws of the United States and State of

10  California that the foregoing is true and correct, and that this declaration was executed on

11  July 12        , 2020 in   Sacramento, California.

12

13

14  _____

15  Stephen Patrick Kodur

16

17

18

19

20

21

22

23

24

25

26

27

28

7